# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| JOANNE WITCHKO, Derivatively on Behalf of Nominal Defendant AMERICAN REALTY CAPITAL PROPERTIES, INC., <br><br> Plaintiff, <br><br> v. <br><br> NICHOLAS S. SCHORSCH, DAVID KAY, LESLIE D. MICHELSON, EDWARD G. RENDELL, WILLIAM G. STANLEY, THOMAS A. ANDRUSKEVICH, BRUCE FRANK, SCOTT BOWMAN, WILLIAM KAHANE, EDWARD M. WEIL, JR., BRIAN BLOCK, LISA MCALISTER, and LISA BEESON, <br><br> Defendants, <br><br> and <br><br> AMERICAN REALTY CAPITAL PROPERTIES, INC., <br><br> Nominal Defendant. | Case No. |

## VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

Plaintiff Joanne Witchko, by and through her undersigned attorneys, brings this derivative complaint for the benefit of nominal defendant, American Realty Capital Properties, Inc. ("ARCP" or the "Company"), against certain current and former officers and members of its Board of Directors (the "Board") seeking to remedy defendants' breaches of fiduciary duties, abuse of control, violations of §14(a) of the Securities Exchange Act, and unjust enrichment. All facts relating to Plaintiff and his own acts are pled on personal knowledge, while other facts are pled upon information and belief.

## SUMMARY OF ACTION

1.       ARCP is a publicly traded Real Estate Investment Trust ("REIT") incorporated under the laws of the State of Maryland.   ARCP was headquartered in New York City during the wrongdoing at issue herein, and is currently headquartered in Arizona. ARCP is a component of a broader REIT business empire built by ARCP's former Chief Executive Officer ("CEO") defendant Nicholas S. Schorsch ("Schorsch").

2.       ARCP went public in September 2011when it raised approximately $70 million by selling 5.5 million shares for $12.50 each.   Fueled by acquisitions, ARCP grew quickly and by mid-2014, ARCP was the largest REIT of its kind in the U.S. with assets of approximately $21 billion.   ARCP owns and operates single-tenant, freestanding, commercial real estate properties and earns money by leasing them to primarily corporate clients.   A typical ARCP property might be, for example, the type of structure that houses a Walgreens pharmacy or a Red Lobster restaurant.

3.       On October 29, 2014, ARCP stunned the markets when it disclosed "intentional" accounting errors in most of its publicly filed financial statements since it went public.   The intentional accounting manipulation regarded a very important, REIT-specific financial measure that ARCP had consistently told shareholders was the best metric to measure the Company's performance.

4.       ARCP collects rents from its tenants and passes on to shareholders a minimum of 90% of taxable income received.   As a result, at all relevant times, ARCP's most important financial metric was adjusted funds from operations ("AFFO"), a non-GAAP financial measure based on funds from operations ("FFO").   The intentional accounting manipulation related to the overstatement of reported AFFO, among other things.

5.      In the wake of this scandal, defendants initially attempted to blame the wrongdoing on several subordinate executives and terminated them.   However, one of these executives sued the Company and certain of the Individual Defendants (defined herein) for defamation.   Although the suit was later settled, the allegations in the complaint reveal that certain of the Individual Defendants knew since at least February 2014 of the accounting manipulation and not only declined to halt it, but attempted a cover-up.

6.      Ultimately, defendant Schorsch, most of the Board, and the other senior executives of ARCP resigned or were forced out.   In the aftermath of the October 2014 revelations, the Company was forced to restate the majority of the financial statements it had issued since going public.   It also became clear that the accounting manipulation went beyond the overstatement of AFFO, and the wrongdoing went beyond accounting manipulation: defendant Schorsch and his cronies had hugely enriched themselves through various types of fraud and self-dealing detailed herein.   These schemes included charging ARCP millions of dollars for unsubstantiated expenses that later were found to lack documentation and the unilateral increase of an executive performance plan pool by approximately $100 million beyond the amount authorized.

7.      ARCP shareholders have lost at least $3.5 billion in market capitalization.   The Company is facing a securities class action arising not only out of the intentionally misleading financial statements, but also the numerous offerings of stock and debt that the Company conducted based on these financial statements between 2012 and 2014.   A number of the Individual Defendants are facing other securities class actions and other litigation arising from the impact that the wrongdoing at ARCP had on other entities controlled by defendant Schorsch. ARCP is also the subject of a criminal probe by the Federal Bureau of Investigation ("FBI"), and

investigations by at least the U.S. Securities and Exchange Commission ("SEC"), the Securities Division of the Office of the Secretary of the Commonwealth of Massachusetts, and the U.S. Attorney's Office for the Southern District of New York.

8.      After the intentional accounting manipulation was revealed in October 2014, in November 2014, plaintiff served a litigation demand on ARCP's Board (the "Demand"). Approximately seven months later, the Board refused the Demand.   The litigation demand was wrongfully refused and the Board's "investigation" did not follow the well-accepted process described by Maryland law.   As alleged herein, the Board, which failed to convene an independent committee to investigate the demand even though half of ARCP's outside directors face likely liability in the securities class action and were targets of the Demand, did not in fact act independently in its response to the Demand.   The Board also failed to conduct a reasonable investigation in response to the Demand: no report was compiled by the Board, it is unclear whether anyone at all was interviewed or any documents were reviewed to assess director liability, and the Board's "investigation" did not even reach the merits of whether breaches of fiduciary duties or other Board-level wrongdoing had occurred.   As a result, plaintiff's Demand was wrongfully refused and plaintiff should be permitted to maintain this action on behalf of ARCP and its absent shareholders.

9.      This action seeks to recoup losses that ARCP has already sustained, and will continue sustaining, in connection with the wrongdoing alleged herein, accounting restatement, and all related proceedings.

## JURISDICTION AND VENUE

10.      This Court has subject matter jurisdiction under 28 U.S.C. § 1332(a)(l) because complete diversity exists between plaintiffs and each defendant, and the amount in controversy

exceeds $75,000 exclusive of interest and costs. This action is not a collusive one designed to confer jurisdiction upon a court of the United States that it would not otherwise have.

11. This Court has jurisdiction over each defendant because each defendant is either a corporation that conducts business in and maintains operations in this District, a citizen of New York, or is an individual with sufficient minimum contacts with this District so as to render the exercise of jurisdiction permissible under traditional notions of fair play and substantial justice.

12. This Court also has jurisdiction over this action pursuant to 28 U.S.C. § 1331 in that this Complaint states a federal question: violations of Section 14(a) of the Securities Exchange Act of 1934.  This Court has supplemental jurisdiction over the state law claims asserted herein pursuant to 28 U.S.C. § 1367(a).   This action is not a collusive one to confer jurisdiction on a court of the United States which it would not otherwise have

13. Venue is proper in this District pursuant to 28 U.S.C. § 1391(a) because during the wrongdoing alleged herein ARCP maintained its principal place of business in this District, one or more of the individual defendants resides in or maintains executive offices in this District, a substantial portion of the transactions complained of herein occurred in this District, and defendants have received substantial compensation in this District by doing business here and engaging in numerous activities that had an effect in this District.

## THE PARTIES

### Plaintiff

14. Plaintiff Joanne Witchko currently owns 1,000 shares of ARCP common stock, and has held shares of ARCP common stock continuously since prior to the revelations of wrongdoing alleged herein.   Ms. Witchko is a citizen of Florida.

**Nominal Defendant**

15.     ARCP is a publicly traded REIT organized under Maryland law.   ARCP maintains its corporate headquarters at 2325 E. Camelback Road, Suite 1100, Phoenix, Arizona 85016.   According to its public filings, ARCP acquires, owns and operates single-tenant and multi-tenant commercial real estate properties. ARCP's properties are primarily leased to corporate tenants occupying properties in "well-trafficked, strategic locations."   ARCP's strategy focuses on acquiring mid-term and long-term leases to generate monthly income and long-term growth potential.   ARCP is traded on NASDAQ Exchange under the symbol "ARCP."   ARCP is a citizen of the States of Maryland and Arizona.

**Individual Defendants**

16.     Defendant Schorsch founded ARCP and served as its CEO and Chairman of the Board at relevant times.   He ceased serving as CEO on October 1, 2014 but remained as Chairman until December 15, 2014.   At relevant times, defendant Schorsch served as an officer and/or director at a multitude of entities affiliated with ARCP.   In his capacities as founder and an officer of ARCP, defendant Schorsch has earned stunning sums of money.   In 2014, defendant Schorsch's salary was $1.1 million and he was awarded an equity retention award valued at $24.8 million by the Compensation Committee. As if this compensation were not enough, under a 2013 "Multiyear Outperformance Plan" approved by the Compensation Committee, Schorsch could have been given 42.5% of a bonus pool valued at hundreds of millions over the next five years.   Defendant Schorsch is also a defendant in the related securities class action.   Upon information and belief, defendant Schorsch is a citizen of New York

17.     Defendant William G. Stanley ("'Stanley") has served as a director of ARCP

since January 2014 and is member of the Board that refused the Demand.   During his tenure on the Board, defendant Stanley has served as a member of the Board's Audit Committee, Compensation Committee, and Nominating and Governance Committee.   From December 15, 2014 to April 1, 2015, defendant Stanley served as Interim Chief Executive Officer and Interim Chairman of the Board following the departures of defendants Schorsch and Kay.   In these interim positions, Stanley was compensated $150,000 per month.   Defendant Stanley previously served as an officer and/or director numerous entities connected to defendant Schorsch.   These include, Business Development Corporation of America, Business Development Corporation of America II, ARCP Capital, Retail Centers of America, Inc., and New York REIT Inc. Defendant Stanley served as a director of American Realty Capital Trust IV, Inc. ("ARCT IV"), along with defendants Schorsch, Weil, and Budko, prior to ARCT IV's merger with ARCP. Stanley did not begin to resign from his positions at the other Schorsch-related entities until December 2014 when we became interim Chairman and CEO.   Defendant Stanley is named as a defendant in the pending securities class action due to his wrongdoing arising from his actions as a director of ARCP and ARCT IV.   Defendant Stanley faces likely liability in the securities class action as a defendant facing claims under §§ 11, 12(a)(2), and 15 of the 1933 Act, 15 U.S.C. §§ 77k, §77l(a)(2), 77o and §20(a) of the 1934 Act, 15 U.S.C. § 78t.   This likely liability arises out of, among other things, defendant Stanley's having been a signatory on false and misleading publicly filed financial statements and registration statements.   Upon information and belief, defendant Stanley is a citizen of New York.

18.   Defendant Thomas A. Andruskevich ("Andruskevich") has served as a director of ARCP since February 2014 and is a member of the Board that refused the Demand.   From December 31, 2014 to April 1, 2015, defendant Andruskevich served as "Interim Lead

7

Independent Director," for which he was compensated $100,000 per month.   Defendant Andruskevich is currently, and was at relevant times, a member of the Audit Committee, the Compensation Committee, and the Nominating and Corporate Governance Committee.   Prior to becoming a director of ARCP, defendant Andruskevich was a director of Cole Inc. ("Cole") from October 2008 until Cole's merger with ARCP in February 2014.   Defendant Andruskevich is named as a defendant in the pending consolidated securities class action both due to his wrongdoing as an ARCP Board member and due to his wrongdoing as a member of Cole's board.   Defendant Andruskevich faces likely liability in the securities class action as a defendant facing claims under §§ 11, 12(a)(2), and 15 of the 1933 Act, 15 U.S.C. §§ 77k, §77l(a)(2), 77o and §20(a) of the 1934 Act, 15 U.S.C. § 78t.   This likely liability arises out of, among other things, defendant Andruskevich's having been a signatory on false and misleading publicly filed financial statements and registration statements.   Upon information and belief, defendant Andruskevich is a citizen of New York.

19.     Defendant Bruce D. Frank ("Frank") has served as a director of ARCP since July 8, 2014 and is a member of the Board that refused the Demand.   Defendant Frank is currently, and was at relevant times, a member of the Audit Committee, the Compensation Committee, and the Nominating and Corporate Governance Committee.   Defendant Frank faces likely liability in the securities class action as a defendant facing claims under §§ 11, 12(a)(2), and 15 of the 1933 Act, 15 U.S.C. §§ 77k, §77l(a)(2), 77o and §20(a) of the 1934 Act, 15 U.S.C. § 78t.   This likely liability arises out of, among other things, defendant Frank's having been a signatory on false and misleading publicly filed financial statements and registration statements.   Upon

information and belief, defendant Frank is a citizen of New York.[1]

20.    Defendant Kay served as the President of ARCP beginning in December 2013 and he became a director of the Company in February 2014.   Defendant Key replaced defendant Schorsch as CEO on October 1, 2014.   On December 15, 2014, defendant Kay resigned from all of his positions at ARCP.   Defendant Kay's 2014 salary was $600,000 and he was awarded by the following 2014 compensation by the Compensation Committee: (a) a cash retention award of $4.6 million; (b) an equity retention award of $3.2 million; and (c) a $15,000 signing bonus.   In 2013, defendant Kay was given a cash bonus of $4.6 million and a stock award of $3.2 million. Defendant Kay is also a defendant in the related securities class action.   Upon information and belief, defendant Kay is a citizen of New York.

21.    Defendant Leslie D. Michelson ("Michelson") served as a director of ARCP from October 2012 to April 1, 2015.   During his tenure on the Board, defendant Michelson was a member of the Board's Audit Committee, Compensation Committee, and Nominating and Governance Committee.   During 2013, defendant Michelson received $273,280 in fees related to his service as a director.   Upon information and belief, defendant Michelson is a citizen of New York.

22.    Defendant Edward G. Rendell ("Rendell") served as a director of ARCP from February 2013 until April 1, 2015.   Defendant Rendell is the former Governor of Pennsylvania. During his tenure on the Board, defendant Rendell was a member of the Audit Committee, Compensation Committee, and Nominating and Governance Committee.   In 2013, defendant Rendell received $202,272 in fees related to his service as a director.   Upon information and

---

[1]    Defendants Andruskevich, Frank, and Stanley, along with non-defendant directors Hugh R. Frater, Glenn J. Rufrano, and Julie G. Richardson, were the six members of the ARCP Board when the Board refused the Demand (together, the "Demand Board.")

belief, defendant Rendell is a citizen of Pennsylvania.

23.     Defendant Scott J. Bowman ("Bowman") served as a director of ARCP from February 2013 through September 2014.   At times relevant hereto, defendant Bowman was a member of the Audit Committee.   Upon information and belief, defendant Bowman is a citizen of New York.

24.     Defendant William Kahane ("Kahane") co-founded ARCP with defendant Schorsch and served as a director of ARCP from February 28, 2013 until June 24, 2014.   At relevant times, defendant Kahane served as an officer and director of various other entities affiliated with Schorsch and ARCP.   Upon information and belief, defendant Kahane is a citizen of New York.

25.     Defendant Edward M. Weil, Jr. ("Weil") served as ARCP's President, Treasurer and Secretary from its formation, and as a director from March 2012, until June 24, 2014 when he resigned in an effort to "enhance corporate governance."   Weil has also served as a director and officer of numerous entities in the Schorsch entity ecosystem, and upon information and belief, defendant Weil continues to serve as an officer at numerous Schorsch-related entities. According to ARCP's public filings, defendant Weil was not an independent director.   At relevant times, defendant Weil served as an officer and director of various REITs and other companies affiliated with Schorsch and ARCP.   Defendant Weil is also a defendant in the related securities class action.   Upon information and belief, defendant Weil is a citizen of New York.

26.     Defendant Block served as ARCP's Chief Financial Officer ("CFO") and Executive Vice President from ARCP's formation in December 2010 and became its Treasurer and Secretary in December 2013.   On October 28, 2014, defendant Block resigned.   However,

defendant Block remained Executive Vice President and CFO of AR Capital (defined herein), ARCP's former manager, and other non-traded direct investments sponsored and/or controlled by defendant Schorsch.   Defendant Block signed the admittedly false and misleading 2014 Forms 10-Q and the 2013 Form 10-K.   Defendant Block has been employed in the REIT businesses of defendant Schorsch since approximately 2007.   According to ARCP's public filings, defendant Block previously served as CFO and executive vice president of all non-traded investment programs sponsored by AR Capital until January 2014.   Defendant Block served as a director of Schorsch-related RCAP (defined herein) since February 2013 and served as its CFO and treasurer from February 2013 until December 2013.   Defendant Block was previously responsible for the accounting, finance and reporting functions at the ARCP Capital group of companies.   Defendant Block is also a defendant in the related securities class action.   Upon information and belief, defendant Block is a citizen of New York.

27.   Defendant Peter M. Budko ("Budko") served as ARCP's Executive Vice President and Chief Investment Officer from December 2010 until January 8, 2014.   At relevant times defendant Budko served as an officer and/or director at numerous Schorsch-entities. Defendant Budko is also a defendant in the related securities class action.   Upon information and belief, defendant Budko is a citizen of North Carolina.

