G629WITA

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

JOANNE WITCHKO, ET AL.,

               Plaintiffs,

        v.                          15 CV 6043 (AKH)

NICHOLAS S. SCHORSCH, ET AL.,

               Defendants.

------------------------------x

                         New York, N.Y.
                         June 2, 2016
                         2:43 p.m.

Before:

              HON. ALVIN K. HELLERSTEIN

                           District Judge

G629WITA

1                                    APPEARANCES

2    HARWOOD FEFFER LLP
          Attorneys for Plaintiff Joanne Witchko
3    BY:  SAMUEL KENNETH ROSEN

4    PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP
          Attorneys for Defendant Nicholas S. Schorsch
5    BY:  JUSTIN DAVID LERER

6    WEIL, GOTSHAL & MANGES LLP
          Attorneys for Defendants Andruskevich, Frank, Michelson,
7    Rendell and Stanley
     BY:  STEPHEN ALAN RADIN
8             EVERT CHRISTENSEN

9    KELLOGG, HUBER, HANSEN, TODD, EVANS & FIGEL, PLLC
          Attorneys for Defendants Bowman, Kahane and Weil
10   BY:  BRADLEY E. OPPENHEIMER

11   SAUL EWING, LLP
          Attorneys for Defendant ARCP (Vereit, Inc.)
12   BY:  CHARLES OWEN MONK , II

13   STEPTOE & JOHNSON, LLP
          Attorneys for Defendant Brian Block
14   BY:  LARA ELIZABETH ROMANSIC
              MICHAEL GERARD SCAVELLI
15
     ZUCKERMAN SPAEDER, LLP
16        Attorneys for Defendant Lisa McAlister
     BY:  ADAM FOTIADES
17
     KIRKLAND & ELLIS
18        Attorneys for Defendant Kay
     BY:  JASON PARISH
19
     PETRILLO KLEIN & BOXER LLP
20        Attorney for Defendant Beeson
     BY:  GUY PETRILLO
21

22

23

24

25

G629WITA

1              (In open court; case called)

2              THE COURT:  Good afternoon, everyone.

3              Mr. Rosen.

4              MR. ROSEN:  Yes, your Honor.

5              THE COURT:  For the plaintiff is here, Samuel K.

6    Rosen.

7              Bradley Oppenheimer for various individual defendants.

8              MR. OPPENHEIMER:  Yes, your Honor.

9              THE COURT:  And Steve Radin.

10             MR. RADIN:  Yes, sir.

11             THE COURT:  For other defendants.

12             MR. RADIN:  Yes.

13             THE COURT:  Who are the other two gentlemen?

14             MR. CHRISTENSEN:  Good afternoon, your Honor.  Evert

15   Christensen from Weil, Gotshal & Manges along with Mr. Radin.

16             THE COURT:  Yes.  You're on here.  Thank you.

17             MR. MONK:  Good afternoon, your Honor.  Charles Monk

18   from Saul Ewing on behalf of ARCP as a corporate entity.

19             THE COURT:  You haven't signed in, have you, Mr. Monk?

20             MR. MONK:  Yes, I have, your Honor.  There are two

21   sheets up there.

22             THE COURT:  Sorry.  I have you.  Yes.

23             Where is Brian Block?

24             MR. SCAVELLI:  Your Honor, Michael Scavelli for Brian

25   Block.

G629WITA

```
 1              THE COURT:  You're Mr. Scavelli?

 2              MR. SCAVELLI:  Yes, sir.

 3              THE COURT:  And Ms. Romansic?

 4              MR. SCAVELLI:  She's on her way.

 5              THE COURT:  You don't want to come up to the table?

 6              MR. SCAVELLI:  I don't intend on speaking, your Honor.

 7              THE COURT:  And Adam Fotiades.

 8              MR. FOTIADES:  Yes, your Honor, on behalf of

 9   Ms. McAlister.

10              THE COURT:  You can also come up to the table if you

11   like.

12              MR. FOTIADES:  We don't intend on speaking, your

13   Honor.

14              THE COURT:  So let me do the Section 14 issues first

15   which is the only federal claim.  Who will speak on that

16   motion?

17              MR. RADIN:  I will, your Honor.

18              THE COURT:  Mr. Radin.

19              MR. RADIN:  Good afternoon.

20              Steve Radin, Weil, Gotshal & Manges.

21              As a threshold matter, it is undisputed between the

22   parties that certain defendants can be dismissed from this

23   claim because they did not sign proxy statements or solicit

24   proxies.  And their names are on pages 28 and 29 of the opening

25   brief and page 18 of the reply brief.
```

G629WITA

| | |
|---|---|
| 1 | THE COURT:  Where are they? |
| 2 | MR. RADIN:  On the May 4, 2012 proxy:  Block, Frank, |
| 3 | Kay, Beeson, McAlister, Andruskevich, Bowman, Kahane, Michelson |
| 4 | and Stanley. |
| 5 | THE COURT:  Who is left? |
| 6 | MR. RADIN:  Schorsch, Weil, and Governor Rendell. |
| 7 | THE COURT:  Is that agreed by the plaintiff? |
| 8 | MR. ROSEN:  Yes, your Honor. |
| 9 | THE COURT:  The allegations against them for the |
| 10 | May 4, 2000 proxy are stricken. |
| 11 | MR. RADIN:  2012 proxy. |
| 12 | THE COURT:  2012.  Sorry. |
| 13 | MR. RADIN:  On the April 30, 2013 proxy, Messrs. |
| 14 | Block, Frank, Kay, Ms. Beeson, Ms. McAlister, Mr. Andruskevich |
| 15 | and Mr. Stanley are out. |
| 16 | THE COURT:  Who is left? |
| 17 | MR. RADIN:  Schorsch, Weil, Kahane, Michelson, |
| 18 | Rendell, and Bowman. |
| 19 | THE COURT:  Plaintiff agree? |
| 20 | MR. ROSEN:  Yes, your Honor. |
| 21 | THE COURT:  Then those allegations are stricken. |
| 22 | Okay. |
| 23 | MR. RADIN:  On the April 2014 proxy the following |
| 24 | defendants are out:  Block, Frank, Kay, Beeson, and McAlister. |
| 25 | THE COURT:  Who is left? |

G629WITA

1          MR. RADIN:  Schorsch, Weil, Kahane, Michelson,

2     Rendell, Bowman, Stanley, and Andruskevich.

3          THE COURT:  Same?

4          MR. ROSEN:  Agreed, your Honor.

5          THE COURT:  Okay.

6          MR. RADIN:  With respect to all defendants, both

7     remaining and not remaining, we have two grounds.  One is the

8     Rule 23.1 demand motion which I assume you want to wait on.

9          THE COURT:  I'd like to wait because that pertains to

10    the entire complaint.

11         MR. RADIN:  Okay.

12         The second ground, the federal law ground, is the no

13    essential link requirement of 14(a) which is dispositive as to

14    all defendants.

15         Second Circuit, as we all know, has repeatedly

16    dismissed plain vanilla mismanagement claims dressed up in what

17    the Second Circuit calls 14(a) clothes.  That's the Maldonado,

18    Trump and Cappel cases.

19         To effectuate this principle, the courts in this

20    circuit and elsewhere have held that the challenged proxy

21    statement must be an essential link in the accomplishment of

22    the transaction.  The action approved of pursuant to the proxy

23    statement must be a direct cause of the pecuniary interest.

24         Here, the action approved pursuant to the proxy

25    statement is simply the reelection of directors who are down

G629WITA

1   the road in turn indirectly accused of mismanagement.

