UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| JOANNE WITCHKO, Derivatively on Behalf of Nominal Defendant AMERICAN REALTY CAPITAL PROPERTIES, INC., <br><br>            Plaintiff, <br>    v. <br><br> NICHOLAS S. SCHORSCH, et al., <br><br>            Defendants, <br> and <br><br> AMERICAN REALTY CAPITAL PROPERTIES, INC., <br><br>         Nominal Defendant. | Lead Case No. 15-cv-6043-AKH <br><br> (Consolidated with Case No. 15-cv-8563-AKH) <br><br> **AMENDED VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT** <br><br> **JURY TRIAL DEMANDED** |

Plaintiff Joanne Witchko, by and through her undersigned attorneys, brings this amended derivative complaint for the benefit of nominal defendant, American Realty Capital Properties, Inc. ("ARCP" or the "Company"), against certain former officers and members of its Board of Directors (the "Board") seeking to remedy defendants' breaches of fiduciary duties.   All facts relating to plaintiff and her own acts are pled on personal knowledge, while other facts are pled upon information and belief.

## SUMMARY OF THE ACTION

1.      ARCP,[1]  is a publicly traded Real Estate Investment Trust ("REIT") incorporated under the laws of Maryland.   The Company is a component of a REIT business empire built by ARCP's former Chief Executive Officer ("CEO"), defendant Nicholas S. Schorsch ("Schorsch").

2.      ARCP went public in September 2011.   Fueled by acquisitions, the Company grew quickly and by mid-2014 was the largest REIT of its kind in the U.S., with assets of approximately $21 billion.   ARCP owns and operates single-tenant, freestanding, commercial real estate properties, and earns money by leasing them to primarily corporate clients.   A typical ARCP property might be, for example, the type of structure that houses a Walgreens pharmacy or a Red Lobster restaurant.

3.      On October 29, 2014, ARCP stunned the markets when it disclosed intentional accounting errors in its financial statements for 2013 and the first half of 2014.   The accounting manipulation, which made the Company appear more successful than it really was, involved a REIT-specific financial measure that ARCP consistently told shareholders was the best metric to measure the Company's performance.

---

[1]      ARCP now operates under the name VEREIT, Inc.

4. After revealing the wrongdoing, defendants initially attempted to blame several subordinate executives and terminated them.  However, one of these executives sued the Company and certain other defendants for defamation.   Although the suit was later settled, the allegations reveal that defendants had known of the accounting manipulation since at least February 2014 and not only declined to halt it, but attempted a cover-up.

5. Ultimately, defendant Schorsch, most of the Board, and the other senior executives of ARCP resigned or were forced out.   The Company restated its financial statements for all years and most quarters since going public.   It also became clear that the accounting manipulation went far beyond what was initially revealed, and the wrongdoing went beyond accounting manipulation: defendant Schorsch and other defendants had hugely enriched themselves by plundering ARCP through fraud and self-dealing.

6. ARCP shareholders have lost billions in market capitalization.   The Company faces numerous lawsuits under the federal securities laws, including a securities class action that has been sustained on a motion to dismiss.   ARCP is the subject of a criminal probe by the Federal Bureau of Investigation ("FBI") and investigations by at least the U.S. Securities and Exchange Commission ("SEC"), the Securities Division of the Office of the Secretary of the Commonwealth of Massachusetts, and the U.S. Attorney's Office for the Southern District of New York.

7. In November 2014, plaintiff served a litigation demand on ARCP's Board (the "Demand").   The Board refused the Demand approximately seven months later.   The Board's response to the Demand did not follow the process required by Maryland law.   It failed to convene an independent committee to investigate the Demand, even though half of ARCP's outside directors at the time were targets of the investigation and faced likely liability in the

securities class action.   The Board did not compile a report, interview any witnesses, review any documents, evaluate the merits of potential breach of fiduciary duty claims, examine the level of damages available, or analyze if delay in pursuing claims would prejudice the Company.   As a result, plaintiff's Demand was wrongfully refused and plaintiff should be permitted to maintain this action on behalf of ARCP and its absent shareholders.

8.     This action seeks to recoup losses ARCP has already sustained and will continue to sustain in connection with the wrongdoing alleged herein, the accounting restatement, and all related proceedings.

**JURISDICTION AND VENUE**

9.     This Court has subject matter jurisdiction under 28 U.S.C. § 1332(a)(l) because complete diversity exists between plaintiffs and each defendant, and the amount in controversy exceeds $75,000 exclusive of interest and costs.   This action is not a collusive one designed to confer jurisdiction upon a court of the United States that it would not otherwise have.

10.     This Court has jurisdiction over each defendant because each defendant is either a corporation that conducts business in and maintains operations in this District, a citizen of New York, or an individual with sufficient minimum contacts with this District so as to render the exercise of jurisdiction permissible under traditional notions of fair play and substantial justice.

11.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(a) because during the wrongdoing alleged herein ARCP maintained its principal place of business in this District, one or more of the individual defendants resides in or maintains an office in this District, a substantial portion of the transactions complained of herein occurred in this District, and defendants have received substantial compensation in this District by doing business here and engaging in numerous activities that had an effect in this District.

## THE PARTIES

**Plaintiff**

12.     Plaintiff Joanne Witchko currently owns 1,000 shares of ARCP common stock, and has held shares of ARCP common stock continuously since prior to the revelations of wrongdoing alleged herein.   Plaintiff is a citizen of Florida.

**Nominal Defendant**

13.     ARCP is a publicly traded REIT organized under Maryland law.   The Company maintains its corporate headquarters at 2325 E. Camelback Road, Suite 1100, Phoenix, Arizona 85016.   ARCP acquires, owns, and operates single-tenant and multi-tenant commercial real estate properties.   ARCP's properties are primarily leased to corporate tenants.   When this action was commenced, ARCP stock traded on the NASDAQ Exchange under the symbol "ARCP."   The Company's stock now trades on the NASDAQ Exchange under the symbol "VER."   ARCP is a citizen of Maryland and Arizona.

**Individual Defendants**

14.     Defendant Schorsch founded ARCP and served as its CEO and Chairman of the Board during the wrongdoing.   He ceased serving as CEO on October 1, 2014 and as Chairman on December 15, 2014.   At relevant times, defendant Schorsch served as an officer and/or director at numerous entities affiliated with ARCP.   In addition to his executive and directorial positions at ARCP, defendant Schorsch controlled the Company through ARCP's former manager, ARC Properties Advisors, LLC (the "Manager"), which conducted ARCP's business until January 2014.   Defendant Schorsch owned and was a member of AR Capital, LLC ("AR Capital"), which wholly owned the Manager.   In addition to the schemes he employed to direct ARCP's money to himself through his affiliated entities, defendant Schorsch was highly

compensated as CEO of ARCP.   He was entitled to 42.5% of an over-$100 million executive compensation pool (described below), as well as: (a) a guaranteed base salary of $1.1 million in 2014; (b) an estimated $8.8 million cash bonus and equity awards; (c) a "retention grant" of $24.9 million, paid over nine years in installments of $2.8 million.   Defendant Schorsch breached his fiduciary duties, acted with active and deliberate dishonesty, and retained improper benefits as set forth more fully herein and as alleged in Count I (¶¶ 143-48).   Defendant Schorsch is also a defendant in the related securities class action.   Upon information and belief, defendant Schorsch is a citizen of New York

15.   Defendant David S. Kay ("Kay") became President of ARCP in December 2013. He became a director in February 2014.   He replaced defendant Schorsch as CEO on October 1, 2014.   On December 15, 2014, defendant Kay resigned from all of his positions at ARCP. Defendant Kay's 2014 salary was $600,000 and he was awarded the following 2014 compensation: (a) a cash retention award of $4.6 million; (b) an equity retention award of $3.2 million; and (c) a $15,000 signing bonus.   In 2013, defendant Kay was given a cash bonus of $4.6 million and a stock award of $3.2 million.   Defendant Kay breached his fiduciary duties, acted with active and deliberate dishonesty, and retained improper benefits as set forth more fully herein and as alleged in Count II (¶¶ 149-54).   Defendant Kay is also a defendant in the related securities class action.   Upon information and belief, defendant Kay is a citizen of New York.

16.   Defendant William Kahane ("Kahane") co-founded ARCP with defendant Schorsch and served as an inside director of ARCP from February 2013 until June 24, 2014. Defendant Kahane served as President and Chief Operating Officer of ARCP from December 2010 until March 2012.   He was an executive officer of ARCP's Manager from November 2010

6

until March 2012 and a member of AR Capital, owner of the Manager.   Defendant Kahane also served as an officer and director of numerous other Schorsch-entities that did business with ARCP, such as RCS Capital Corporation ("RCS Capital"), which provided investment banking services to the Company.   Each of these companies received payments from ARCP during the relevant period.   Defendant Kahane breached his fiduciary duties, acted with active and deliberate dishonesty, and retained improper benefits as set forth more fully herein and as alleged in Count III (¶¶ 155-60).   Defendant Kahane is also a defendant in the related securities class action.   Upon information and belief, defendant Kahane is a citizen of New York.

17.   Defendant Edward M. Weil, Jr. ("Weil") served as ARCP's President, Treasurer and Secretary from its founding to June 24, 2014.   He served as an inside director from March 2012 until June 24, 2014.   Defendant Weil was an executive officer of the Manager from its formation in 2010 until January 2014, when ARCP transitioned to self-management, and a member of AR Capital, owner of the Manager.   Defendant Weil has served as a director and officer of numerous Schorsch-entities that did business with ARCP, including RCS Capital. Each of these companies received payments from ARCP during the relevant period.   Defendant Weil breached his fiduciary duties, acted with active and deliberate dishonesty, and retained improper benefits as set forth more fully herein and as alleged in Count IV (¶¶ 161-66). Defendant Weil is also a defendant in the related securities class action.   Upon information and belief, defendant Weil is a citizen of New York.

18.   Defendant Brian S. Block ("Block") served as ARCP's Chief Financial Officer ("CFO") and Executive Vice President from its formation in December 2010, and as its Treasurer and Secretary from December 2013, until his resignation on October 28, 2014.   He was employed by Schorsch-entities since approximately 2007.   Until January 2014, he served

7

as CFO and executive vice president of non-traded investment programs at AR Capital, of which he was also a member.   Defendant Block was a director of RCS Capital from February 2013 and its CFO and treasurer from February 2013 until December 2013.   Defendant Block signed the admittedly false and misleading financial statements.   Defendant Block breached his fiduciary duties, acted with active and deliberate dishonesty, and retained improper benefits as set forth more fully herein and as alleged in Count V (¶¶ 167-72).   Defendant Block is also a defendant in the related securities class action.   Upon information and belief, defendant Block is a citizen of New York.

19.     Defendant Lisa McAlister served as the Company's Chief Accounting Officer ("CAO") and Senior Vice President from November 2013 to October 2014, when she was forced to resign in connection with the accounting restatement.   Defendant McAlister breached her fiduciary duties, acted with active and deliberate dishonesty, and retained improper benefits as set forth more fully herein and as alleged in Count VI (¶¶ 173-78).   Defendant McAlister is also a defendant in the related securities class action.   Upon information and belief, defendant McAlister is a citizen of New York.

20.     Defendant Lisa Beeson served as the Company's President and COO from November 2013 to December 15, 2014.   In 2013, defendant Beeson was given a $750,000 cash bonus and a stock award of approximately $730,000.   Beeson signed the Form 10-K for the 2013 fiscal year containing misleading and inaccurate financial statements.   Defendant Beeson breached her fiduciary duties, acted with active and deliberate dishonesty, and retained improper benefits as set forth more fully herein and as alleged in Count VII (¶¶ 179-84).   Defendant Beeson is also a defendant in the related securities class action.   Upon information and belief, defendant Beeson is a citizen of New York.

21.     The defendants named in ¶¶ 14-20 are referred to herein as the "Individual Defendants."

## DUTIES OF THE INDIVIDUAL DEFENDANTS

22.     By reason of their positions as officers, directors, and/or fiduciaries of ARCP and because of their ability to control the business and corporate affairs of ARCP, the Individual Defendants owed ARCP and its shareholders fiduciary obligations of good faith, loyalty, and candor, and were required to use their utmost ability to control and manage ARCP in a fair, just, honest, and equitable manner.   The Individual Defendants were required to act in furtherance of the best interests of ARCP and its shareholders so as to benefit all shareholders equally, and not in furtherance of their personal interests or benefit.   Each director and officer of the Company owed to ARCP and its shareholders a fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, and the highest obligations of fair dealing.

23.     The Individual Defendants, because of their positions of control and authority as directors and/or officers of ARCP, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by the Company.   Because of their advisory, executive, managerial, and directorial positions with ARCP, each of the Individual Defendants had knowledge of material non-public information regarding the Company.

24.     To discharge their duties, the Individual Defendants were required to exercise reasonable and prudent supervision over the management, policies, practices and controls of the Company.   By virtue of such duties, the Individual Defendants were required to, among other things:

a.  Exercise good faith to ensure that the affairs of the Company were conducted in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business;

b.  Exercise good faith to ensure that the Company was operated in a diligent, honest and prudent manner, and complied with all applicable federal and state laws, rules, regulations and requirements, as well as all contractual obligations, including acting only within the scope of its legal authority;

c.  Exercise good faith to ensure that the Company's communications with the public and with shareholders were made with due candor in a timely and complete fashion; and

d.  When put on notice of problems with the Company's business practices and operations, exercise good faith in taking appropriate action to correct the misconduct and prevent its recurrence.

## SUBSTANTIVE ALLEGATIONS

### A.  Background

25.   ARCP's primary business is the ownership and acquisition of single-tenant, freestanding commercial real-estate properties subject to net leases.   These properties are the type of structures that house pharmacies like Walgreens and CVS, banks like Citizens Bank, and restaurants like Red Lobster, among others.   In a net lease, the tenant is responsible for expenses such as building maintenance and property taxes that would normally be the responsibility of the landlord.   The use of net leases allows ARCP to distribute as dividends the rent received from its properties after payment of fees.

26.   On September 7, 2011, ARCP's initial public offering raised approximately $70 million by selling 5.5 million shares for $12.50 each.   After the public offering, defendant Schorsch continued to completely control ARCP.   The Company's day-to-day business was managed by the Manager (ARC Properties Advisors, LLC), which was wholly owned by AR Capital.   The members of AR Capital were defendants Schorsch, Kahane, Block, and Weil, who, in addition to non-defendant Peter M. Budko, owned all the equity interests in AR Capital.

Defendant Schorsch also controlled ARCP through the Company's operating partnership, ARC Properties Operating Partnership L.P. (the "Operating Partnership").

27.     ARCP collects rents from its tenants and passes on to its shareholders a minimum of 90% of taxable income received.   Because ARCP's business model is based on the pass-through of rents to its shareholders, financial metrics measuring funds from operations are fundamental to understanding the Company's performance.   For this reason, ARCP reports its results using a financial measure called adjusted funds from operations ("AFFO"), a non-Generally Accepted Accounting Principles ("GAAP") financial measure based on funds from operations ("FFO").   ARCP defines FFO as "net income or loss computed in accordance with GAAP, excluding gains or losses from sales of property but including asset impairment write-downs, plus depreciation and amortization, after adjustments for unconsolidated partnerships and joint ventures."   AFFO is FFO adjusted to exclude acquisition-related fees and expenses, amortization of above-marketplace assets and liabilities, amortization of deferred financing costs, straight-line rent, non-cash mark-to-market adjustments, amortization of restricted stock, non-cash compensation and gains and losses adjusted for recurring capital expenditures used to maintain the underlying assets.