28.   Defendant Brian D. Jones ("Jones") served as ARCP's Chief Operating Officer ("COO") from February 2013 until November 2013.   At relevant times defendant Jones served as an officer and/or director at numerous Schorsch-entities.   Defendant Jones is also a defendant in the related securities class action.   Upon information and belief, defendant Jones is a citizen of California or New York.

29.   Defendant McAlister served as the Company's Chief Accounting Officer

("CAO") and Senior Vice President from November 2013 to when she was forced to resign in October 2014 in connection with the accounting restatement.   Defendant McAlister is also a defendant in the related securities class action.   Upon information and belief, defendant McAlister is a citizen of New York.

30.     Defendant Beeson served as the Company's President and COO from November 2013 to December 15, 2014 when she "stepped down."   In 2013, defendant Beeson was given a $750,000 cash bonus and a stock award of approximately $730,000.   Beeson signed the subsequently-restated Form 10-K for the 2013 fiscal year filed in February 2014 containing misleading and inaccurate financial statements.   Defendant Beeson is also a defendant in the related securities class action.   Upon information and belief, defendant Beeson is a citizen of New York.

31.     The defendants named in ¶¶ 16-30 are referred to herein as the "Individual Defendants."

## DUTIES OF THE INDIVIDUAL DEFENDANTS

32.     By reason of their positions as officers, directors, and/or fiduciaries of ARCP and because of their ability to control the business and corporate affairs of ARCP, at all relevant times the Individual Defendants owed ARCP and its shareholders fiduciary obligations of good faith, loyalty, and candor, and were required to use their utmost ability to control and manage ARCP in a fair, just, honest, and equitable manner.   The Individual Defendants were required to act in furtherance of the best interests of ARCP and its shareholders so as to benefit all shareholders equally and not in furtherance of their personal interest or benefit.   Each director and officer of the Company owes to ARCP and its shareholders a fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and

preservation of its property and assets, and the highest obligations of fair dealing.

33.     The Individual Defendants, because of their positions of control and authority as directors and/or officers of ARCP, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by the Company.   Because of their advisory, executive, managerial, and directorial positions with ARCP, each of the Individual Defendants had knowledge of material non-public information regarding the Company.

34.     To discharge their duties, the Individual Defendants were required to exercise reasonable and prudent supervision over the management, policies, practices and controls of the Company.   By virtue of such duties, the officers and directors of ARCP were required to, among other things:

    a. Exercise good faith to ensure that the affairs of the Company were conducted in an efficient, business-like manner so as to make it possible to provide the highest quality performance of their business;

    b. Exercise good faith to ensure that the Company was operated in a diligent, honest and prudent manner and complied with all applicable federal and state laws, rules, regulations and requirements, and all contractual obligations, including acting only within the scope of its legal authority;

    c. Exercise good faith to ensure that the Company's communications with the public and with shareholders are made with due candor in a timely and complete fashion; and

    d. When put on notice of problems with the Company's business practices and operations, exercise good faith in taking appropriate action to correct the misconduct and prevent its recurrence.

35.     The Company maintains a Code of Ethics, which requires "honest and ethical conduct, including the ethical handling of actual or apparent conflicts of interest between personal and professional relationships; full, fair, accurate, timely, and understandable disclosure in the periodic reports required to be filed by the Company; compliance with applicable

governmental rules and regulations; and accountability for adherence to this Code."

36.    The Code of Ethics also states:

**Public Company Reporting**

As a public company, it is of critical importance that the Company's filings with the Securities and Exchange Commission (the "SEC") be accurate, timely and in accordance with all applicable laws and regulations. Depending on their position with the Company, an employee, officer or director may be called upon to provide necessary information to assure that the Company's public reports are complete, fair and understandable. The Company expects employees, officers and directors to take this responsibility very seriously and to provide prompt accurate answers to inquiries related to the Company's public disclosure requirements.

**Financial Statements and Other Records**

All of the Company's books, records, accounts and financial statements must be maintained in reasonable detail, must appropriately reflect the Company's transactions and must both conform to applicable legal requirements and to the Company's system of internal controls. Unrecorded or ''off the books" funds or assets should not be maintained unless permitted by applicable law or regulation.

Records should always be retained or destroyed according to the Company's record retention policies. In accordance with those policies, in the event of litigation or governmental investigation, please consult the board of directors.

**Duty to Report**

Employees, officers and directors who suspect or know of violations of this Code or illegal or unethical business or workplace conduct by employees, officers or directors have a duty to report it immediately. Each person is encouraged to report such conduct to a supervisor or superior, but if the individuals to whom such information is conveyed are not responsive, or if there is reason to believe that reporting to such individuals is inappropriate in particular cases, then the employee, officer or director may contact the Chief Executive Officer of the Company, Such communications will be kept in confidence to the extent appropriate or permitted by law. If the employee is still not satisfied with the response, the employee may contact the Chief Executive Officer, the Chairman of the board of directors or any of the Company's outside directors. While employees, officers and directors are encouraged to use the Company's internal reporting system outlined, above, in all cases, employees, directors and officers may directly report such violations outside the Company to appropriate authorities in accordance with law.

The Company's policy is to comply with all applicable financial reporting and

accounting regulations. If any director, officer or employee of the Company has unresolved concerns or complaints regarding questionable accounting or auditing matters of the Company, then he or she is encouraged to submit those concerns or complaints (anonymously, confidentially or otherwise) to the Company's audit committee or the Chief Financial Officer. Subject to its legal duties, the audit committee and the Chief Financial Officer will treat such submissions confidentially. Such submissions may be directed to the attention of the Company's audit committee, any director who is a member of the Company's audit committee or the Chief Financial Officer.

Each director, officer and employee who is involved in the Company's periodic reports and other documents filed with the SEC, including all financial statements and other financial information, must comply with applicable federal securities laws and SEC regulations. Each director, officer and employee who is involved in the Company's public disclosure process must: (a) be familiar with and comply with the Company's disclosure controls and procedures and its internal control over financial reporting; and (b) take all necessary steps to ensure that all filings with the SEC and all other public communications about the financial and business condition of the Company provide full, fair, accurate, timely and understandable disclosure.

**Violations**

Violation of this Code is grounds for disciplinary action up to and including termination of employment. Such action is in addition to any civil or criminal liability which might be imposed by any court or regulatory agency.

37.    According to the charter of the Audit Committee, the purpose of the Committee is

to:

1.    oversee the accounting and financial reporting process of the Company and the audits of the financial statements of the Company;

2.    appoint, retain and oversee the work of any independent registered public accounting firm engaged by the Company for the purpose of preparing or issuing an audit report or performing other audit, review or attest services  for the Company (the "Independent Auditor"), and determine the compensation of the Independent Auditor; and

3.    monitor the integrity of the Company's financial statements, the Independent Auditor's qualifications and independence, the performance of the Company's internal audit function, the Company's compliance with legal and regulatory requirements and the Company's overall risk profile.

38.    Defendants Michelson, Rendell, Bowman, Frank, and Stanley served on the Audit

Committee at times relevant hereto.   The Audit Committee Charter required these five Individual Defendants to oversee and monitor: (a) ARCP's the accounting and financial reporting process; (b) the audits of ARCP's financial statements; (c) the integrity of the Company's financial statements; (d) the performance of the Company's internal audit function; (e) the Company's compliance with legal and regulatory requirements; and (f) the Company's overall risk profile.   The Audit Committee charter further states these Individual Defendants were required to "review and discuss the quarterly financial statements with management and the Independent Auditor" and discuss with management and the auditor the Company's earnings press releases, as well as financial information and earnings guidance provided to analysts and rating agencies.

## SUBSTANTIVE ALLEGATIONS

### A.    Background

39.    ARCP is a self-managed REIT that operates in two segments: (a) Real Estate Investment; and (b) private capital management, comprised of Cole Capital.   The Real Estate Investment segment acquires, owns, and operates single-tenant, freestanding, commercial real estate properties primarily subject to long-term net leases with high credit quality tenants.   The Company seeks to acquire net lease assets by self-originating individual or small portfolio acquisitions by executing sale-leaseback transactions.   Cole Capital manages the direct investment programs.

40.    On September 7, 2011, ARCP's initial public offering raised approximately $70 million by selling 5.5 million shares for $12.50 each.   The Company's total assets have grown significantly since it first went public and it quickly became one of the largest REITs in the U.S. As of December 31, 2011, ARCP had total assets of $132 million.   A year later on December

31, 2012, ARCP's assets had nearly doubled at $256 million.

41.     Then, beginning in 2013, the Company embarked on an acquisition spree. Between February 2013 and July 2014, ARCP acquired numerous REITs and related businesses, including American Realty Capital Trust III Inc. for $2.2 billion, CapLease, Inc. for $2.2 billion, ARCT IV for $3 billion, 500 Red Lobster restaurant locations for $1.5 billion, and Cole, Inc. for $11.2 billion.

42.     By mid-2014, ARCP was the largest REIT of its kind in the U.S. with assets of approximately $21 billion.   As of June 30, 2014, ARCP owned 3,966 properties in 49 states representing 106.8 million square feet of single and multi-tenant retail and commercial space. At the time, the rentable space available at these properties was 98.8% leased with a weighted average remaining lease term of 9.95 years.

43.     According to the Company's public filings, ARCP collects rents from its tenants and passes on to shareholders a minimum of 90% of taxable income received.   Because ARCP's business model is based on the pass-through of rents to its shareholders, financial metrics measuring funds from operations are fundamental to understanding the Company's performance.   For this reason, ARCP regularly reports its results using a non-U.S. GAAP financial measure called adjusted funds from operations ("AFFO").   AFFO is based on funds from operations ("FFO").   ARCP defines FFO as "net income or loss computed in accordance with GAAP, excluding gains or losses from sales of property but including asset impairment write-downs, plus depreciation and amortization, after adjustments for unconsolidated partnerships and joint ventures."   AFFO is FFO adjusted to exclude acquisition-related fees and expenses, amortization of above-marketplace assets and liabilities, amortization of deferred financing costs, straight-line rent, non-cash mark-to-market adjustments, amortization of

restricted stock, non-cash compensation and gains and losses adjusted for recurring capital expenditures used to maintain the underlying assets is equal to the AFFO.

44.     At all relevant times, ARCP referred to AFFO as the most important metric for understanding its financial performance and prominently reported and discussed AFFO in its financial filings and press releases.   The Company has repeatedly stated in its public filings that FFO and AFFO are the prime indicators of its performance.

**B.     Defendant Schorsch's Tangled Web Of Related Entities**

45.     ARCP is the center of a veritable ecosystem of Schorsch-controlled entities, a complex network of companies created by defendant Schorsch.   Among these approximately four-dozen entities, RCS Capital Corporation ("RCAP"), AR Capital LLC ("AR Capital"), and Cole Capital in particular were used to raise money for defendant Schorsch's non-traded REITs and used by ARCP equity securities as currency to buy out the non-traded REITs.   Defendant Schorsch served as Executive Chairman of RCAP and as Chairman and CEO of AR Capital.   A December 19, 2014 *Forbes* article titled "As His Empire Quakes, ARCP Founder Nick Schorsch No Longer A Billionaire," described Schorsch's network of entities:

> Schorsch became a billionaire by constructing a complex web of interrelated companies-at one point he was CEO of more than a dozen companies.   He raised money for his nontraded REITs, took them public, and then used those vehicles to buy out his own other nontraded REITs.   His fully integrated operation not only manufactured nontraded, high-yielding REITs, it also provided research and advisory services to them, and controlled the second-largest independent financial advisory operation in the nation (9,200 brokers) who peddled them.

46.     As described in a November 5, 2014 article in *The Wall Street Journal* titled "For Schorsch, an Empire Under Siege," Schorsch's companies are "a tangle of like-sounding names such as ARCP Capital Global Trust II and ARCP Capital Healthcare Trust III" that have "raised $20.8 billion over the past seven years from small investors, the most of any real-estate

company....   The companies use the money to buy properties ranging from nursing homes to FedEx Corp. distribution centers.   The goal is to flip properties quickly at a profit to repay investors and build a strong track record in hopes of collecting still more money from them."

### C.   ARCP's Incestuous Acquisition Spree

47.   One hallmark of business in defendant Schorsch's empire of companies has been large transactions between companies owned and controlled by defendant Schorsch.   *The Wall Street Journal* described defendant Schorsch's system this way:

> [O]ften the deals involve selling properties to other companies in Mr. Schorsch's empire, each time racking up fees for Mr. Schorsch and his management team. When ARCP Capital Properties bought ARC-IV, a large nontraded REIT sponsored by Mr. Schorsch, in 2013, the prospectus listed a $62.7 million payment to the owners of ARC-IV's advisory company, which at the time was controlled by Mr. Schorsch.[2]

48.   Prior to January 8, 2014, an "external" manager called ARC Properties Advisors, LLC ("ARC Advisors") was responsible for the day-to-day affairs of ARCP.   ARC Advisors was controlled by defendants Schorsch, Block, Weil, and Kahane.   Shorsch was the CEO of ARC Advisors.   However, ARCP did not own ARC Advisors and the money it earned managing ARCP did not benefit ARCP shareholders.

49.   To affect its acquisitions, ARCP raised billions of dollars in a string of securities offerings during the relevant period, including: (a) $300 million in 3% Convertible Senior Notes due 2018, in July 2013; (b) $287.5 million in 3% Convertible Notes due 2018, in December 2033; (c) $402.5 million in 3.75% Convertible Senior Notes due 2020, in December; (d) 79.1 million shares of stock issued in connection with the ARCT-IV merger, in January 2014; (e) 520.8 million shares of stock issued in connection with the Cole merger, in February 2014; (f)

---

[2]      In another example of this practice, when ARCP purchased Cole, Inc. in February 2014, a Schorsch-entity called Realty Capital Securities, LLC received $28 million in fees for "financial advisory and strategic services" provided to ARCP in connection with the merger.

138 million shares of stock, in May 2014; and $2.55 billion of Senior Notes, in September 2014.

50.     ARCP's acquisition spree was designed to (and did) transfer hundreds of millions of dollars from ARCP to entities owned and/or controlled by defendants Schorsch, Weil, Kahane, Block and Budko.   Over a three year period, ARCP paid ARC Advisors and related entities over *$917 million* in the form of commissions, fees, and expenses.   During 2012 and 2013, ARCP paid over $66 million to ARC Advisors and $240 million in 2013 and 2014 for "subordinated distribution fees" and "strategic advisory services," as well as an additional $119 million for "general and administrative expenses" and another $31 million for "management fees."

51.     The forgoing are only some of the largest transfers of this type from ARCP to Schorsch-controlled non-ARCP entities.   This scheme clarifies the motive behind the accounting manipulation described herein: through it defendants to direct huge sums of money to themselves, often without adequate documentation and under doubtful circumstances.   For example, in 2014, ARCP paid *exactly* $20 million to ARC Advisors for the simple switch from external management to internal management.   Suspiciously, this $20 million was evenly split between "post-transaction support services" and "furniture, fixtures, and equipment." Unsurprisingly, ARCP later admitted that "there was no evidence of the receipt and it could not support the value of" these costs.

**D.     The Individual Defendants Granted Each Other Excessive Compensation**

52.     Another way the Individual Defendants directed massive sums of money to themselves through the acquisition spree was via executive incentive payments.   This is because the acquisitions were designed to expand ARCP's asset base in order to increase the basis for incentive compensation under the Company's Multi-Year Outperformance Plan (the

"Outperformance Plan").   The Outperformance Plan was approved in October 2013 by the Compensation Committee.   At the time, the Compensation Committee was comprised of defendants Michelson, Bowman, Rendell, and Stanley.   These four defendants in defiance of common sense and their roles as fiduciaries allocated 42.5% of the $120 million compensation pool under the Outperformance Plan to defendant Schorsch alone.   However, defendants Schorsch and Block, apparently unsatisfied with this absurd level of compensation, subsequently increased the Outperformance Plan by $100 million by unilaterally altering the plan and disseminating a proxy statement stating the maximum award value of the Plan was $222.1 million.[3]

53.     The Outperformance Plan is designed with two elements, an "absolute" metric and a "relative" metric.   Both of these are measured over a three-year period based on total returns to stockholders including stock price increase (if any) and common stock distributions. If ARCP achieved a total return to stockholders of more than 7% a year, the plan would pay out 4% of the dollar amount of the return.   If the Company's annual performance exceeded the median total return of a peer group of companies by 6% or more, the Plan would also pay out an additional 4% of that excess total return.   Amazingly, the Outperformance Plan provided that defendants, including Schorsch and Block, would receive 50% of their target incentive compensation under this prong of the Plan even if ARCP posted a zero percent total return,

---

[3]     Notably, the Company's shareholders overwhelmingly rejected the Outperformance Plan in their non-binding advisory vote at the 2014 annual meeting of shareholders.   Of the approximately 413 million shares represented, only 32.4% voted in favor of the Plan. Defendants ignored the shareholder vote and apparently subsequently adopted the Plan even though the shareholders had rejected it and defendants Schorsch and Block had arbitrarily increased its value by over 80%.   This is evidenced by the December 12, 2014 agreement between defendant Schorsch and ARCP in connection with his resignation referring to the "Award Agreement dated January 8, 2014, under the ARCP 2014 Multi-Year Outperformance Plan."

providing shareholders with no return at all.