2          The alleged harm is the harm to the corporation

3   resulting from the mismanagement after these individuals became

4   directors or were reelected, not harm resulting from the

5   election itself.

6          We cite in our brief, as you know, the principle cases

7   GE case, the Edward Goodman case, the Diamond case, the Fink

8   case.  These cases all stand for the proposition that just

9   because mismanagement happens under the watch of directors who

10  are reelected that's not a 14(a) claim.  It may be a breach of

11  fiduciary duty claim, and we'll come to that later, but it's

12  not a federal 14(a) claim.

13         The plaintiffs rely principally upon the Second

14  Circuit's 1979 decisions, coincidentally both are 1979, in

15  Maldonado and Weisberg.  These cases illustrate precisely my

16  point, precisely the harm to which 14(a) is directed in

17  director-election cases if directed to the invalidation of

18  director elections.  Plaintiffs here are not seeking to

19  invalidate a director election.  They couldn't because the

20  terms of every director elected pursuant to every one of the

21  proxy statements at issue were all one-year terms that have

22  expired.  Maldonado and Weisberg thus have no bearing on cases

23  seeking relief under the invalidation of an election.

24         Weisberg indeed draws this precise distinction

25  upholding the 14(a) claim seeking to set aside the election but

G629WITA

1    dismissing the 14(a) claim to the extent it sought damages

2    through mismanagement by the directors once they were elected

3    or reelected.

4              This GE case in the Third Circuit draws the same

5    distinction.  As we noted in our brief, they even have bold

6    captions separating those two types of claims.

7              The only case that I know of that comes out

8    differently is the Zoran case in California which the plaintiff

9    emphasizes along with the two Second Circuit cases I've already

10   distinguished.  Zoran, as we say in our brief, is simply

11   inconsistent with all of the other cases.  And as we outlined

12   in our brief it's been rejected almost universally.

13             THE COURT:  Mr. Rosen.

14             MR. ROSEN:  Thank you, your Honor.

15             This isn't a case of simple mismanagement as was the

16   case in the GE case to which Mr. Radin referred or to the

17   Diamond Foods case that they cite in their brief.

18             This is a case of corporate plunder.  Nine hundred

19   million dollars was taken out of this company by its insiders

20   through self-dealing.  And it has long been held when a proxy

21   statement concealing the plunder of corporate funds by insiders

22   results in the reelection of directors who permit the

23   self-dealing to continue thereafter causation is fulfilled for

24   the purposes of the 12(b)(6) motion.  This is particularly true

25   where there's been an improper manipulation of executive

9

G629WITA

1    compensation plans and the executive compensation plan is a

2    critical portion of our complaint here.

3            As the court said --

4            THE COURT:  You seem to have quoted from something.

5            MR. ROSEN:  I'm just about to quote from Maldonado.

6            THE COURT:  Which Maldonado?

7            MR. ROSEN:  597 F.2d at 789.

8            Where the Second Circuit said:  Since self-dealing

9    presents opportunities for abuse of a corporate position of

10   trust the circumstances surrounding corporate transactions in

11   which directors have a personal interest are directly relevant

12   to a determination of whether they are qualified to exercise

13   stewardship of the corporation.  That's at page 796 of

14   Maldonado.

15           In the 2013 proxy statement, defendants Schorsch,

16   Weil, Kahane, Michelson, Rendell, and Bowman solicited votes on

17   their behalf.  The proxy concealed the self-dealing of

18   defendants Schorsch, Kay, Block, Weil, and Budd Co., each of

19   whom was associated with at least one Schorsch entity.  The

20   proxy disclosed that the board oversaw conflict of interests

21   and related party transactions -- indeed, they had a conflicts

22   committee -- specifically including transactions with the

23   Schorsch entities with which the company did business.

24           However, concealed was the fact that the board was

25   presided over, as I said before, the payment of over $917

G629WITA

1    million to Schorsch entities during 2012, 2013, and 2014.  And

2    those were in the form of fees that ARCP admitted lacked

3    documentation and apparent basis.

4           It's, therefore, plausible that due to their failure

5    to disclose this information defendants Schorsch, Weil, Kahane,

6    Michelson, Rendell, and Bowman were reelected.

7           During the terms for which they were reelected these

8    defendants approved the outperformance plans in October of 2013

9    and formally agreed to it in January of 2014 even though it had

10   been altered by over a hundred million dollars to benefit

11   defendants Schorsch and Block.

12          The 2014 proxy statement was also a causal link in

13   defendant's wrongdoing.  Defendants Schorsch, Weil, Kahane, and

14   Michelson, Rendell, Bowman, Stanley, and Andruskevich solicited

15   votes on their own behalf.  They discussed -- it was discussed

16   in detail in the proxy that the outperformance plan had been --

17   I'm sorry, the proxy concealed the fact that the outperformance

18   plan had been improperly altered.  The reelection of these

19   directors who were already breaching their fiduciary duties

20   permitted further account manipulation and self-dealing to

21   occur.  These facts allege a causal link between the proxy

22   solicitation and the harm to ARCP.

23          THE COURT:  Show me in the complaint where these

24   allegations are made.

25          The complaint is almost 80 pages in length.  It's a

G629WITA

1  narrative of every kind of bad fact that you can think of

2  without any kind of analysis.

3        Take me through this.  Start with the allegations that

4  there are false and misleading statements in the proxies.

5  Where do I find this?

6        MR. ROSEN:  As to defendants Andruskevich, Bowman,

7  Frank, Michelson, Stanley, and Rendell I would refer your Honor

8  to paragraphs 67.

9        THE COURT:  Paragraph 67.

10        MR. ROSEN:  67 and 68 for a start.

11        THE COURT:  Paragraph 67 runs on for a page.  It deals

12  with form 10-K.

13        MR. ROSEN:  Right.  And it talks about the FFO and

14  AFFO and how they -- how they have been properly analyzed in

15  the financial statements.

16        When we turn to paragraph 102 --

17        THE COURT:  So this is attached to the proxy.  Is that

18  what you're saying?  Because I see nothing about a proxy here.

19        MR. ROSEN:  It's not attached to the proxy.  It's a

20  statement that concealed this information in -- this is in the

21  10-K.  The proxy conceals the information that this is false

22  and misleading.

23        THE COURT:  You need to have a proxy statement that's

24  issued.  Where is a proxy statement issued?

25        MR. ROSEN:  Paragraph 69 the proxy to which -- which

G629WITA

1    refers to the 10-K which came right after the 10-K on April 29

2    of 2014 at paragraph 69.

3            THE COURT:  And the last step, you say that it

4    incorporates by reference the 2013 form 10-K.

5            MR. ROSEN:  Right.

6            THE COURT:  And then it goes on to state a lot of

7    other things.

8            MR. ROSEN:  And then at paragraph 102 the company

9    issued a restatement.  And at paragraph 104 the company amended

10   that 10-K to indicate the investigation that had been made

11   about the information contained in the original 2013 proxy

12   statement, the original 2013 10-K.  And that lays out all the

13   errors and misstatements that were included.  As of the time of

14   this amended 10-K it shows all of the misstatements that had

15   been determined at the time of the filing of the amended 10-K.

16           THE COURT:  Is that it?

17           MR. ROSEN:  No.  As to additional false -- as to

18   breach of duty claims -- I guess you just wanted to stick with

19   the proxy statement.