28.     At all relevant times, ARCP's public filings referred to AFFO as the most important metric for understanding the Company's financial performance and prominently reported and discussed AFFO in its financial statements, press releases, and quarterly conference calls.   Time and again, defendants told investors that AFFO was the prime indicator of the Company's performance.

**B.    Defendant Schorsch's Tangled Web Of Related Entities**

29.    ARCP is at the center of a complex network of companies created and controlled by defendant Schorsch.    In addition to the Manager, AR Capital, the Operating Partnership, and RCS Capital, at any given time, defendant Schorsch was CEO and/or Chairman of approximately two-dozen of these four-dozen entities, many of which did business with ARCP.

30.    A December 19, 2014 *Forbes* article titled "As His Empire Quakes, ARCP Founder Nick Schorsch No Longer A Billionaire," describes Schorsch's network of entities:

> Schorsch became a billionaire by constructing a complex web of interrelated companies - at one point he was CEO of more than a dozen companies.    He raised money for his nontraded REITs, took them public, and then used those vehicles to buy out his own other nontraded REITs.    His fully integrated operation not only manufactured nontraded, high-yielding REITs, it also provided research and advisory services to them, and controlled the second-largest independent financial advisory operation in the nation (9,200 brokers) who peddled them.

31.    As described in a November 5, 2014 article in *The Wall Street Journal* titled "For Schorsch, an Empire Under Siege," defendant Schorsch's companies are "a tangle of like-sounding names such as ARCP Capital Global Trust II and ARCP Capital Healthcare Trust III" that have "raised $20.8 billion over the past seven years from small investors, the most of any real-estate company....    The companies use the money to buy properties ranging from nursing homes to FedEx Corp. distribution centers.    The goal is to flip properties quickly at a profit to repay investors and build a strong track record in hopes of collecting still more money from them."

32.    The Schorsch-companies also shared overlapping executives and directors, all of whom reported to Schorsch.    For example, in February 2013, ARCP acquired American Realty Capital Trust III, Inc. ("ARCT III") for approximately $1.6 billion.    Defendant Schorsch was ARCT III's Chairman and CEO, defendant Weil was a director, President, Chief Operating

Officer, Treasurer, and Secretary, and defendant Kahane was an executive officer.   Defendants

Schorsch, Weil, and Kahane were also officers of the ARCT III's advisor and property manager,

which was owned by AR Capital (which they owned).   In January 2014, ARCP acquired

American Realty Capital Trust IV, Inc. ("ARCT IV") for approximately $3.1 billion.

Defendant Schorsch was ARCT IV's CEO and Chairman and defendant Weil was president,

chief operating officer, treasurer and secretary.   Defendants Schorsch and Kahane were also

officers of ARCT IV's advisor and property manager, which was owned by AR Capital.

33.     Through this REIT network, defendants Schorsch, Weil, and Kahane directed

hundreds of millions of dollars to themselves via director fees, management fees, profit-sharing

arrangements, research and advisory fees, and corporate acquisitions.

### C.     ARCP's Acquisition Spree

34.     One hallmark of defendant Schorsch's empire of companies has been large

transactions between companies owned and controlled by him.   *The Wall Street Journal*

reported:

> [O]ften the deals involve selling properties to other companies in Mr. Schorsch's
> empire, each time racking up fees for Mr. Schorsch and his management team.
> When ARCP Capital Properties bought [ARCT IV], a large nontraded REIT
> sponsored by Mr. Schorsch, in 2013, the prospectus listed a $62.7 million
> payment to the owners of [ARCT IV's] advisory company, which at the time was
> controlled by Mr. Schorsch.

35.     To affect its acquisitions, ARCP raised billions of dollars in a string of securities

offerings, including: (a) $300 million in 3% Convertible Senior Notes due 2018, in July 2013;

(b) $287.5 million in 3% Convertible Notes due 2018, in December 2013; (c) $402.5 million in

3.75% Convertible Senior Notes due 2020, in December 2013; (d) 79.1 million shares of stock

issued in connection with the ARCT IV merger, in January 2014; (e) 520.8 million shares of

stock issued in connection with the Cole Real Estate Investments, Inc. ("Cole") merger, in

February 2014; (f) 138 million shares of stock, in May 2014; and $2.55 billion of Senior Notes, in September 2014.

36.     These securities offerings were successful because ARCP was perceived as a successful company.   This perception was due in large part to the false inflation of AFFO by defendants and the concealment of the rampant looting and self-dealing in which they were engaged.

37.     ARCP's acquisition spree was designed to (and did) transfer hundreds of millions of dollars from ARCP to entities owned and/or controlled by defendants Schorsch, Weil, Kahane, and Block.   Over a three year period, ARCP paid the Manager and related entities over *$917 million* in the form of commissions, fees, and expenses.   During 2012 and 2013, ARCP paid over $66 million to the Manager, and $240 million in 2013 and 2014 for "subordinated distribution fees" and "strategic advisory services," as well as an additional $119 million for "general and administrative expenses" and another $31 million for "management fees."

38.     A few of the many additional examples of this practice are: when ARCP purchased Cole in February 2014, Realty Capital Securities, LLC ("Realty Capital Securities"), a subsidiary of RCS Capital, received $28 million in fees for "financial advisory and strategic services" provided to ARCP in connection with the merger.   When ARCP acquired ARCT IV, Realty Capital Securities was paid $7,663,369 for financial advisory and strategic services to ARCP prior to the merger, and $7,663,369 for the same services provided to ARCT IV prior to the merger.

39.     ARCP additionally paid tens, if not hundreds of millions of dollars to other entities controlled by Schorsch, Weil, Kahane, and Block as well.   Through these transactions, defendants Schorsch, Weil, Kahane, and Block directed huge sums of money to themselves

14

under doubtful circumstances, and often without adequate documentation.   For example, in 2014, ARCP paid exactly $20 million to the Manager for the simple switch from external management to internal management.   Suspiciously, this $20 million was evenly split between "post-transaction support services" and "furniture, fixtures, and equipment."   Unsurprisingly, ARCP later admitted that "there was no evidence of the receipt and it could not support the value of" these costs.

40.   In order to further this scheme, defendants Schorsch, Weil, and Kahane, all members of the Board, created an incentive compensation plan for ARCP's officers that encouraged both the inflation of AFFO and the continued acquisition of Schorsch-controlled entities.   Under this plan, ARCP's executives, defendants Schorsch, Kay, Beeson, and Block, were evaluated using performance goals that considered whether ARCP met AFFO earnings expectations and the value of acquisitions completed.   An additional portion of their performance compensation were factors indirectly contingent on reported AFFO, such as investment grade ratings given to ARCP.   Defendant Schorsch's incentive compensation plan also relied heavily on whether the Company met AFFO expectations.

### D.   The Individual Defendants Granted Each Other Excessive Compensation

41.   Another way certain defendants directed ARCP funds to themselves through the acquisition spree was via an executive performance pool.   The acquisitions were designed to expand ARCP's asset base in order to increase awards of incentive compensation under the Company's Multi-Year Outperformance Plan (the "Outperformance Plan"), approved in October 2013 by the Board's Compensation Committee.   At that time, the Compensation Committee was comprised of non-defendant directors Leslie D. Michelson ("Michelson"), Scott Bowman ("Bowman"), Edward G. Rendell ("Rendell"), and William G. Stanley ("Stanley").   These four

directors allocated 42.5% of the $120 million incentive compensation pool under the Outperformance Plan to defendant Schorsch, 5% to defendant Kay, 3.75% to defendant Beeson, and 10% to defendant Block. However, defendant Schorsch and one or all of defendants Kay, Beeson, and Block, apparently unsatisfied with this already-high level of compensation, increased the Outperformance Plan by $100 million by unilaterally altering the plan and stating in public filings that the maximum award value of the Plan was $222.1 million.

42.     The Outperformance Plan was designed with two elements, an "absolute" metric and a "relative" metric. Both of these were measured over a three-year time period based on total returns to shareholders, including stock price increase (if any) and common stock distributions. If ARCP achieved a total return to shareholders of more than 7% a year, the plan would pay out 4% of the dollar amount of the return. If the Company's annual performance exceeded the median total return of a peer group of companies by 6% or more, the Plan would also pay out an additional 4% of that excess total return. Amazingly, the Outperformance Plan provided that defendants would receive 50% of their target incentive compensation under this prong of the Plan even if ARCP posted a zero percent total return, providing shareholders with no return at all.

### E.      Misleading and Inaccurate Statements

43.     On July 5, 2011, defendants caused ARCP to file with the SEC a final amended registration statement on Form S-11 in anticipation of its initial public offering in September of that year. The registration statement states that AFFO is the fundamental metric for assessing the Company's performance and ARCP's various expenses and management fees would be tied to reported AFFO. Management fees paid by ARCP were set by a formula relying in part on AFFO. AFFO would govern when dividends could be paid on shares of stock owned by the

Manager of ARCP.   Also limited based on AFFO was the amount of permissible distributions made under the Company's acquisitions credit facility.   Thus, defendants used AFFO as the benchmark for assessing their own performance and the Company's performance, encouraged shareholders to do the same, and made numerous other elements of ARCP's business contingent on AFFO, and by extension, the accurate reporting of AFFO.

44.   On March 19, 2012, defendants caused ARCP to file with the SEC its Form 10-K for the 2011 fiscal year.   The Form 10-K reports AFFO of $287,000 and $1,491,000 for the third and fourth quarters of 2011, respectively.   Defendants Schorsch and Block each executed certifications pursuant to the federal securities laws attesting to the truth and accuracy of the 2011 Form 10-K.   As with all the Company's financial statements, the Form 10-K emphasizes the importance of AFFO:

> By providing AFFO, we believe we are presenting useful information that assists investors and analysts to better assess the sustainability of our operating performance. Further, we believe AFFO is useful in comparing the sustainability of our operating performance with the sustainability of the operating performance of other real estate companies, including exchange-traded and non-traded REITs. As a result, we believe that the use of FFO and AFFO, together with the required GAAP presentations, provide a more complete understanding of our performance relative to our peers and a more informed and appropriate basis on which to make decisions involving operating, financing, and investing activities.

> \* \* \*

> In accordance with Rules 13a-15(b) and 15d-15(b) of the Exchange Act, management, with the participation of our Chief Executive Officer and Chief Financial Officer, has evaluated the effectiveness of our disclosure controls and procedures (as defined in Rules 13a-15(e) and 15d-15(e) of the Exchange Act) as of the end of the period covered by this Annual Report on Form 10-K. Based on such evaluation, our Chief Executive Officer and Chief Financial Officer have concluded, as of the end of such period, that our disclosure controls and procedures are effective in recording, processing, summarizing and reporting, on a timely basis, information required to be disclosed by us in our reports that we file or submit under the Exchange Act.

45.     The 2011 Form 10-K is signed by defendants Schorsch, Block, and Weil.   As later revealed, the AFFO figures reported in this Form 10-K were falsely overstated and the certifications attesting to the adequacy of the Company's internal controls were false.

46.     On May 4, 2012, defendants caused ARCP to file with the SEC its definitive proxy statement in advance of the 2012 annual meeting of shareholders to be held June 6, 2012. According to the proxy statement, the Board met 11 times during 2011 and the Audit Committee met twice.   The proxy statement solicits votes to: (a) elect five directors, including defendants Schorsch and Weil, to one-year terms; and (b) ratify the Audit Committee's choice as independent auditor.   The proxy statement expressly incorporates by reference the 2011 Form 10-K and also states:

**Oversight of Conflicts of Interest**

The Company does not have a standing conflicts committee. Instead, the entire Board of Directors, including our independent directors, is responsible for approving transactions, and resolving other conflicts of interest, between the Company and its subsidiaries, on the one hand, and [AR Capital], any director, the Manager or their respective affiliates, on the other hand. The Board of Directors is responsible for reviewing and approving all transactions with affiliated parties, all purchase or leases of properties from or sales or leases to an affiliate, and reviewing and approving all agreements and amendments to agreements between the Company and affiliates, including [AR Capital] or the Manager and their subsidiaries.

During the fiscal year ended December 31, 2011, all of the members of the Board of Directors reviewed our policies and report that they are being followed by us and are in the best interests of our stockholders. Certain of the factors considered by the Board of Directors are set forth in the financial statements (including the notes thereto) and Risk Factors contained in our Annual Report on Form 10-K for the year ended December 31, 2011. The Board reviewed the material transactions between [AR Capital], the Manager and their respective affiliates, on the one hand, and us, on the other hand, which occurred during the fiscal year ended December 31, 2011. The Board has determined that all our transactions and relationships with [AR Capital], the Manager and their respective affiliates during the fiscal year ended December 31, 2011 were fair and were approved in accordance with the policies referenced in "Certain Relationships and Related Transactions" below.

47.     On June 12, 2012, defendants caused the Company to file a Form 8-K with the SEC disclosing the results of the shareholder votes solicited in the May 2012 Proxy Statement. Defendants Schorsch and Weil were elected to one year terms on the Board.

48.     On February 28, 2013, defendants caused the Company to file with the SEC its Form 10-K for the 2012 fiscal year and reported AFFO for the year of approximately $10.4 million.   Accompanying the Form 10-K were certifications signed by defendants Schorsch and Block pursuant to the federal securities laws attesting to the truth and accuracy of the 2012 Form 10-K.   The 2012 Form 10-K contains disclosures about AFFO substantially similar to those in the 2011 10-K (¶ 44, *supra*).

49.     The 2012 Form 10-K is signed by defendants Schorsch and Block.   As later revealed, the AFFO figures reported in this Form 10-K were falsely overstated and the certifications attesting to the adequacy of the Company's internal controls were also false.

50.     On April 30, 2013, defendants caused the Company to file with the SEC its definitive proxy statement in advance of the 2013 annual meeting of shareholders to be held June 4, 2013.   The proxy statement discloses the Board met 22 times during 2012 and the Audit Committee met four times.   The proxy statement solicits votes to: (a) elect seven directors, including defendants Schorsch, Weil, and Kahane to one-year terms; and (b) ratify the Audit Committee's choice of independent auditor.   The proxy statement expressly incorporates by reference the 2012 Form 10-K and contains a disclosure about oversight of conflicts of interest identical to the 2012 proxy statement (¶ 46, *supra*), except relating to 2012 rather than 2011.

51.     On June 10, 2013, defendants caused the Company to file a Form 8-K with the SEC disclosing the results of the shareholder votes solicited in the April 2013 Proxy Statement. Defendants Schorsch, Weil, and Kahane were elected to one year terms on the Board.

52.     On July 23, 2013, defendants caused the Company to file with the SEC the preliminary prospectus, and on July 25, 2013, a preliminary prospectus supplement, for the July 2013 Offering of $300 million in 3% notes.   The offering materials incorporates by reference the misleading 2012 Form 10-K and first quarter 2013 Form 10-Q.