54.    The Outperformance Plan entitling defendant Schorsch to such startling sums of money was not the full extent of his compensation, however.   He was also entitled to: (a) a guaranteed base salary of $1.1 million 2014; (b) an estimated $8.8 million cash bonus and equity awards; (c) a "retention grant" of $24.9 million, paid over nine years in installments of $2.8 million.    Thus, if Schorsch achieved only the mid-range of his compensation under the Outperformance Plan, he was entitled to approximately $28.5 million in 2014 – more than two dozen times his base salary.

**E.    Misleading and Inaccurate Statements**

55.    On July 5, 2011, ARCP filed with the SEC its final amended registration statement on Form S-11 in anticipation of its initial public offering to be conducted in September of that year.   The registration statement tells investors that AFFO is the fundamental metric in assessing the Company's performance and that ARCP's various expenses and management fees would be pegged to reported AFFO.   For example, the registration statement states the management fees paid by ARCP would be set by a formula relying in part on AFFO.   The amount of permissible distributions made under the Company's senior secured revolving acquisitions credit facility were limited based on AFFO.   AFFO would govern when dividends could be paid on shares of stock owned by the manager of ARCP.   In short, the Company was using AFFO as the benchmark for assessing performance, encouraged shareholders to do the same, and made numerous other elements of its business contingent on AFFO, and by extension, the accurate reporting of AFFO.

56.    On March 19, 2012, the Company filed with the SEC its Form 10-K for the 2011 fiscal year.   This was ARCP's first Form 10-K filed as a public Company.   The Form 10-K

reported AFFO of $287,000 for the third quarter of 2011 and $1,491,000 for the fourth quarter of 2011.   Defendants Schorsch and Block each executed certifications pursuant to the federal securities laws attesting to the truth and accuracy of the 2011 Form 10-K.   As with all the Company's financial statements, the Form 10-K emphasized the importance of AFFO:

> By providing AFFO, we believe we are presenting useful information that assists investors and analysts to better assess the sustainability of our operating performance. Further, we believe AFFO is useful in comparing the sustainability of our operating performance with the sustainability of the operating performance of other real estate companies, including exchange-traded and non-traded REITs. As a result, we believe that the use of FFO and AFFO, together with the required GAAP presentations, provide a more complete understanding of our performance relative to our peers and a more informed and appropriate basis on which to make decisions involving operating, financing, and investing activities.
>
> * * *
>
> In accordance with Rules 13a-15(b) and 15d-15(b) of the Exchange Act, management, with the participation of our Chief Executive Officer and Chief Financial Officer, has evaluated the effectiveness of our disclosure controls and procedures (as defined in Rules 13a-15(e) and 15d-15(e) of the Exchange Act) as of the end of the period covered by this Annual Report on Form 10-K. Based on such evaluation, our Chief Executive Officer and Chief Financial Officer have concluded, as of the end of such period, that our disclosure controls and procedures are effective in recording, processing, summarizing and reporting, on a timely basis, information required to be disclosed by us in our reports that we file or submit under the Exchange Act.

57.   The 2011 Form 10-K was signed by defendants Schorsch, Block, Weil and Rendell.   As later revealed, and alleged in detail below, the AFFO figures reported in this Form 10-K were falsely overstated and the certifications attesting to the adequacy of the Company's internal controls were false.

58.   On May 4, 2012, the Company filed with the SEC its definitive proxy statement in advance of the 2012 annual meeting of stockholders to be held June 6, 2012.   According to the proxy statement, the Board met 11 times during 2011 and the Audit Committee met twice. The proxy statement solicited votes to: (a) elect five directors, including defendants Schorsch,

Weil, and Rendell, to one-year terms; and (b) ratify the Audit Committee's choice as independent auditor.   The proxy statement expressly incorporates by reference the 2011 Form 10-K.   The proxy statement also states:

**Oversight of Conflicts of Interest**

The Company does not have a standing conflicts committee. Instead, the entire Board of Directors, including our independent directors, is responsible for approving transactions, and resolving other conflicts of interest, between the Company and its subsidiaries, on the one hand, and ARC, any director, the Manager or their respective affiliates, on the other hand. The Board of Directors is responsible for reviewing and approving all transactions with affiliated parties, all purchase or leases of properties from or sales or leases to an affiliate, and reviewing and approving all agreements and amendments to agreements between the Company and affiliates, including ARC or the Manager and their subsidiaries.

During the fiscal year ended December 31, 2011, all of the members of the Board of Directors reviewed our policies and report that they are being followed by us and are in the best interests of our stockholders. Certain of the factors considered by the Board of Directors are set forth in the financial statements (including the notes thereto) and Risk Factors contained in our Annual Report on Form 10-K for the year ended December 31, 2011. The Board reviewed the material transactions between ARC, the Manager and their respective affiliates, on the one hand, and us, on the other hand, which occurred during the fiscal year ended December 31, 2011. The Board has determined that all our transactions and relationships with ARC, the Manager and their respective affiliates during the fiscal year ended December 31, 2011 were fair and were approved in accordance with the policies referenced in "Certain Relationships and Related Transactions" below.

59.     On June 12, 2012, the Company filed a Form 8-K with the SEC disclosing the results of the shareholder votes solicited in the May 2012 Proxy Statement.   Defendants Schorsch, Weil, and Rendell were elected to one year terms on the Board.   The reelection of these three defendants was an essential causal link in their continued breaches of fiduciary duties as detailed herein.   Any reasonable investor would have found it material in deciding how to vote that: (a) AFFO was being improperly manipulated; (b) the Company's financial results were incorrect; and (c) the Board was not adequately discharging its function in oversight of conflicts of interest as represented by the proxy statement.

60.     On February 28, 2013, the Company filed with the SEC its Form 10-K for the 2012 fiscal year and reported AFFO for 2012 of approximately $10.4 million.   Accompanying the Form 10-K were certifications signed by defendants Schorsch and Block pursuant to the federal securities laws attesting to the truth and accuracy of the 2012 Form 10-K.   The 2012 Form 10-K states in part:

> We consider FFO and FFO, as adjusted to exclude acquisition-related fees and expenses, or AFFO, useful indicators of the performance of a RE1T. Because FFO calculations exclude such factors as depreciation and amortization of real estate assets and gains or losses from sales of operating real estate assets (which can vary among owners of identical assets in similar conditions based on historical cost accounting and useful-life estimates), they facilitate comparisons of operating performance between periods and between other REITs in our peer group. Accounting for real estate assets in accordance with U.S. GAAP implicitly assumes that the value of real estate assets diminishes predictably over time. Since real estate values have historically risen or fallen with market conditions, many industry investors and analysis have considered the presentation of operating results for real estate companies that use historical cost accounting to be insufficient by themselves.

> Additionally, we believe that AFFO, by excluding acquisition-related fees and expenses, provides information consistent with management's analysis of the operating performance of the properties. By providing AFFO, we believe we are presenting useful information that assists investors and analysts to better assess the sustainability of our operating performance. Further, we believe AFFO is useful in comparing the sustainability of our operating performance with the sustainability of the operating performance of other real estate companies, including exchange-traded and non-traded REITs.

> As a result, we believe that the use of FFO and AFFO, together with the required U.S. GAAP presentations, provide a more complete understanding of our performance relative to our peers and a more informed and appropriate basis on which to make decisions involving operating, financing, and investing activities.

> * * *

> In accordance with Rules 13a-15(b) and 15d-15(b) of the Exchange Act, management, with the participation of our Chief Executive Officer and Chief Financial Officer, has evaluated the effectiveness of our disclosure controls and procedures (as defined in Rules 13a-15(e) and 15d-15(e) of the Exchange Act) as of the end of the period covered by this Annual Report on Form 10-K.. Based on such evaluation, our Chief Executive Officer and Chief Financial Officer have

concluded, as of the end of such period, that our disclosure controls and procedures are effective in recording, processing, summarizing and reporting, on a timely basis, information required to be disclosed by us in our reports that we file or submit under the Exchange Act.

61.     The 2012 Form 10-K was signed by defendants Schorsch, Weil, Block and Michelson.   As later revealed, and alleged in detail below, the AFFO figures reported in this Form 10-K were falsely overstated and the certifications attesting to the adequacy of the Company's internal controls were also false.

62.     On April 30, 2013, the Company filed with the SEC its definitive proxy statement in advance of the 2013 annual meeting of shareholders to be held June 4, 2013.   The proxy statement discloses the Board met 22 times during 2012 and the Audit Committee met four times.   The proxy statement solicits votes to: (a) elect seven directors, including defendants Schorsch, Weil, Kahane, Michelson, Rendell, and Bowman to one-year terms; and (b) ratify the Audit Committee's choice as independent auditor.   The proxy statement expressly incorporates by reference the 2012 Form 10-K.   The proxy statement also states:

**Oversight of Conflicts of Interest**

The Company does not have a standing conflicts committee. Instead, the entire Board of Directors, including our independent directors, is responsible for approving transactions, and resolving other conflicts of interest, between the Company and its subsidiaries, on the one hand, and ARC, any director, the Manager or their respective affiliates, on the other hand. The Board of Directors is responsible for reviewing and approving all transactions with affiliated parties, all purchase or leases of properties from or sales or leases to an affiliate, and reviewing and approving all agreements and amendments to agreements between the Company and affiliates, including ARC or the Manager and their subsidiaries.

During the fiscal year ended December 31, 2012, all of the members of the Board of Directors reviewed our policies and report that they are being followed by us and are in the best interests of our stockholders. Certain of the factors considered by the Board of Directors are set forth in the financial statements (including the notes thereto) and Risk Factors contained in our Annual Report on Form 10-K for the year ended December 31, 2012. The Board reviewed the material transactions between ARC, the Manager and their respective affiliates, on the one hand, and us,

on the other hand, which occurred during the fiscal year ended December 31, 2012. The Board has determined that all our transactions and relationships with ARC, the Manager and their respective affiliates during the fiscal year ended December 31, 2012 were fair and were approved in accordance with the policies referenced in "Certain Relationships and Related Transactions" below.

63.     On June 10, 2013, the Company filed a Form 8-K with the SEC disclosing the results of the shareholder votes solicited in the April 2013 Proxy Statement.   Defendants Schorsch, Weil, Kahane, Michelson, Rendell, and Bowman were elected to one year terms on the Board.   The reelection of these six defendants was an essential causal link in their continued breaches of fiduciary duties as detailed herein.   Any reasonable investor would have found it material in deciding how to vote that: (a) AFFO was being improperly manipulated; (b) the Company's financial results were incorrect; and (c) the Board was not adequately discharging its function in oversight of conflicts of interest as represented by the proxy statement.

64.     On July 23, 2013, the Company filed with the SEC the preliminary prospectus, and on July 25, 2013, a preliminary prospectus supplement, for the July 2013 Offering of $300 million in 3% notes.   The offering materials specifically incorporated by reference the misleading 2012 Form 10-K and first quarter 2013 Form 10-Q.

65.     On December 4, 2013, the Company announced: (a) reopening of the 2018 notes offered in July 2013 (directly above); and (b) an the December 2013 3.75% Notes Offering for notes due 2020 and priced at $402.5 million.   These offering materials specifically incorporated by reference the Company's 2012 Form 10-K, the first

66.     On February 6, 2014, the Company completed a $2.55 billion notes offering of 2.0% Senior Notes due February 6, 2017, 3.0% Senior Notes due February 6, 2019, and 4.6% Senior Notes due February 6, 2024.   The offering documents set forth ARCP's reported financial and operating results, including AFFO, for 2012 and the nine-months ended September

30, 2013, and incorporated by reference the Company's 2012 Form 10-K, and its first, second, and third quarter 2013 Forms 10-Q.

67.     On February 27, 2014, the Company filed its Form 10-K for the 2013 fiscal year with the SEC. The Form 10-K reported AFFO for 2013 of $163.9 million and net loss of approximately $406 million.   The Form 10-K states the award pool under the Outperformance Plan was $222.1 million.   Filed with the Form 10-K were certifications signed by defendants Schorsch and Block pursuant to the federal securities laws attesting to the truth and accuracy of the 2013 Form 10-K.   The 2013 Form 10-K also states in part:

> We consider FFO and AFFO useful indicators of the performance of a REIT. Because FFO calculations exclude such factors as depreciation and amortization of real estate assets and gains or losses from sales of operating real estate assets (which can vary among owners of identical assets in similar conditions based on historical cost accounting and useful-life estimates), they facilitate comparisons of operating performance between periods and between other REITs in our peer group. Accounting for real estate assets in accordance with U.S. GAAP implicitly assumes that the value of real estate assets diminishes predictably over time. Since real estate values have historically risen or fallen with market conditions, many industry investors and analysts have considered the presentation of operating results tor real estate companies that use historical cost accounting to be insufficient by themselves.

> We exclude certain income or expense items from AFFO that we consider more reflective of investing activities, other non-cash income and expense items and the income and expense effects of other activities that are not a fundamental attribute of our business plan. These items include unrealized gains and losses, which may not ultimately be realized, such as gains or losses on derivative instruments, gains or losses on contingent valuation rights, gains and losses on investments and early extinguishment of debt. In addition, by excluding non-cash income and expense items such as amortization of above and below market leases, amortization of deferred financing costs, straight-line rent and non-cash equity compensation from AFFO we believe we provide useful information regarding income and expense items which have no cash impact and do not provide us liquidity or require our capital resources. By providing AFFO, we believe we are presenting useful information that assists investors and analysts to better assess the sustainability of our ongoing operating performance without the impacts of transactions that are not related to the ongoing profitability of our portfolio of properties. We also believe that AFFO is a recognized measure of sustainable operating performance by the REIT industry. Further, we believe AFFO is useful

in comparing the sustainability of our operating performance with the sustainability of the operating performance of other real estate companies that are not as involved in activities which are excluded from our calculation.

\* \* \*

In accordance with Rules 13a-15(b) and 15d-15(b) of the Exchange Act, management, with the participation of our Chief Executive Officer and Chief Financial Officer, has evaluated the effectiveness of our disclosure controls and procedures (as defined in Rules I3a-15(e) and 15d-15(e) of the Exchange Act) as of the end of the period covered by this Annual Report on Form 10-K..   Based on such evaluation, our Chief Executive Officer and Chief Financial Officer have concluded, as of the end of such period, that our disclosure controls and procedures are effective in recording, processing, summarizing and reporting, on a timely basis, information required to be disclosed by us in our reports that we file or submit under the Exchange Act.

68.    The Form 10-K. was signed by defendants Schorsch, Block, McAlister, Beeson, Kay, Michelson, Stanley, Rendell and Andruskevich.   As subsequently revealed in 2015 and alleged in detail below, the AFFO figures reported in this Form 10-K were falsely overstated and as were the certifications attesting to the adequacy of the Company's internal controls.

69.    On April 29, 2014, the Company filed with the SEC its definitive proxy statement in advance of the 2014 annual meeting of stockholders to be held May 29, 2014.   According to the proxy statement, the Board met 58 times during 2013 and the Audit Committee met five times.   The proxy statement solicited votes to: (a) elect nine directors, including defendants Schorsch, Weil, Kahane, Michelson, Rendell, Bowman, Stanley, and Andruskevich to one-year terms; (b) ratify the Audit Committee's choice as independent auditor; (c) adopt a non-binding advisory resolution approving executive compensation for ARCP's executive officers; and (d) adopt a non-binding resolution regarding the frequency of the ratification of executive compensation.   The proxy statement expressly incorporates by reference the 2013 Form 10-K. The proxy statement also states:

**Conflicts Committee**

During the fiscal year ended December 31, 2013, the Company did not have a standing Conflicts Committee. Pursuant to the terms of the Company's Agreement and Plan of Merger with Cole and Clark Acquisition, LLC (the "Cole Merger Agreement"), effective with the close of the Company's acquisition of Cole (the "Cole Merger"), on February 7, 2014, the Company adopted an amendment to its bylaws by which it established a Conflicts Committee. The Conflicts Committee is composed of Messrs. Michelson, Stanley, Andruskevich and Sealy. A majority of the Conflicts Committee must approve any material contracts and transactions between the Company and AR Capital, LLC and its affiliates (subject to certain exceptions) and the Conflicts Committee has the power to monitor compliance with certain self-management requirements specified by the Cole Merger Agreement. The entire Board of Directors will review transactions that remain outside of the scope of the Conflicts Committee's purview and, should certain conflicts arise with management or the non-executive directors, the independent directors will review such transactions. The Board of Directors is responsible for reviewing and approving all transactions with affiliated parties, all purchases or leases of properties from or sales or leases to an affiliate and reviewing and approving all agreements and amendments to agreements between the Company and any affiliates.