20           THE COURT:  I do.

21           MR. ROSEN:  Yes.

22           THE COURT:  So where is the claim, the proxy claim?

23   Where do I find it?

24           MR. ROSEN:  The proxy claim --

25           THE COURT:  Under Section 14(a).

G629WITA

1           MR. ROSEN:  The proxy claim is Count Four of the

2     complaint at paragraph 166, page 76.

3           THE COURT:  I hold for the reasons stated in Maldonado

4     against Flynn, 597 F.2d 789 at page 796 this complaint is

5     nothing but an effort to dress up claims of other actionable

6     alleged wrongs under Section 10b and under state law disguised

7     in a proxy violation.  And the relationship between these

8     violations, these alleged violations, and damage to the company

9     is very hard to find.  Motions to dismiss proxy allegation

10    Section 14(a) Count Four is granted.

11          Okay Mr. Radin do you want to take up 23.1?

12          MR. RADIN:  The court, of course, is familiar with the

13    business judgment rule which governs the refusal of demands.

14    It's a presumption that directors have acted in accordance with

15    their fiduciary duties.  The plaintiff must overcome the

16    presumption by pleading particularity.  Unless the plaintiff

17    does so, the business judgment rule insulates poor decisions --

18          THE COURT:  Louder please, Mr. Radin.

19          MR. RADIN:  Excuse me.

20          THE COURT:  Talk to me, not to your notes.

21          MR. RADIN:  Unless the presumption is overcome the

22    business judgment rule insulates under Maryland law poor

23    decisions from any substantive judicial review.

24          Your Honor knows this.  Your Honor wrote the Boston

25    Scientific decision that both parties have cited.  Boston

G629WITA

1   Scientific was governed by Delaware law.  Here Maryland

2   governs.  But Maryland law looks at Delaware corporate law on

3   this type of issue and is identical to Delaware law with

4   respect to refusals of demands, the only issues at stake here.

5           THE COURT:  So clearly the board met.  I already held

6   that there were sufficient independent directors to form a

7   majority.  The fact that they did not form a special litigation

8   committee I don't think is crucial here because the independent

9   directors held a clear majority.  It probably would have been

10  better if they had met without the inside directors involved

11  but I don't think that's crucial.

12          MR. RADIN:  They did not meet with inside directors.

13          THE COURT:  Okay.  I stand corrected.

14          So the issues that the board gave start on page four

15  of the Saul Ewing letter of June 15, 2015.

16          It's written as follows:  A consensus emerged that of

17  all the factors previously discussed with the board, two

18  factors deserve especially great weight in the board's

19  consideration of the demand and would outweigh any

20  considerations in favor of pursuing the claims at this time.

21          One, the likely negative impact on the ongoing

22  litigation and governmental investigation in pursuing the

23  claims at this time, assuming only for the sake of argument

24  that the claims have merit; and second, the likelihood that the

25  ongoing litigation and governmental investigations would yield

G629WITA

```
1    more information concerning the claims before the statute of

2    limitations for bringing the claims would expire.

3              What is the statute of limitations?

4              MR. RADIN:  I can't answer that question specifically.

5    There are a number of different claims.  There are claims

6    including indemnification and contribution.

7              THE COURT:  What's the range?

8              MR. RADIN:  Well indemnification and contribution

9    claims have not even accrued yet.

10             THE COURT:  So we don't worry about that.

11             MR. RADIN:  I personally don't think there's much

12   difference between the claims that are in this case and the

13   indemnification and contribution claims --

14             THE COURT:  You have a claim for --

15             MR. RADIN:  The statute --

16             THE COURT:  You want a return of all fees, $900

17   million of fees and payments that were made to the insiders

18   allegedly for improper motives and without proper regard for

19   the corporation's welfare.  The cause of action on that runs

20   from the time of the damage, which was immediate.

21             MR. RADIN:  That's correct.

22             THE COURT:  So some time has already elapsed.

23             MR. RADIN:  Yes.

24             Some time has.  But on the date that this business

25   judgment was made, there is no dispute that ample time
```

G629WITA

1    remained.

2              THE COURT:  How much time?  I'm asking.

3              MR. RADIN:  It might be three years.  It might be

4    more.

5              THE COURT:  So let's say it's three years.

6              MR. RADIN:  There are any number of different

7    states --

8              THE COURT:  Let's say it's three years.  All right

9    some time has elapsed.

10             MR. RADIN:  That is correct.

11             THE COURT:  The lawsuit -- the class action, the

12   government investigation all might take longer than three

13   years.  Has the board considered a tolling agreement?

14             MR. RADIN:  I can't speak to what the board has

15   considered because I don't represent the board internally

16   within --

17             THE COURT:  Who does?

18             MR. RADIN:  Mr. Monk does.

19             MR. MONK:  Charles Monk from Saul Ewing.  The board

20   has considered a tolling agreement.

21             THE COURT:  And.

22             MR. MONK:  And if we approach the statute of

23   limitations we will reconsider a tolling agreement.

24             THE COURT:  That doesn't sound to me to be

25   satisfactory.

G629WITA

1          So let me ask you this, Mr. Radin.  What's my role?

2     Do I have to take everything here ipse dixit?

3          MR. RADIN:  The Oliveira decision by the Maryland

4     court of appeals in January of 2016 holds that any statement in

5     a letter refusing a demand is to be deemed true and correct

6     unless the plaintiff pleads with particularity something is not

7     true.

8          On the date -- you here, your Honor, are assessing --

9          THE COURT:  That's true and correct but on this point

10    perhaps inadequate.

11         MR. RADIN:  Well a board -- whether or not the company

12    is going to pursue this claim is up to the company's board.

13    The board can make a business judgment to pursue a claim or not

14    to pursue a claim.

15         THE COURT:  Well supposing I find that the report that

16    directors issued is -- there is not sufficient merit to it, not

17    sufficient weight; that there has not been an adequate

18    consideration; there's been no valuation of the claims; there

19    is no attempt to try to predict the values of these claims.

20         Assume that the allegations have merit.  So if they

21    have merit that means that $917 million have been wasted and no

22    one is to be held to account for it.

23         MR. RADIN:  Not at all.  The statute of limitations

24    hasn't run.  On the date that this court made this business

25    judgment there is no dispute that ample time remained.

G629WITA

1          THE COURT:  What is that ample time?  You don't tell

2     me.

3          MR. RADIN:  It could be different statutes under

4     different state laws.

5          THE COURT:  But as few as three years?

6          MR. RADIN:  If it's three years we, still have

7     another -- the earliest it could start to run would be -- early

8     2014.  We still have plenty of time.

9          THE COURT:  You don't have plenty of time.  2014.

10          So if that happened in 2014, that means in 2017 the

11     statute will have run.

12          MR. RADIN:  If the statute -- Mr. Monk has said if the

13     board determines that a statute of limitations is approaching

14     and that it's in the best interests of the corporation to

15     pursue the claim based on what the corporation knows then, the

16     corporation can file a complaint.

17          THE COURT:  It may.  It may not.

18          MR. RADIN:  But if the corporation doesn't, then

19     Mr. Rosen can come back.

20          Mr. Rosen can make another demand.  Any time he wants

21     he can say you have a change in circumstances.

22          THE COURT:  Excuse me.  I don't find that an adequate

23     response.  Without a clear knowledge of the statute of

24     limitations, without a clear knowledge of how this case would

25     impact on those other lawsuits, there's nothing here of any

G629WITA

1     substance.