53.     On December 4, 2013, defendants caused the Company to announce: (a) the reopening of the 2018 notes offered in July 2013 (directly above); and (b) the December 2013 3.75% Notes Offering for notes due 2020 and priced at $402.5 million.   These offering materials incorporate by reference the Company's 2012 Form 10-K, and the first, second, and third quarter 2013 Forms 10-Q.

54.     On February 6, 2014, the Company completed a $2.55 billion notes offering of 2.0% Senior Notes due February 6, 2017, 3.0% Senior Notes due February 6, 2019, and 4.6% Senior Notes due February 6, 2024.   The offering documents set forth ARCP's reported financial and operating results, including AFFO, for 2012 and the nine-months ended September 30, 2013, and incorporates by reference the Company's 2012 Form 10-K, and its first, second, and third quarter 2013 Forms 10-Q.

55.     On February 27, 2014, defendants caused the Company to file its Form 10-K for the 2013 fiscal year with the SEC.   The Form 10-K reports AFFO for 2013 of $163.9 million and a net loss of approximately $406 million and states the award pool under the Outperformance Plan was $222.1 million.   Filed with the Form 10-K were certifications signed by defendants Schorsch and Block pursuant to the federal securities laws attesting to the truth and accuracy of the 2013 Form 10-K.   The 2013 Form 10-K also contained disclosures about the importance of AFFO substantially similar to those excerpted in the 2011 Form 10-K (¶ 44, *supra*).

56.     The Form 10-K is signed by defendants Schorsch, Block, McAlister, Beeson, and Kay.   As subsequently revealed in 2015, the AFFO figures reported in this Form 10-K were falsely overstated and the certifications attesting to the adequacy of the Company's internal controls were false.

57.     On April 29, 2014, defendants caused the Company to file with the SEC its definitive proxy statement in advance of the 2014 annual meeting of shareholders to be held May 29, 2014.   According to the proxy statement, the Board met 58 times during 2013 and the Audit Committee met five times.   The proxy statement solicits votes to: (a) elect nine directors, including Stanley and Thomas A. Andruskevich ("Andruskevich"), and defendants Schorsch, Weil, and Kahane to one-year terms; (b) ratify the Audit Committee's choice of independent auditor; (c) adopt a non-binding advisory resolution approving executive compensation for ARCP's executive officers; and (d) adopt a non-binding resolution regarding the frequency of the ratification of executive compensation.   The proxy statement expressly incorporates by reference the 2013 Form 10-K.   The proxy statement also states:

**Conflicts Committee**

During the fiscal year ended December 31, 2013, the Company did not have a standing Conflicts Committee. Pursuant to the terms of the Company's Agreement and Plan of Merger with Cole and Clark Acquisition, LLC (the "Cole Merger Agreement"), effective with the close of the Company's acquisition of Cole (the "Cole Merger"), on February 7, 2014, the Company adopted an amendment to its bylaws by which it established a Conflicts Committee. The Conflicts Committee is composed of Messrs. Michelson, Stanley, Andruskevich and Sealy. A majority of the Conflicts Committee must approve any material contracts and transactions between the Company and [AR Capital] and its affiliates (subject to certain exceptions) and the Conflicts Committee has the power to monitor compliance with certain self-management requirements specified by the Cole Merger Agreement. The entire Board of Directors will review transactions that remain outside of the scope of the Conflicts Committee's purview and, should certain conflicts arise with management or the non-executive directors, the independent directors will review such transactions. The Board of Directors is responsible for reviewing and approving all transactions with affiliated parties, all purchases or leases of properties from or sales or leases to an affiliate and reviewing and approving all

agreements and amendments to agreements between the Company and any affiliates.

During the fiscal year ended December 31, 2013, all of the members of the Board of Directors reviewed our policies and report that they are being followed by us and are in the best interests of our stockholders. Certain of the factors considered by the Board of Directors are set forth in the financial statements (including the notes thereto) and Risk Factors contained in our Annual Report on Form 10-K for the year ended December 31, 2013. The Board reviewed the material transactions between [AR Capital], [ARC Advisors] and their respective affiliates, on the one hand, and us, on the other hand, which occurred during the fiscal year ended December 31, 2013. The Board has determined that all our transactions and relationships with [AR Capital], [ARC Advisors] and their respective affiliates during the fiscal year ended December 31, 2013 were fair and were approved in accordance with the policies referenced in "Certain Relationships and Related Transactions" below.

* * *

In October 2013, the Compensation Committee approved the adoption of the 2014 Multi-Year Outperformance Plan (the "OPP"), which became effective as of January 8, 2014. The OPP was established to provide an element of incentive compensation to the named executive officers, among other participants, which would be tied directly to the performance of the Company in respect of the Absolute Component and Relative Component, described in the table below. Under the OPP, participants (including each of our named executive officers) are issued LTIP Units in the Operating Partnership. The maximum award value of all LTIP Units that may be earned under the OPP will be *$222.1 million*, which is equal to approximately 5% of our equity market capitalization ("the OPP Cap") at the time of the Compensation Committee's approval of the OPP.

(Emphasis added.)

58.    On June 2, 2014, defendants caused the Company to file with the SEC a Form 8-K disclosing the results of the shareholder votes solicited in the April 2014 Proxy Statement. Defendants Schorsch, Weil, and Kahane, and directors Stanley and Andruskevich were elected to one year terms on the Board.   Even without knowing of the massive fraud occurring at ARCP, the Company's shareholders overwhelmingly rejected the advisory resolution approving named executive officer compensation with 134 million votes in favor of the resolution and 279.5 million against.

59.     On May 8, 2014, defendants caused the Company to issue a press release

disclosing its financial results for the first quarter of 2014.    The press release states in part:

- **Increased AFFO**: Increased AFFO available to common stockholders to
  $147.4 million, up 334.6% compared to the same period a year earlier.

* * *

"I am very pleased with our results for the first quarter of the year," said Nicholas
S. Schorsch, Chief Executive Officer and Executive Chairman of ARCP. "We had
a record quarter with earnings coming exactly in line with our expectations of
$0.26 AFFO per share, consistent with our previously stated guidance for the
year…."

"With our acquisitions team firing on all cylinders, every aspect of our business is
exceeding our expectations," said David S. Kay, President of ARCP. "With strong
earnings, our acquisition volume is outpacing our guidance, our cap rates surpass
all industry peers …. we are ramping up our capital raising initiatives in May and
remain confident that we will achieve our target of raising $3.1 billion of capital
during 2014."

* * *

Adjusted funds from operations ("AFFO") for the three months ended March 31,
2014 totaled $147.4 million, or $0.26 per fully diluted share.

60.     On the same day, defendants also caused the Company to file with the SEC its

Form 10-Q for the quarter.    The Form 10-Q is signed by defendants Schorsch and Block, who

certified that the financial statements were accurate, and that the Company's internal controls

were sufficient.

61.     As later revealed, the AFFO figures reported in this Form 10-Q and the associated

press release were falsely overstated and the certifications attesting to the adequacy of the

Company's internal controls were also false.

62.     Pursuant to a preliminary prospectus supplement filed May 21, 2014 and a

prospectus supplement filed May 23, 2014, defendants caused the Company to conduct an

offering of 138 million shares of ARCP common stock at $12 per share.    The offering

documents incorporate by reference the Company's 2012 and 2013 Forms 10-K and its first quarter 2014 Form 10-Q, all of which were false and misleading because they: (a) state the financial results were accurate; (b) state the Company's internal controls were effective; and (c) include misleading certifications attesting to the Company's internal controls signed by defendants Schorsch and Block.

63.     On June 3, 2014, Marcato Capital Management, LP, a shareholder of ARCP, wrote a letter to the Board raising red flags regarding ARCP's deficient internal controls and financial reporting:

> ARCP's rapid acquisitions of CapLease, ARCT IV, and Cole, followed by the recent purchase of the Red Lobster portfolio, sale of the multi-tenant retail portfolio, and equity issuance, have made the Company's financials complicated and difficult to understand. So many moving pieces make the Company challenging for investors and analysts to model. Indeed, we believe the best evidence of this is that the Company itself seemingly cannot keep its own financials straight. On May 20th, in an 8-K filing in which it attempted to show its Pro Forma first quarter financial statements, the Company used an inaccurate share count; as a result, it was forced to file an amendment telling the market to disregard the previous filing, and a subsequent 8-K with new Pro Forma financials. ARCP's shares sold off on news of the inaccurate 8-K, and have yet to substantially recover . . . .
>
> It certainly did not help that the Company then made another mistake in its filings. In the prospectus for its recent equity issuance, the Company stated the fees associated with the Red Lobster transaction were $108 million. On May 29th, the Company put out an 8-K disclosing that the fees were actually $10.8 million, and it had initially overstated the figure by a factor of 10. While we are relieved to know that the Company did not spend $108 million in fees to close a $1.5 billion portfolio acquisition, we are alarmed by what appear to be disorderly financial controls exposed by the Company's second material disclosure error in as many weeks.
>
> We believe the existence of these errors is symptomatic of the larger problem: The Company is engaging in too many transformative transactions too quickly.

64.     On July 29, 2014, defendants caused the Company to issue a press release announcing its financial results for the second quarter of 2014.   The press release states in part:

- **Increased AFFO**: Increased AFFO to $205.3 million, up 429.0% compared to the same period a year earlier, and increased AFFO per share to $0.24, up 26% compared to the same period a year earlier.
- **Pro Forma AFFO Run Rate**: Pro forma normalized estimated AFFO run rate as of year-end 2014 of $1.18 - $1.20 per share including 2014 completed and announced transactions. This AFFO estimate does not include any balance sheet acquisitions in excess of our $4.5 billion 2014 guidance, no dispositions, no rent growth or G&A synergies for 2015 and assumes results for Cole Capital consistent with the Company's 2014 projection.

\* \* \*

**President's Comments on Operating Results**

"Our second quarter results and accomplishments are indicative of our focus on driving long-term value by delivering on our commitments as outlined in our June 20th stockholder letter," said David S. Kay, President of ARCP . . . .

… "At the same time, we are thoughtfully managing our debt portfolio by lengthening debt maturities and taking advantage of the current rate environment. The daily execution of these collective actions allows us to maintain our 2014 AFFO per share guidance of $1.13 - $1.19, while significantly de-levering the balance sheet and maximizing value for our stockholders."

**Chairman's Comments on Corporate Governance**

"As I outlined in yesterday's stockholder letter, I have continued to focus my attention on improving corporate governance," said Nicholas S. Schorsch, Chairman and CEO of ARCP.   "With the support of our Board of Directors, we are improving our practices by eliminating related party transactions, enhancing disclosures, evaluating executive compensation, opting out of the MUTA to assure our stockholders' right to elect the entire Board at each annual meeting, and implementing other policies designed to improve our reporting and transparency, further align interest with our stockholders, and eliminate potential conflicts of interest.   Our goal is to constantly improve our corporate governance, which we expect will ultimately be reflected in our corporate governance scores.   All of these efforts are taken with a view toward creating long-term value for stockholders."

\* \* \*

AFFO for the six months ended June 30, 2014 totaled $353.1 million, or $0.49 per fully diluted share.

65.     On July 29, 2014, defendants caused the Company to file its Form 10-Q for the second quarter.   The Form 10-Q is signed by defendants Schorsch, Block, and McAlister. Defendants Schorsch and Block certified that the financial statements were accurate and the Company's internal controls were adequate.

66.     As later revealed, the AFFO figures reported in this Form 10-Q and the associated press release were falsely overstated and the certifications attesting to the adequacy of the Company's internal controls were also false.

**F.      The Truth Begins To Be Revealed**

67.     On October 29, 2014, defendants shocked the market when they caused ARCP to file a Form 8-K and press release disclosing wide-ranging errors in its financial statements.   The Form 8-K states:

> **Item 4.02 Non-Reliance on Previously Issued Financial Statements or a Related Audit Report or Completed Interim Review.**
>
> On October 24, 2014, the Audit Committee of the Board of Directors (the "Audit Committee") of ARCP Capital Properties, Inc. (the "Company") concluded that the previously issued audited consolidated financial statements and other financial information contained in the Company's Annual Report on Form 10-K for the fiscal year ended December 31, 2013, the previously issued unaudited financial statements and other financial information contained in the Company's Quarterly Reports on Form 10-Q for the fiscal periods ended March 31, 2014 and June 30, 2014, and the Company's earnings releases and other financial communications for these periods (collectively, the "Prior Financial Information") should no longer be relied upon.
>
> The Audit Committee based its conclusion on the preliminary findings of its investigation into concerns regarding accounting practices and other matters that first were reported to the Audit Committee on September 7, 2014.   The Audit Committee promptly initiated an investigation, which is being conducted with the assistance of independent counsel and forensic experts.
>
> The investigation conducted to date has not uncovered any errors in the consolidated financial statements (prepared in accordance with U.S. GAAP) for the three months ended March 31, 2014.   However, based on the preliminary findings of the investigation, the Audit Committee believes that the Company

incorrectly included certain amounts related to its non-controlling interests in the calculation of adjusted funds from operations ("AFFO"), a non-U.S. GAAP financial measure, for the three months ended March 31, 2014 and, as a result, overstated AFFO for this period.   The Audit Committee believes that this error was identified but intentionally not corrected, and other AFFO and financial statement errors were intentionally made, resulting in an overstatement of AFFO and an understatement of the Company's net loss for the three and six months ended June 30, 2014.

As discussed in Item 5.02 of this Current Report on Form 8-K, at the request of the Audit Committee, the Company's Chief Financial Officer and Chief Accounting Officer have resigned.

Nothing has come to the attention of the Audit Committee that leads it to believe that there are any errors in the Company's previously issued audited consolidated financial statements contained in the Company's Annual Report on Form 10-K for the fiscal year ended December 31, 2013.   However, the Audit Committee has expanded its investigation to encompass the Company's audited consolidated financial statements for the fiscal year ended December 31, 2013 in light of the fact that the Company's former Chief Financial Officer and former Chief Accounting Officer had key roles in the preparation of those financial statements.

Based on the preliminary findings of the investigation, the Company has identified the potential adjustments set forth in Exhibit 99.1 to this Report to the Company's reported net loss in accordance with U.S. GAAP for the three and six months ended June 30, 2014 and to reported AFFO (a non-U.S. GAAP financial measure described in Exhibit 99.1) for the three months ended March 31, 2014 and the three and six months ended June 30, 2014.   Note that, in calculating AFFO for the first quarter of 2014, the Company presented activity from non-controlling interests on a net basis, while in the second quarter of 2014, as permitted, the Company presented its activity from non-controlling interests on a gross basis (which it will continue to do in calculating AFFO in future periods). The weighted average number of shares used in calculating AFFO differs depending on whether the net or gross method is used (but does not change for purposes of calculating net loss per share in accordance with U.S. GAAP).   The investigation is ongoing and there can be no assurance that the potential adjustments set forth in the table below will not change based upon the final results of the investigation, and any such change could be material.

The Company will work with the Audit Committee and the Audit Committee's independent advisors to determine the adjustments required to be made to the Prior Financial Information as expeditiously as possible.   Upon the completion of this process, which could identify further adjustments in addition to those discussed above, the Company will restate the Prior Financial Information and amend its prior periodic filings to the extent required.   The Company will file its

Quarterly Report on Form 10-Q for the quarter ended September 30, 2014 after the amended filings have been made.