During the fiscal year ended December 31, 2013, all of the members of the Board of Directors reviewed our policies and report that they are being followed by us and are in the best interests of our stockholders. Certain of the factors considered by the Board of Directors are set forth in the financial statements (including the notes thereto) and Risk Factors contained in our Annual Report on Form 10-K for the year ended December 31, 2013. The Board reviewed the material transactions between AR Capital, LLC, our former Manager and their respective affiliates, on the one hand, and us, on the other hand, which occurred during the fiscal year ended December 31, 2013. The Board has determined that all our transactions and relationships with AR Capital, LLC, our former Manager and their respective affiliates during the fiscal year ended December 31, 2013 were fair and were approved in accordance with the policies referenced in "Certain Relationships and Related Transactions" below.

* * *

In October 2013, the Compensation Committee approved the adoption of the 2014 Multi-Year Outperformance Plan (the "OPP"), which became effective as of January 8, 2014. The OPP was established to provide an element of incentive compensation to the named executive officers, among other participants, which would be tied directly to the performance of the Company in respect of the Absolute Component and Relative Component, described in the table below. Under the OPP, participants (including each of our named executive officers) are issued LTIP Units in the Operating Partnership. The maximum award value of all LTIP Units that may be earned under the OPP will be $222.1 million, which is equal to

approximately 5% of our equity market capitalization ("the OPP Cap") at the time of the Compensation Committee's approval of the OPP.

(Emphasis added.)

70.     On June 2, 2014, the Company filed a Form 8-K with the SEC disclosing the results of the shareholder votes solicited in the April 2014 Proxy Statement.   Defendants Schorsch, Weil, Kahane, Michelson, Rendell, Bowman, Stanley, and Andruskevich were elected to one year terms on the Board.   The reelection of these eight defendants was an essential causal link in their continued breaches of fiduciary duties as detailed herein.   Even without knowing of the massive fraud occurring at ARCP, the Company's shareholders overwhelmingly rejected the advisory resolution approving named executive officer compensation, 134 million votes in favor of the resolution and 279.5 million against.   Any reasonable investor would have found it material in deciding how to vote that: (a) AFFO was being improperly manipulated; (b) the Company's financial results were incorrect; and (c) the Board was not adequately discharging its function in oversight of conflicts of interest as represented by the proxy statement.

71.     On May 8, 2014, the Company issued a press release disclosing its financial results for the first quarter of 2014.   The press release states in part:

Selected operating highlights for the quarter include:

- **Increased Revenue**: Increased revenue to a record $320.6 million, up 647.4% compared to the same period a year earlier.
- **Increased AFFO**: Increased AFFO available to common stockholders to $147.4 million, up 334.6% compared to the same period a year earlier.
- **Balance Sheet Acquisitions**: Completed $1.03 billion of acquisitions on the balance sheet, comprised of 224 properties in 78 individual transactions at an average cap rate of 8.24% (8.02% cash cap rate), with another over $700 million already closed or under contract for the second quarter.
- **Cole Capital Acquisitions**: Acquired $419.9 million of real estate assets on behalf of the managed funds in the first quarter, comprising 84 properties in 51 individual transactions.
- **Cole Capital**: On track to raise $3.1 billion in 2014: Raised $897 million

of capital on behalf of the managed funds in the first quarter.

- **Investment Grade Balance Sheet**: Secured investment grade rating from S&P and received a reaffirmation of investment grade from Moody's.
- **Multi-Tenant Spin-off**: Announced spin-off of ARCP Capital Centers, Inc. (NASDAQ: ARCM) ("ARCM") which is expected to be completed by mid-June.

"I am very pleased with our results for the first quarter of the year," said Nicholas S. Schorsch, Chief Executive Officer and Executive Chairman of ARCP. "We had a record quarter with earnings coming exactly in line with our expectations of $0.26 AFFO per share, consistent with our previously stated guidance for the year. Additionally, our year-to-date acquisitions, combined with properties currently under contract puts us well-ahead of schedule to achieve our total 2014 annual acquisition targets by midyear. With our strengthened balance sheet, and the Company ready to capitalize on a number of large-scale sale-leaseback transactions, we are in position to deliver strong shareholder return this year. The management team is working cohesively and my plan for succession as Chairman is advancing as anticipated."

"With our acquisitions team firing on all cylinders, every aspect of our business is exceeding our expectations," said David S. Kay, President of ARCP. "With strong earnings, our acquisition volume is outpacing our guidance, our cap rates surpass all industry peers, Cole Capital launched two new products, and we successfully integrated our management and systems, all of which is allowing us to execute with a disciplined intensity. The $1.7 billion of acquisitions we have closed or placed under contract were at a 7.92% cash cap rate or 8.26% GAAP cap rate. These 150 self-originated transactions are indicative of the scale and expertise of our platform, providing a significant competitive advantage. Finally, we are ramping up our capital raising initiatives in May and remain confident that we will achieve our target of raising $3.1 billion of capital during 2014."

\* \* \*

Adjusted funds from operations ("AFFO") for the three months ended March 31, 2014 totaled $147.4 million, or $0.26 per fully diluted share.

72.     On the same day, the Company filed with the SEC its Form 10-Q for the quarter. The Form 10-Q was signed by defendants Schorsch and Block.  Defendants Schorsch and Block certified that the financial statements were accurate, and that the Company's internal controls were sufficient:

In accordance with Rules 13a-15(b) and 15d-15(b) of the Securities Exchange Act, as amended (the "Exchange Act"), we, under the supervision and with the

participation of our Chief Executive Officer and Chief Financial Officer, earned out an evaluation of the effectiveness of our disclosure controls and procedures (as defined in Rules 13a-15(e) and 15d-15(e) of the Exchange Act) as of the end of the period covered by this Quarterly Report on Form 10-Q and determined that the disclosure controls and procedures are effective.

73.     As later revealed, and alleged in detail below, the AFFO figures reported in this Form 10-Q and the associated press release were falsely overstated and the certifications attesting to the adequacy of the Company's internal controls were also false.

74.     Pursuant to a preliminary prospectus supplement filed May 21, 2014 and a prospectus supplement filed May 23, 2014, the Company conducted an offering of 138 million shares of ARCP common stock at $12 per share.   The offering documents incorporated by reference the Company's 2012 and 2013 Forms 10-K and its first quarter 2014 Form 10-Q, all of which were false and misleading because they: (a) stated the financial results were accurate; (b) stated the Company's internal controls were effective; and (c) included misleading certifications attesting the Company's internal controls signed by defendants Schorsch and Block.

75.     On June 3, 2014, Marcato Capital Management, LP, a shareholder of ARCP, wrote a letter to then-lead independent director defendant Michelson raising red flags to ARCP's deficient internal controls and financial reporting.

> ARCP's rapid acquisitions of CapLease, ARCT IV, and Cole, followed by the recent purchase of the Red Lobster portfolio, sale of the multi-tenant retail portfolio, and equity issuance, have made the Company's financials complicated and difficult to understand. So many moving pieces make the Company challenging for investors and analysts to model. Indeed, we believe the best evidence of this is that the Company itself seemingly cannot keep its own financials straight. On May 20th, in an 8-K filing in which it attempted to show its Pro Forma first quarter financial statements, the Company used an inaccurate share count; as a result, it was forced to file an amendment telling the market to disregard the previous filing, and a subsequent 8-K with new Pro Forma financials. ARCP's shares sold off on news of the inaccurate 8-K, and have yet to substantially recover . . . .

> It certainly did not help that the Company then made another mistake in its

filings. In the prospectus for its recent equity issuance, the Company stated the fees associated with the Red Lobster transaction were $108 million. On May 29th, the Company put out an 8-K disclosing that the fees were actually $10.8 million, and it had initially overstated the figure by a factor of 10. While we are relieved to know that the Company did not spend $108 million in fees to close a $1.5 billion portfolio acquisition, we are alarmed by what appear to be disorderly financial controls exposed by the Company's second material disclosure error in as many weeks.

We believe the existence of these errors is symptomatic of the larger problem: The Company is engaging in too many transformative transactions too quickly.

76.    On July 29, 2014, the Company issued a press release announcing its financial results for the second quarter of 2014.    The press release states in part:

Selected operating highlights for the quarter include:

- **Increased Revenues**: Increased revenues to $382.0 million, up 595.2% compared to the same period a year earlier.
- **Increased AFFO**: Increased AFFO to $205.3 million, up 429.0% compared to the same period a year earlier, and increased AFFO per share to $0.24, up 26% compared to the same period a year earlier.
- **Pro Forma AFFO Run Rate**: Pro forma normalized estimated AFFO run rate as of year-end 2014 of $1.18 - $1.20 per share including 2014 completed and announced transactions. This AFFO estimate does not include any balance sheet acquisitions in excess of our $4.5 billion 2014 guidance, no dispositions, no rent growth or G&A synergies for 2015 and assumes results for Cole Capital consistent with the Company's 2014 projection.
- **Acquisitions**: Completed $834.7 million of net lease acquisitions on the balance sheet and an additional $751.1 million of real estate assets on behalf of the Cole Capital managed funds.
- **Dispositions**: Sold eight properties for total net proceeds of $40.8 million, for a year—to—date total of 25 properties sold for $96.4 million.
- **Cole Capital Equity Raise**: Raised $161.0 million of capital on behalf of the managed REITs in the second quarter and $1.1 billion year-to-date as of June 30, 2014.
- **De-levered and Refinanced Debt**: Refinanced $282.2 million in Q2 with an average maturity of 1.9 years and a weighted average interest rate of 3.5%; $1.0 billion refinanced year-to-date as of June 30, 2014 with an average maturity of 2.0 years and a weighted average interest rate of 4.7%.   Pro forma net debt annualized adjusted EBITDA as of June 30, 2014 is 6.3x.

- **Improved Corporate Governance**: Terminated our investment relationship with CS Capital; took steps to eliminate independent directors' presence on the boards of any non-traded real estate investment trusts sponsored by AR Capital. LLC ("ARC"); enhanced intellectual diversity and leadership by expanding our Board in 2014 with four new members including William Stanley, Thomas Andruskevich, Bruce Frank and David Kay (Mr. Kay's appointment effective October 1) and establishing plans to add an additional independent director by year-end.   In addition, our directors will opt-out of the Maryland Unsolicited Takeover Act ("MUTA") allowing our stockholders the right to elect our entire Board of Directors at each annual meeting.   Further governance and compensation changes are described below.

* * *

**President's Comments on Operating Results**

"Our second quarter results and accomplishments are indicative of our focus on driving long-term value by delivering on our commitments as outlined in our June 20th stockholder letter," said David S. Kay, President of ARCP.   "In six months, we have fully integrated the organization, achieved $38.0 million of the $77.0 million of cost synergies to come in the first year, reduced leverage, de-risked the balance sheet, lengthened debt maturities, created $11.8 billion of unencumbered assets and significantly extended and upsized our credit facility.   With these actions undertaken and the formative stage of the company behind us, we are focused on the day-to-day operations of the company.   Through all of these undertakings, we are positioned for long-term success."

"Our balance sheet acquisitions in the quarter, owned and under contract, of 1,217 properties in over 210 separate transactions demonstrates the continuing systematic execution of our core acquisition strategy and testifies to the repeatability of our investment process.   As always, we see a tremendous volume of deals, but with only approximately $250 million of acquisitions remaining to transact in calendar year 2014 on the balance sheet to meet our previously announced $4.5 billion target, we intend to maintain a highly disciplined and selective approach to purchase the best assets for the portfolio.   Our real estate team remains able to self-originate and close transactions in a timely manner -both at a granular level and for large-scale sale-leasebacks.   This enables us to achieve superior pricing.   Moreover, by routinely culling through the existing portfolio, we are identifying further opportunities that can be realized by harvesting capital derived from non-core assets and re-deploying that capital in an accretive manner.   At the same lime, we are thoughtfully managing our debt portfolio by lengthening debt maturities and taking advantage of the current rate environment. The daily execution of these collective actions allows us to maintain our 2014 AFFO per share guidance of $1.13 - $1.19, while significantly

de-levering the balance sheet and maximizing value for our stockholders."

**Chairman's Comments on Corporate Governance**

"As I outlined in yesterday's stockholder letter, I have continued to focus my attention on improving corporate governance," said Nicholas S. Schorsch, Chairman and CEO of ARCP.   "With the support of our Board of Directors, we are improving our practices by eliminating related party transactions, enhancing disclosures, evaluating executive compensation, opting out of the MUTA to assure our stockholders' right to elect the entire Board at each annual meeting, and implementing other policies designed to improve our reporting and transparency, further align interest with our stockholders, and eliminate potential conflicts of interest.   Our goal is to constantly improve our corporate governance, which we expect will ultimately be reflected in our corporate governance scores.   All of these efforts are taken with a view toward creating long-term value for stockholders."

\* \* \*

AFFO for the six months ended June 30, 2014 totaled $353.1 million, or $0.49 per fully diluted share.

77.     On July 29, 2014, the Company filed its Form 10-Q for the quarter.   The Form 10-Q was signed by defendants Schorsch, Block, and McAlister.   Defendants Schorsch and Block certified that the financial statements were accurate and the Company's internal controls were adequate:

> In accordance with Rules 13a-15(b) and 15d-15(b) of the Securities Exchange Act, as amended (the "Exchange Act"), we, under the supervision and with the participation of our Chief Executive Officer and Chief Financial Officer, carried out an evaluation of the effectiveness of our disclosure controls and procedures (as defined in Rules 13a-15(e) and 15d-15(e) of the Exchange Act) as of the end of the period covered by this Quarterly Report on Form 10-Q and determined that the disclosure controls and procedures are effective.

78.     As later revealed, and alleged in detail below, the AFFO figures reported in this Form 10-Q and the associated press release were falsely overstated and the certifications attesting to the adequacy of the Company's internal controls were also false.

**F.**     **The Truth Begins To Be Revealed**

79.     On October 29, 2014, ARCP shocked the market when it filed a Form 8-K and press release disclosing wide-ranging errors in its financial statements and changes in accounting personnel.   The Form 8-K states:

> **Item 4.02 Non-Reliance on Previously Issued Financial Statements or a Related Audit Report or Completed Interim Review.**
>
> On October 24, 2014, the Audit Committee of the Board of Directors (the "Audit Committee") of ARCP Capital Properties, Inc. (the "Company") concluded that the previously issued audited consolidated financial statements and other financial information contained in the Company's Annual Report on Form 10-K. for the fiscal year ended December 31, 2013, the previously issued unaudited financial statements and other financial information contained in the Company's Quarterly Reports on Form 10-Q for the fiscal periods ended March 31, 2014 and June 30, 2014, and the Company's earnings releases and other financial communications for these periods (collectively, the "Prior Financial Information") should no longer be relied upon.
>
> The Audit Committee based its conclusion on the preliminary findings of its investigation into concerns regarding accounting practices and other matters that first were reported to the Audit Committee on September 7, 2014.   The Audit Committee promptly initiated an investigation, which is being conducted with the assistance of independent counsel and forensic experts.
>
> The investigation conducted to date has not uncovered any errors in the consolidated financial statements (prepared in accordance with U.S. GAAP) for the three months ended March 31, 2014.   However, based on the preliminary findings of the investigation, the Audit Committee believes that the Company incorrectly included certain amounts related to its non-controlling interests in the calculation of adjusted funds from operations ("AFFO"), a non-U.S. GAAP financial measure, for the three months ended March 31, 2014 and, as a result, overstated AFFO for this period.   The Audit Committee believes that this error was identified but intentionally not corrected, and other AFFO and financial statement errors were intentionally made, resulting in an overstatement of AFFO and an understatement of the Company's net loss for the three and six months ended June 30, 2014.
>
> As discussed in Item 5.02 of this Current Report on Form 8-K, at the request of the Audit Committee, the Company's Chief Financial Officer and Chief Accounting Officer have resigned.
>
> Nothing has come to the attention of the Audit Committee that leads it to believe

that there are any errors in the Company's previously issued audited consolidated financial statements contained in the Company's Annual Report on Form 10-K for the fiscal year ended December 31, 2013.   However, the Audit Committee has expanded its investigation to encompass the Company's audited consolidated financial statements for the fiscal year ended December 31, 2013 in light of the fact that the Company's former Chief Financial Officer and former Chief Accounting Officer had key roles in the preparation of those financial statements.

Based on the preliminary findings of the investigation, the Company has identified the potential adjustments set forth in Exhibit 99.1 to this Report to the Company's reported net loss in accordance with U.S. GAAP for the three and six months ended June 30, 2014 and to reported AFFO (a non-U.S. GAAP financial measure described in Exhibit 99.1) for the three months ended March 31, 2014 and the three and six months ended June 30, 2014.   Note that, in calculating AFFO for the first quarter of 2014, the Company presented activity from non-controlling interests on a net basis, while in the second quarter of 2014, as permitted, the Company presented its activity from non-controlling interests on a gross basis (which it will continue to do in calculating AFFO in future periods). The weighted average number of shares used in calculating AFFO differs depending on whether the net or gross method is used (but does not change for purposes of calculating net loss per share in accordance with U.S. GAAP).   The investigation is ongoing ami there can be no assurance that the potential adjustments set forth in the table below will not change based upon the final results of the investigation, and any such change could be material.