2              MR. RADIN:  I would respectfully suggest, your Honor,

3     that Judge Rakoff came out differently in the Merrill Lynch

4     case.  That was affirmed in the Lambert decision in the Second

5     Circuit in I believe 2012.  Judge Castel ruled differently in

6     Bank of America.  We've cited the Morefield case, the Furman

7     case, that any number of decisions upheld boards who have

8     determined that it's in the best interests of the corporation,

9     even if the statute of limitations were approaching an end, but

10    that's not the case here.

11             THE COURT:  Anything else?

12             MR. RADIN:  On this point I would urge the court to

13    look at the decisions cited in our brief.  There really are a

14    lot of them.  That this would be a -- I don't want -- with due

15    respect, it would be an unprecedented decision.

16             You yourself quoted, in Boston Scientific, Judge

17    Winter's statement way back in RCM 1991.  Few, if any,

18    plaintiffs can surmount the business judgment rule obstacle in

19    this context.  The Second Circuit Chief Judge Katzmann last

20    year in Espinoza quoted that twice.  This is a very difficult

21    standard and if this --

22             THE COURT:  I know it's difficult.

23             MR. RADIN:  If this allegation were sufficient, it

24    could be made in almost any case.

25             THE COURT:  That's not true.  Perhaps there's not an

G629WITA

adequate report here because perhaps there's not an adequate

evaluation.

        So the report is that the ongoing derivative lawsuit

would create damage to the company's defenses in other

lawsuits.  In other words, the interest of the company in

defending against the other claims outweighs the interest of

the company in recovering from ousted directors and officers.

        MR. RADIN:  No.  It outweighs it at this time.  In

June of 2015.

        THE COURT:  So, Mr. Radin, suppose you were to make a

motion to stay the other discovery or to the extent it exceeds

the discovery going on in the class action to stay further

discovery, wouldn't that protect you?

        MR. RADIN:  No.  We're fully protected because the

statute of limitations has time to run.

        THE COURT:  But if you were to sue -- if the board

were to sue, if the board would authorize suit and you're

worried about endangering the company's defenses, couldn't that

be taken care of by an appropriate stay of discovery.

        MR. RADIN:  I think one of -- the second reason the

board gave was that it's going to watch what's happening in the

class action.  We have very skilled, experienced, sophisticated

plaintiffs' lawyers prosecuting that case.  The board will

watch what's going on and make a business judgment at the

appropriate time, with respect.  Nothing bad is happening to

G629WITA

1   the company.

2          THE COURT:  So the company would undertake the expense

3   of watching the litigation?  Does that mean that they send

4   someone to every deposition?  Does that party have standing to

5   attend the depositions?

6          MR. RADIN:  The company is a defendant in the

7   litigation.

8          THE COURT:  But now the company is in the position of

9   a potential plaintiff.  There's a conflict.

10          MR. RADIN:  The company is --

11          THE COURT:  The representatives of the company as a

12   defendant is in conflict with the interest of the company as a

13   plaintiff.

14          MR. RADIN:  Well the company -- first, the company's

15   interest is doing what's best for the company.  And if the

16   company believes that what's best for the company is to

17   prosecute claims against others and contribution or whatever,

18   it would do so.

19          Secondly, the company is represented by Saul Ewing for

20   this purpose.  It has separate counsel.

21          THE COURT:  Is Saul Ewing going to be attending every

22   deposition?

23          MR. RADIN:  That would be a decision that Saul Ewing

24   makes.  It's not a decision for me.  I would assume they would.

25          THE COURT:  It would presumably be a decision for the

G629WITA

1    company to make.

2              Supposing one of the parties to that litigation

3    objects to the presence of Saul Ewing.  What status do they

4    have?  It's a private --

5              MR. RADIN:  They represent the company in this

6    litigation.  They've made an appearance.  They have the same

7    right.

8              THE COURT:  But this litigation, you say, shouldn't be

9    going on, it should be dismissed.  Once it's dismissed there is

10   no more standing for Saul Ewing.

11             MR. RADIN:  You are correct there.  They would be

12   attending the depositions in the class action, not this

13   derivative action.  If somebody objected to their presence we

14   would deal with that question then.

15             THE COURT:  I have to deal with it now.  Because you

16   want me to dismiss the lawsuit and I have to examine whether I

17   should.

18             Mr. Monk.

19             MR. MONK:  Your Honor, with respect to keeping an eye,

20   if you will, on the securities class action and the other

21   litigation, on behalf of the board of the company.  Certainly

22   the company is entitled to have its counsel in that litigation

23   report to the board on the status of that litigation and for

24   its independent counsel advising it in connection with this

25   demand and anything that it might pursue as reflected in this

1    demand to be appraised of the developments in those cases.

2    That counsel has a fiduciary responsibility to the company to

3    fully inform the company.  We have access to whatever

4    information they would have.  I don't have to sit in the

5    depositions to make a judgment about the viability of pursuing

6    the claim.  I can seek the information from counsel.  That's

7    point one.

8            THE COURT:  Wouldn't a derivative plaintiff be in a

9    better situation since he's not conflicted in any way?

10           MR. MONK:  Your Honor, I don't believe I'm conflicted

11   in any way but I don't believe a derivative plaintiff --

12           THE COURT:  You're as good as your principal.  Your

13   principal is conflicted and it's looking with an eye to saving

14   liability potential.

15           MR. MONK:  But that's precisely what --

16           THE COURT:  It doesn't give him an opportunity to

17   consider, especially since he's not valued any of these claims,

18   how good a claim he has against Mr. Schorsch and company.

19           MR. MONK:  Your Honor, if I could just be heard on

20   that issue.

21           So my client here is a board of directors now a

22   completely independent board of directors who was not involved

23   in any way in the allegations involved here.  That board of

24   directors is certainly in a position to make what it considers

25   its best business judgment on behalf of the company on how to

24

G629WITA

|     |                                                                      |
| --- | -------------------------------------------------------------------- |
| 1   | manage the securities claims that are coming against it and the      |
| 2   | affirmative claims that it may have against others.                  |
| 3   |        The analysis that we did here was to say at the time |
| 4   | the demand was made the right decision for the company was to        |
| 5   | say we've got plenty of time on the statute of limitations.          |
| 6   | There is no reason to pursue these claims now but it makes good      |
| 7   | strategic business sense --                                          |
| 8   |        THE COURT:  If it's a three-year statute how much time |
| 9   | do you have?                                                         |
| 10  |        MR. MONK:  Your Honor, the earliest the company was |
| 11  | informed of any of this was September of 2014 when the audit         |
| 12  | committee became aware of the vice through a tip.                    |
| 13  |        THE COURT:  But the vice is not when the fraud was |
| 14  | uncovered.  The vice is when it happened.  Because this is a         |
| 15  | tort case, I believe?                                                |
| 16  |        MR. MONK:  Yes.                               |
| 17  |        THE COURT:  So I think the statute runs from when the |
| 18  | damage was incurred.                                                |
| 19  |        The damage was incurred not when it was found out that |
| 20  | there had been fraud -- and I assume there's fraud because it's     |
| 21  | an allegation I must accept -- it's when the fraud took place.      |
| 22  |        MR. MONK:  Right, your Honor.                 |
| 23  |        The discovery rule will apply.  So it would be three |
| 24  | years from the time that you knew or should have become aware       |
| 25  | of the circumstances.                                               |

G629WITA

1          The first time the company was aware of this was when

2     the tip came in, in September of 2014.  So, under Maryland law

3     it would be three years from that time.  In other

4     jurisdictions, we have longer periods of time.  As Mr. Radin

5     has said, there are additional claims that can be brought as

6     indemnification claims.