In light of the preliminary findings of the Audit Committee's investigation, the Company is reevaluating its internal control over financial reporting and its disclosure controls and procedures. The Company intends to make the necessary changes to its control environment to remediate all control deficiencies that are identified as a result of the ongoing investigation and the restatement process.

68.     The accompanying press release corrects the Company's three-month results for the periods ended March 31, 2014 and June 30, 2014, as well as the six-month results for the period ended June 30, 2014.   The adjustments were:

|  | 1Q 2014 | 2Q 2014 | 1H 2014 |
|---|---|---|---|
| Originally reported AFFO: | $147,780,000 | $205,278,000 | $353,058,000 |
| Restated AFFO: | $135,806,000 | $194,409,000 | $330,215,000 |
| AFFO Difference: | ($11,974,000) | ($10,869,000) | ($22,843,000) |
| Originally reported net loss: | $332,313,000 | $63,419,000 | $395,732,000 |
| Restated net loss: | N/A | $72,661,000 | $404,974,000 |
| Net loss difference: | -- | ($9,242,000) | ($9,242,000) |

69.     The press release implies that defendants McAlister and Block were solely responsible for the improper accounting.   The press release also contains an unusual statement in support of management made by the Board, notwithstanding the concurrent admission that the account errors were intentionally caused:

Although the Board is disappointed in these developments, the Board has full confidence in the management team and staff. The Audit Committee, Board and management team are fully committed to resolving this matter in an expedited and thorough manner. The Board continues to support management's efforts surrounding the simplification of the business, enhancements in transparency, and improvements to the predictability of our earnings, all with the goal of enhancing long-term value.

The Audit Committee's investigation conducted to date has not uncovered any errors in the consolidated financial statements (prepared in accordance with U.S. GAAP) for the three months ended March 31, 2014. However, based on the preliminary findings of the investigation, the Audit Committee believes that the Company incorrectly included certain amounts related to its non-controlling

interests in the calculation of adjusted funds from operations ("AFFO"), a non-U.S. GAAP financial measure, for the three months ended March 31, 2014 and, as a result, overstated AFFO for this period. The Audit Committee believes that this error was identified but intentionally not corrected, and other AFFO and financial statement errors were intentionally made, resulting in an overstatement of AFFO and an understatement of the Company's net loss for the three and six months ended June 30, 2014.

The Audit Committee has indicated that nothing has come to its attention that leads it to believe that there are any errors in the Company's previously issued audited consolidated financial statements for the fiscal year ended December 31, 2013 contained in the Company's 2013 Form 10-K. However, the Audit Committee has expanded its investigation to encompass the Company's audited financial statements for this period in light of the fact that the Company's former Chief Financial Officer and former Chief Accounting Officer had key roles in the preparation of those financial statements.

(Emphasis added.)

71.     On this news, ARCP stock fell from $12.38 per share at close on October 28, 2014 to $10.00 per share at close the next day.

71.     Also on October, 29, 2014, *The Wall Street Journal* published an article titled "SEC to Open Inquiry into ARCP Capital's Accounting," stating in part:

One of the largest U.S. real-estate empires was battered Wednesday by its disclosure of an accounting mistake and subsequent cover-up that forced the resignations of two top executives, slashed its flagship company's stock-market value by 19% and sparked a regulatory probe.

* * *

Standard & Poor's on Wednesday placed ARCP Capital's triple-B-minus credit rating, which is one notch above so-called junk status, on watch for possible downgrade.

The accounting incident sent shock waves through the real-estate industry, where Mr. Schorsch has raised tens of billions of dollars in recent years, much of it from individual investors.

* * *

Analysts suggested it was too soon to assess the damage to the company or Mr. Schorsch's broader empire.   Some investors "may throw in the towel on today's

news, as accounting missteps take a while to sort out," Paul Adornato, a REIT analyst with BMO Capital Markets, said in a client note. "Confidence takes longer to return, if ever."

Others said the errors could directly undermine ARCP Capital's growth strategy, which has relied on tapping the debt and equity markets for capital to pay for acquisitions.

The company's "credibility is likely impugned for some period of time," wrote J.P. Morgan analyst Anthony Paolone, adding that "capital costs will be higher in the near term . . . thus making growth more difficult."

Investors also are worried the timing of the accounting revelations could imperil a deal that ARCP Capital announced earlier this month, according to a person familiar with the matter.  On Oct. 1, the company said that it would sell its private capital-management business, Cole Capital, which raises money for nontraded REITs, for $700 million to RCS Capital Corp., another company chaired by Mr. Schorsch.

72.     On October 30, 2014, the Company conducted a conference call for analysts and investors to discuss the accounting manipulation.   During the call, defendant Kay explained the wrongdoing this way:

The best way that I can describe what happened there is that we don't have bad people, we had some bad judgment there. And we had 2 employees which have resigned as a result of the effects of that calculation and the nondisclosure of the error in the first quarter.

* * *

This isn't the ideal situation, but I think that it is not the parade of horribles that the market may view this as today. We have an exceptional team that runs this company. It's an ethical team.

73.     Also beginning on October 30, 2014, at least ten securities class actions and four shareholder derivative actions were filed against ARCP and its officers and directors.

74.     On October 31, 2014, *Reuters* reported the FBI and the U.S. Attorney for the Southern District of New York had "opened a criminal probe of [ARCP]… in the wake of the accounting errors."

30

75.     On November 3, 2014, Wells Fargo suspended equity research coverage of ARCP citing the reports that the FBI and U.S. Attorney's office had opened criminal probes into the Company.

76.     On November 3, 2014, RCS Capital issued a press release disclosing it would terminate its agreement to acquire Cole Capital Partners, LLC and Cole Capital Advisors, Inc. from ARCP in a transaction that had been valued at approximately $700 million.   The press release states in part:

> NEW YORK, Nov. 3, 2014 /PRNewswire/ -- RCS Capital Corporation ("RCAP") (RCAP), announced today that it has terminated the previously disclosed definitive agreement to acquire Cole Capital Partners, LLC and Cole Capital Advisors, Inc. (together, "Cole Capital") from American Realty Capital Properties, Inc. (ARCP).
>
> In addition, concurrently with the termination of the definitive agreement to acquire Cole Capital, the previously disclosed interim sub-advisory agreements entered into on October 22, 2014 among RCAP and the five non-traded REITs sponsored and advised by Cole Capital were terminated, and the wholesaling agreements entered into on October 22, 2014 between Realty Capital Securities, LLC ("RCS"), a subsidiary of RCAP, and Cole Capital Corporation, a subsidiary of Cole Capital, whereby Cole Capital engaged RCS to act as its distribution agent for the three non-traded REITs for which it currently serves as dealer-manager, were terminated.

77.     By close of the markets November 3, 2014, ARCP stock had fallen to $7.85 per share, an all-time low approximately 45% below the price of ARCP stock a mere week earlier.

78.     On November 4, 2014, *Bloomberg* published an article titled "American Realty Accounting Errors Roil Real Estate Empire," reporting in part:

> The disclosure last week that accounting errors were intentionally concealed at the real estate investment trust, leading to the resignation of two executives, has erased almost $4 billion in market value, sparked an FBI investigation and a review by the Securities and Exchange Commission. It also is leading some brokers to halt sales tied to Schorsch's AR Capital LLC, the biggest sponsor of nontraded REITs.

* * *

"It's the intentional nature of the error" that raises concern, said Kevin Gannon, president and managing director at Robert A. Stanger & Co., a Shrewsbury, New Jersey-based investment bank that compiles data on nontraded REITs. "This industry is all about credibility. People will raise money for you but they have to be confident that you're a straight shooter. We hope they demonstrate that this is an isolated incident."

\*\*\*

Deal Spree

The REIT has completed more than 20 acquisitions since its inception, according to data compiled by Bloomberg. The company's stock price rose to as high as $17.82 in May 2013.

"There were many people in the space who raised concerns about very rapid growth," said Barry Vinocur, the editor of REIT Wrap, an industry newsletter. "When you grow that rapidly the risk is things may fall through the cracks. Then, there were those who downplayed those concerns saying those raising them were envious."

\* \* \*

Broker Sales

The concerns are spilling into AR Capital. LPL Financial Holdings Inc. said yesterday it is indefinitely suspending sales of investment products sponsored by companies tied to American Realty and RCS. Securities America, a broker-dealer with more than 1,800 advisers, also has suspended sales for two REITs --- Cole Capital Properties V and Phillips Edison - ARC Grocery Center REIT II, the company said in a statement.

Sandlapper Securities LLC, an independent broker-dealer based in Greenville, South Carolina also suspended orders for AR Capital REITs, CEO Trevor Gordon said in a phone interview.

"This accounting error is very troubling to us," Gordon said. "Is this an isolated incident or a systemic problem? We're stepping back at this moment in time. We're not terminating our agreement but we're suspending new purchases for the time being."

\*\*\*

32

Due Diligence

"Most of the independent broker-dealers that sell nontraded REITs have some due-diligence effort in order to vet the sponsors of the nontraded REITs," Adornato said in a telephone interview from New York. "It would be difficult if not impossible for any broker to sell shares in any Cole product until the investigation into ARCP/Cole's financial controls is satisfactorily completed."

79.     On November 7, 2014, *The Wall Street Journal* published an article titled "ARCP

Capital Accounting Errors Tied to Employee Bonuses," reporting in part:

The accounting irregularities disclosed last week by American Realty Capital Properties Inc. were tied in part to the computation of bonus payments, according to a member of the company's board.

* * *

The mistake stemmed from computing bonuses, said former Pennsylvania Gov. Edward Rendell, who has served as an independent director of the company since February 2013 and sits on its audit committee. The results were "incorrect because [executives] fudged something about bonuses to cover up a prior mistake."

* * *

Nicholas Schorsch, who served as chief executive of American Realty Capital Properties until last month and remains chairman, drew scrutiny over the summer after the company proposed a $222.1 million incentive compensation pool from which Mr. Schorsch stood to earn $94.4 million over the next five years provided the company met performance goals. Shareholders voted against the pay package in a nonbinding vote in June. Mr. Schorsch didn't respond to a request for comment.

* * *

CEO David Kay said during a conference call last week that second-quarter financial results incorrectly omitted about $10.5 million in accruals. Further details about the mistakes weren't known, and Mr. Rendell declined to provide additional comment on the bonus payments.

According to the company's most recent proxy statement, Mr. Kay was set to earn a target cash bonus of 250% of his base salary of $600,000 and an equity bonus worth 350% of the same base salary. Mr. Kay didn't respond to a request for comment. A spokesman said he has elected to take his bonus in stock rather than cash.

33

Brian Block, the former chief financial officer who resigned last week over the accounting irregularities, was in line to receive a cash bonus worth 250% of his base salary of $500,000 and an equity bonus worth 350% of his base salary as part of the performance plan.

80.     On November 14, 2014, defendants caused the Company to file a Form 8-K with the SEC revealing some of the harm to ARCP caused by the wrongdoing: due to the accounting manipulation, the Company was forced to seek consent from its lenders under its unsecured credit facility for an extension of time to deliver its third quarter 2014 financial statements. ARCP was successful in obtaining the consent, but in return was forced to "permanently reduce the maximum amount of indebtedness [under the credit facility] from $4.65 billion to $4.0 billion" and "until the 2013 and 2014 financial statements are filed with the [SEC], the maximum principal amount of indebtedness outstanding under the unsecured credit facility is temporarily reduced to $3.6 billion."   Thus, due to the wrongdoing, the Company was already experiencing a credit crunch and had lost access to over $1 billion in credit in the short term and $650 million permanently.

81.     On December 15, 2014, defendants caused ARCP to file with the SEC a Form 8-K and issue a press release disclosing that defendants Schorsch, Kay, and Beeson had resigned. The Form 8-K states defendant Schorsch "resigned as Executive Chairman and a director" of ARCP and "also resigned from all other employment and board positions that he held at the Company and its subsidiaries and certain Company-related entities . . . .''   The press release accompanying the Form 8-K states:

NEW YORK, NY December 15, 2014 – American Realty Capital Properties, Inc. ("ARCP") (NASDAQ: ARCP) today announced that Nick Schorsch has stepped down as Executive Chairman of ARCP and from the ARCP Board of Directors and the Boards of Directors of the non-traded REITs managed by Cole Capital. William Stanley, Lead Independent Director, will assume the role of Chairman on an interim basis until a replacement can be found.

In connection with Mr. Schorsch's departure as Executive Chairman, ARCP will be unwinding all of its relationships with entities in which Mr. Schorsch maintains an executive or director-level role or is a significant stockholder. These steps will not only enhance the Company's corporate governance structure but will also lead to further simplification of its business relationships.

Mr. Stanley said, "The steps taken today enhance ARCP's corporate governance structure, increase transparency and further simplify its business relationships. We thank Nick for his vision and years of service on behalf of ARCP, and wish him well in his continuing business endeavors."

82.     On December 16, 2014, Moody's downgraded ARCP's unsecured debt as follows: "Senior unsecured shelf to (P)Ba1, from (P)Baa3; subordinate shelf to (P)Ba2, from (P)Ba1; preferred stock shelf to (P)Ba2, from (P)Ba1."   According to Moody's "[o]bligations rated Ba are… subject to substantial credit risk" and are below investment grade.

## G.     McAlister Sues ARCP, Schorsch, and Kay for Defamation

83.     On December 18, 2014, defendant McAlister filed a complaint in New York Supreme Court in New York County against ARCP, defendant Schorsch, and defendant Kay asserting claims of defamation per se in an action captioned *Lisa Pavelka McAlister v. ARCP Capital Properties, Inc., et al.*, Index No. 162499/2014 (Sup. Ct. N.Y. Cnty.) (the "McAlister Complaint").   The allegations of the McAlister Complaint starkly contradict ARCP's public statements regarding the accounting manipulation and demonstrate that in addition to the underlying wrongdoing, defendants engaged in a cover-up.

84.     The McAlister Complaint alleges that beginning in or about February 2014, defendant McAlister "repeatedly informed" defendants Schorsch, Kay, and "senior management" she had discovered that in the fourth quarter of 2013, "and possibly in earlier quarters, suddenly and without any apparent justification or basis," the Company had changed the method by which it was reporting AFFO relative to previous quarters.   According to the

McAlister Complaint, when defendant McAlister became aware of this, she informed defendants

Schorsch, Kay, and senior management that:

> [W]hile in quarters previous to 2013 Q4, or the earlier quarter in which the
> Company first changed its AFFO accounting methods (the "Change Quarter"), the
> Company, in its Securities and Exchange Commission ("SEC") 10Q filings, had
> correctly added back to AFFO only the Company's *pro rata* share of certain
> non-recurring transaction and deferred financing costs - appropriately ensuring
> that the portion of such costs allocable to other holders of limited partnership
> interests in the Company's operating partnership, ARC Properties Operating
> Partnership LP, not be added to the Company's AFFO - beginning in the Change
> Quarter, the Company suddenly ceased pro-rating the non-recurring transaction
> and deferred financing costs on its 10K and 10Q filings, opting instead to add to
> and increase the Company's AFFO by the entirety of the added-back costs,
> instead of only the Company's *pro rata* share thereof.