The Company will work with the Audit Committee and the Audit Committee's independent advisors to determine the adjustments required to be made to the Prior Financial Information as expeditiously as possible.   Upon the completion of this process, which could identify further adjustments in addition to those discussed above, the Company will restate the Prior Financial Information and amend its prior periodic filings to the extent required.   The Company will file its Quarterly Report on Form 10-Q for the quarter ended September 30, 2014 after the amended filings have been made.

In light of the preliminary findings of the Audit Committee's investigation, the Company is reevaluating its internal control over financial reporting and its disclosure controls and procedures. The Company intends to make the necessary changes to its control environment to remediate all control deficiencies that are identified as a result of the ongoing investigation and the restatement process.

80.     The accompanying press release corrected the Company's three-month results for the periods ended March 31, 2014 and June 30, 2014, as well as the six-month results for the six months ended June 30, 2014.   The adjustments were as follows:

|  | 1Q 2014 | 2Q 2014 | 1H 2014 |
|---|---|---|---|
| Originally reported AFFO: | $147,780,000 | $205,278,000 | $353,058,000 |
| Restated AFFO: | $135,806,000 | $194,409,000 | $330,215,000 |
| AFFO Difference: | ($11,974,000) | ($10,869,000) | ($22,843,000) |
| Originally reported net loss: | $332,313,000 | $63,419,000 | $395,732,000 |
| Restated net loss: | N/A | $72,661,000 | $404,974,000 |
| Net loss difference: | -- | ($9,242,000) | ($9,242,000) |

81.    The press release implies that defendants McAlister and Block were solely responsible for the improper accounting and announced that they had resigned "effective immediately."   The press release also contains an unusual statement in support of management made by the Board, notwithstanding the concurrent admission that the account errors were intentionally caused.   The Board reviewed this press release prior to its issuance as evidenced by this express statement purporting to convey Board sentiment.   The lack of basis for the Board's support for management is clearly evident in the following paragraphs presented consecutively in the press release:

Although the Board is disappointed in these developments, *the Board has full confidence in the management team and staff.* The Audit Committee, Board and management team are fully committed to resolving this matter in an expedited and thorough manner. *The Board continues to support management's efforts* surrounding the simplification of the business, enhancements in transparency, and improvements to the predictability of our earnings, all with the goal of enhancing long-term value.

The Audit Committee's investigation conducted to date has not uncovered any errors in the consolidated financial statements (prepared in accordance with U.S. GAAP) for the three months ended March 31, 2014. However, based on the preliminary findings of the investigation, the Audit Committee believes that the Company incorrectly included certain amounts related to its non-controlling interests in the calculation of adjusted funds from operations ("AFFO"), a non-U.S. GAAP financial measure, for the three months ended March 31, 2014 and, as a result, overstated AFFO for this period. *The Audit Committee believes that this error was identified but intentionally not corrected, and other AFFO and financial statement errors were intentionally made*, resulting in an overstatement of AFFO and an understatement of the Company's net loss for the three and six months ended June 30, 2014.

The Audit Committee has indicated that nothing has come to its attention that leads it to believe that there are any errors in the Company's previously issued audited consolidated financial statements for the fiscal year ended December 31, 2013 contained in the Company's 2013 Form 10-K. However, the Audit Committee has expanded its investigation to encompass the Company's audited financial statements for this period *in light of the fact that the Company's former Chief Financial Officer and former Chief Accounting Officer had key roles in the preparation of those financial statements.*

(Emphasis added.)

82. On this news, ARCP stock fell from $12.38 per share at close on October 28, 2014 to $10.00 per share at close the next day.

83. Also on October, 29, 2014, *The Wall Street Journal* published an article titled "SEC to Open Inquiry into ARCP Capital's Accounting," stating in part:

One of the largest U.S. real-estate empires was battered Wednesday by its disclosure of an accounting mistake and subsequent cover-up that forced the resignations of two top executives, slashed its flagship company's stock-market value by 19% and sparked a regulatory probe.

ARCP Capital Properties Inc., the primary holding of property mogul Nicholas Schorsch, said in a securities filing that it asked its chief financial officer and chief accounting officer to resign after determining the company had overstated a measure of income in the first quarter, and that the executives chose not to correct the error in the second quarter.   Shares of three other companies overseen by Mr. Schorsch also fell.

The Securities and Exchange Commission intends to launch an inquiry into the accounting irregularities, according to a person familiar with the matter.

The revelation is a black eye for Mr. Schorsch, chairman of ARCP Capital and one of the biggest real-estate investors in the U.S.   The college dropout and son of a scrapyard owner in recent years embarked on an acquisition spree that fueled one of the swiftest rises in the real-estate world.

* * *

Standard & Poor's on Wednesday placed ARCP Capital's triple-B-minus credit rating, which is one notch above so-called junk status, on watch for possible downgrade.

The accounting incident sent shock waves through the real-estate industry, where

40

Mr. Schorsch has raised tens of billions of dollars in recent years, much of it from individual investors.

* * *

Mr. Block didn't respond to requests for comment.   A spokeswoman for Grant Thornton LLP, ARCP's auditor, declined to comment.   Ms. McAlister couldn't be reached for comment.

* * *

Analysts suggested it was too soon to assess the damage to the company or Mr. Schorsch's broader empire.   Some investors "may throw in the towel on today's news, as accounting missteps take a while to sort out," Paul Adornato, a REIT analyst with BMO Capital Markets, said in a client note.   "Confidence takes longer to return, if ever."

Others said the errors could directly undermine ARCP Capital's growth strategy, which has relied on tapping the debt and equity markets for capital to pay for acquisitions.

The company's "credibility is likely impugned for some period of time," wrote J.P. Morgan analyst Anthony Paolone, adding that "capital costs will be higher in the near term . . . thus making growth more difficult."

Investors also are worried the timing of the accounting revelations could imperil a deal that ARCP Capital announced earlier this month, according to a person familiar with the matter.   On Oct. 1, the company said that it would sell its private capital-management business, Cole Capital, which raises money for nontraded REITs, for $700 million to RCS Capital Corp., another company chaired by Mr. Schorsch.

84.     On October 30, 2014, the Company conducted a conference call for analysts and investors to discuss the accounting manipulation.   During the call, defendant Kay explained the wrongdoing this way:

The best way that I can describe what happened there is that we don't have bad people, we had some bad judgment there. And we had 2 employees which have resigned as a result of the effects of that calculation and the nondisclosure of the error in the first quarter.

* * *

This isn't the ideal situation, but I think that it is not the parade of horribles that the market may view this as today. We have an exceptional team that runs this company. It's an ethical team.

85.     Also beginning on October 30, 2014, at least ten securities class actions and four shareholder derivative actions were filed against ARCP and its officers and directors.

86.     On October 31, 2014, *Reuters* reported the FBI and the U.S. Attorney for the Southern District of New York had "opened a criminal probe of [ARCP]… in the wake of the accounting errors."

87.     On November 3, 2014, Wells Fargo suspended equity research coverage of ARCP citing the reports of the FBI and U.S. Attorney's office had both opened criminal probes into the Company.

88.     On November 3, 2014, RCS issued a press release disclosing it would terminate its agreement to acquire Cole Capital in a transaction that had been valued at approximately $700 million.   The press release stated in part:

> NEW YORK, Nov. 3, 2014 /PRNewswire/ -- RCS Capital Corporation ("RCAP") (RCAP), announced today that it has terminated the previously disclosed definitive agreement to acquire Cole Capital Partners, LLC and Cole Capital Advisors, Inc. (together, "Cole Capital") from American Realty Capital Properties, Inc. (ARCP).
>
> In addition, concurrently with the termination of the definitive agreement to acquire Cole Capital, the previously disclosed interim sub-advisory agreements entered into on October 22, 2014 among RCAP and the five non-traded REITs sponsored and advised by Cole Capital were terminated, and the wholesaling agreements entered into on October 22, 2014 between Realty Capital Securities, LLC ("RCS"), a subsidiary of RCAP, and Cole Capital Corporation, a subsidiary of Cole Capital, whereby Cole Capital engaged RCS to act as its distribution agent for the three non-traded REITs for which it currently serves as dealer-manager, were terminated.

89.     By close of the markets November 3, 2014, ARCP stock had fallen to $7.85 per share, an all-time low approximately 45% below the price of ARCP stock a mere week earlier.

90.     On November 4, 2014, *Bloomberg* published an article titled "American Realty Accounting Errors Roil Real Estate Empire," reporting in part:

Nov. 5 (Bloomberg) -- The accounting scandal at American Realty Capital Properties Inc. is threatening to upend a real estate empire built by Nicholas Schorsch in an industry where reputation propels growth.

The disclosure last week that accounting errors were intentionally concealed at the real estate investment trust, leading to the resignation of two executives, has erased almost $4 billion in market value, sparked an FBI investigation and a review by the Securities and Exchange Commission. It also is leading some brokers to halt sales tied to Schorsch's AR Capital LLC, the biggest sponsor of nontraded REITs.

The accounting mistakes are weighing on other parts of the web of companies created by Schorsch, the 53-year-old chairman of New York-based American Realty Capital Properties and its chief executive officer until last month. The REIT now faces the challenge of regaining investors' trust, as does AR Capital, which uses brokers to sell shares to individual investors who only need Google to find the recent travails.

"It's the intentional nature of the error" that raises concern, said Kevin Gannon, president and managing director at Robert A. Stanger & Co., a Shrewsbury, New Jersey-based investment bank that compiles data on nontraded REITs. "This industry is all about credibility. People will raise money for you but they have to be confident that you're a straight shooter. We hope they demonstrate that this is an isolated incident."

***

RCS Capital

Another Schorsch company, RCS Capital Corp., is an investment firm with businesses including raising money for AR Capital and other nontraded REITs. That company -- whose shares have plunged more than 40 percent since the news of the accounting issues on Oct. 29 -- this week pulled out of a deal to buy American Realty Capital Properties's [sic] Cole Capital private-capital management unit.

RCS, where Schorsch is chairman, today took steps to distance itself from American Realty Capital Properties, emphasizing that it's a separate company from American Realty Capital with a distinct board and management. RCS learned of the accounting matters with the rest of the market on Oct. 29, the company said in a statement.

***

Deal Spree

The REIT has completed more than 20 acquisitions since its inception, according to data compiled by Bloomberg. The company's stock price rose to as high as

43

$17.82 in May 2013.

"There were many people in the space who raised concerns about very rapid growth," said Barry Vinocur, the editor of REIT Wrap, an industry newsletter. "When you grow that rapidly the risk is things may fall through the cracks. Then, there were those who downplayed those concerns saying those raising them were envious."

* * *

Broker Sales

The concerns are spilling into AR Capital. LPL Financial Holdings Inc. said yesterday it is indefinitely suspending sales of investment products sponsored by companies tied to American Realty and RCS. Securities America, a broker-dealer with more than 1,800 advisers, also has suspended sales for two REITs --- Cole Capital Properties V and Phillips Edison - ARC Grocery Center REIT II, the company said in a statement.

Sandlapper Securities LLC, an independent broker-dealer based in Greenville, South Carolina also suspended orders for AR Capital REITs, CEO Trevor Gordon said in a phone interview.

"This accounting error is very troubling to us," Gordon said. "Is this an isolated incident or a systemic problem? We're stepping back at this moment in time. We're not terminating our agreement but we're suspending new purchases for the time being."

***

Ron Edde, CEO of San Diego-based Millennium Career Advisors, a recruiting firm for financial advisers, said the recent headlines make brokers that sell to individual investors nervous.

"Any time your firm gets a public black eye, especially a high-profile black eye, that makes clients nervous," Edde said. "It makes brokers nervous because they don't want to lose clients. No broker in any firm wants to see their nose bloodied in the press."

* * *

Due Diligence

"Most of the independent broker-dealers that sell nontraded REITs have some due-diligence effort in order to vet the sponsors of the nontraded REITs," Adornato said in a telephone interview from New York. "It would be difficult if

not impossible for any broker to sell shares in any Cole product until the investigation into ARCP/Cole's financial controls is satisfactorily completed."

91.     On November 7, 2014, *The Wall Street Journal* published an article titled "ARCP Capital Accounting Errors Tied to Employee Bonuses," reporting in part:

> The accounting irregularities disclosed last week by American Realty Capital Properties Inc. were tied in part to the computation of bonus payments, according to a member of the company's board.
>
> * * *
>
> The mistake stemmed from computing bonuses, said former Pennsylvania Gov. Edward Rendell, who has served as an independent director of the company since February 2013 and sits on its audit committee. The results were "incorrect because [executives] fudged something about bonuses to cover up a prior mistake."
>
> * * *
>
> "Everyone in the market is making a mountain out of a molehill here," Mr. Rendell said. "This doesn't go to the core business at all. It doesn't go to what the company does."
>
> * * *
>
> Nicholas Schorsch, who served as chief executive of American Realty Capital Properties until last month and remains chairman, drew scrutiny over the summer after the company proposed a $222.1 million incentive compensation pool from which Mr. Schorsch stood to earn $94.4 million over the next five years provided the company met performance goals. Shareholders voted against the pay package in a nonbinding vote in June. Mr. Schorsch didn't respond to a request for comment.
>
> * * *
>
> CEO David Kay said during a conference call last week that second-quarter financial results incorrectly omitted about $10.5 million in accruals. Further details about the mistakes weren't known, and Mr. Rendell declined to provide additional comment on the bonus payments.
>
> According to the company's most recent proxy statement, Mr. Kay was set to earn a target cash bonus of 250% of his base salary of $600,000 and an equity bonus worth 350% of the same base salary. Mr. Kay didn't respond to a request for comment. A spokesman said he has elected to take his bonus in stock rather than

cash.

Brian Block, the former chief financial officer who resigned last week over the accounting irregularities, was in line to receive a cash bonus worth 250% of his base salary of $500,000 and an equity bonus worth 350% of his base salary as part of the performance plan.

92.     On November 14, 2014, the Company filed a Form 8-K with the SEC revealing some of the harm incurred by ARCP in connection with the wrongdoing.   The Form 8-K disclosed that due to the accounting manipulation, the Company was forced to seek consent from its lenders under its unsecured credit facility for an extension of time to deliver its third quarter 2014 financial statements.   ARCP was successful in obtaining the consent, but in return was forced to "permanently reduce the maximum amount of indebtedness [under the credit facility] from $4.65 billion to $4.0 billion" and "until the 2013 and 2014 financial statements are filed with the [SEC], the maximum principal amount of indebtedness outstanding under the unsecured credit facility is temporarily reduced to $3.6 billion."   Thus, due to the wrongdoing, the Company was already experiencing a credit crunch and had lost access to over *$1 billion* in credit in the short term and *$650 million* permanently.

93.     On December 15, 2014, ARCP filed a Form 8-K and issued a press release disclosing that defendants Schorsch, Kay, and Beeson had resigned.   The Form 8-K states defendant Schorsch "resigned as Executive Chairman and a director" of ARCP and "also resigned from all other employment and board positions that he held at the Company and its subsidiaries and certain Company-related entities . . . ."   The press release accompanying the Form 8-K states:

NEW YORK, NY December 15, 2014 – American Realty Capital Properties, Inc. ("ARCP") (NASDAQ: ARCP) today announced that Nick Schorsch has stepped down as Executive Chairman of ARCP and from the ARCP Board of Directors and the Boards of Directors of the non-traded REITs managed by Cole Capital. William Stanley, Lead Independent Director, will assume the role of Chairman on

an interim basis until a replacement can be found.

In connection with Mr. Schorsch's departure as Executive Chairman, ARCP will be unwinding all of its relationships with entities in which Mr. Schorsch maintains an executive or director-level role or is a significant stockholder. These steps will not only enhance the Company's corporate governance structure but will also lead to further simplification of its business relationships.

Mr. Stanley said, "The steps taken today enhance ARCP's corporate governance structure, increase transparency and further simplify its business relationships. We thank Nick for his vision and years of service on behalf of ARCP, and wish him well in his continuing business endeavors."

94.     On December 16, 2014, Moody's downgraded ARCP's unsecured debt as follows: "Senior unsecured shelf to (P)Ba1, from (P)Baa3; subordinate shelf to (P)Ba2, from (P)Ba1; preferred stock shelf to (P)Ba2, from (P)Ba1."   According to Moody's "[o]bligations rated Ba are… subject to substantial credit risk," and are below investment grade.   *The Wall Street Journal* published an article summarizing this news titled "Moody's Cuts American Realty Capital Properties to Junk."