7          The other point I would make, your Honor, is in

8     resolving the securities class action there is no question that

9     the company will be seeking to involve other parties, other

10    putative defendants in any of the lawsuits that we might bring,

11    to bring about a resolution of that.  That would encompass

12    presumably whatever claim the company may have against these

13    individuals.  It will all be resolved as part of that case.  To

14    do it independently in this case then creates additional issues

15    associated with resolving the securities class action, which is

16    the analysis the company's board made in saying we would prefer

17    to wait at this time and to see how the securities class action

18    develops, to see how the federal securities investigation

19    develops

20         THE COURT:  I would feel better about it if there were

21    a tolling agreement.

22         MR. MONK:  Your Honor, I've handled these cases

23    before.  The time for tolling agreements comes when you get

24    closer to the statute of limitations.

25         THE COURT:  Not necessarily, Mr. Monk.

26

G629WITA

| | |
|---|---|
| 1 | MR. MONK:  My experience has been, your Honor, that |
| 2 | the putative defendant says I'm not going to give you a tolling |
| 3 | agreement at that point, which then forces you to decide am I |
| 4 | going to file a lawsuit or just stand on my hands. |
| 5 | THE COURT:  You may very well have to file a lawsuit |
| 6 | because if they say no now they'll say no then.  They'll say no |
| 7 | later, and you're in a tough position because you're right up |
| 8 | against a deadline. |
| 9 | MR. MONK:  I've done several of these cases and I've |
| 10 | gotten tolling agreements but they usually come, in my |
| 11 | experience, at the time that it's close to the deadline. |
| 12 | THE COURT:  They come when there's pressure. |
| 13 | MR. MONK:  When there's pressure, correct. |
| 14 | THE COURT:  No one to postpone the day that suits have |
| 15 | to be brought.  No one wants to eliminate the protection of the |
| 16 | statute of limitations. |
| 17 | MR. RADIN:  Your Honor, could I suggest that since the |
| 18 | issue before the court today is the business judgment in June |
| 19 | of 2015, that Mr. Monk be asked to go back to the board and |
| 20 | advise the board concerning what your Honor's views are and |
| 21 | ascertain whether or not the board in the first instance wants |
| 22 | to seek tolling agreements, whether the board can obtain them, |
| 23 | etc. and report back to you in a short period of time. |
| 24 | THE COURT:  That's possible.  But I want to study this |
| 25 | more before I do that.  Thank you. |

G629WITA

```
 1              MR. RADIN:  One more point, your Honor, as I was
 2     looking at my notes while you and Mr. Monk were speaking.
 3              In addition to the Merrill Lynch and Lambert cases
 4     that I referred to earlier and the Bank of America case, the
 5     Second Circuit's decision in Espinoza last year, Judge Katzmann
 6     includes a line stating that, "A board's response to the
 7     stockholders' demands could expose the corporation to
 8     regulatory or legal risks and the board is entitled to and
 9     typically required to mitigate the risk in deciding how to
10     respond to the stockholders' demands.  That's what I believe
11     this board sought to do.
12              THE COURT:  I think that's sound.
13              I understand these propositions.  I need some more
14     time to study them in relationship to this report.
15              MR. ROSEN:  May I be heard, your Honor?
16              THE COURT:  But I have a few issues.
17              MR. ROSEN:  May I be heard on this point, your Honor?
18              THE COURT:  Yes.
19              MR. ROSEN:  First --
20              THE COURT:  Podium.
21              MR. ROSEN:  -- we talk about other --
22              THE COURT:  Take the podium.
23              MR. ROSEN:  We talk about other jurisdictions'
24     statutes of limitations but the Supreme Court has made clear
25     that since this is a Maryland corporation we look to Maryland
```

G629WITA

 1  law.

 2              THE COURT:  I understand that.

 3              MR. ROSEN:  Other jurisdictions --

 4              THE COURT:  You've heard my attitude.  The attitude is

 5  that we have to think of it as a three year statute of

 6  limitations, presumably from notice.  And since the people who

 7  represented the company were those who were involved in the

 8  fraud, there's another wrinkle there because you don't know

 9  when notice occurred.  So for safety's sake I think one needs

10  to consider that the statute of limitations will run out in

11  about a year.

12              MR. ROSEN:  Correct.

13              THE COURT:  And if we're worrying about dismissing

14  this lawsuit with leave to bring it again if the statute of

15  limitations is impending, it's like tomorrow.

16              So I don't see any point here.  And that's why I said

17  that I'd look better on the arguments if there were a tolling

18  agreement in place.

19              If defendants refuse to give a tolling agreement, then

20  it may be that your arguments for suing them are advanced.

21              MR. ROSEN:  The cases that were cited by defendants

22  were all Delaware cases.  This is a Maryland --

23              THE COURT:  Well Maryland looks to Delaware law.

24              MR. ROSEN:  But not on certain issues.  And

25  Maryland --

G629WITA

| | |
|---|---|
| 1 | THE COURT:  If there's Maryland law in place, the |
| 2 | Maryland courts undoubtedly will look to Maryland law.  They |
| 3 | will be affected by Delaware law because, as I've written in my |
| 4 | previous order in the case, they do look to Delaware law. |
| 5 | MR. ROSEN:  But let me speak to this board and how |
| 6 | it's handled the demand.  There are six members of the board |
| 7 | who refused demand.  Three of those members were on the board |
| 8 | while -- |
| 9 | THE COURT:  Six members who refused demand -- sorry. |
| 10 | MR. ROSEN:  Yes.  Six of them were there.  Three |
| 11 | Mr. Frank, Mr. Stanley, and Mr. Andruskevich were on the board |
| 12 | while misconduct was occurring of the. |
| 13 | Now, Maryland doesn't require a special litigation |
| 14 | committee be formed.  But they had the perfect opportunity here |
| 15 | for a special litigation committee because they had two new |
| 16 | directors who came on April 1.  They had Ms. Richardson and |
| 17 | Mr. Frayer.  In addition to those five, there was the CEO of |
| 18 | the company who was made a board member on April 1.  He was |
| 19 | beholden to the board for his salary and his position.  So I |
| 20 | would submit that there were four board members who should not |
| 21 | be considered independent for purposes only of deciding whether |
| 22 | or not to refuse demand.  And that seems particularly clear |
| 23 | from Saul Ewing's letter in which they stated the board's |
| 24 | refusal of demand where they talk about the 40 meetings that |
| 25 | the board of directors had, the 20 meetings that the audit |

G629WITA

```
 1   committee had, the 1.5 million documents taken off servers that
 2   were reviewed by the board, and the 200,000 pages of documents
 3   reviewed by Weil, Gotshal.  But the three new directors did not
 4   come on to the board until April 1 when most of those meetings
 5   had taken place.  Their decision was made on three meetings
 6   that took place after they became board members.  And this was
 7   not a board decision based on knowledge of the facts.  And
 8   that, under Maryland law, does not permit them to refuse
 9   demand.
10            THE COURT:  Okay.  Thanks.
11            I'd like to discuss another issue.
12            MR. RADIN:  To the extent, your Honor, it influences
13   your thinking, I can't speak for defendants I don't represent.
14            THE COURT:  There is no indication that the three were
15   just not as advised and not as informed as the other directors
16   and I'll view the merits of what they did as a whole and not
17   because of three who came on later and three who were there
18   earlier.  I'd like to discuss another issue with you.
19            Assuming I dismiss -- I already dismissed the single
20   federal claim and we are left with these state claims.  Should
21   I exercise discretion under 28 U.S.C. 1367 to retain the state
22   claims?
23            MR. ROSEN:  First, we're here under diversity.  We
24   have more than five million dollars -- well more than the
25   damage amount.
```

G629WITA

1          THE COURT:  So that answers the question.

2          MR. RADIN:  We're not here under diversity.  As we

3    note in our brief, Mr. Andruskevich is a citizen of Florida, as

4    is one of Mr. Rosen's clients.