85.     However, "in an apparent effort to avoid public disclosure of its faltering financial

performance," ARCP *continued* to use this improper and misleading accounting "at the specific

direction" of defendants Schorsch and Kay until approximately July 28, 2014, when defendant

Schorsch allegedly directed defendant Block to "reallocate the funds used to calculate the AFFO

and shift the numbers on the 2014 second quarter 10Q report."   The McAlister Complaint

recounts that defendants Schorsch and Kay conceived of a scheme to cover-up the fraud by

changing the beginning point for the AFFO calculation.

86.     The McAlister Complaint further alleges that defendant McAlister was terminated

in retaliation for "blowing the whistle on ARCP and to use her publicly as a scapegoat for

Defendants' fraudulent conduct," and that the Company had falsely blamed her for the

accounting problems.

87.     The parties ultimately resolved defendant McAlister's action for an undisclosed

amount, and on February 19, 2015 entered a stipulation of discontinuance.

88.     On February 9, 2015, Corvex Management LP, a shareholder of ARCP, wrote an open letter to the Board, and to prospective candidates for the new CEO position in particular, stating as follows:

> As you are most certainly aware, ARCP's shareholders have suffered through the destruction of billions of dollars in shareholder value resulting from grossly conflicted self-dealing, an alleged accounting fraud and general mismanagement. We could write a long list looking backwards at all of the misdeeds committed by this Company and overseen by this Board . . . .   As such, we believe that any candidates for CEO or Chairman should be committed to the following in order to bring about a fresh opportunity for value creation at ARCP (which we are confident any high quality candidate would eagerly embrace) . . . .   Commit to having a board of truly independent directors including elimination of the current Board members from all positions with the company.

89.     Similarly, on February 27, 2015, Dutch pension fund PGGM specifically called for the resignation of directors Stanley, Michelson, Rendell and Andruskevich, stating:

> In our view, ARCP needs to completely refresh the Board's membership in order to ensure a cultural change that will foster strong corporate governance. We are convinced that a truly independent Board is necessary to choose a new management team for ARCP. We believe that any Board member with current or past ties to Nicholas Schorsch or to his affiliated entities could be subject to inherent conflicts of interest that could compromise the selection process for the new CEO and Chairman. This selection process will be of crucial importance in ensuring that all successful candidates are free from any real or perceived conflicts of interest.
>
> Given the composition of the Board at this time, which includes Board members with current or past ties to Nicholas Schorsch or to his affiliated entities, we are concerned that the Board lacks sufficient depth and true independence. We therefore believe it absolutely necessary that the current Board consult with shareholders throughout this process. To be explicit, we would like to see:
>
> * * *
>
> • The resignation of Mr. Stanley, Mr. Michelson, Mr. Rendell and Mr. Andruskevich from the Board upon the completion of the search process for, and announcement of the appointment of, the new CEO, Chairman and truly independent Board members. Given that Mr. Frank has been appointed to the Board no earlier than July 2014, we believe that retaining him will deliver the desired continuity in the Board.

In our view, ARCP needs to completely refresh the Board's membership in order to ensure a cultural change that will foster strong corporate governance. We are convinced that a truly independent Board is necessary to choose a new management team for ARCP. We believe that any Board member with current or past ties to Nicholas Schorsch or to his affiliated entities could be subject to inherent conflicts of interest that could compromise the selection process for the new CEO and Chairman. This selection process will be of crucial importance in ensuring that all successful candidates are free from any real or perceived conflicts of interest.

## H.   The Restatement

90.   On March 2, 2015, the Board caused ARCP to issue a press release announcing the filing of its restated financial reports for the full years 2012 and 2013, and the first and second quarters of 2014.   The press release states in part:

The Audit Committee investigation reported the following key findings:

- Net loss was understated for 2013 (including each quarter of 2013) and the second quarter of 2014. Net loss was overstated for the first quarter of 2014. AFFO was overstated for 2011, 2012, 2013 (including each fiscal quarter of 2013) and the first two quarters of 2014.

- The Audit Committee's investigation identified certain payments made by the Company to ARC Properties Advisors, LLC and certain of its affiliates that were not sufficiently documented or otherwise warrant scrutiny. The Company has recovered consideration valued at approximately $8.5 million in respect of certain such payments that the Company concluded were inappropriate.

- The investigation found that equity awards made to two former executives in connection with the Company's transition to self-management contained provisions that, as drafted, were more favorable to such executives than the Compensation Committee of the Company's Board of Directors had approved.

- The investigation found certain material weaknesses in the Company's internal controls over financial reporting and its disclosure controls and procedures.

"The restatement of our financial statements is an important milestone for ARCP and enables the Company to put this matter behind us," said William Stanley, interim Chairman and Chief Executive Officer of ARCP. "The Board moved swiftly to put in place new senior management, realign the Board committee

compositions, appoint an interim Chief Executive Officer, and conduct an extensive review of the Company's financial statements, accounting policies, financial controls and corporate governance, with the assistance of the new management team. Importantly, the investigation did not identify any material changes relating to our real estate ownership, the validity of our leases or our fundamental business operations. With the restatement, we are moving swiftly to appoint a new Chief Executive Officer and independent Chairman of the Board, which we hope to announce in the near term, and will focus on bringing our financial controls and corporate governance to world-class standards as a leading net lease REIT."

Mr. Stanley reiterated the strength of the Cole Capital platform: "At Cole Capital, the team is turning its attention to normalizing relationships with its broker-dealer partners and clearing firms, as well as re-engaging its financial advisor network. We are optimistic that we can quickly build momentum and resume the normal course of business operations soon."

The restatements had the following effects:

- Previously reported net loss attributable to stockholders, and net loss per share will be increased while AFFO (net method) and AFFO per share will be decreased by approximately $16.8 million, $0.08 per share, $43.9 million and $0.20 per share, respectively, for the full year 2013, as compared to originally reported amounts.

- Previously reported net loss attributable to the Company, net loss per share, AFFO (net method) and AFFO per share will be decreased by approximately $17.2 million, $0.03 per share, $38.5 million and $0.07 per share, respectively, for the three months ended March 31, 2014, as compared to originally reported amounts.

- Previously reported net loss attributable to the Company and net loss per share will be increased while AFFO (gross method) and AFFO per share will be decreased by approximately $14.4 million, $0.02 per share, $19.3 million and $0.03 per share, respectively, for the three months ended June 30, 2014, as compared to originally reported amounts.

91.    The third quarter 2014 Form 10-Q states:

The Company failed to implement and maintain an effective internal control environment that had appropriate processes to manage the changes in business conditions resulting from the volume and complexity of its 2013 and first quarter 2014 transactions, combined with the pressure of market expectations inherent in announcing AFFO per share guidance for 2014.

92.     The accompanying amended 2013 Form 10-K discloses numerous instances of incorrect accounting, many of which were apparently designed to obscure large payments to the Individual Defendants and Schorsch-controlled entities.   For example, the original 2013 Form 10-K had misclassified $75.7 million of expenses, including $59.6 million of equity-based compensation, as merger and non-routine transaction-related expenses when, in fact, they were recurring, general and administrative expenses.   The original 2013 Form 10-K had misclassified $13 million in management fees as merger and other non-routine transaction-related expenses. These should have been reported as management fees to affiliates.   The amended Form 10-K further states in part:

> The investigation found that Adjusted Funds From Operations ("AFFO"), a non-GAAP measure presented in the Company's SEC filings and other financial communications, was overstated for fiscal year 2011, fiscal year 2012, fiscal year 2013 (including each fiscal quarter of 2013) and, as previously disclosed in the October 29 8-K, the first two fiscal quarters of 2014. Senior management considered AFFO to be an important metric used by analysts and investors in evaluating the Company's performance and, for the first two quarters of 2014, sought to maintain reported AFFO within the 2014 guidance range of $1.13 to $1.19 per share announced at the end of 2013. The overstatements of AFFO were due in part to errors in reflecting amounts attributable to the limited partnership interests in the Company's operating partnership, ARC Properties Operating Partnership, L.P., held by holders other than the Company (known as non-controlling interests or "NCI"). Prior to the filing of the Quarterly Report on Form 10-Q for the first quarter of 2014, some members of senior management were aware of NCI errors but allowed the report to be filed without completing an analysis of the errors. In the Company's Quarterly Report on Form 10-Q for the second quarter of 2014, as previously reported in the October 29 8-K, the NCI errors in the first quarter were intentionally not corrected, and other AFFO and financial statement errors were intentionally made, resulting in an overstatement of AFFO and an understatement of the Company's net loss for the three and six months ended June 30, 2014. See "Management's Discussion and Analysis of Financial Condition and Results of Operations – Sources of Funds – Funds from Operations and Adjusted Funds from Operations (As Restated)" in Item 7 of this Form 10-K/A.
>
> The investigation identified certain payments made by the Company to ARC Properties Advisors, LLC (the "Former Manager") and certain affiliates of the Former Manager that were not sufficiently documented or otherwise warrant

scrutiny. The Company has recovered consideration valued at approximately $8.5 million in respect of certain such payments. The Company is considering whether it has a right to seek recovery for any other such payments and, if so, its alternatives for seeking recovery. No asset has been recognized in the financial statements related to any potential recovery. See Note 19-Related Party Transactions and Arrangements (As Restated) to the consolidated financial statements in this Form 10-K/A.

The investigation found that the agreements relating to equity awards made to Nicholas S. Schorsch and Brian S. Block in connection with the transition from external to internal management of the Company contained provisions that, as drafted, were more favorable to them than the Compensation Committee of the Company's Board of Directors (the "Compensation Committee") had authorized. At the time the awards took effect, Mr. Schorsch was the Company's Executive Chairman and Chief Executive Officer and Mr. Block was the Company's Chief Financial Officer. Immediately prior to his resignation from the Company, Mr. Schorsch and the Company agreed that the terms of his equity awards should have been consistent with the Compensation Committee's authorization. In connection with their resignations from the Company, Mr. Block relinquished all of his equity awards and Mr. Schorsch relinquished all of his equity awards other than 1,000,000 shares of restricted stock, the vesting of which was accelerated. These shares are subject to clawback by the Company if, in any proceeding, after all appeals, Mr. Schorsch is found to have breached his fiduciary duty of loyalty or is found to have committed or admits to fraud or misconduct in connection with his responsibilities as a director or officer of the Company.

* * *

In reviewing its AFFO methodology, the Company has determined that it is appropriate to include certain adjustments that were not included in the previously reported AFFO calculation.

* * *

In reviewing its AFFO methodology, the Company has determined that it was not appropriate to adjust for operating fees incurred to affiliates as these expenses represent operating expenses that are typical for the industry

* * *

**Material Weaknesses in Disclosure Controls and Procedures** – The Company's disclosure controls and procedures were not properly designed or implemented to ensure that the information contained in the Company's periodic reports and other SEC filings correctly reflected the information contained in the Company's accounting records and other supporting information and that AFFO per share (a non-GAAP measure that is an important industry metric) was

41

correctly calculated. In addition, the Company did not have appropriate controls to ensure that its SEC filings were reviewed on a timely basis by senior management or that significant changes to amounts or other disclosures contained in a document that had previously been reviewed and approved by the Audit Committee were brought to the attention of the Audit Committee or its Chair for review and approval before the document was filed with the SEC. Finally, the Company did not have appropriate controls over the formulation of AFFO per share guidance or the periodic re-assessment of the Company's ability to meet its guidance.

**Material Weaknesses in Internal Control Over Financial Reporting** – A material weakness is defined as a deficiency, or a combination of deficiencies, in internal control over financial reporting such that there is a reasonable possibility that a material misstatement of our annual or interim financial statements will not be prevented or detected on a timely basis.

During 2013, due in part to a number of large portfolio acquisitions, the Company experienced significant growth and increases in the complexity of its financial reporting and number of non-routine transactions. In late 2013, as a result of three impending transactions – the transition to self-management announced in August 2013 and effective on January 8, 2014, the acquisition of ARCT IV announced in July 2013 and completed on January 3, 2014 and the acquisition of Cole Real Estate Investments, Inc. announced in October 2013 and completed on February 7, 2014 – the complexity of the Company's transactions and the need for accounting judgments and estimates became more prevalent and had a severe impact on the Company's control environment. These changes in business conditions, combined with the pressure of market expectations inherent in announcing AFFO per share guidance for 2014, demanded an enhanced control environment.

The control environment, as part of the internal control framework, sets the tone of an organization, influencing the control consciousness of its people and providing discipline and structure. Current management identified the following material weaknesses through its re-assessment of the Company's internal control over financial reporting:

**Related Party Transactions and Conflicts of Interest** – The Company did not maintain the appropriate controls to assess, authorize and monitor related party transactions, validate the appropriateness of such transactions or manage the risks arising from contractual relationships with affiliates. Without the appropriate controls, the Company made certain payments to the Former Manager and its affiliates that were not sufficiently documented or that otherwise warrant scrutiny.

**Equity-Based Compensation** – The Company did not maintain appropriate controls over various grants of equity-based compensation. In the fourth quarter of 2013, in anticipation of the Company's transition to self-management, the

42

Company entered into employment agreements with the Company's former Executive Chairman and Chief Executive Officer and its former Chief Financial Officer, and also approved the 2014 Outperformance Plan pursuant to which awards were made to them on January 8, 2014. Without the appropriate controls, these documents contained terms that were inconsistent with the terms authorized by the Compensation Committee. Additionally, the Company did not obtain copies of or administer the equity awards made by means of block grants allocated by the Former Manager and its affiliates, nor did the Company review the awards for consistency with the Compensation Committee's authorization.

**Aggregation of Significant Deficiencies Within Business Process-Level Control Activities and Financial Reporting Controls** – The following significant deficiencies together constitute a material weakness:

> **Accounting Close Process** – The Company did not have consistent policies and procedures throughout its offices relating to purchase accounting, accounting for gain or loss on disposition and testing for impairment. In addition, senior management did not establish clear reporting lines and job responsibilities or promote accountability over business process control activities.

> **Critical Accounting Estimates and Non-Routine Transactions** – The Company did not maintain effective controls or develop standardized policies and procedures for critical accounting estimates and non-routine transactions, including management review and approval of the accounting treatment of all critical and significant estimates on a periodic basis.

93.    The amended first quarter 2014 Form 10-Q states that $9.4 million of recurring general and administrative expenses were incorrectly reported as merger and other non-routine transaction-related expenses.   Additionally, $13.9 million of management fees were incorrectly reported as merger and non-routine transaction related expenses, when they should have been recorded as management fees to affiliates.

94.    The amended second quarter 2014 Form 10-Q states that $5.8 million in annual bonus payments should have been reported that were not.   Additionally, $5.2 million in general and administrative expenses were improperly reported as merger-related expenses.   The amended Form 10-Q also states:

The Audit Committee's investigation identified certain payments made by the Company to the Former Manager or its affiliates that were not sufficiently documented or otherwise require scrutiny. In November 2014, as a result of the Audit Committee investigation, the Company terminated a lease agreement with an affiliate of its Former Manager for space in a building in Newport, Rhode Island. The Company, which never occupied the building, was reimbursed for certain leasehold improvements and other costs by delivery of 916,423 OP Units valued at approximately $8.5 million, which were retired. The Company is considering whether it has a right to seek recovery for any other such payments and, if so, its alternatives for seeking recovery. No asset has been recognized in the financial statements related to any potential recovery.