## G.      **McAlister Sues ARCP, Schorsch and Kay for Defamation**

95.     On December 18, 2014, defendant McAlister filed a complaint in New York Supreme Court in New York County against ARCP, Schorsch and Kay, asserting claims of defamation per se in an action captioned *Lisa Pavelka McAlister v. ARCP Capital Properties, Inc., et al.*, Index No. 162499/2014 (Sup. Ct. N.Y. Cnty.) (the "McAlister Complaint").   The allegations of the McAlister Complaint starkly contradict ARCP's public statements regarding the accounting manipulation and demonstrate that in addition to the underlying wrongdoing, defendants engaged in a cover-up.

96.     The McAlister Complaint alleges beginning in or about February 2014, defendant McAlister "repeatedly informed" defendants Schorsch, Kay, and "senior management" she had discovered that in the fourth quarter of 2013, "and possibly in earlier quarters, suddenly and

without any apparent justification or basis," the Company had changed the method by which it was reporting AFFO relative to previous quarters. According to the McAlister Complaint, when defendant McAlister became aware of this, she informed defendants Schorsch, Kay and senior management that:

> [W]hile in quarters previous to 2013 Q4, or the earlier quarter in which the Company first changed its AFFO accounting methods (the "Change Quarter"), the Company, in its Securities and Exchange Commission ("SEC") 10Q filings, had correctly added back to AFFO only the Company's *pro rata* share of certain non-recurring transaction and deferred financing costs - appropriately ensuring that the portion of such costs allocable to other holders of limited partnership interests in the Company's operating partnership, ARC Properties Operating Partnership LP, not be added to the Company's AFFO - beginning in the Change Quarter, the Company suddenly ceased pro-rating the non-recurring transaction and deferred financing costs on its 10K and 10Q filings, opting instead to add to and increase the Company's AFFO by the entirety of the added-back costs, instead of only the Company's *pro rata* share thereof.

97. However, "in an apparent effort to avoid public disclosure of its faltering financial performance," ARCP *continued* to use this improper and misleading accounting "at the specific direction" of defendants Schorsch and Kay until approximately July 28, 2014, when defendant Schorsch allegedly directed defendant Block to "reallocate the funds used to calculate the AFFO and shift the numbers on the 2014 second quarter 10Q report." The McAlister Complaint recounts that defendants Schorsch and Kay conceived of a scheme to cover-up the fraud by changing the beginning point for the AFFO calculation.

98. The McAlister Complaint alleges that defendant McAlister was terminated in retaliation for "blowing the whistle on ARCP and to use her publicly as a scapegoat for Defendants' fraudulent conduct," and that the Company had falsely blamed her for the accounting problems.

99. The parties ultimately resolved defendant McAlister's action for an undisclosed amount and on February 19, 2015, entered a stipulation of discontinuance.

48

100.     On February 9, 2015, Corvex Management LP, a shareholder of ARCP, wrote an

open letter to the Board, and to prospective candidates for the new CEO position in particular,

stating as follows:

> As you are most certainly aware, ARCP's shareholders have suffered through the
> destruction of billions of dollars in shareholder value resulting from grossly
> conflicted self-dealing, an alleged accounting fraud and general mismanagement.
> *We could write a long list looking backwards at all of the misdeeds committed by
> this Company and overseen by this Board* . . . .   As such, we believe that any
> candidates for CEO or Chairman should be committed to the following in order to
> bring about a fresh opportunity for value creation at ARCP (which we are
> confident any high quality candidate would eagerly embrace) . . . .   *Commit to
> having a board of truly independent directors* including elimination of the current
> Board members from all positions with the company.

(Emphasis added.)

101.     Similarly, on February 27, 2015, Dutch pension fund PGGM spefically called for

the resignation of defendants Stanley, Michelson, Rendell and Andruskevich, stating:

> In our view, *ARCP needs to completely refresh the Board's membership in order
> to ensure a cultural change that will foster strong corporate governance*. We are
> convinced that a truly independent Board is necessary to choose a new
> management team for ARCP. *We believe that any Board member with current or
> past ties to Nicholas Schorsch or to his affiliated entities could be subject to
> inherent conflicts of interest* that could compromise the selection process for the
> new CEO and Chairman. This selection process will be of crucial importance in
> ensuring that all successful candidates are free from any real or perceived
> conflicts of interest.
>
> *Given the composition of the Board at this time, which includes Board members
> with current or past ties to Nicholas Schorsch or to his affiliated entities,*[4] *we are
> concerned that the Board lacks sufficient depth and true independence*. We
> therefore believe it absolutely necessary that the current Board consult with
> shareholders throughout this process. To be explicit, we would like to see:
>
> * * *
>
> - The resignation of *Mr. Stanley*, Mr. Michelson, Mr. Rendell and *Mr.
>   Andruskevich* from the Board upon the completion of the search process

---

[4]      At the time, defendants Frank, Stanley, and Andruskevich were members of ARCP's
Board.

for, and announcement of the appointment of, the new CEO, Chairman and truly independent Board members. Given that Mr. Frank has been appointed to the Board no earlier than July 2014, we believe that retaining him will deliver the desired continuity in the Board.

In our view, *ARCP needs to completely refresh the Board's membership in order to ensure a cultural change that will foster strong corporate governance.* We are convinced that a truly independent Board is necessary to choose a new management team for ARCP. *We believe that any Board member with current or past ties to Nicholas Schorsch or to his affiliated entities could be subject to inherent conflicts of interest* that could compromise the selection process for the new CEO and Chairman. This selection process will be of crucial importance in ensuring that all successful candidates are free from any real or perceived conflicts of interest.

(Emphasis added.)

## H.   <u>The Restatement</u>

102.   On March 2, 2015, the Company issued a press release announcing the filing of its restated financial reports for the full years 2012 and 2013, the first, second, and third quarters of 2013, and the first and second quarters of 2014.   The press release states in part:

The Audit Committee investigation reported the following key findings:

- Net loss was understated for 2013 (including each quarter of 2013) and the second quarter of 2014. Net loss was overstated for the first quarter of 2014. AFFO was overstated for 2011, 2012, 2013 (including each fiscal quarter of 2013) and the first two quarters of 2014.

- The Audit Committee's investigation identified certain payments made by the Company to ARC Properties Advisors, LLC and certain of its affiliates that were not sufficiently documented or otherwise warrant scrutiny. The Company has recovered consideration valued at approximately $8.5 million in respect of certain such payments that the Company concluded were inappropriate.

- The investigation found that equity awards made to two former executives in connection with the Company's transition to self-management contained provisions that, as drafted, were more favorable to such executives than the Compensation Committee of the Company's Board of Directors had approved.

- The investigation found certain material weaknesses in the Company's

internal controls over financial reporting and its disclosure controls and procedures.

"The restatement of our financial statements is an important milestone for ARCP and enables the Company to put this matter behind us," said William Stanley, interim Chairman and Chief Executive Officer of ARCP. "The Board moved swiftly to put in place new senior management, realign the Board committee compositions, appoint an interim Chief Executive Officer, and conduct an extensive review of the Company's financial statements, accounting policies, financial controls and corporate governance, with the assistance of the new management team. Importantly, the investigation did not identify any material changes relating to our real estate ownership, the validity of our leases or our fundamental business operations. With the restatement, we are moving swiftly to appoint a new Chief Executive Officer and independent Chairman of the Board, which we hope to announce in the near term, and will focus on bringing our financial controls and corporate governance to world-class standards as a leading net lease REIT."

Mr. Stanley reiterated the strength of the Cole Capital platform: "At Cole Capital, the team is turning its attention to normalizing relationships with its broker-dealer partners and clearing firms, as well as re-engaging its financial advisor network. We are optimistic that we can quickly build momentum and resume the normal course of business operations soon."

The restatements had the following effects:

- Previously reported net loss attributable to stockholders, and net loss per share will be increased while AFFO (net method) and AFFO per share will be decreased by approximately $16.8 million, $0.08 per share, $43.9 million and $0.20 per share, respectively, for the full year 2013, as compared to originally reported amounts.

- Previously reported net loss attributable to the Company, net loss per share, AFFO (net method) and AFFO per share will be decreased by approximately $17.2 million, $0.03 per share, $38.5 million and $0.07 per share, respectively, for the three months ended March 31, 2014, as compared to originally reported amounts.

- Previously reported net loss attributable to the Company and net loss per share will be increased while AFFO (gross method) and AFFO per share will be decreased by approximately $14.4 million, $0.02 per share, $19.3 million and $0.03 per share, respectively, for the three months ended June 30, 2014, as compared to originally reported amounts.

103.     Also on March 2, 2015, the Company filed its Form 10-Q for the third quarter of

2013, which disclosed in part:

> The Company failed to implement and maintain an effective internal control environment that had appropriate processes to manage the changes in business conditions resulting from the volume and complexity of its 2013 and first quarter 2014 transactions, combined with the pressure of market expectations inherent in announcing AFFO per share guidance for 2014.

104.     On the same day, the Company filed its amended Form 10-K for the 2013 fiscal

year which states in part:

> The investigation found that Adjusted Funds From Operations ("AFFO"), a non-GAAP measure presented in the Company's SEC filings and other financial communications, was overstated for fiscal year 2011, fiscal year 2012, fiscal year 2013 (including each fiscal quarter of 2013) and, as previously disclosed in the October 29 8-K, the first two fiscal quarters of 2014. Senior management considered AFFO to be an important metric used by analysts and investors in evaluating the Company's performance and, for the first two quarters of 2014, sought to maintain reported AFFO within the 2014 guidance range of $1.13 to $1.19 per share announced at the end of 2013. The overstatements of AFFO were due in part to errors in reflecting amounts attributable to the limited partnership interests in the Company's operating partnership, ARC Properties Operating Partnership, L.P., held by holders other than the Company (known as non-controlling interests or "NCI"). Prior to the filing of the Quarterly Report on Form 10-Q for the first quarter of 2014, some members of senior management were aware of NCI errors but allowed the report to be filed without completing an analysis of the errors. In the Company's Quarterly Report on Form 10-Q for the second quarter of 2014, as previously reported in the October 29 8-K, the NCI errors in the first quarter were intentionally not corrected, and other AFFO and financial statement errors were intentionally made, resulting in an overstatement of AFFO and an understatement of the Company's net loss for the three and six months ended June 30, 2014. See "Management's Discussion and Analysis of Financial Condition and Results of Operations – Sources of Funds – Funds from Operations and Adjusted Funds from Operations (As Restated)" in Item 7 of this Form 10-K/A.

> The investigation identified certain payments made by the Company to ARC Properties Advisors, LLC (the "Former Manager") and certain affiliates of the Former Manager that were not sufficiently documented or otherwise warrant scrutiny. The Company has recovered consideration valued at approximately $8.5 million in respect of certain such payments. The Company is considering whether it has a right to seek recovery for any other such payments and, if so, its alternatives for seeking recovery. No asset has been recognized in the financial

statements related to any potential recovery. See Note 19-Related Party Transactions and Arrangements (As Restated) to the consolidated financial statements in this Form 10-K/A.

The investigation found that the agreements relating to equity awards made to Nicholas S. Schorsch and Brian S. Block in connection with the transition from external to internal management of the Company contained provisions that, as drafted, were more favorable to them than the Compensation Committee of the Company's Board of Directors (the "Compensation Committee") had authorized. At the time the awards took effect, Mr. Schorsch was the Company's Executive Chairman and Chief Executive Officer and Mr. Block was the Company's Chief Financial Officer. Immediately prior to his resignation from the Company, Mr. Schorsch and the Company agreed that the terms of his equity awards should have been consistent with the Compensation Committee's authorization. In connection with their resignations from the Company, Mr. Block relinquished all of his equity awards and Mr. Schorsch relinquished all of his equity awards other than 1,000,000 shares of restricted stock, the vesting of which was accelerated. These shares are subject to clawback by the Company if, in any proceeding, after all appeals, Mr. Schorsch is found to have breached his fiduciary duty of loyalty or is found to have committed or admits to fraud or misconduct in connection with his responsibilities as a director or officer of the Company.

\* \* \*

In reviewing its AFFO methodology, the Company has determined that it is appropriate to include certain adjustments that were not included in the previously reported AFFO calculation.

\* \* \*

In reviewing its AFFO methodology, the Company has determined that it was not appropriate to adjust for operating fees incurred to affiliates as these expenses represent operating expenses that are typical for the industry

\* \* \*

**Material Weaknesses in Disclosure Controls and Procedures** – The Company's disclosure controls and procedures were not properly designed or implemented to ensure that the information contained in the Company's periodic reports and other SEC filings correctly reflected the information contained in the Company's accounting records and other supporting information and that AFFO per share (a non-GAAP measure that is an important industry metric) was correctly calculated. In addition, the Company did not have appropriate controls to ensure that its SEC filings were reviewed on a timely basis by senior management or that significant changes to amounts or other disclosures contained in a document that had previously been reviewed and approved by the Audit

Committee were brought to the attention of the Audit Committee or its Chair for review and approval before the document was filed with the SEC. Finally, the Company did not have appropriate controls over the formulation of AFFO per share guidance or the periodic re-assessment of the Company's ability to meet its guidance.

**Material Weaknesses in Internal Control Over Financial Reporting** – A material weakness is defined as a deficiency, or a combination of deficiencies, in internal control over financial reporting such that there is a reasonable possibility that a material misstatement of our annual or interim financial statements will not be prevented or detected on a timely basis.

During 2013, due in part to a number of large portfolio acquisitions, the Company experienced significant growth and increases in the complexity of its financial reporting and number of non-routine transactions. In late 2013, as a result of three impending transactions – the transition to self-management announced in August 2013 and effective on January 8, 2014, the acquisition of ARCT IV announced in July 2013 and completed on January 3, 2014 and the acquisition of Cole Real Estate Investments, Inc. announced in October 2013 and completed on February 7, 2014 – the complexity of the Company's transactions and the need for accounting judgments and estimates became more prevalent and had a severe impact on the Company's control environment. These changes in business conditions, combined with the pressure of market expectations inherent in announcing AFFO per share guidance for 2014, demanded an enhanced control environment.

The control environment, as part of the internal control framework, sets the tone of an organization, influencing the control consciousness of its people and providing discipline and structure. Current management identified the following material weaknesses through its re-assessment of the Company's internal control over financial reporting:

**Related Party Transactions and Conflicts of Interest** – The Company did not maintain the appropriate controls to assess, authorize and monitor related party transactions, validate the appropriateness of such transactions or manage the risks arising from contractual relationships with affiliates. Without the appropriate controls, the Company made certain payments to the Former Manager and its affiliates that were not sufficiently documented or that otherwise warrant scrutiny.

**Equity-Based Compensation** – The Company did not maintain appropriate controls over various grants of equity-based compensation. In the fourth quarter of 2013, in anticipation of the Company's transition to self-management, the Company entered into employment agreements with the Company's former Executive Chairman and Chief Executive Officer and its former Chief Financial Officer, and also approved the 2014 Outperformance Plan pursuant to which awards were made to them on January 8, 2014. Without the appropriate controls,

these documents contained terms that were inconsistent with the terms authorized by the Compensation Committee. Additionally, the Company did not obtain copies of or administer the equity awards made by means of block grants allocated by the Former Manager and its affiliates, nor did the Company review the awards for consistency with the Compensation Committee's authorization.

**Aggregation of Significant Deficiencies Within Business Process-Level Control Activities and Financial Reporting Controls** – The following significant deficiencies together constitute a material weakness:

> **Accounting Close Process** – The Company did not have consistent policies and procedures throughout its offices relating to purchase accounting, accounting for gain or loss on disposition and testing for impairment. In addition, senior management did not establish clear reporting lines and job responsibilities or promote accountability over business process control activities.

> **Critical Accounting Estimates and Non-Routine Transactions** – The Company did not maintain effective controls or develop standardized policies and procedures for critical accounting estimates and non-routine transactions, including management review and approval of the accounting treatment of all critical and significant estimates on a periodic basis.

105. On March 3, 2015, RDG Capital Fund Management, LP wrote an open letter to the Board, calling for shareholder involvement in the selection of a new Board and management, and further stating as follows:

> *We believe the Board of Directors of ARCP (the "Board") has lost the confidence of the Company's shareholders in light of recent management turmoil, admission of material weaknesses in the Company's internal controls over financial reporting, and revelations concerning alleged malfeasance* . . . . While we respect individual Board members' personal credentials, it is apparent to us that ARCP has been plagued by *a toxic corporate culture* and *shareholders have lost confidence in the existing Board due to its failure to supervise former members of senior management* **who until only recently had the Board's full support**.

(Emphasis added.)

106. On March 30, 2015, the Company filed its Form 10-K for the 2014 fiscal year with the SEC. The Form 10-K stated the following in part:

In October 2013, the Compensation Committee approved an aggregate award pool to be measured by the General Partner's market capitalization as of the date of such approval; however, the OPP was definitively documented to measure market capitalization on a pro forma basis as of the General Partner's transition to self-management (including the pro forma impact of various transactions expected to be consummated prior to the General Partner's transition to self-management on January 8, 2014), which was calculated in December 2013. After the Audit Committee's and new management's review of the OPP, it was determined that *the Compensation Committee's intention in respect of the OPP was that the maximum award pool opportunity (the "2014 OPP Cap") should have been $120.0 million.*

(Emphasis added.)