5          THE COURT:  Mr. Rosen.

6          MR. ROSEN:  If it comes down to that we would either

7    drop the -- one of the plaintiffs or drop Mr. Andruskevich as a

8    defendant so as not to destroy diversity.  Otherwise, your

9    Honor, I think that you should -- even if that were an issue

10   which we can resolve --

11         THE COURT:  Well, there clearly isn't diversity.

12         MR. ROSEN:  At the moment there isn't, but we can drop

13   one of the plaintiffs to ensure.

14         THE COURT:  What you do you may do, but right now

15   there is no diversity.

16         So I put the question to you again.  Should I exercise

17   discretion and retain the state claims?

18         MR. ROSEN:  You should, your Honor, because you have

19   the securities case in front of you.  You are familiar with the

20   facts.  You're familiar with the issues.  And I believe that

21   under the circumstances you should exercise your discretion to

22   retain jurisdiction.

23         THE COURT:  Mr. Radin.

24         MR. RADIN:  We stated in our brief that we thought it

25   was prudent to have the cases all in one jurisdiction.

G629WITA

```
1                THE COURT:  So that's the answer.
2                The next point is the difficult nature of this
3      complaint.  It's a narrative.  It has all the vices that I
4      pointed out in the first iteration of a class action complaint.
5      It's very difficult to work with.
6                Assuming I find that there is a cause of action, is it
7      worthwhile in your opinion, Mr. Radin, to require Mr. Rosen to
8      amend?  Or should we live with what we have?
9                MR. RADIN:  Are you going -- I don't think there is a
10     cause of action.  Even if we --
11               THE COURT:  Assuming I find one, should I make him
12     amend to create a clearer statement of what he claims is wrong
13     or should we live with the existing complaint?
14               MR. RADIN:  If you find that there's a 12(b)(6) claim
15     then I'm not sure it would make terribly much difference.
16               THE COURT:  What 12(b)(6)?  I mean if I deny the
17     motion.
18               MR. RADIN:  But you haven't heard the 12(b)(6) motion
19     yet on the state law claims.
20               THE COURT:  I know.  I just asking generally.
21               MR. RADIN:  It's always nice to have a more clear
22     complaint but I don't think it would materially advance the
23     ball if you find that there's enough here but there's nothing
24     here.
25               THE COURT:  That's good.
```

G629WITA

1          MR. RADIN:  They can't reduce --

2          THE COURT:  Is there enough here?

3          MR. RADIN:  No, there is not.

4          THE COURT:  Go ahead.

5          MR. RADIN:  The principle state law claim is a breach

6    of fiduciary duty claim.  And on this point I speak on behalf

7    of the outside directors.  And other counsel will speak to the

8    extent they deem appropriate for their clients.

9          THE COURT:  Well, it's general.  That's true of

10   everybody, isn't it?

11         MR. RADIN:  No.  Because the allegation -- there are

12   different allegations against different individuals.

13         THE COURT:  Okay.

14         MR. RADIN:  We did, as your Honor asked, submit one

15   brief.  But we put separate things covering different

16   defendants.

17             With respect to the outside directors who I represent,

18   there are two grounds upon which the breach of fiduciary duty

19   claim fails.  One is statutory under Maryland law and one is

20   case law.  Maryland Corporations Code Section 5-418 permits

21   corporations to adopt charters and ARCP has done so, Section

22   8.01 of its charter, stating that there is no liability to the

23   corporation by a director unless the plaintiff alleges one of

24   two very specific things.  And this particular statute is more

25   exacting and intentionally more exacting than the Delaware

G629WITA

1      statute that you may have seen in other cases.

2              The first is -- and quote, an improper benefit or

3      profit in money.

4              THE COURT:  Well there is --

5              MR. RADIN:  Not on the part of the outside directors.

6      There is nothing in the complaint, whether they amend it to

7      shorten it, to make it more concise or anything, there is

8      absolutely nothing suggesting that any outside director got

9      anything other than ordinary outside director compensation.  We

10     challenged the plaintiff in our opening brief to say why --

11             THE COURT:  So the lawsuit can only go against the

12     people who got the benefit of the insiders' profits, insiders'

13     money, the consultants' fees and the advisory fees and the

14     like.  And no other director.

15             MR. RADIN:  If the lawsuit is going to go forward that

16     is the view that the outside directors would take, yes.

17             THE COURT:  So you're saying if it goes forward it

18     should go against Schorsch and maybe a couple of others but not

19     your clients.

20             MR. RADIN:  Not my clients.  I'm not here today to

21     point fingers, but I'm saying --

22             THE COURT:  I understand.

23             MR. RADIN:  The statute with respect to the outside

24     directors I represent, the statute requires an improper benefit

25     in profit or money.  There is nothing here but ordinary outside

G629WITA

1    directors fees.  And we've cited the cases that say that.  And

2    the plaintiff has not taken issue with that.

3             The second way you can sue directors in Maryland is --

4             THE COURT:  The case is -- go ahead.  I'm sorry.

5             MR. RADIN:  You need a finding of active and

6    deliberate dishonesty.  The words active and deliberate

7    dishonesty do not appear in the complaint with respect to any

8    outside director.  Maryland law for this purpose defines

9    dishonesty as lying or an intent to commit fraud.  There is no

10   allegation that any outside director lied.  There is no

11   allegation of fraud against any outside director.  Certainly

12   not under 9(b) pleading rules there isn't.  The plaintiffs on

13   page 39 concede that the breach of fiduciary duty is not a

14   fraud claim.

15            THE COURT:  So you're making these arguments on behalf

16   of Andruskevich, Frank, Michelson, Rendell and Stanley?

17            MR. RADIN:  Yes.  And one other director.

18            THE COURT:  What about that, Mr. Rosen?

19            And one other?

20            MR. RADIN:  There is one other director represent by

21   Mr. Oppenheimer.

22            MR. OPPENHEIMER:  My client, Mr. Bowman, is also an

23   outside director who is similarly situated to Mr. Radin's

24   clients.

25            THE COURT:  What about that, Mr. Rosen?

G629WITA

1              MR. ROSEN:  We would look to the compensation that

2       they received which was not insubstantial.  These directors

3       were receiving --

4              THE COURT:  There is no indication they got paid

5       anymore than directors get paid in companies of this size.

6              MR. ROSEN:  $150,000 a month in certain instances.

7              MR. RADIN:  There were certain payments made to a

8       couple of directors after management left.  A couple of the

9       outside directors stood up and said we'll take over, until we

10      get new management, then we will take care of this company.

11             THE COURT:  So in exchange for various expansions of

12      services.

13             MR. RADIN:  But that was after the fact.  Certainly

14      not during the period of time any wrongdoing is alleged.

15             THE COURT:  Mr. Rosen.

16             MR. ROSEN:  There were substantial payments made but

17      perhaps not $150,000 a month during the period, but they

18      received substantial payments.

19             THE COURT:  Is there anything in the complaint that

20      satisfies these two prongs of Maryland Section 5-418.