95. On March 3, 2015, RDG Capital Fund Management, LP wrote an open letter to the Board, calling for shareholder involvement in the selection of a new Board and management, and further stating as follows:

We believe the Board of Directors of ARCP (the "Board") has lost the confidence of the Company's shareholders in light of recent management turmoil, admission of material weaknesses in the Company's internal controls over financial reporting, and revelations concerning alleged malfeasance . . . . While we respect individual Board members' personal credentials, it is apparent to us that ARCP has been plagued by a toxic corporate culture and shareholders have lost confidence in the existing Board due to its failure to supervise former members of senior management who until only recently had the Board's full support.

96. On March 30, 2015, the Board caused the Company to file its Form 10-K for the 2014 fiscal year with the SEC.   The Form 10-K stated the following in part:

In October 2013, the Compensation Committee approved an aggregate award pool to be measured by the General Partner's market capitalization as of the date of such approval; however, the OPP was definitively documented to measure market capitalization on a pro forma basis as of the General Partner's transition to self-management (including the pro forma impact of various transactions expected to be consummated prior to the General Partner's transition to self-management on January 8, 2014), which was calculated in December 2013. After the Audit Committee's and new management's review of the OPP, it was determined that *the Compensation Committee's intention in respect of the OPP was that the maximum award pool opportunity (the "2014 OPP Cap") should have been $120.0 million*.

(Emphasis added.)

## REASONS WHY ARCP'S FINANCIAL STATEMENTS WERE
## INACCURATE AND MISLEADING

97.    Defendants caused ARCP to issue pervasively inaccurate and misleading financial statements.   The intentional manipulation of the Company's financials included at least the following improper and illegal accounting practices:

   a.   understatement of expenses;

   b.   understatement of the Company's loss by improperly deferring current period expenses to subsequent periods;

   c.   failure to record millions of dollars in merger and other non-routine merger-related expenses;

   d.   recording of transfer tax liabilities in incorrect accounting periods;

   e.   failure to record bonus expenses on a timely basis;

   f.   recording general and administrative expenses in incorrect periods;

   g.   recording management and administrative expenses as merger-related

   h.   delayed recording of depreciation and acquisition related expenses;

   i.   capitalizing non-capitalizable expenses as assets and improperly amortizing them over time, instead of properly expensing them at the time of incurring them; and

   j.   failure to write down the value of impaired assets.

## DAMAGES TO THE COMPANY

98.    ARCP has been, and will continue to be, severely damaged and injured by the Individual Defendants' misconduct.   As a direct and proximate result of the Individual Defendants' conduct, ARCP has been seriously harmed and will continue to be.   Such harm includes, but is not limited to:

   a.   Enormous legal costs incurred and to be incurred due to the wrongdoing alleged herein and defending the Company and defendants against a wide variety of civil and criminal investigations and lawsuits;

b.  Likely criminal and/or civil liability arising out of the various government investigations of ARCP;

c.  Loss of access to hundreds of millions of dollars in credit facilities due to the wrongdoing;

d.  Enormous loss of market capital;

e.  Loss of ability to access credit markets on favorable terms;

f.  Costs incurred and to be incurred due to the retention of outside advisors to assist in the internal investigations and in responding to the governmental investigations and subpoenas;

g.  Funds diverted from ARCP to the Individual Defendants entities controlled by them through self-dealing; and

h.  Incentive compensation wrongly paid to defendants as a result of the manipulated financial results.

99.     In addition, ARCP's business, goodwill, and reputation with its business partners, regulators, and shareholders have been gravely impaired.  The Company has still not held defendants accountable for their intentional illegal acts.   As a result, the credibility and motives of management are in serious doubt, even after the hiring of a new CEO and the addition of new directors to the Board.

100.    The actions complained of herein have irreparably damaged ARCP's corporate image and goodwill.   For at least the foreseeable future, ARCP will suffer from what is known as the "liar's discount," a term applied to the stocks of companies who have been implicated in illegal behavior and have misled the investing public, such that ARCP's ability to raise equity capital or debt on favorable terms has already been impaired and will be in the future.

## DERIVATIVE AND DEMAND ALLEGATIONS

101.    Plaintiff brings this action derivatively in the right and for the benefit of ARCP to redress injuries suffered by ARCP as a direct result of the breaches of fiduciary duty by the

Individual Defendants detailed herein.   ARCP is named as a nominal defendant solely in a derivative capacity.   This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have

102.    Plaintiff will adequately and fairly represent the interests of ARCP in enforcing and prosecuting its rights.

103.    Plaintiff was a shareholder of ARCP at the time of the wrongdoing complained of, has continuously been a shareholder since that time, and is a current ARCP shareholder.

104.    Plaintiff made a demand on the Board to investigate and remedy the violations of law described herein as required by Maryland law.    When the Board rejected the Demand it was not fully informed and was not acting independently.    Accordingly, the Board's refusal of the Demand was not a protected exercise of business judgment.

105.    On November 17, 2014, plaintiff sent the Demand to the Board.   The Demand states plaintiff owns 1,000 shares of ARCP and has owned those shares since prior to all dates in the Demand.    Attached to the Demand was documentary proof of such ownership.   The Demand alleges that, as described above and admitted by the Company, multiple periods of ARCP's financial results were intentionally manipulated to artificially inflate AFFO.   The Demand states these intentional wrongs violated applicable law, overstated reported AFFO, understated net loss, and gave rise to a criminal investigation by the FBI.

106.    The Demand asks the Board to "take action [including], the institution of an action for breach of fiduciary duty against any and all persons who are responsible" and to "seek appropriate remedial measures by obtaining damages from all persons who were unjustly enriched by permitting ARCP to engage in the wrongful activity or otherwise committed waste." The Demand alleges that wrongdoing was committed by defendants Block and Schorsch, and

that the Board of ARCP had breached its fiduciary duties.   A true and correct copy of the Demand is attached hereto as Exhibit A.

107.    Over two months later, on December 19, 2014, plaintiff's counsel received a response from ARCP's then-General Counsel, Richard A. Silfen ("Silfen"), stating the Demand had not yet been presented to the Board but would be at "its next regularly scheduled meeting on the next scheduled board date."   The letter requests, without basis, additional documentation of plaintiffs' share holdings and asks plaintiff to provide "any [additional] specific factual information" supporting the allegations in the Demand.   A true and correct copy of Mr. Silfen's December 19, 2014 letter is attached hereto as Exhibit B.

108.    Plaintiff, in a good faith effort to ensure the Demand was reviewed by the Board, undertook the lengthy process required to obtain the additional requested proof of share ownership from her broker even though the request for additional proof was entirely without legal basis.   On February 10, 2015, plaintiff's counsel sent a letter to Mr. Silfen enclosing the additional proof.   In this letter, plaintiff observed that there were fourteen actions brought by shareholders pending against the Company in this Court and that those actions generally arose out of the same facts as the wrongdoing at issue in the Demand.   Plaintiff's counsel concluded the letter by requesting Mr. Silfen confirm receipt of the letter and provide information regarding the Board's response.   A true and correct copy of plaintiff's February 10, 2015 letter is attached hereto as Exhibit C.

109.    Nearly a month went by and plaintiff had received no response from the Company, the Board, or Mr. Silfen.   On March 6, 2015, plaintiff's counsel hand-delivered another letter to Mr. Silfen at ARCP's headquarters in Manhattan, New York stating plaintiff had received no response to her February 10, 2015 letter and requesting: "[p]lease provide us, within

five business days, an update on the board's consideration of Ms. Witchko's Demand."   A true and correct copy of plaintiff's March 6, 2015 letter is attached hereto as Exhibit D.

110.   On March 12, 2015, plaintiff received a letter from Mr. Silfen stating the Board had engaged outside counsel to advise it in connection with the Demand and she would be informed of the Board's decision regarding the Demand once one was made.   A true and correct copy of Mr. Silfen's March 12, 2015 letter is attached hereto as Exhibit E.

111.   In a letter dated April 3, 2015, the Board's outside counsel, Saul Ewing LLP ("Saul Ewing") advised plaintiff it had been retained to assist the Board in its review of the Demand.   A true and correct copy of Saul Ewing's April 3, 2015 letter is attached hereto as Exhibit F.

112.   On April 22, 2015, plaintiff responded and stated that since the Demand was initially served on the Board, "the indications of wrongdoing at ARCP, which were already plentiful, have grown in number and scope" (the "Supplemental Demand").   A true and correct copy of the Supplemental Demand is attached hereto as Exhibit G.   In the Supplemental Demand, plaintiff's counsel stated "[w]e expect that any investigation… in response to the Demand would include events that have occurred since the demand was made."

113.   For the avoidance of doubt, the Supplemental Demand specifies that the following should be included in the Board's review of the Demand: (i) the additional wrongdoing by defendant Schorsch revealed in March 2015; (ii) facts related to the McAlister Complaint; (iii) the Board's dissolution of its conflicts committee in December 2014; (iv) complaints by other ARCP investors about windfall payments made to directors Stanley and Andruskevich; (v) the expanded scope of the restatement; and (vi) that various broker-dealers had suspended sales of ARCP-related products, resulting in a decrease in ARCP's capital-raising activity.

114.   The Supplemental Demand asks the Board again to investigate whether defendants Schorsch, Kay, and Beeson breached their fiduciary duties in connection with the additional wrongdoing revealed since the original Demand was served, and specifically whether the compensation paid to these three defendants during previous years was obtained due to self-dealing or was paid while they were breaching their fiduciary duties.   The Supplemental Demand concludes:

> [W]ithout limitation, the Board should investigate which other individuals, including former directors of ARCP, are responsible for the calamitous situation that has unfolded at the company since October 2014 and take appropriate action to hold them accountable.   Finally, the Board should investigate the ongoing corporate governance failures affecting ARCP.   Affirmative steps must be taken to improve the company's corporate governance to institute systems and controls to prevent problems like this from recurring.

115.   In a letter dated May 1, 2015, Saul Ewing informed plaintiff it had met with the Board on April 20, 2015 and discussed the Demand.   The letter states the Board expected to meet and again discuss the Demand and Supplemental Demand later in the month.   A true and correct copy of Saul Ewing's May 1, 2015 letter is attached hereto as Exhibit H.

116.   Finally, on June 18, 2015, seven months after receipt, the Board formally rejected plaintiff's Demand and Supplemental Demand (the "Refusal").   A true and correct copy of the Refusal is attached hereto as Exhibit I.   According to the Refusal, the entire conflicted ARCP Board, including directors alleged to have engaged in wrongdoing, reviewed and rejected the Demand, not an independent committee.   Ex. I at 1.   The Refusal Board had six members: three post-wrongdoing directors, Glenn Rufrano ("Rufrano"), Hugh R. Frater, and Julie G. Richardson, and three directors who had presided over the wrongdoing, Frank, Stanley, and Andruskevich.

117.    The Refusal demonstrates the Board was disinclined to fairly consider the Demand from the beginning.   The Board discussed the Demand on January 12, 2015, but decided not to conduct an investigation into the proposed claims, hire outside advisors to aid in assessing the Demand, or consider whether the Company might suffer increased harm by delaying to bring the claims.   Ex. I. at 3.   Instead, the Board "agreed to focus first on completion of the Audit Committee Investigation."   *Id.*   The Board also declined to apprise plaintiff of its decision to put the Demand on the back-burner.

118.    In March 2015, two months after first discussing the Demand, the Board engaged Saul Ewing.   *Id.*   At a Board meeting on April 20, 2015, the Board finally, cursorily, considered the Demand.   *Id.*   The Board did not convene a special committee of disinterested independent directors and it did not commission or receive a report specifically addressing the claims urged in the Demand.   The only information relied on by the Board in considering the Demand were two reports that did not address the particular claims, facts, legal standards, or procedure involved in bringing the type of litigation at issue in the Demand.   *Id.*   These were reports by: (a) Weil, Gotshal & Manges ("Weil Gotshal"), the Audit Committee's counsel, produced for the Audit Committee's investigation into "accounting practices and other matters"; and (b) Milbank, Tweed, Hadley & McCloy LLP ("Milbank"), outside counsel to ARCP "concerning the Audit Committee Investigation and ongoing federal securities litigation" and the multiple governmental investigations facing the Company.   *Id.* at 3-4.   The Refusal concedes these reports did not squarely address the allegations in the Demand.   *Id.* at 4 (the subject matter of the report of ARCP's outside counsel covers "many" of the same allegations as the Demand). Neither of these reports addressed the pending derivative actions alleging demand futility, let alone the Demand itself.

119. The Refusal reveals that the Board considered allegations in the Supplemental Demand in an even more perfunctory fashion than those in the original Demand. In a footnote, the Refusal states that the Supplemental Demand provides no basis "for suggesting" that directors Stanley, Andruskevich, or "any other member of the Board received improper or unauthorized payments, or that Mr. Andruskevich had any ties whatsoever to Schorsch-related entities other than ARCP, and we believe the allegations are baseless." *Id.* at 4 n. 3. Perplexingly, the Refusal concedes earlier in the same footnote that the allegations regarding directors Stanley and Andruskevich did have a basis: a letter to ARCP's Board from a third-party investor completely unaffiliated with plaintiff. *Id.* In light of the admitted wrongdoing at ARCP and the fact that directors Andruskevich, Frank, and Stanley were named defendants in multiple counts of the securities class action and plainly failed to discharge their duties on the Audit Committee and Conflicts Committee by permitting defendant Schorsch's wrongdoing, these allegations merited investigation at a bare minimum. However, as is clear from the Refusal, these allegations were dismissed out of hand for no apparent reason other than that these defendants were permitted to investigate themselves.

120. The Refusal concedes that the Board did not make an informed determination as to whether the claims urged in the Demand and Supplemental Demand have merit. When the Board considered the Demand again at a meeting on May 21, 2015, the Board determined that two considerations "would outweigh any considerations in favor of pursuing the Claims at this time," "the likely negative impact on the Ongoing Litigation and Governmental Investigations" of pursuing the claims "assuming only for the sake of argument that the Claims have merit," and the "likelihood" that the current litigation and governmental investigations would yield more information concerning the claims before the statute of limitations expired. *Id.* at 4.

According to the Refusal, the Board (incorrectly) believed pursuing the Demand might "expose ARCP and its stockholders to significant impairment in the value of their ARCP stock."   *Id*. at 5.   This conclusion is baseless and no rationale for it is given.

121.   The Refusal states that purported "remedial measures undertaken by ARCP… address any future concerns regarding the potential for the conduct underlying the Demand to reoccur."   *Id*. at 5.   While plaintiff welcomes any corporate governance enhancements at ARCP to address the culture of fraud and self-dealing that previously prevailed, this is not a rational basis to deny the Demand.   The Company has been seriously financially harmed by the breaches of fiduciary duties by defendants.   While some corporate governance enhancements are a step toward preventing the recurrence of these problems in the future, they do not make the Company whole.[2]

122.   On June 11, 2015, the Board officially adopted the Refusal.   *Id*. at 5.

123.   Plaintiff's counsel received the Refusal on June 22, 2015.   On June 24, 2015, plaintiff sent a letter to Saul Ewing requesting the opportunity to review the Milbank and Weil Gotshal reports, and, if they existed, any other reports produced in connection with the Board's consideration of the Demand.   A true and correct copy of Plaintiff's June 24, 2015 letter is attached hereto as Exhibit J.