## REASONS WHY ARCP'S FINANCIAL STATEMENTS WERE INACCURATE AND MISLEADING

107.    Defendants caused ARCP to issue pervasively inaccurate and misleading financial statements.   The intentional manipulation of the Company's financials included at least the following improper and illegal accounting practices:

    a.   understatement of expenses;

    b.   understatement of the Company's loss by improperly deferring current period expenses to subsequent periods;

    c.   failure to record millions of dollars in merger and other non-routine merger-related expenses;

    d.   recording of transfer tax liabilities in incorrect accounting periods;

    e.   failure to record bonus expenses on a timely basis;

    f.   recording general and administrative expenses in incorrect periods;

    g.   delayed recording of depreciation and acquisition related expenses;

    h.   capitalizing non-capitalizable expenses as assets and improperly amortizing them over time, instead of properly expensing them at the time of incurring them; and

    i.   failure to write down the value of impaired assets.

## DAMAGES TO THE COMPANY

108.    ARCP has been, and will continue to be, severely damaged and injured by the Individual Defendants' misconduct.   As a direct and proximate result of the Individual Defendants' conduct, ARCP has been seriously harmed and will continue to be.   Such harm includes, but is not limited to:

e.  Enormous legal costs incurred and to be incurred due to the wrongdoing alleged herein and defending the Company and defendants against a wide variety of civil and criminal investigations and lawsuits;

f.  Likely criminal and/or civil liability arising out of the various government investigations of ARCP;

g.  The loss of access to hundreds of millions of dollars in credit facilities due to the wrongdoing;

h.  Enormous loss of market capital;

i.  Loss of ability to access credit markets on favorable terms;

j.  Costs incurred and to be incurred due to the retention of outside advisors to assist in the internal investigations and in responding to the governmental investigations and subpoenas; and

k.  Incentive compensation wrongly paid to defendants as a result of the manipulated financial results.

109.    In addition, ARCP's business, goodwill, and reputation with its business partners, regulators, and shareholders have been gravely impaired.   The Company has still not held defendants accountable for their outrageous and intentional illegal acts.   As a result, the credibility and motives of management are in serious doubt, even after the hiring of a new CEO and the addition of new directors to the Board.

110.    The actions complained of herein have irreparably damaged ARCP's corporate image and goodwill.   For at least the foreseeable future, ARCP will suffer from what is known as the "liar's discount," a term applied to the stocks of companies who have been implicated in

illegal behavior and have misled the investing public, such that ARCP's ability to raise equity capital or debt on favorable terms has already been impaired and will be in the future.

## DERIVATIVE AND DEMAND ALLEGATIONS

111.   Plaintiff brings this action derivatively in the right and for the benefit of ARCP to redress injuries suffered by ARCP as a direct result of these breaches of fiduciary duty, waste of corporate assets, and unjust enrichment, as well as the aiding and abetting thereof, by the Individual Defendants.   ARCP is named as a nominal defendant solely in a derivative capacity. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have

112.   Plaintiff will adequately and fairly represent the interests of ARCP in enforcing and prosecuting its rights.

113.   Plaintiff was a shareholder of ARCP at the time of the wrongdoing complained of, and has continuously been a shareholder since that time, and is a current ARCP shareholder.

114.   Plaintiff made a demand on the Board to investigate and remedy the violations of law described herein as required by Maryland law.   As detailed below, the Board's conduct in response to the Demand shows that it rejected the Demand without evaluating its merits in good faith based on all information reasonably available to it.   And, as alleged below, the Board did not in fact act independently in its review of the Demand.   The Board's conduct upon receipt of the Demand and thereafter demonstrates not only that the Board did not fully inform itself during its consideration of the Demand, but also that the Board never considered the Demand in good faith, and rejected it for reasons unrelated to the merits of the claims and ARCP's best interests. Accordingly, the Board's refusal of the Demand is not a protected exercise of business judgment.

115.   On November 17, 2014, plaintiff sent the Demand to the Board.   The Demand states plaintiff owns 1,000 shares of ARCP, has owned those shares since prior to all dates in the

Demand, attached documentary proof of such ownership.   The Demand alleges that, as detailed above and admitted by the Company, multiple periods of ARCP's financial results were intentionally manipulated to artificially inflate AFFO.   The Demand states these intentional practices violated applicable law, overstated reported AFFO, and understated net loss, and gave rise to a criminal investigation by the FBI.

116.    The Demand asks the Board to "take action [including], the institution of an action for breach of fiduciary duty against any and all persons who are responsible" and to "seek appropriate remedial measures by obtaining damages from all persons who were unjustly enriched by permitting ARCP to engage in the wrongful activity or otherwise committed waste." The Demand specifically alleges that wrongdoing was committed by defendants Block and Schorsch, and that the Board, which at the time included defendants Frank, Andurskevich, and Stanley, had also breached its fiduciary duties.   A true and correct copy of the Demand is attached hereto as Exhibit A.

117.    Over two months later, on December 19, 2014, plaintiff's counsel received a response from ARCP's then-General Counsel, Richard A. Silfen stating the Demand had not yet been presented to the Board, but that it would be a "its next regularly scheduled meeting on the next scheduled board date."   The letter further requests, without basis, additional documentation of plaintiffs' share holdings and asks plaintiff to provide "any [additional] specific factual information" supporting the allegations in the Demand.   A true and correct copy of Mr. Silfen's December 19, 2014 letter is attached hereto as Exhibit B.

118.    Plaintiff, in a good faith effort to ensure the Demand received review by the Board, undertook the lengthy process required to obtain the additional requested proof of share ownership from her broker even though the Company's request for additional proof of holdings

was entirely without legal basis.   On February 10, 2015, plaintiff's counsel sent a letter to Mr. Silfen enclosing the unnecessary additional proof.   In this letter, plaintiff observed that there were fourteen actions brought by stockholders pending against the Company in this Court and that those actions generally arose out of the same facts as the wrongdoing at issue in the Demand.   Plaintiff's counsel concluded the letter by requesting Mr. Silfen confirm receipt of the letter and provide information regarding the Board's response.   A true and correct copy of plaintiff's February 10, 2015 letter is attached hereto as Exhibit C.

119.   Nearly a month went by and plaintiff had received no response whatsoever from the Company, the Board, or Mr. Silfen.   On March 6, 2015, plaintiff's counsel hand delivered another letter to Mr. Silfen at ARCP's headquarters in Manhattan, New York stating plaintiff had received no response to her February 10, 2015 letter and asking: "[p]lease provide us, within five business days, an update on the board's consideration of Ms. Witchko's Demand."   A true and correct copy of plaintiff's March 6, 2015 letter is attached hereto as Exhibit D.

120.   On March 12, 2015, plaintiff received a letter from Mr. Silfen stating the Board had engaged outside counsel to advise it in connection with the Demand and she would be informed of the Board's decision regarding the Demand once one was made.   A true and correct copy of Mr. Silfen's March 12, 2015 letter is attached hereto as Exhibit E.

121.   In a letter dated April 3, 2015, the Board's outside counsel, Saul Ewing LLP ("Saul Ewing") advised plaintiff it had been retained to assist the Board in its review of the Demand.   A true and correct copy of Saul Ewing's April 3, 2015 letter is attached hereto as Exhibit F.

122.   On April 22, 2015, plaintiff responded and stated that since the Demand was initially served on the Board, "the indications of wrongdoing at ARCP, which were already

plentiful, have grown in number and scope" (the "Supplemental Demand").   A true and correct copy of the Supplemental Demand is attached hereto as Exhibit G.   In the Supplemental Demand, plaintiff's counsel stated "[w]e expect that any investigation… in response to the Demand would include events that have occurred since the demand was made."

123.   For the avoidance of doubt, the Supplemental Demand specifies that the following should be included in the Board's review of the Demand: (i) the additional wrongdoing by defendant Schorsch revealed after the Audit Committee investigation in March 2015; (ii) facts related to the McAlister action in state court in New York; (iii) the Board's dissolution of its conflicts committee in December 2014; (iv) complaints by other investors of ARCP about windfall payments made to current Board members, defendants Stanley and Andruskevich; (v) the expanded the scope of the restatement; and (vi) that various broker-dealers had suspended sales activity with Cole Capital, resulting in a decrease in ARCP's capital-raising activity.

124.   The Supplemental Demand asks the Board again to investigate whether defendants Schorsch, Kay, and Beeson had breached their fiduciary duties in connection with the additional wrongdoing revealed since the original Demand was served, and specifically whether the compensation paid during previous years to these three defendants was obtained due to self-dealing or was paid while they were breaching their fiduciary duties.   The Supplemental Demand concludes:

> [W]ithout limitation, the Board should investigate which other individuals, including former directors of ARCP, are responsible for the calamitous situation that has unfolded at the company since October 2014 and take appropriate action to hold them accountable.   Finally, the Board should investigate the ongoing corporate governance failures affecting ARCP.   Affirmative steps must be taken to improve the company's corporate governance to institute systems and controls to prevent problems like this from recurring.

125.   In a letter dated May 1, 2015, Saul Ewing informed plaintiff it had met with the Board on April 20, 2015 and discussed the Demand.   The letter states the Board expected to meet and against discuss the Demand and Supplemental Demand later in the month.   A true and correct copy of the Saul Ewing's May 1, 2015 letter is attached hereto as Exhibit H.

126.   Finally, on June 18, 2015, seven months after receipt, the Board formally rejected plaintiff's Demand and Supplemental Demand (the "Refusal").   The Refusal is attached hereto as Exhibit I.   According to the Refusal, the entire conflicted ARCP Board including directors alleged to have engaged in wrongdoing, not an independent committee, reviewed and rejected the Demand.   Ex. I at 1.   The Refusal Board was constituted of six directors: Rufrano, Frater, Richardson, and defendants Frank, Stanley, and Andruskevich.

127.   As the Refusal demonstrates, the Board was disinclined to fairly consider the Demand from the beginning.   The Board discussed the Demand on January 12, 2015, but decided not to conduct an investigation into the merits of the proposed claims, hire outside advisors to aid in assessing the Demand, or even consider whether the Company might suffer increased harm by delaying to bring the claims.   Ex. I. at 3.   Instead, the Board "agreed to focus first on completion of the Audit Committee Investigation."   *Id*.   The Board also declined to apprise plaintiff of its decision to put the Demand on the back-burner.

128.   Two months after first discussing the Demand, in March 2015, the Board engaged Saul Ewing to advise it in connection with the Demand.   *Id*.   At a Board meeting on April 20, 2015, the Board finally, cursorily, considered the Demand.   *Id*.   The Board not only did not convene a special committee of disinterested independent directors, but it also failed to commission or receive a report specifically addressing the claims urged in the Demand or the unique issues related to them.   The only information relied on by the Board in considering the

Demand were two reports that did not address the particular claims, facts, legal standards, or procedure involved in bringing the type of litigation at issue in the Demand.  *Id.*   These were reports by: (a) Weil, Gotshal & Manges ("Weil"), the Audit Committee's counsel produced for the Audit Committee's investigation into "accounting practices and other matters"; and (b) Milbank, Tweed, Hadley & McCloy LLP ("Milbank"), outside counsel to ARCP "concerning the Audit Committee Investigation and ongoing federal securities litigation" and the multiple governmental investigations facing the Company.  *Id.* at 3-4.   Stunningly, the Refusal concedes these reports do not squarely address the allegations in the Demand.  *Id.* at 4 (the subject matter of the report of ARCP's outside counsel covers "many" of the same allegations as the Demand).   According to the Refusal, neither of these reports specifically addressed the pending derivative actions alleging demand futility, let alone the Demand itself.

129.   The Refusal reveals that the Board considered allegations in the Supplemental Demand in an even more perfunctory fashion than the original Demand.   In a footnote, the Refusal states conclusorily that the Supplemental Demand provides no basis "for suggesting" that defendants Stanley, Andruskevich, or "any other member of the Board received improper or unauthorized payments, or that Mr. Andruskevich had any ties whatsoever to Schorsch-related entities other than ARCP, and we believe the allegations are baseless."  *Id.* at 4 n. 3. Perplexingly, the Refusal concedes earlier in the same footnote that the allegations regarding defendant Stanley and Andruskevich did have a basis: a letter to ARCP's Board from a third-party investor completely unaffiliated with plaintiff.  *Id.*   Moreover, in light of the breathtaking array of corruption and self-dealing that has now been revealed at ARCP, as well as the fact that defendants Andruskevich, Frank, and Stanley are named defendants in multiple counts of the securities class action and plainly failed to discharge their duties on the Audit

Committee and Conflicts Committee by permitting defendant Schorsch's wrongdoing, these allegations merited investigation at a bare minimum.   However, as is clear from the Refusal, these allegations were dismissed out of hand for no apparent reason other than that these defendants, who were obviously not disinterested, were permitted to investigate themselves.

130.   The Refusal tacitly concedes that the Board did not even make an informed determination as to whether the claims urged in the Demand and Supplemental Demand have merit.   When the Board considered the Demand again at a meeting on May 21, 2015, the Board determined that two considerations "would outweigh any considerations in favor of pursuing the Claims at this time," "the likely negative impact on the Ongoing Litigation and Governmental Investigations" of pursuing the claims "assuming only for the sake of argument that the Claims have merit," and the "likelihood" that the current litigation and governmental investigations would yield more information concerning the claims before the statute of limitations expired. *Id*. at 4.   According to the Refusal, the Board (incorrectly) believed pursuing the Demand might "expose ARCP and its stockholders to significant impairment in the value of their ARCP stock." Id. at 5.   This conclusion is baseless and no rationale for it is given.

131.   The Refusal states that purported "remedial measures undertaken by ARCP… address any future concerns regarding the potential for the conduct underlying the Demand to reoccur."   Id. at 5.   While plaintiff welcomes any corporate governance enhancements at ARCP to address the culture of fraud and self-dealing that previously prevailed, this is not a rational basis to deny the Demand.   The Company has been seriously financially harmed by the criminality and breaches of fiduciary duties by defendants.   While corporate governance

enhancements are a step toward preventing the recurrence of these problems in the future, they do not make the Company whole.[5]

132.     On June 11, 2015, the Board officially adopted the Refusal.   *Id*. at 5.

133.     Plaintiff's counsel received the Refusal on June 22, 2015.   On June 24, 2015, plaintiff sent a letter to Saul Ewing requesting the opportunity to review the Milbank and Weil reports, and, if they existed, any other reports produced in connection with the Board's consideration of the Demand.   Plaintiff's June 24, 2015 letter is attached hereto as Exhibit J.

134.     On June 29, 2015, plaintiff received a letter from Saul Ewing refusing to produce the Milbank and Weil reports.   The June 29, 2015 letter is attached hereto as Exhibit K.

The Board Did Not Act Independently

135.     The Board that refused the Demand and Supplemental Demand was comprised of a majority of conflicted directors and it did not in fact act independently.   Of the six directors that evaluated the Demand, four were not disinterested and independent.   Rufrano is the Company's CEO and is reliant on the goodwill of his fellow directors for his continued compensation and employment, including defendants Andruskevich, Frank, and Stanley.   The conflicts and wrongdoing of defendants Stanley and Andruskevich were subjects of the Demand and Supplemental Demand as alleged above.   Defendants Andruskevich, Frank, and Stanley are

---

[5]     That these corporate governance enhancements were implemented does not in the slightest undermine the need for swift action to vindicate the Company's rights.   There is a finite insurance policy and defendants have finite assets.   As the Refusal elsewhere acknowledges, the securities class actions and government actions seek significant damages from some of the same defendants.   Moreover, with every day the Company's D&O insurance policy may be wasting on legal fees.   In order to protect the Company's claim to assets of the defendants and insurance proceeds, the Company's claim must be filed as soon as possible as the damages sought by the various litigations almost certainly exceed the Company's insurance and the ability of defendants to withstand a judgment.

all defendants in the securities class action due to their having signed false and misleading registration statements as detailed above.[6]

136.    Defendant Stanley was a member of the Audit Committee that reviewed the audited financial statements for the year ended December 31, 2013 and recommended the financial statements be included in the Company's Form 10-K for the year.   One subject of the investigation in response to the Demand was whether the Audit Committee members, including defendant Stanley, breached their fiduciary duties.   Defendant Andruskevich not only was a target of the investigation requested in the Demand, but also was a member of ARCP's Conflicts Committee at a time that it too was breaching its fiduciary duties by failing to halt the wrongdoing described in the Demand and Supplemental Demand – the conflicts of interest at the heart of defendant Schorsch's deception.