21             MR. ROSEN:  Section 5-418 has been determined in more

22      recent Maryland cases as being an affirmative defense.  It's

23      not a 12(b)(6) dismissible argument.  And to look to what

24      compensation is --

25             THE COURT:  I don't think it's an affirmative defense.

G629WITA

1    It's not any particular matter as to which a defendant has

2    peculiar knowledge.  It's the plaintiffs' allegation that there

3    is no improper benefit to any director who is sued.  And the

4    allegation of active and deliberate dishonesty is a type of

5    scienter that's customarily the obligation of plaintiffs to

6    allege and in particular.

7              No.  I don't follow those.  Whether it's an

8    affirmative defense or a matter for the complaint or as a

9    matter of federal law.  And I hold that it's a matter of proof

10   for the plaintiff to plead.

11             So is the case then dismissed against these defendants

12   that I mentioned or do you want a chance to replead?

13             MR. ROSEN:  Well to that extent --

14             THE COURT:  You're not going to be able to replead.

15             MR. ROSEN:  Then I won't ask for it.

16             THE COURT:  So the motion is granted as to those

17   defendants.

18             MR. RADIN:  We also have on behalf of my clients an

19   abuse of control and an unjust enrichment state law claim, two

20   state law claims.  The plaintiffs concede in their brief that

21   these are simply duplicates of the fiduciary duty claims.

22             THE COURT:  So the complaint is entirely dismissed

23   against your defendants.

24             MR. RADIN:  Thank you, your Honor.

25             THE COURT:  And Mr. Bowman.

G629WITA

1            MR. OPPENHEIMER:  Thank you, your Honor.

2            THE COURT:  So there are other defendants.

3            MR. OPPENHEIMER:  Yes, your Honor.  I also represent

4   Mr. Kahane and Mr. Weil in this action.

5            THE COURT:  Are they similarly situated?

6            MR. OPPENHEIMER:  Mr. Kahane and Mr. Weil are alleged

7   to have been directors of the company but inside directors.

8   Mr. Weil is also alleged to have had an officer position at

9   certain times ending in June 2014.

10           THE COURT:  So how shall I treat them?

11           MR. OPPENHEIMER:  I think the same rationale that

12  Mr. Radin discussed.

13           THE COURT:  Probably Mr. Rosen could allege those two

14  prongs against them.

15           MR. OPPENHEIMER:  Well, your Honor, I don't believe he

16  does.

17           THE COURT:  I agree.  But probably he can.

18           MR. OPPENHEIMER:  Well regardless of whether he can,

19  he does not in this complaint.  The complaint does not allege

20  any actions at all by Mr. Kahane.

21           THE COURT:  Do you want a chance to replead?

22           MR. ROSEN:  No.

23           THE COURT:  With Kahane and Weil?

24           MR. ROSEN:  No, your Honor.

25           THE COURT:  You think you've done it?

G629WITA

1          MR. ROSEN:  Yes.

2          THE COURT:  Show me where.

3          MR. ROSEN:  At paragraph 24 we state that Mr. Kahane

4     cofounded ARCP with defendant Schorsch, served as a director of

5     ARCP from February 28, 2013 to June 24, 2014.  At relevant

6     times he served as an officer and director of various entities

7     affiliated with Schorsch and ARCP.  Defendant Weil served as

8     ARC's president, treasurer, and secretary from its formation.

9          THE COURT:  I have these statements and their

10    positions.  You need more than that.

11         MR. ROSEN:  Right.

12         So, at paragraph 102 in their restatement at the

13    second bullet point on page 50 the audit committee's

14    investigation identified certain payments made by the company

15    to ARC Properties Advisors and certain of its affiliates that

16    were not sufficiently documented or otherwise warrant security.

17         THE COURT:  Scrutiny.  Warrant scrutiny.

18         MR. ROSEN:  Scrutiny, I'm sorry.

19         Now if I could take your Honor back to paragraph 48,

20    at the risk of going backwards.  Prior to January 8, 2014 an

21    external manager called ARC Properties referred to in the

22    restatement was responsible for day-to-day affairs of ARCP.

23    ARC Advisors was controlled by defendants Schorsch, Block, Weil

24    and Kahane.  Schorsch was the CEO.

25         So, they stated that there were improprieties in

G629WITA

1   dealings between ARCP and this other corporation of which

2   Messrs. Weil and Kahane were officers and had a controlling

3   issue.  They got something from ARCP.  We're alleging they got

4   something from ARCP through Advisors of which they had a

5   controlling interest.

6           MR. OPPENHEIMER:  Your Honor, they don't allege that.

7           THE COURT:  But they were providing services.  So if

8   you want to allege waste and mismanagement you've got to allege

9   more than you have.

10          For example, Schorsch was getting duplication of

11  compensation, was being paid in one instance by ARCP as an

12  advisor -- as an officer and another indication as an advisor

13  to do the same thing.  So it's a double payment.  But you

14  haven't alleged it.  It's got to be combined through

15  comparisons of various paragraphs.  It's a bad pleading.

16          The motion is granted with leave to replead against

17  Kahane and Weil and probably other defendants as well.

18          MR. OPPENHEIMER:  Thank you, your Honor.

19          THE COURT:  Other defendants?  Who is speaking for

20  them?  Any motion?

21          Come up.  What's your name?

22          MR. LERER:  My name is Justin Lerer, good morning, for

23  Mr. Schorsch.

24          THE COURT:  Are you signed in?

25          MR. LERER:  I have, your Honor.  I would like to just

G629WITA

1    make a claim -- an argument that I think several defendants

2    have made and it wasn't clear to me if you had ruled on this.

3              THE COURT:  I don't think I have your name here.

4              MR. LERER:  First name Justin, common spelling.  Last

5    name L-E-R-E-R from Paul, Weiss, Rifkind, Wharton & Garrison

6    for Mr. Schorsch.

7              THE COURT:  Justin, what's your last name?

8              MR. LERER:  My last name is Lerer, L-E-R-E-R, your

9    Honor.

10             THE COURT:  From Paul, Weiss.

11             MR. LERER:  Yes, sir.

12             THE COURT:  For Schorsch.  Okay.

13             MR. LERER:  Perhaps I misheard you, and you ruled on.

14   Several defendants have just raised, and Mr. Schorsch is among

15   them, the argument the abuse of control claim does not exist.

16             THE COURT:  I'm sorry.  I'm not hearing you.

17             MR. LERER:  Several defendants --

18             THE COURT:  It's not working.  Speak to me louder.

19             MR. LERER:  Several defendants, including

20   Mr. Schorsch, have raised an argument which I do not think you

21   addressed, unless I misheard you, that the abuse of control

22   claim does not exist at all under Maryland law.

23             THE COURT:  It's a means to get to somewhere else.

24   What are the claims here?  What are the state claims?

25             MR. LERER:  The claims against Mr. Schorsch are a

G629WITA

1    breach of fiduciary duty claim, the abuse of control claim.

2    That does not exist.  And an unjust enrichment claim.

3            THE COURT:  It all subsets breach of fiduciary duty.

4            MR. LERER:  So then I guess your Honor Mr. Schorsch

5    would ask.

6            THE COURT:  It's one claim.  These are claims for

7    waste and mismanagement are the same as breach of fiduciary

8    duty.  It's a common law claim with statutory clothing against

9    directors and officers who breach their obligations to the

10   company.

11           MR. LERER:  Your Honor, my understanding, the court

12   then to dismiss the other formulations of it and there are only

13   would remain a breach of fiduciary claim --

14           THE COURT:  The others are just different wordings.

15   You'll fix that up, please, Mr. Rosen.

16           MR. ROSEN:  Yes, your Honor.

17           MR. LERER:  Thank you, your Honor.

18           THE COURT:  So that's the only motion you're making?

19           MR. LERER:  Well we joined, your Honor, in Mr. Radin's

20   motions.