---

[2]   That these corporate governance enhancements were implemented does not in the slightest undermine the need for swift action to vindicate the Company's rights.   There is a finite insurance policy and defendants have finite assets.   As the Refusal elsewhere acknowledges, the securities class actions and government actions seek significant damages from some of the same defendants.   Moreover, with every day the Company's Directors and Officers insurance policy may be wasting on legal fees.   The Company's claim must be filed as soon as possible to protect ARCP's claim to assets of the defendants and insurance proceeds.   The damages sought by the various litigations likely exceed the Company's insurance and the ability of defendants to withstand a judgment.

124.     On June 29, 2015, plaintiff received a letter from Saul Ewing refusing to produce the Milbank and Weil Gotshal reports.   A true and correct copy of the June 29, 2015 letter is attached hereto as Exhibit K.

### A.     The Board Did Not Act Independently

125.     When the Board refused the Demand and Supplemental Demand it was comprised of a majority of conflicted directors and it did not act independently.   Of the six directors that evaluated the Demand, four were not disinterested and independent.    Rufrano is the Company's CEO and was reliant on the goodwill of his fellow directors, including Andruskevich, Frank, and Stanley, for his continued compensation and employment.   The conflicts and wrongdoing of Andruskevich, Frank, and Stanley were subjects of the Demand and Supplemental Demand. Andruskevich, Frank, and Stanley are all defendants in the securities class action due to their having signed false and misleading registration statements.[3]

126.     Stanley was a member of the Audit Committee that reviewed the audited financial statements for the year ended December 31, 2013 and recommended they be included in the Company's Form 10-K for the year.   One subject of the investigation in response to the Demand was whether the Audit Committee members, including defendant Stanley, breached their fiduciary duties.

127.     Andruskevich was also a target of the investigation requested in the Demand. He was a member of ARCP's Conflicts Committee when it was breaching its fiduciary duties by failing to halt the self-dealing and conflicts of interest described in the Demand and Supplemental Demand.

---

[3]      At the time, Andruskevich, Frank, and Stanley were defendants in claims brought under §§ 11, 12(a)(2), and 15 of the 1933 Act, as well as claims under § 20(a) of the Securities Exchange Act of 1934.

128.    With a majority of the Board interested in the outcome of the investigation either due to being targets of it (Andruskevich, Frank, and Stanley) or being beholden to the targets of the investigation (Rufrano), the Board did not act independently.   One example of this lack of independence is the Board's decision not to convene a committee of independent directors to review the Demand.   That decision resulted in a situation where Andruskevich, Stanley, and Frank were tasked with investigating allegations of their own wrongdoing.   Likewise, Rufrano was tasked with investigating allegations of the wrongdoing of directors controlling his compensation: the Compensation Committee of ARCP's Board was three members, the majority of which were Andruskevich and Frank.   Convening a committee of disinterested directors would have, at least superficially, insulated consideration of the Demand from improper influences.

129.    The failure to convene an independent committee to review the Demand, while itself demonstrating that the Board did not act independently, also resulted in a second example of the failure to act independently.   The Refusal provides no conclusion regarding the allegations of breaches of fiduciary duties against, among others, Andruskevich, Frank, and Stanley.   When presented with a litigation Demand, a Board will normally issue a report including, among other things, a conclusion regarding the merits of the claims.   Here, the Board declined to reach the merits of the claims.   A Board acting independently would have conducted an analysis of whether targets of the investigation, including Andruskevich, Frank, and Stanley, were likely liable to the Company, and then decided a course of action in light of that determination and considerations such as the strength of the claims, damages available, and the time left on the statute of limitations.   Here, the Board did not conduct this analysis because targets of the investigation were deciding whether to investigate themselves.   Thus, the Board

did not in fact act independently in responding to the Demand and plaintiff should be permitted to maintain this derivative action on behalf of ARCP.

### B.     The Board Failed To Conduct A Reasonable Investigation

130.    The Board's investigation in response to the Demand was unreasonably incomplete and, as a result, the Board did not act on an informed basis when it rejected the Demand.    The refusal therefore was not a valid exercise of business judgment.

131.    Saul Ewing, retained by the entire Board to aid in responding to the Demand, was not independent of directors Andruskevich, Frank, and Stanley.   In its representation of the Board, Saul Ewing represented these three defendants as well.   As a result, Saul Ewing was conflicted in its representation, owing duties both to directors that might be defendants in a potential breach of fiduciary duty action and to directors who might be prosecuting that action. Had the Board convened an independent committee to evaluate the Demand and empowered the committee to retain its own outside advisor, at least this conflict would have been avoided.

132.    The Board did not investigate and reach a conclusion on the theories of recovery stated in the Demand.    *See* Ex. I at 5 ("the Board determined that, even if the allegations in the Demand and Ongoing Litigation had merit…").    There is no evidence the Board did anything other than conduct an informal discussion regarding the Demand.    The Board did not apply relevant law to facts.    There is no evidence the Board evaluated the possible claims under the correct legal standards, or under any legal standards at all.    The Board did not even distinguish the relevant standards for liability in a breach of fiduciary action from the standards for liability in the federal securities class action.    *See id.* (not recognizing that a breach of fiduciary duty claim is distinct from a securities fraud claim, "even if the allegations in the Demand and the Ongoing Litigation had merit…").    The Board did not conduct a sufficient investigation to

inform itself whether the claims in the Demand had merit. The Board did not opine on whether, in its view, a breach of fiduciary duty claim could succeed, and if so, what damages might be available.

133. The Board's failure to consider the merits of the claims under the appropriate legal standards applicable to the different categories of potential defendants demonstrates the unreasonableness of the investigation. At least some of the defendants in a breach of fiduciary duty action brought on behalf of ARCP engaged in conduct that the Company had already admitted was intentional. Contrary to the Refusal's assertion that exculpation rights render the claims unworthy of pursuit, there is no exculpation defense where, as here, there is active and deliberate dishonesty. The Refusal shows the Board simply ignored, or negligently failed to consider in good faith, the strong evidence demonstrating the merits and probability of success of the claims against the defendants.

134. Nor did the Board evaluate whether it would be in ARCP's interests to seek compensation for any of defendants' non-exculpable breaches of the duty of loyalty in light of the chances of success compared to the potential damages recoverable. It does not appear that any of the defendants would be judgment-proof or lacking in assets sufficient to fund a reasonable settlement of claims or a judgment. A potential recovery could offset ARCP's substantial damages and there does not appear to be a significant risk of disruption to the Board given that the majority of the defendants were no longer associated with the Company.

135. Because it failed to ascertain an estimate of recoverable damages, the Board was not informed as to whether the potential funds available for recovery were wasting and whether,

as a result, the Company would ultimately be prejudiced by delay in filing an action against defendants.[4]

136.    Neither the Board nor its counsel, Saul Ewing, created or produced a report on its investigation in response to the Demand.   The Board apparently did not interview anyone to evaluate the claims urged in the Demand or review any documents to that end, itself or through counsel.   There has been no documentation at all of the procedures and methodology of the supposed investigation in response to the Demand, including what, if any interviews were conducted, by whom, who was interviewed, how many documents were reviewed, where they were obtained from, and who reviewed them.   As such, the Board's investigation was not reasonable under any applicable legal standard and the Board's refusal does not receive business judgment protection because it was not informed.

137.    Neither of the two reports the Board considered prior to rejecting the Demand concerned an investigation of breach of fiduciary duty claims.   Both were produced by law firms that were at the time representing the Company and certain individual defendants in the related securities class action.   Weil Gotshal was representing directors Stanley, Andruskevich, and Frank in the then-pending demand futility action and the related securities class action. Milbank was defending the Company in the related securities class action.

138.    The report of Weil Gotshal, independent counsel for the Audit Committee investigation, focused on "concerns regarding accounting practices" and the advice of Weil Gotshal was sought "to determine the adjustments required to be made" to the fraudulent

---

[4]      As was subsequently revealed, the Board refused the Demand without taking any action to protect the Company from the potential expiration of relevant statutes of limitations.

financial statements.[5]   There is no evidence whatsoever that this investigation examined self-dealing, Board conduct, or breach of fiduciary duty claims.   Indeed, the Audit Committee's investigation as described by the Company's public filings does not mention self-dealing, breach of fiduciary duty claims, or Board conduct.

139.   Likewise, the report of Milbank did not involve breach of fiduciary duty claims and there is no evidence it included an investigation of self-dealing or Board level wrongdoing. Milbank was outside counsel to ARCP "concerning the Audit Committee Investigation and ongoing *federal securities litigation* and [governmental] investigations currently being conducted…"   Ex. I at 3 (emphasis added).   Milbank's role was not to evaluate the breach of fiduciary duty and other claims and theories urged in the Demand.   There is no evidence in the Refusal that Milbank interviewed anyone at all, reviewed any documents, or produced a written report subject to any methodology at all.   Thus, whatever the relevance of the Milbank "report," it did not inform the Board regarding the legal standards on a breach of fiduciary duty claim.

140.   The Refusal states that the Board refused the Demand based on two considerations, neither of which were chosen on the basis of being informed about the merits of the claims: (i) "the likely negative impact on the Ongoing Litigation and Governmental Investigations of pursuing the Claims at this time, *assuming for the sake of argument that the claims have merit*, and (ii) the likelihood that the Ongoing Litigation and Governmental Investigations would yield more information concerning the claims…"   *Id.* at 4 (emphasis added).   Because the Board did not create a report documenting its methodology and reasoning, it is unknown in what respect the Board believed the claims would have a negative impact on the Company's other legal problems.   Indeed, it was highly unlikely that the litigation and

---

[5]   As described by the Company's Form 8-K filed on October 29, 2014.

investigations would yield additional information before the statutes of limitations expired and the Board was at least reckless in not considering the likelihood of the statute of limitations expiring.   Having failed to adequately investigate, this decision lacked basis.

141.   The Board's failure to convene an independent committee, conduct a reasonable investigation, evaluate the merits, apply correct legal standards, evaluate chances for a recovery, potential amounts recoverable, or create a report documenting its supposed investigation cannot be deemed a valid exercise of business judgment entitled to any presumption of reasonableness and good faith under the law.   No legal action has been filed by ARCP against any of the Individual Defendants.   The primary architects of the accounting fraud and other wrongdoing detailed herein have been allowed to resign and retire, rather than being terminated for cause. Accordingly, plaintiff's institution of this action is necessary to preserve the claims asserted herein for the benefit of the Company.

142.   Plaintiff has not made any demand on the other shareholders of ARCP to institute this action since such demand would be a futile and useless act for at least the following reasons:

a.   ARCP is a publicly held company with over 905 million shares outstanding and thousands of shareholders;

b.   Making a demand on such a number of shareholders would be impossible for plaintiff who has no way of determining the names, addresses, or phone numbers of the other shareholders; and

c.   Making a demand on all shareholders would force plaintiff to incur excessive expenses, assuming all shareholders could be individually identified.

## COUNT I
## BREACH OF FIDUCIARY DUTY AS TO DEFENDANT SCHORSCH

143.     Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

144.     Defendant Schorsch owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of ARCP's business and affairs.  He was duty-bound to act in good faith in a manner he reasonably believed to be in the best interests of the Company with the care that an ordinarily prudent person in a like position would use under similar circumstances.

145.     Defendant Schorsch's conduct set forth herein breached that duty.  In so doing, defendant Schorsch acted with active and deliberate dishonesty by directing defendant Block, ARCP's CFO, to report incorrect AFFO figures in the Company's public filings.  Defendant Schorsch acted with active and deliberate dishonesty when he directed defendant Block and others to conceal the improper accounting and incorrect AFFO figures by improperly deferring the accrual of expenses.  Even though defendant Schorsch knew the Company's accounting was wrong and its financial statements were incorrect, he repeatedly certified the accuracy of ARCP's SEC filings and conducted securities offerings on the basis of those results.   Defendant Schorsch also acted with active and deliberate dishonesty when he improperly altered the Outperformance Plan as described above.

146.     Defendant Schorsch received improper benefits as a result of his breaches of fiduciary duty.   Through his self-dealing and improper accounting, he directed over $900 million of ARCP's money to himself and entities controlled by him over a three year period.   Defendant Schorsch, knowing ARCP's reported AFFO figures were incorrect, nevertheless used the incorrect AFFO results to successfully raise billions of dollars on ARCP's behalf via securities offerings

during 2013 and 2014.   He then caused ARCP to use the money raised to purchase entities that he owned and controlled.   Defendant Schorsch also received executive compensation that was not due him both in the form of incentive compensation paid on the basis of incorrect AFFO numbers and through the Outperformance Plan which was wrongfully increased by approximately $100 million.   He further received millions of dollars in fees paid to the former Manager of ARCP for incorrect, undocumented, unverifiable, and/or false expenses due to his ownership of the former Manager.

147.     Through the foregoing, defendant Schorsch willfully caused the Company to expend unnecessarily its corporate funds and failed to act in good faith in his role overseeing ARCP's business, rendering him personally liable to the Company for breaching his fiduciary duties.

148.     As a direct and proximate result of defendant Schorsch's breaches of his fiduciary obligations, ARCP has sustained and continues to sustain significant damages.   As a result defendant Schorsch is liable to the Company.

**COUNT II**
**BREACH OF FIDUCIARY DUTY AS TO DEFENDANT KAY**

149.     Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

150.     Defendant Kay owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of ARCP's business and affairs.   He was duty-bound to act in good faith in a manner he reasonably believed to be in the best interests of the Company with the care that an ordinarily prudent person in a like position would use under similar circumstances.

151.    Defendant Kay's conduct set forth herein breached that duty.   Defendant Kay, as President of ARCP, was responsible for the Company's day-to-day operations, and was familiar with the Company's internal controls.   Defendants Block and McAlister alerted defendant Kay to improper AFFO accounting.   Defendant Kay acted with active and deliberate dishonesty by directing defendants Block and McAlister not to change or correct the false financial statements, apparently to avoid public disclosure of ARCP's true financial performance.   Defendant Kay also acted with active and deliberate honesty because he knew the reported AFFO figures were incorrect but signed ARCP's 2013 Form 10-K containing the incorrect AFFO figures, made repeated public statements about the strength of the Company's performance based on the AFFO figures, and then publicly blamed the improper accounting on others when he himself had participated in it.   Defendant Kay also acted with active and deliberate dishonesty when, knowing the original value of the Outperformance Plan, he either: (a) participated in the alteration of its terms; or (b) became aware of the improper increase in the value of the plan through ARCP's public statements and participated in concealing that the Plan had been altered.

152.    Defendant Kay received improper benefits as a result of his breaches of fiduciary duty.   Defendant Kay, knowing ARCP's reported AFFO figures were incorrect, nevertheless used the incorrect AFFO results to raise billions of dollars on ARCP's behalf via securities offerings during 2013 and 2014 for the purpose of making acquisitions.   Defendant Kay received incentive compensation that was not due to him on the basis of incorrect AFFO numbers and acquisitions made by ARCP that were only possible due to money raised on the basis of the incorrect AFFO figures.   Defendant Kay was also a beneficiary of the improperly increased Outperformance Plan.

153.    Through the foregoing, defendant Kay willfully caused the Company to expend unnecessarily its corporate funds and failed to act in good faith in his role overseeing ARCP's business, rendering him personally liable to the Company for breaching his fiduciary duties.

154.    As a direct and proximate result of defendant Kay's breaches of his fiduciary obligations ARCP has sustained and continues to sustain significant damages.   As a result, defendant Kay is liable to the Company.