137.    It is not surprising that with a majority of the Board interested in the outcome of investigation either due to being targets of it (Andruskevich, Frank, and Stanley) or being beholden to the targets of the investigation (Rufrano), the Board did not in fact act independently.   One example of this failure to act independently was the Board's decision not to convene a committee of independent directors to review the Demand.   This resulted in a situation where defendants Andruskevich, Stanley, and Frank were tasked with investigating allegations of their own wrongdoing.   Likewise, Rufrano was tasked with investigating allegations of the wrongdoing of directors controlling his compensation: the Compensation Committee of ARCP's Board is three members, the majority of which are Andruskevich and Frank (the third member is non-defendant director Richardson).   Convening a committee of

---

[6]    Defendants Andruskevich, Frank, and Stanley, by virtue of having signed false registration statements are defendants in claims brought under §§ 11, 12(a)(2), and 15 of the 1933 Act, as well as claims under § 20(a) of the Securities Exchange Act of 1934.

disinterested directors would have at least superficially insulated consideration of the Demand from improper influences, but of course, defendants Andruskevich, Frank, and Stanley are facing potentially ruinous liability in the securities class action and would be as well in a breach of fiduciary action and so could not risk the possibility of an independent committee choosing to pursue claims against them.

138.    The failure to convene an independent committee to review the Demand, while itself demonstrating that the Board did not in fact act independently, also resulted in second example of the failure to act independently.   The Refusal provides *no conclusion* regarding the allegations of breaches of fiduciary duties against, among others, defendants Andruskevich, Frank, and Stanley.   While this stunning omission also goes to the Board's failure to properly investigate and review the legal basis for the Demand, it demonstrates the Board's failure to act independently.   When presented with a litigation Demand, a Board will normally issue a report including, among other things, *providing a conclusion* regarding the merit of the claims.   Here, the Board declined to reach the merits of the claims.   The failure to opine on the merits is a failure to act independently – a Board acting independently in response to the Demand and Supplemental Demand would have conducted an analysis of whether defendants, including Andruskevich, Frank, and Stanley, were likely liable to the Company, and then determined a course of action in light of that determination.   Here, the Board did not conduct this analysis because targets of the investigation were considering whether to investigate themselves.   This resulted in a situation where in order to ensure peace on the Board, a satisfactory investigation could not be conducted.   Thus, the Board did not in fact act independently in responding to the Demand and plaintiff should be permitted to maintain this derivative action on behalf of ARCP.

<u>The Board Failed To Conduct A Reasonable Investigation</u>

139.    The Board's investigation in response to the Demand was unreasonably incomplete and, as a result, the Board did not act on an informed basis when it rejected the Demand.

140.    The Board's outside advisor retained to aid it in assessing the Demand was conflicted.   Saul Ewing, retained by the entire Board to aid in responding to the Demand was not independent of defendants Andruskevich, Frank, and Stanley: in its representation of the Board, Saul Ewing represented these three defendants as well.   As a result, Saul Ewing was conflicted in its representation, owing duties both to directors that might be defendants in a potential breach of fiduciary duty action and to directors who might be prosecuting that action. Had the Board convened an independent committee to evaluate the Demand and empowered the committee to retain its own outside advisor, at least this conflict would have been avoided.

141.    As evidenced by the Refusal, the Board did not investigate and reach a conclusion on the theories of recovery stated in the Demand.   *See* Ex. I at 5 ("the Board determined that, even if the allegations in the Demand and Ongoing Litigation had merit…").   The Board did not conduct a sufficient investigation to inform itself whether the claims in the Demand even had merit.   The Board did not opine on whether, in its view, a breach of fiduciary duty claim could succeed, and if so, what damages might be available.   Because it failed to ascertain an estimate of recoverable damages, the Board was not informed as to whether the potential funds for recovery were wasting and whether, as a result, the Company would ultimately be prejudiced in its ability to be made whole by declining to swiftly file an action against defendants.   The rejection of the Demand in the absence of this information was not an informed act and is not entitled to business judgment protection.

142.    The Board did not create or produce a report on its investigation in response to the Demand.   The Refusal acknowledges that no report was created.   As a result, the Board failed to document the procedures it employed in its investigation or its reasoning with respect to its refusal to pursue the claims.   The Refusal demonstrates that the Board did not even distinguish the relevant standards for liability in a breach of fiduciary action from the standards for liability in the federal securities class action.   *See id.* (failing to recognize that a breach of fiduciary duty claim is distinct from a securities fraud claim, "even if the allegations in the Demand and the Ongoing Litigation had merit…").   There is no evidence of who, if anyone, the Board interviewed to evaluate the claims urged in the Demand, or what documents, if any, it reviewed to that end.   The Refusal does not mention the Board conducting any interviews or reviewing any documents regarding the claims urged by plaintiff and, upon information and belief, no interviews were conducted and no documents were reviewed.

143.    While the Refusal states the Board received two reports which it considered in responding to the Demand, *neither* of these concerned an investigation of breach of fiduciary claims against directors.   The report of Weil, independent counsel for the Audit Committee investigation, focused on "concerns regarding accounting practices" and the advice of Weil was sought "to determine the adjustments required to be made" to the fraudulent financial statements.[7]   While the Refusal catalogues the efforts of Weil in the Audit Committee investigation (*see* Ex. I at 2), and mentions documents obtained from the offices of "certain employees," conspicuously absent from that description is any hint that the investigation involved the assessment of any claims against, or even the examination of any conduct of, ARCP's directors.   There is no evidence whatsoever that this investigation examined Board

---

[7]      As described by the Company's Form 8-K filed on October 29, 2014.

conduct, let alone breach of fiduciary duty claims, and indeed, the results of the Audit Committee's investigation as characterized in the Company's own SEC filings do not so much as mention any breach of fiduciary duty claims or Board conduct.   The Board's refusal to produce this report to plaintiff further supports this conclusion.

144.   Likewise, the report of Milbank did not include breach of fiduciary duty claims and there is no evidence it even included an investigation of Board level wrongdoing.   Milbank was outside counsel to ARCP "concerning the Audit Committee Investigation and ongoing *federal securities litigation* and [governmental] investigations currently being conducted…" Ex. I at 3 (emphasis added).   Milbank's role therefore was not to evalute the breach of fiduciary duty and other claims and theories urged in the Demand.   Moreover, there is no evidence in the Refusal that Milbank interviewed anyone at all, reviewed any documents, or even produced a written report subject to any methodology at all.   Thus, whatever the relevance of the Milbank "report," it did not inform the Board regarding the legal standards on a breach of fiduciary duty claim.

145.   Nothing in the Board's facile and generic Refusal indicates any reasonable, let alone good faith, attempt to grapple with the relevant law and facts indicating the existence of meritorious claims for non-exculpable breaches of the duty of loyalty by at least some of the director defendants.   The Refusal *does not even opine on the merits of these claims*, for the same set of generic reasons that could be asserted in response to any shareholder demand under the circumstances, comparable or not.   This evidences bad faith: any reasonable investigation of potential claims for breaches of fiduciary duties must at least makes an attempt to ascertain whether breaches of fiduciary duties have occurred.

146.    Nor does the Refusal evidence any serious appraisal of whether it would be in ARCP's interests to attempt to seek compensation for any of defendants' non-exculpable breaches of the duty of loyalty.  It does not appear that any of the defendants would be judgment-proof or lacking in assets sufficient to fund a reasonable settlement of claims or a judgment.   And, as set forth above, the facts do not in any way support the Refusal's generic assertion that adopting a wait-and-see approach does anything other than reduce the amount of funds that could be available to the Company by judgment if it prevailed on the claims.   As with litigation against the officer defendants, the potential recovery on the claims could offset ARCP's substantial damages, and there does not appear to be a significant risk of disruption to the Board given that the majority of the director defendants no longer serve on the Board.   The Board's assertion of purely generic objections to the pursuit of these viable claims indicates that it failed to even conduct this analysis and did not do so in good faith.

147.    The Refusal summarily dismisses the Demand without the requisite appraisal of the claims' merits as to each defendant and their potential value to ARCP.  Without any substantive explanation, the Refusal states in a footnote that it has considered a number of generic factors that could just as easily have been copied and pasted from a hornbook (Ex. I at 4 n.2), without explanation of what the Board's consideration involved, what it concluded with respect to each factor, and the reasoning behind that conclusion.   The deficiency in this cursory response is demonstrated by an example: the Refusal states, without any substantive detail, that the Board considered the impact on corporate resources, "such as the time that management would necessarily devote to pursuing the Claims."   *Id.*   What is meant by this is unclear and how this could possibly be a factor against commencing litigation is not explained.   ARCP's management will be overseeing litigation related to the wrongdoing alleged herein for the

foreseeable future.   How filing litigation to vindicate the Company's rights could be an unreasonable burden on management which owes fiduciary duties to the Company is neither evident nor explained.

148.   The Refusal then concludes that the Board refused the Demand based on two considerations, neither of which are remotely related to the merits of the claims or even were chosen on the basis of being informed about the merits of the claims: (i) "the likely negative impact on the Ongoing Litigation and Governmental Investigations of pursuing the Claims at this time, *assuming for the sake of argument that the claims have merit*, and (ii) the likelihood that the Ongoing Litigation and Governmental Investigations would yield more information concerning the claims…"   *Id.* at 4 (emphasis added).   Because the Board did not create a report documenting its methodology and reasoning, it is unknown in what respect the Board believed the claims would have a negative impact on the Company's other legal problems. Taken together with the Board's failure to convene an independent committee, conduct a reasonable investigation, or create a report documenting its supposed investigation, the Board's response to the Demand, rather than an informed evaluation of the viability and value of the claims, cannot be deemed a valid exercise of business judgment entitled to any presumption of reasonableness and good faith under the law.

149.   There is no evidence the Board properly identified the claims at issue, investigated the theories of recovery in the Demand, or what legal standards, if any, it assessed the Demand against.   There is no evidence the Board did anything other than conduct an informal discussion regarding the Demand.   The hallmark of a reasonable investigation in response to a litigation demand is some evidence of an adequate investigation by the Board to inform itself as to the merits of the claims.   Here, there has been no documentation *at all* of the

procedures and methodology of the supposed investigation conducted in response to the Demand, including what, if any interviews were conducted by whom and who was interviewed and how many documents were reviewed, where they were obtained from and who reviewed them, what legal standards were applied, whether the Board believes the claims have merit, and the reasoning supporting that conclusion.   As such, the Board's investigation was not reasonable under any applicable legal standard and the Board's refusal does not receive business judgment protection because it was not informed.

150.   The Board's failure to consider the legal merits of the claims under the appropriate legal standards applicable to the different categories of potential defendants is itself conclusive evidence of the unreasonableness of the investigation.   Here, at least some of the defendants in a breach of fiduciary action brought on behalf of ARCP engaged in conduct that the Company has already admitted was *intentional*.   Contrary to the Refusal's assertion that exculpation rights render the claims unworthy of pursuit, there is no exculpation defense where, as here, there is admitted fraud.   The Refusal shows the Board simply ignored, or negligently failed to consider in good faith, the strong evidence demonstrating the merits and probability of success of the claims against the defendants.

151.   No legal action has been filed by ARCP against any of the Individual Defendants. The primary architects of the accounting fraud and other wrongdoing detailed herein have been allowed to resign and retire, rather than being terminated for cause.   Accordingly, plaintiff's institution of this action is necessary to preserve the claims asserted herein for the benefit of the Company.

152.   Plaintiff has not made any demand on the other shareholders of ARCP to institute this action since such demand would be a futile and useless act for at least the following reasons:

a.     ARCP is a publicly held company with over 905 million shares outstanding and thousands of shareholders;

b.     Making demand on such a number of shareholders would be impossible for plaintiff who has no way of finding out the names, addresses, or phone numbers of the other shareholders; and

c.     Making demand on all shareholders would force plaintiff to incur excessive expenses, assuming all shareholders could be individually identified.

## COUNT I
## BREACH OF FIDUCIARY DUTY

153.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

154.    Each defendant owes and owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of ARCP's business and affairs, particularly with respect to maintaining compliance with applicable laws and regulations in core areas of the Company's business, as well as controls over disclosure.

155.    Defendants' conduct set forth herein was due to their intentional or reckless breach of the fiduciary duties they owed to the Company.  Defendants intentionally or recklessly breached or disregarded their fiduciary duties to protect the rights and interests of ARCP.

156.    In breach of their fiduciary duties owed to ARCP, defendants willfully participated in and caused the Company to expend unnecessarily its corporate funds, and failed to act in good faith in their roles overseeing ARCP's business, rendering them personally liable to the Company for breaching their fiduciary duties.

157.    As a direct and proximate result of defendants' breaches of their fiduciary obligations, ARCP has sustained and continues to sustain significant damages.   As a result of the

misconduct alleged herein, defendants are liable to the Company.

## COUNT II
## ABUSE OF CONTROL

158.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

159.    Defendants' misconduct alleged herein constituted an abuse of their ability to control and influence ARCP, for which they are legally responsible.

160.    As a direct and proximate result of defendants' abuse of control, ARCP has sustained significant damages.

161.    As a direct and proximate result of defendants' breaches of their fiduciary obligations, ARCP has sustained and continues to sustain significant damages.   As a result of the misconduct alleged herein, defendants are liable to the Company.

162.    By reason of the foregoing, ARCP has been damaged.

## COUNT III
## AGAINST THE DEFENDANTS FOR UNJUST ENRICHMENT

163.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

164.    By their wrongful acts and omissions, the Individual Defendants were unjustly enriched at the expense of and to the detriment of ARCP.

165.    Plaintiff, as a shareholder and representative of ARCP, seeks restitution from these defendants, and each of them, and seeks an order of this Court disgorging all profits, benefits and other compensation obtained by these defendants, and each of them, from their wrongful conduct and fiduciary breaches.

## COUNT IV
## AGAINST THE DEFENDANTS FOR VIOLATIONS OF SECTION 14 OF THE SECURITIES EXCHANGE ACT OF 1934

166.   Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

167.   Rule 14a-9, promulgated pursuant to §14(a) of the Securities Exchange Act of 1934, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading."   17 C.F.R. §240.14a-9.   Specifically, the Company's proxy statements filed May 4, 2012, April 30, 2013, and April 29, 2014 violated §14(a) and Rule 14a-9 because they omitted material information regarding the wrongdoing of defendants and included by reference materially false and misleading financial statements.

168.   In the exercise of reasonable care, defendants should have known that the statements contained in the proxy statement were materially false and misleading.

169.   The misrepresentations and omissions in the proxy statement were material to Company shareholders in voting on the proxy statement.   The proxy statement was an essential link in the accomplishment of the continuation of defendants' continued violation of their fiduciary duties in connection with the improper accounting and the failure to institute sufficient controls over financial reporting.

170.   The Company was damaged as a result of the defendants' material misrepresentations and omissions in the proxy statement.

## PRAYER FOR RELIEF

FOR THESE REASONS, plaintiff demands judgment in the Company's favor against all defendants as follows:

A.      Declaring that plaintiff may maintain this action on behalf of ARCP and that plaintiff is an adequate representative of the Company;

B.      Declaring that the Individual Defendants have breached their fiduciary duties to ARCP;

C.      Determining and awarding to ARCP the damages sustained by it as a result of the violations set forth above from each of the defendants, jointly and severally, together with interest thereon;

D.      Directing ARCP and the Individual Defendants to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect ARCP and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote the following resolutions for amendments to the Company's By-Laws or Articles of Incorporation; and the following actions as may be necessary to ensure proper Corporate Governance Policies:

1.      a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board;

2.      a provision to permit the shareholders of ARCP to nominate at least three candidates for election to the Board;

3.      a proposal to ensure the establishment of effective oversight of compliance with applicable laws, rules, and regulations;

E.      Determining and awarding to ARCP exemplary damages in an amount necessary to punish defendants and to make an example of defendants to the community according to proof at trial;

F.      Awarding ARCP restitution from defendants, and each of them;

G.      Awarding plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs, and expenses; and

H.      Granting such other and further equitable relief as this Court may deem just and proper.

## JURY DEMAND

Pursuant to Fed. R. Civ. P. 38(b), Plaintiff demands a trial by jury.

Dated: July 31, 2015

**HARWOOD FEFFER LLP**

  s/ Robert I. Harwood
Robert I. Harwood
Samuel K. Rosen
Benjamin Sachs-Michaels
488 Madison Avenue, 8th Floor
New York, New York 10001
Telephone: (212) 935-7400
Facsimile: (212) 753-3630
rharwood@hfesq.com
srosen@hfesq.com
bsachsmichaels@hfesq.com

**LAW OFFICE OF ALFRED G. YATES, JR., P.C.**
Alfred G. Yates, Jr.
Gerald L. Rutledge
519 Allegheny Building
429 Forbes Avenue
Pittsburgh, PA 15219
Phone: (412) 391-5164
Fax: (412) 471-1033
yateslaw@aol.com

*Attorneys for Plaintiff*

## AMERICAN REALTY CAPITAL PROPERTIES, INC. VERIFICATION

I, Joanne Witchko, hereby verify that I am familiar with the allegations in the Complaint, and that I have authorized the filing of the Complaint, and that the foregoing is true and correct to the best of my knowledge, information, and belief.

Date: 7-31-15

Joanne Witchko