21           THE COURT:  I want you to redraft this complaint,

22   focusing -- conform it to my rulings and then in those state

23   claims focus it on what the statutes require.

24           MR. ROSEN:  Just to be clear, your Honor.

25   Mr. Schorsch, Mr. Block, and Ms. McAlister did not move to

G629WITA

1    dismiss the breach of fiduciary duty claims.  And Mr. Kay -- I

2    don't know if anybody has spoken for Mr. Kay.

3              THE COURT:  I haven't heard anybody.

4              MR. ROSEN:  You've already sustained the 10-B claim

5    against him in the securities case.

6              THE COURT:  You can keep the complaint as is.  If you

7    don't add anything, then you have the defendants.  But if you

8    want to sue -- I see somebody who is just standing up to make

9    an argument.  Who are you, sir?

10             MR. PARISH:  Your Honor, Jason Parish for Mr. Kay.

11             THE COURT:  Have you signed in?

12             MR. PARISH:  I have not signed in.

13             THE COURT:  So I don't want to hear you.

14             MR. PARISH:  Pardon me.

15             THE COURT:  I don't want to hear you.

16             If you want to keep anybody else in, then you have to

17   amend.  If you're not going to amend, you leave it the way it

18   is.

19             Did Mr. Kay make a motion?

20             MR. PARISH:  Yes, your Honor.

21             THE COURT:  Why are you not up here?

22             MR. PARISH:  I unfortunately came in late.  I was

23   delayed getting here. I apologize.

24             THE COURT:  What's your name?  Come up.

25             MR. PARISH:  Jason P-A-R-I-S-H.

G629WITA

1          THE COURT:  What firm?

2          MR. PARISH:  From Kirkland & Ellis.

3          THE COURT:  You represent?

4          MR. PARISH:  David Kay.

5          THE COURT:  Who do you align with?

6          MR. PARISH:  Mr. Kay was the president and briefly CEO

7    of the company.  He is one of the officers of the company.

8          THE COURT:  And was he also involved with the ARC

9    Advisors?

10          MR. PARISH:  No.

11          THE COURT:  So what's your motion?

12          MR. PARISH:  Our motion was to dismiss the breach of

13    fiduciary duty claim.  We're prepared for the most part to

14    stand on the papers.  I just wanted to note though under

15    Section 5 --

16          THE COURT:  I don't want to study the papers again.

17    What's your point?

18          MR. PARISH:  So it's two points.  Active and

19    deliberate dishonesty, improper benefit.

20          THE COURT:  The same points that were made before.

21          MR. PARISH:  Active and deliberate dishonesty.

22          THE COURT:  So, Mr. Rosen, if he wants to keep Kay as

23    a defendant will have to make those allegations in proper form.

24    So the motion to dismiss is granted with leave to replead.

25          Anything else, folks?

G629WITA

1          MR. OPPENHEIMER:  Very briefly, your Honor, if I may.

2          THE COURT:  We have somebody -- I've heard you already

3     Mr. Oppenheimer.

4          MR. PETRILLO:  Guy Petrillo for Ms. Beeson.  And we

5     have the very same arguments that you've heard for Mr. Kay.

6          THE COURT:  Same rule.

7          MR. PETRILLO:  On a separate matter, I apologize.  I

8     was not here yesterday.  I had moved to proceed by submission

9     and I erred in not checking that you had approved of that

10    application.

11         THE COURT:  I had approved.

12         MR. PETRILLO:  It was on consent, but it had not been

13    approved.  I did not show and I apologize for --

14         THE COURT:  Your apology is accepted.

15         Anything else?

16         Mr. Oppenheimer.

17         MR. OPPENHEIMER:  If I may, very briefly.  As to the

18    jurisdiction issue.  In the brief my clients agreed that

19    supplemental jurisdiction would be in the interests of judicial

20    efficiency if the court were to dismiss the claims.

21         THE COURT:  Thank you.

22         MR. OPPENHEIMER:  But we do intend to challenge

23    jurisdiction should the plaintiff replead.

24         THE COURT:  You will do what?

25         MR. OPPENHEIMER:  We intend to challenge jurisdiction

G629WITA

```
 1  if the plaintiff repleads.  We do not think that the court
 2  should exercise discretion to keep the state law claims.  We
 3  think it would be more efficient --
 4           THE COURT:  Did you make a motion on that ground?
 5           I've thought about it, Mr. Oppenheimer.  And as much
 6  as I'd like to let the claims go, it seems to me that if I have
 7  all of the class actions it would not do well to put this over
 8  into another court.  There is no way another judge, even a
 9  justice in the Supreme Court, could coordinate the different
10  cases in a way that would do justice to both.  I need to keep
11  this case even though I don't want to.
12           MR. OPPENHEIMER:  Thank you, your Honor.
13           THE COURT:  So you can go by that ruling and we'll put
14  that into our order.
15           Anything else?
16           Mr. Rosen, how much time do you need or want?
17  Understanding that you will not ask me for an enlargement.
18  Think about it and tell me how much time you want.
19           MR. ROSEN:  Probably two weeks, your Honor.
20           THE COURT:  You're not going to do it in two weeks.
21           MR. ROSEN:  Four weeks.
22           THE COURT:  I will give you until June 30.
23           July 22 to answer.
24           Status conference on August 12 at 11:00, which will be
25  the initial case management conference in this case.
```

G629WITA

1          One minute.  Let me take that back.

2          Let me say a few things and then ask you for your

3    advise before I set a date.  I have to -- I'm going to reserve

4    decision on the Rule 23.1 motion, I should have said that

5    before, with the expectation that it will issue so as not to

6    interfere with the pleading requirements.  Because if I grant

7    the motion that means that the whole case is gone.  If I deny

8    the motion then what I said before as the dates would apply.

9    And I'm hoping that I can come in early enough so you have

10   enough time to plan accordingly.

11         Assuming that I hold that the cause of action can

12   stay, I think defendants are -- for the company are going to

13   want to intervene in some fashion to express their view for the

14   need of some protective order so that the discovery in this

15   case will not conflict with the defense of the company in the

16   investigations and other proceedings that are going on of which

17   I've heard but really don't know.

18         It's probably worthwhile to have a case management

19   conference to discuss that, put off for a related date

20   exchanges of information, initial disclosures and the like.

21         What do you think, Mr. Rosen?

22         MR. ROSEN:  I think that makes sense, your Honor.

23         THE COURT:  So the conference date of August 12 at

24   11:00 will be for the purpose of discussing the relationship of

25   this lawsuit with the class action lawsuits and other

G629WITA

1      litigation with which the company is involved.

2              Who represents the company in those other lawsuits?

3              MS. APPS:  In the class action, the other

4      individual --

5              THE COURT:  Ms. Apps?

6              MS. APPS:  Yes.  Antonia Apps for the company ARCP.

7              THE COURT:  You should come.  You'll need to take an

8      active role in that conference.

9              MS. APPS:  Yes, your Honor.

10             THE COURT:  It will probably make sense for some

11     formal submission.  We'll try to get in touch with you

12     beforehand so that you could be on record of what you think is

13     in the best interests of the company recognizing every

14     plaintiffs need to go forward.  We'll have more to say as we go

15     along with that.

16             Anything else?

17             Thank you all.

18             (Adjourned)

19

20

21

22

23

24

25