**COUNT III**
**BREACH OF FIDUCIARY DUTY AS TO DEFENDANT KAHANE**

155.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

156.    Defendant Kahane owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of ARCP's business and affairs.   He was duty-bound to act in good faith in a manner he reasonably believed to be in the best interests of the Company with the care that an ordinarily prudent person in a like position would use under similar circumstances.

157.    Defendant Kahane's conduct set forth herein breached that duty.   Defendant Kahane, in addition to being an inside director of ARCP, was the Company's President and Chief Operating Officer at times ARCP's financial statements were intentionally incorrect, was one of the controlling members and an executive of ARCP's former Manager, and was an executive of ARCT III and ARCT IV when they were acquired by ARCP.   Defendant Kahane was both an executive of ARCP and of the former Manager in 2011 and 2012 when ARCP's AFFO was being intentionally overstated.   During 2011 and 2012 all of ARCP's day-to-day business and administration was conducted by the former Manager, of which Kahane was an executive and owner.   Defendant Kahane acted with active and deliberate dishonesty because due to the

pervasiveness of the AFFO inflation and the fact that as an executive of ARCP and the former Manager he was charged with reporting AFFO, he knew ARCP's financials were intentionally incorrect.  Even though he knew the reported AFFO figures were incorrect, defendant Kahane signed numerous Forms 10-K that contained the incorrect AFFO figures as a director of ARCP, caused ARCP to use the incorrect AFFO numbers to raise billions of dollars, and solicited proxies based on the incorrect numbers.

158.    Defendant Kahane received improper benefits as a result of his breaches of fiduciary duty.   As a director and officer of ARCP and the various Schorsch entities with which it did business, defendant Kahane directed over $900 million to entities he controlled with defendant Schorsch and others over a three year period.  Defendant Kahane, knowing ARCP's reported AFFO figures were incorrect, nevertheless used the incorrect AFFO results to successfully raise billions of dollars on ARCP's behalf via securities offerings during 2013 and 2014.  He then caused ARCP to use the money raised to purchase companies that he owned, controlled, and/or was an executive of, enriching himself.   He further received millions of dollars in fees paid to the former Manager for incorrect, undocumented, unverifiable, and/or false expenses due to his ownership of the former Manager.

159.    Through the foregoing, defendant Kahane willfully caused the Company to expend unnecessarily its corporate funds and failed to act in good faith in his role overseeing ARCP's business, rendering him personally liable to the Company for breaching his fiduciary duties.

160.    As a direct and proximate result of defendant Kahane's breaches of his fiduciary obligations, ARCP has sustained and continues to sustain significant damages.   As a result defendant Kahane is liable to the Company.

## COUNT IV
## BREACH OF FIDUCIARY DUTY AS TO DEFENDANT WEIL

161.   Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

162.   Defendant Weil owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of ARCP's business and affairs.   He was duty-bound to act in good faith in a manner he reasonably believed to be in the best interests of the Company with the care that an ordinarily prudent person in a like position would use under similar circumstances.

163.   Defendant Weil's conduct set forth herein breached that duty.   Defendant Weil, in addition to being an inside director of ARCP, was the Company's President, Treasurer and Secretary at times ARCP's financial statements were intentionally incorrect, was one of the controlling members and an executive of the former Manager of ARCP, and was an executive of ARCT III and ARCT IV when they were acquired by ARCP.   Defendant Weil was an executive of ARCP from 2012 to 2014 and of the former Manager when ARCP's AFFO was being intentionally overstated from 2011 to 2014.   Prior to January 2014, all of ARCP's day-to-day business and administration was conducted by the former Manager, of which defendant Weil was an executive and owner.   Defendant Weil acted with active and deliberate dishonesty because due to the pervasiveness of the AFFO inflation and the fact that as an executive of ARCP and the former Manager he was charged with reporting AFFO, he knew ARCP's financials were incorrect. Even though he knew the reported AFFO figures were incorrect, defendant Kahane signed numerous Forms 10-K that contained incorrect financial statements as a director of ARCP, caused ARCP to use the incorrect AFFO numbers to raise billions of dollars, and solicited proxies based on the incorrect numbers.   Defendant Weil also acted with active and deliberate dishonesty

because as Treasurer of ARCP, he approved payment to the former Manager, of which he was an executive, for millions of dollars in false and inflated expenses.

164.   Defendant Weil received improper benefits as a result of his breaches of fiduciary duty.   As a director and officer of ARCP and the various Schorsch-entities with which it did business, defendant Weil directed over $900 million to entities he controlled with defendant Schorsch over a three year period.   Defendant Weil, knowing ARCP's reported AFFO figures were incorrect, nevertheless used the incorrect AFFO results to successfully raise billions of dollars on ARCP's behalf via securities offerings during 2013 and 2014.   He then caused ARCP to use the money raised to purchase companies that he owned, controlled, and/or was an executive of, enriching himself.   He further received millions of dollars in fees paid to the former Manager for incorrect, undocumented, unverifiable, and/or false expenses due to his ownership of the former Manager.

165.   Through the foregoing, defendant Weil willfully caused the Company to expend unnecessarily its corporate funds and failed to act in good faith in his role overseeing ARCP's business, rendering him personally liable to the Company for breaching his fiduciary duties.

166.   As a direct and proximate result of defendant Weil's breaches of his fiduciary obligations, ARCP has sustained and continues to sustain significant damages.   As a result defendant Weil is liable to the Company.

## COUNT V
### BREACH OF FIDUCIARY DUTY AS TO DEFENDANT BLOCK

167.   Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

168.   Defendant Block owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of ARCP's business and affairs.   He was

duty-bound to act in good faith in a manner he reasonably believed to be in the best interests of the Company with the care that an ordinarily prudent person in a like position would use under similar circumstances.

169.   Defendant Block's conduct set forth herein breached that duty.   Defendant Block was ARCP's CFO and therefore was ultimately responsible for the content of ARCP's financial statements.   Defendant Block acted with active and deliberate dishonesty by publishing intentionally incorrect AFFO numbers during all periods that were restated.   Defendant Block acted with active and deliberate dishonesty by improperly reallocating funds used to calculate AFFO in ARCP's second quarter 2014 financial statements.   Defendant Block therefore knew that ARCP's financial statements were incorrect but he did nothing to correct them and participated in the cover-up.   Even though defendant Block knew the Company's accounting was wrong and its financial statements were incorrect, he repeatedly certified the accuracy of ARCP's SEC filings.   Defendant Block also acted with active and deliberate dishonesty when, knowing the original value of the Outperformance Plan, he either: (a) participated in the alteration of its terms; or (b) became aware of the improper increase in the value of the plan through ARCP's public statements and participated in concealing that the Plan had been altered.

170.   Defendant Block received improper benefits as a result of his breaches of fiduciary duty.   Through his self-dealing and improper accounting he directed over $900 million to himself and entities controlled by him, defendant Schorsch, and others over a three year period. Defendant Block, knowing ARCP's reported AFFO figures were incorrect, nevertheless used the incorrect AFFO results to successfully raise billions of dollars on ARCP's behalf via securities offerings during 2013 and 2014.   He then caused ARCP to use the money raised to purchase companies that defendant Schorsch owned and that he controlled and/or was employed by,

enriching himself.   Defendant Block also received executive compensation that was not due him both in the form of incentive compensation paid on the basis of incorrect AFFO numbers and through the Outperformance Plan which was wrongfully increased by approximately $100 million.   He further received millions of dollars in fees paid to the former Manager for incorrect, undocumented, unverifiable, and/or false expenses due to his ownership of the former Manager.

171.   Through the foregoing, defendant Block willfully caused the Company to expend unnecessarily its corporate funds and failed to act in good faith in his role overseeing ARCP's business, rendering him personally liable to the Company for breaching his fiduciary duties.

172.   As a direct and proximate result of defendant Block's breaches of his fiduciary obligations, ARCP has sustained and continues to sustain significant damages.   As a result defendant Block is liable to the Company.

**COUNT VI**
**<u>BREACH OF FIDUCIARY DUTY AS TO DEFENDANT McALISTER</u>**

173.   Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

174.   Defendant McAlister owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of ARCP's business and affairs.   She was duty-bound to act in good faith in a manner she reasonably believed to be in the best interests of the Company with the care that an ordinarily prudent person in a like position would use under similar circumstances.

175.   Defendant McAlister's conduct set forth herein breached that duty.   Defendant McAlister was ARCP's Chief Accounting Officer.   In her complaint, she admitted that she acted with active and deliberate dishonesty because she knew ARCP's financial statements included AFFO numbers that were incorrect and she did not correct them.   She further acted with active

69

and deliberate dishonesty because she knew defendants Schorsch and Kay directed defendant Block to conceal the improper accounting and she participated in the concealment. Defendant McAlister also acted with active and deliberate dishonesty because she knew the AFFO numbers were incorrect but signed ARCP's 2013 Form 10-K containing them anyway.

176.   Defendant McAlister received improper benefits as a result of her breaches of fiduciary duty. Defendant McAlister, upon information and belief, received executive compensation that was not due to her in the form of incentive compensation and/or bonuses paid on the basis of incorrect AFFO numbers and acquisitions made by ARCP that were only possible due to money raised on the basis of the incorrect AFFO figures.

177.   Through the foregoing, defendant McAlister willfully `caused the Company to expend unnecessarily its corporate funds and failed to act in good faith in her role overseeing ARCP's business, rendering her personally liable to the Company for breaching her fiduciary duties.

178.   As a direct and proximate result of defendant McAlister's breaches of her fiduciary obligations ARCP has sustained and continues to sustain significant damages. As a result, defendant McAlister is liable to the Company.

## COUNT VII
## BREACH OF FIDUCIARY DUTY AS TO DEFENDANT BEESON

179.   Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

180.   Defendant Beeson owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of ARCP's business and affairs. She was duty-bound to act in good faith in a manner she reasonably believed to be in the best interests of the

Company with the care that an ordinarily prudent person in a like position would use under similar circumstances.

181.    Defendant Beeson's conduct set forth herein breached that duty.   Defendant Beeson was ARCP's President and Chief Operating Officer.   Defendant Beeson was one of ARCP's "senior management" when defendant McAlister alerted defendants Schorsch, Kay, and "senior management" that ARCP's reported AFFO numbers were incorrect.   She acted with active and deliberate dishonesty because she knew ARCP's financial statements included AFFO numbers that were incorrect and she did not correct them.   She acted with active and deliberate dishonesty because she knew defendants Schorsch and Kay directed defendant Block to conceal the improper accounting and she participated in the concealment.   Defendant Beeson also acted with active and deliberate dishonesty because she knew the AFFO numbers were incorrect but signed ARCP's 2013 Form 10-K containing them anyway.   Defendant Beeson further acted with active and deliberate dishonesty when, knowing the original value of the Outperformance Plan, she either: (a) participated in the alteration of its terms; or (b) became aware of the improper increase in the value of the plan through ARCP's public statements and participated in concealing that the Plan had been altered.

182.    Defendant Beeson received improper benefits as a result of her breaches of fiduciary duty.   Defendant Beeson, knowing ARCP's reported AFFO figures were incorrect, nevertheless used the incorrect AFFO results to successfully raise billions of dollars on ARCP's behalf via securities offerings during 2013 and 2014 for the purpose of making acquisitions. Defendant Beeson received executive compensation that was not due to her in the form of incentive compensation paid on the basis of incorrect AFFO numbers and acquisitions made by

ARCP that were only possible due to money raised on the basis of the incorrect AFFO figures. Defendant Beeson was also a beneficiary of the improperly increased Outperformance Plan.

183.    Through the foregoing, defendant Beeson willfully caused the Company to expend unnecessarily its corporate funds and failed to act in good faith in her role overseeing ARCP's business, rendering her personally liable to the Company for breaching her fiduciary duties.

184.    As a direct and proximate result of defendant Beeson's breaches of her fiduciary obligations ARCP has sustained and continues to sustain significant damages.  As a result, defendant Beeson is liable to the Company.

## PRAYER FOR RELIEF

FOR THE FOREGOING REASONS, plaintiff demands judgment in the Company's favor against all defendants as follows:

A.    Declaring that plaintiff may maintain this action on behalf of ARCP and that plaintiff is an adequate representative of the Company;

B.    Declaring that the Individual Defendants have breached their fiduciary duties to ARCP;

C.    Determining and awarding to ARCP the damages sustained by it as a result of the violations set forth above by each of the defendants, jointly and severally, together with interest thereon;

D.    Directing ARCP and the Individual Defendants to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect ARCP and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote the following resolutions for amendments to the Company's By-Laws or Articles of Incorporation; and the following actions as may be necessary to ensure proper Corporate Governance Policies:

1.      a proposal to strengthen the Board's supervision of ARCP's operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board;

2.      a provision to permit the shareholders of ARCP to nominate at least three candidates for election to the Board;

3.      a proposal to ensure the establishment of effective oversight of ARCP's compliance with applicable laws, rules, and regulations;

E.      Determining and awarding to ARCP exemplary damages in an amount necessary to punish defendants and to make an example of defendants to the community according to proof at trial;

F.      Awarding ARCP restitution from defendants, and each of them;

G.      Awarding plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs, and expenses; and

H.      Granting such other and further equitable relief as this Court may deem just and proper.

## **JURY DEMAND**

Pursuant to Fed. R. Civ. P. 38(b), Plaintiff demands a trial by jury.

Dated: June 30, 2016                          s/ Robert I. Harwood
                                              Robert I. Harwood
                                              Samuel K. Rosen
                                              Benjamin I. Sachs-Michaels
                                              HARWOOD FEFFER LLP
                                              488 Madison Avenue
                                              New York, NY 10022
                                              (212) 935-7400

                                              *Liaison Counsel for Plaintiffs*

Robert C. Schubert
Willem F. Jonckheer
SCHUBERT JONCKHEER & KOLBE LLP
Three Embarcadero Center, Suite 1650
San Francisco, CA 94111
(415) 788-4220

Curtis V. Trinko
Jennifer E. Traystman
LAW OFFICES OF CURTIS V. TRINKO, LLP
16 West 46th Street, 7th Floor
New York, NY 10036
(212) 490-9550

Jeffrey M. Norton
NEWMAN FERRARA LLP
1250 Broadway, 27th Floor
New York, New York 10001
(212) 619-540

Alfred G. Yates, Jr.
Gerald L. Rutledge
LAW OFFICE OF ALFRED G. YATES JR PC
519 Allegheny Building
429 Forbes Ave.
Pittsburgh, PA 15219
(412) 391-5164

Corey D. Holzer
Marshall P. Dees
HOLZER & HOLZER, LLC
1200 Ashwood Parkway, Suite 410
Atlanta, Georgia 30338
(770) 392-0090

Timothy W. Brown
THE BROWN LAW FIRM, P.C.
127A Cove Road
Oyster Bay Cove, NY 11771
(516) 922-5427

*Plaintiffs' Counsel*

## AMERICAN REALTY CAPITAL PROPERTIES, INC. VERIFICATION

I, Joanne Witchko, hereby verify that I am familiar with the allegations in the Amended Complaint, and that I have authorized the filing of the Amended Complaint, and that the foregoing is true and correct to the best of my knowledge, information, and belief.

Date: _6/28/2016_

_____
Joanne Witchko