UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------------------------x

JOANNE WITCHKO, Derivatively on Behalf of Nominal
Defendant AMERICAN REALTY CAPITAL
PROPERTIES, INC.,

               Plaintiff,

      vs.

NICHOLAS S. SCHORSCH, DAVID KAY, WILLIAM
KAHANE, EDWARD M. WEIL, JR., BRIAN BLOCK,
LISA MCALISTER and LISA BEESON,

              Defendants,

    -and-

AMERICAN REALTY CAPITAL PROPERTIES, INC.,

           Nominal Defendant.

--------------------------------------------------------------------------x

:
:
:
:
:
:
:
:
:
:
:

Lead Case No. 15-CV-6043-AKH

(Consolidated With Case No. 15-cv-8563-AKH)


## MEMORANDUM OF LAW IN SUPPORT OF MOTION
## FOR SUMMARY JUDGMENT OF THE AR INDIVIDUALS


PAUL, WEISS, RIFKIND,
   WHARTON & GARRISON LLP
1285 Avenue of the Americas
New York, NY 10019-6064
(212) 373-3000

*Counsel for Defendant Nicholas S. Schorsch*


KELLOGG, HANSEN, TODD,
   FIGEL & FREDERICK, P.L.L.C.
1615 M Street, N.W., Suite 400
Washington, DC 20036
(202) 326-7968

*Counsel for Defendants William Kahane and
Edward M. Weil*

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT .................................................................................1

PROCEDURAL HISTORY....................................................................................7

STATEMENT OF UNDISPUTED FACTS ...............................................................8

I.     THE AR INDIVIDUALS, AR CAPITAL AND ARCP..........................................8

II.    RELATED-PARTY TRANSACTIONS BETWEEN
ARCP AND AR CAPITAL AND ITS AFFILIATES.........................................9

    A.    Promote Fees and Other Payments Made in Connection
with the ARCT III and ARCT IV Mergers...........................................10

    B.    Promotes are Standard in the REIT Industry and Presumptively
Reasonable if They Do Not Exceed Fifteen Percent of Total Return..................10

    C.    The ARCT III Transaction.................................................................12

        1.    ARCP's Merger with ARCT III Served the Interests of Investors
and Was Subject to a Thorough and Appropriate Governance
Process .............................................................................12

        2.    The ARCT III Promote Was Extensively Reviewed by the
Independent Directors in the Course of Merger Negotiations..................14

        3.    ARCP's Merger with ARCT III, including Delivery of the
Promote, Was Approved by the Company's Independent Directors.........16

        4.    The Promote Was Fully Disclosed and the Merger Between ARCP
and ARCT III Was Overwhelmingly Approved by Shareholders.............16

        5.    The ARCT III Promote Was Consistent with Industry Standards............18

        6.    In Connection with the Merger, ARCP Agreed to Purchase Certain
Assets Used by ARCT III's Manager to Operate the Properties ..............18

    D.    The ARCT IV Transaction.................................................................19

    E.    The Acceleration of the 2013 Outperformance Plan LTIP Units ..........................20

    F.    Asset Purchases In Connection with Internalization ...............................................23

    G.    The 2014 Outperformance Plan and LTIP Units ...................................................24

i

H.      The RCS Advisory Fees................................................................................26

LEGAL STANDARDS .................................................................................................28

ARGUMENT ...............................................................................................................29

I.      THE AR INDIVIDUALS ARE ENTITLED TO SUMMARY JUDGMENT ON
        ALL CLAIMS IN THIS CASE ARISING FROM ALLEGED AFFO
        MISSTATEMENTS .........................................................................................29

        A.      The Amended Complaint Alleges a Single Claim for "Breach of Fiduciary
                Duty" That is Not a Recognized Cause of Action Under Maryland Law ............29

        B.      The AR Individuals Are Entitled to Judgment in This Action on the Same
                Grounds that Summary Judgment Should be Granted in the Class Action ..........31

II.     THE AR INDIVIDUALS ARE ENTITLED TO SUMMARY
        JUDGMENT ON PLAINTIFF'S ADDITIONAL CLAIMS...............................34

        A.      Plaintiff Fails to State a Cognizable Claim Under Maryland Law .......................34

        B.      Each of the Challenged Related-Party Transactions is Not Actionable
                Under Maryland Law Because Each Was Reviewed and Approved by
                Disinterested Directors, Disinterested Shareholders, or Was Fair and
                Reasonable to ARCP.................................................................................34

        C.      The AR Individuals Are Entitled to Summary Judgment Based on the
                Lack of Evidence of Active and Deliberate Dishonesty or Improper
                Benefit .....................................................................................................39

                1.      ARCT III Promote .........................................................................39

                2.      The ARCT IV Promote...................................................................41

                3.      Acceleration of the 2013 OPP Awards .......................................41

                4.      Payments to RCS ..........................................................................43

                5.      The Asset Purchase and Sale Agreements .................................44

                6.      The 2014 Outperformance Plan ...................................................45

CONCLUSION.............................................................................................................46

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*In re American Realty Capital Properties, Inc.*,
 No. 15 Misc. 40 (S.D.N.Y.) ................................................................1

*Anderson v. Liberty Lobby, Inc.*,
 477 U.S. 242 (1986)..........................................................................28

*Assoc. Elec. & Gas Ins. Serv., Ltd. v. Rigas*,
 382 F. Supp. 2d 685 (E.D. Pa. 2004) ................................................33

*Attorney Grievance Comm'n of Md. v. Levin*,
 91 A.3d 1101 (Md. 2014) ..................................................................33

*Beall v. Holloway-Johnson*,
 130 A.3d 406 (Md. 2016) ..................................................................33

*Bennett v. Damascus Cmty. Bank*,
 No. 267722-V, 2006 WL 2458718 (Md. Cir. Ct. Apr. 6, 2006)............42

*Blondell v. Littlepage*,
 968 A.2d 678 (Md. Ct. Spec. App. 2009) ..........................................30

*Boiardi v. Freestate*,
 No. 11 Civ. 1676, 2013 WL 5410131 (D. Md. Sep. 25, 2013)............30

*Burt Shearer Trustee v. Adams*,
 No. 09 Civ. 991, 2010 WL 3782162 (M.D. Tenn. Sep. 21, 2010) ........42

*Celotex Corp. v. Catrett*,
 477 U.S. 317 (1986)..........................................................................28

*City of Brockton Ret. Sys. v. Shaw Group, Inc.*,
 540 F. Supp. 2d 464 (S.D.N.Y. 2008)................................................40

*In re Delta Air Lines, Inc.*,
 386 B.R. 518 (Bankr. S.D.N.Y. 2008)................................................40

*Doppelt v. Denahan*,
 No. 642447-13, 2015 WL 3461082 (N.Y. Sup. Ct. 2015)....................35

*Duty Free Americas, Inc. v. Legg Mason Wood Walker, Inc.*,
 No. 24-C-04-005696, 2005 WL 914395 (Md. Cir. Ct. Jan. 13, 2005) ......30

*In re Ezcorp Inc. Consulting Agreement Derivative Litig.*,
    No. CA 9962, 2016 WL 301245 (Del. Ch. Jan. 25, 2016) ....................................................36

*Goldstein v. Berman*,
    No. 12 Civ. 2507, 2014 WL 824050 (D. Md. Feb. 28, 2014)..................................................32

*Gorby v. Weiner*,
    No. 13 Civ. 3276, 2014 WL 4825962 (D. Md. Sep. 23, 2014)..............................................30

*Gourdine v. Crews*,
    955 A.2d 769 (Md. 2008) ......................................................................................................33

*Hayes v. Crown Central Petroleum Corp.*,
    78 Fed. App'x 857 (4th Cir. 2003) ........................................................................................32

*Hudson* v. *Prime Retail, Inc.*,
    No. 24-C-03-5806, 2004 WL 1982383 (Md. Cir. Ct. Apr. 1, 2004) ......................................43

*Huff Energy Fund, L.P. v. Gershen*,
    CA No. 11116, 2016 WL 5462958 (Del. Ch. Sep. 29, 2016)................................................37

*Hundt v. Snedegar*,
    No. 1854, 2015 WL 6112290 (Md. Ct. Spec. App. Aug. 21, 2015)........................................30

*Hurt v. City of New York*,
    No. 15 Civ. 7612, 2018 WL 6616474 (S.D.N.Y. Dec. 18, 2018)............................................31

*Independent Distribs. v. Katz*,
    637 A.2d 886 (Md. Ct. Spec. App. 1994)......................................................................35, 38

*Kann v. Kann*,
    344 Md. 689 (1997) ..............................................................................................................30

*Beam ex rel. Martha Stewart Living Omnimedia, Inc. v. Stewart*,
    845 A.2d 1040 (Del. 2004) ....................................................................................................36

*Matsushita Elec. Industrial Co.* v. *Zenith Radio Corp.*,
    475 U.S. 574 (1986)..............................................................................................................29

*Mayes v. Bd. of Educ. of Prince George's Cty.*,
    No. 13 Civ. 3770, 2014 WL 3973930 (D. Md. Aug. 12, 2014)..............................................30

*MEE Direct LLC v. Tran Source Logistics, Inc.*,
    No. 13 Civ. 455, 2014 WL 585637 (D. Md. Feb. 14, 2014)..................................................30

*In re NovaGold Res. Inc. Sec. Litig.*,
    629 F. Supp. 2d 272 (S.D.N.Y. 2009)....................................................................................40

*PPI Enterps. v. Del Monte Foods Co.*,
   No. 99 Civ. 3794, 2000 WL 1425093 at *10–11 (S.D.N.Y. Sep. 26, 2000) .........................30

*Pfizer, Inc. Derivative Sec. Litig.*,
   307 F. App'x 590 (2d Cir. 2009) ...........................................................................................37

*Reilly v. U.S. Physical Therapy, Inc.*,
   No. 17 Civ. 2347, 2018 WL 3559089 (S.D.N.Y. July 23, 2018) ...........................................40

*Rockman v. Union Carbide Corp.*,
   No. CV RDB-16-1169, 2017 WL 2687787 (D. Md. June 22, 2017)......................................33

*In re Sanofi-Aventis Sec. Litig.*,
   774 F. Supp. 2d 549 (S.D.N.Y. 2011).....................................................................................40

*Shaev v. Hampel*,
   No. 99 Civ. 10578, 2002 WL 31413805 (S.D.N.Y. Oct. 25, 2002) .......................................40

*Storetrax.com, Inc.* v. *Gurland*,
   915 A.2d 991 (Md. App. Ct. 2007).........................................................................................35

*Tobacco Tech., Inc. v. Taiga Int'l N.V.*,
   626 F. Supp. 2d 537 (D. Md. 2009).................................................................................35, 38

*In re Wal-Mart Stores, Inc. Del. Deriv. Litig.*,
   CA No. 7455, 2016 WL 2908344 (Del. Ch. May 13, 2016) ..................................................31

*Wittman* v. *Crooke*,
   707 A.2d 422 (Md. Ct. Spec. App. 1998)...............................................................................35

## STATUTES

Md. Corp. & Ass'n Code § 2–419 ....................................................................................34, 35

Md. Cts. & Jud. Pro. § 5-418(a)(1)–(2) .................................................................................32

## OTHER AUTHORITIES

James J. Hanks, Jr., *Maryland Corporation Law* § 6.9 (2017 Supp.) ...........................................44

Defendants Nicholas S. Schorsch, William Kahane and Edward M. Weil, Jr. (collectively, the "AR Individuals") respectfully submit this memorandum of law in support of their motion for summary judgment in the above-captioned action (the "Derivative Action"). The AR Individuals also rely on, and incorporate by reference, the motions for summary judgment filed by the defendants in coordinated class action proceedings, *In re American Realty Capital Properties, Inc.*, No. 15 Misc. 40 (S.D.N.Y.) (the "Class Action"), which provide additional grounds for dismissal of the Derivative Action for the reasons described below.[1]

## PRELIMINARY STATEMENT

The core issue in these consolidated proceedings involves an accounting judgment: namely, how American Realty Capital Properties, Inc. ("ARCP" or "the Company") presented the non-GAAP metric, Adjusted Funds from Operations ("AFFO"), in its public disclosures, and whether ARCP personnel acted with an intent to defraud in connection with that accounting judgment. As ARCP's brief in support of its motion for summary judgment in the Class Action clearly demonstrates, discovery unequivocally has shown that the AFFO disclosures were transparent, not misleading, and not made with fraudulent intent.

**AFFO-Related Derivative Action Claims.** In this Derivative Action, the AR Individuals are entitled to summary judgment as to all claims premised on purported AFFO misstatements for two straightforward reasons:

---

[1] Citations to "ARC Parties MSJ" are to the memorandum of law in support of motion for partial summary judgment filed by AR Capital, Defendants Kahane and Weil, and other affiliated parties in the Class Action. Citations to "Schorsch MSJ" are to the memorandum of law in support of motion for summary judgment filed by Mr. Schorsch in the Class Action. Citations to "ARCP MSJ" are to the memorandum of law in support of motion for partial summary judgment filed by ARCP in the Class Action.

*First*, Plaintiff has not asserted a cognizable claim under applicable Maryland state law.  This Court dismissed substantial portions of Plaintiff's original complaint and instructed Plaintiff to file a streamlined version clarifying the basis for relief as to the remaining defendants.  In response, Plaintiff filed the Amended Complaint, which alleges a single cause of action for breach of fiduciary duty.  Maryland law does not, however, recognize an independent tort for breach of fiduciary duty, and federal courts routinely dismiss such claims.  Summary judgment in favor of the AR Individuals should be entered on this basis alone.  *See infra* Section I.A.

*Second*, as the Company's summary judgment brief in the Class Action demonstrates, the challenged AFFO disclosures were fair and accurate, and its directors, officers and employees, including the AR Individuals, acted in good faith in preparing those disclosures at all times before July 28, 2014.  (*See* ARCP MSJ at Argument Sections I–III.)  The briefs submitted by the AR Individuals in the Class Action similarly demonstrate that summary judgment in favor of the AR Individuals should be granted on this basis.  (*See* Schorsch MSJ at Argument Section III; ARC Parties MSJ Argument Section II.)  The evidentiary burden in this Derivative Action under Maryland law is actually *higher* than the standard Class Action Plaintiffs must meet to survive summary judgment.  Accordingly, to the extent ARCP and the AR Individuals prevail on their summary judgment motions in the Class Action, those same arguments require summary judgment in favor of the AR Individuals here.  *See infra* Section I.B.

**Related-Party Transaction Claims**.  Separate and apart from the alleged AFFO misstatements that are the core of this action and the Class Action, Plaintiff's complaint tacks on allegations regarding purportedly improper related-party transactions.  In particular, Plaintiff contends that the AR Individuals, while officers or directors of ARCP, breached fiduciary duties to ARCP by causing it to make payments to entities affiliated with AR Capital, LLC ("AR

Capital"). That conclusory allegation was never supported in the pleadings with any specificity and discovery has served only to further undermine Plaintiff's position. Indeed, Plaintiff has abandoned her claims relating to the overwhelming majority of the alleged $900 million in improper payments by failing to adduce any evidence about such fees *at all*. Summary judgment should be entered on all of the related-party-transaction claims for the following reasons:

*First,* Plaintiff's sole claim in this action for breach of fiduciary duty is not cognizable under Maryland law. This cause of action does not exist, and the related-party transactions cannot form the basis for liability under this legal theory. *See infra* Section II.A.

*Second,* even if Plaintiff were permitted to amend to assert a cognizable cause of action, Maryland law precludes interested director and officer liability where, as here: (a) the challenged corporate transactions were ratified by the disinterested members of the board or where shareholders approved the transactions; or (b) the transactions were objectively fair and reasonable to the Company. In this case, among other safeguards, the AR Individuals recused themselves from Board votes concerning the challenged transactions; the challenged payments were reviewed and approved by disinterested directors who were advised by independent financial advisors and counsel; and the payments were disclosed to shareholders, who voted in favor of the transactions. In addition, there is no evidence that the transactions were not objectively fair and reasonable to shareholders. Maryland law thus precludes liability. *See infra* Section II.B.

*Third,* Plaintiff has failed to adduce clear and convincing evidence of intentional wrongdoing by the AR Individuals, as Maryland law requires, for each of the six related-party payments that Plaintiff focused on at all during discovery. *See infra* Section II.C. Indeed, the undisputed record established that there was no wrongdoing by the AR Individuals in connection with any of the challenged transactions:

(1) **ARCT III Promote Fee**.  Plaintiff's counsel has focused on a subordinated distribution, or "promote" fee, delivered by the shareholders of American Realty Capital Trust III, Inc. ("ARCT III"), an AR Capital-sponsored REIT, to American Realty Capital Trust III Special Limited Partner, LLC (the "ARCT III Sponsor"), when ARCT III was acquired by ARCP.  The ARCT III Sponsor was entitled to that fee because, as a result of the merger, the original ARCT III investors received more than $133 in value for every $100 invested in ARCT III, and the ARCT III Sponsor was contractually entitled to share in 15% of the substantial gain it helped to generate. The promote fee was thoroughly reviewed and authorized by disinterested directors who were advised by independent financial advisors and counsel, reviewed by ARCP's outside auditors, and disclosed to ARCT III and ARCP shareholders, who voted in favor of the merger.  The fee was received in the context of a complex merger transaction between ARCT III and ARCP, with negotiated concessions on both sides, and Maryland law does not permit Plaintiff to unwind one contractually-established component of a transaction that was approved by independent directors, approved by a shareholder vote, and indisputably was in ARCP's best interests.  Nor, in any event, is there any evidence, let alone clear and convincing evidence, that the AR Individuals engaged in active and deliberate dishonesty or received an improper benefit.

(2) **ARCT IV Promote Fee**.  A similar promote fee was delivered by the shareholders of American Realty Capital Trust IV, Inc. ("ARCT IV") to American Realty Capital Trust IV Special Limited Partner, LLC (the "ARCT IV Sponsor"), an AR Capital affiliate, in a 2014 merger between ARCP and ARCT IV.  Plaintiff focused far less attention in discovery on that promote fee, and has adduced no supporting evidence.  In any event, Plaintiff's challenge fails for the same reasons: the ARCT IV promote fee was approved by fully-informed disinterested directors advised by independent financial advisors and experienced counsel; reviewed by ARCP's

outside auditors; and disclosed to ARCT IV and ARCP shareholders.  It was part of a broader transaction that indisputably was in the best interests of ARCP, and cannot be challenged in isolation.  Nor is there any evidence, let alone clear and convincing evidence, supporting an allegation that the AR Individuals engaged in active and deliberate dishonesty, or received improper benefits, in connection with the ARCT IV promote.

**(3) Acceleration of 2013 Outperformance Plan Awards**.  In early 2014, in response to investor feedback and with the encouragement and approval of ARCP's independent directors, ARCP "internalized" management.  ARCP had been an "externally managed" real estate investment trust ("REIT"), such that it paid ARC Properties Advisors, LLC (the "Advisor"), an AR Capital affiliate, a fee to manage the Company and its properties.  On January 8, 2014, ARCP terminated its management agreement with the Advisor.  Recognizing that the Company was terminating without cause an agreement worth hundreds of millions in future fees, ARCP's board agreed to accelerate certain incentive payments to the Advisor that previously had been negotiated.  ARCP's independent directors memorialized their approval in two separate resolutions, and disclosed the acceleration to shareholders.  Nonetheless, Plaintiff seeks to pursue a theory that is at odds with ARCP's public filings and the evidence adduced from its outside auditors and disinterested directors.  It is unsupported by the record and should be swiftly rejected.

**(4) Asset Purchases.**  Plaintiff's counsel has questioned the amounts paid by ARCP for certain purchases of assets from subsidiaries of AR Capital in connection with three transactions.  Those payments, however, were documented in agreements that were approved by the disinterested directors, and were publicly disclosed to shareholders.  And the record lacks any evidence that ARCP did not receive fair value for the amounts it paid under those agreements, or that the AR Individuals acted with deceit or received any improper benefit.

(5) **2014 Outperformance Plan Awards**.  In early 2014, ARCP granted several senior executives, including Mr. Schorsch (but not Messrs. Kahane and Weil), long term incentive plan ("LTIP") awards to incentivize management to achieve the Company's growth and earnings goals.  Plaintiff's counsel has questioned whether the maximum total award under the incentive plan exceeded that approved by ARCP's independent directors, but discovery has conclusively demonstrated that Plaintiff's theory is wrong.  In fact, ARCP's independent directors reviewed and authorized the final incentive plan under which the ARCP executives were awarded LTIP units. The terms of that final plan also were publicly disclosed to ARCP's shareholders.  There is no evidence of active and deliberate dishonesty by any of the AR Individuals in connection with the awards.  Nor was any benefit *actually received*, as Mr. Schorsch and the other executives voluntarily relinquished their rights to any awards.  Plaintiff therefore has no claim.

(6) **Fees Paid to RCS**.  Finally, Plaintiff questions certain fees paid to RCS Capital Corporation ("RCS"), a separate public company in which the AR Individuals held an interest. The decision to engage RCS was made by ARCP's disinterested directors, who concluded that RCS, a leading advisor with significant REIT expertise, provided necessary services at appropriate rates. The fees also were disclosed to shareholders.  The record lacks any evidence that RCS did not provide the agreed-upon services, or that the AR Individuals arranged for the fees through active and deliberate dishonesty.  Moreover, those fees were *not* paid to the AR Individuals, but rather to an independent public company and its operating subsidiaries (in which the AR Individuals had a disclosed interest.)  Because there is no evidence that the AR Individuals "actually received" any purportedly improper benefit, this claim must fail.

For all the above reasons, which are set forth in detail below, summary judgment should be entered on behalf of the AR Individuals as to all claims in this case.

## PROCEDURAL HISTORY

Plaintiff's original complaint in this action, asserting various federal and state law claims, was filed on July 31, 2015.  (ECF No. 1.)  In addition to the current defendants, it asserted claims against ARCP's former independent directors.  (*See id*.)

On June 9, 2016, this Court dismissed as a matter of law substantial portions of the complaint, including all federal law claims.  (Order, ECF No. 75, at 17.)  As to the remaining state law claims, this Court held that Maryland law requires a showing that an officer or director: "(1) actually received an improper benefit or (2) engaged in active and deliberate dishonesty."  (*Id*. at 18.)  Applying that law, this Court dismissed all claims against ARCP's independent directors (*id*. at 18–19), and directed Plaintiff to amend the original complaint to allege, "for each defendant who is named, how the claim against them satisfied the Maryland statute limiting claims to improper benefits . . . or active and deliberate dishonesty."  (*Id*. at 19.)

Notwithstanding this instruction, on June 30, 2016, Plaintiff filed an Amended Verified Shareholder Derivative Complaint (the "Amended Complaint") that alleged a single breach of fiduciary duty claim as to the AR Individuals and other former members of ARCP management.  (Amended Complaint ("AC"), ECF  No. 87.)  The bulk of the Amended Complaint restated the core allegations in the Class Action that the AR Individuals and others made, or caused to be made, AFFO misstatements.  (AC ¶¶ 43–66, 145, 157, 163.)  In addition, the Amended Complaint alleged without specificity that the AR Individuals and other defendants "directed over $900 million of ARCP's money" to entities they own or control (AC ¶¶ 146, 158, 164)—providing scant detail as to what fees make up the alleged figure, the recipients of those payments, or why the fees were improper.  (*See* AC ¶¶ 34–40.)

## STATEMENT OF UNDISPUTED FACTS[2]

### I.  THE AR INDIVIDUALS, AR CAPITAL AND ARCP

Messrs. Schorsch, Kahane and Weil are three of five members of AR Capital.  (56.1 ¶ 1–4.)  AR Capital is a Delaware limited liability company.  (56.1 ¶ 1.)  Through its subsidiaries, AR Capital sponsored and managed more than a dozen REITs.  (56.1 ¶ 5.)

On December 2, 2010, AR Capital formed American Realty Capital Properties, Inc., known as ARCP.  (56.1 ¶ 7.)  ARCP became a public company on September 7, 2011.  (56.1 ¶ 7.)  ARCP focused on acquiring real estate with triple net leases (*i.e.*, leases in which the tenant assumes full responsibility for all real estate taxes, building insurance, and maintenance costs).  (56.1 ¶ 12.)  Common examples of triple-net tenants are stand-alone businesses, such as banks, pharmacies and restaurants.  (56.1 ¶ 13.)  At its outset, the stated goal of ARCP was substantial and strategic growth (56.1 ¶ 14), which was viewed as a key driver of investor value.  (56.1 ¶ 14.)  ARCP publicly stated its intention to achieve such growth through both property acquisition and purchases of other REITs.  (56.1 ¶ 14.)

ARCP was established as an "externally managed" REIT, meaning that it did not have employees of its own.  (56.1 ¶ 15.)  Instead, ARCP was managed by a subsidiary of AR Capital known as ARC Properties Advisors, Inc. (56.1 ¶ 15), hereinafter referred to as the Advisor.  In exchange for managing the Company, ARCP paid the Advisor a management fee that was contractually mandated as a percentage of ARCP's total assets.  (56.1 ¶ 16.)

The relationships between the AR Individuals, AR Capital, the Advisor and ARCP were fully disclosed and well-known to investors.  ARCP's initial 10-K publicly disclosed that

---

[2]  The AR Individuals hereby incorporate by reference undisputed facts related to AFFO and other matters set forth in the Class Action briefing, and do not restate those facts here.

ARCP was "managed by our affiliates, the Manager [the Advisor] and the Sponsor [AR Capital]," and that those parties "have received compensation and fees for services provided to us, and will continue to receive compensation and fees for investing, financing and management services provided to us." (56.1 ¶ 17.) This "externally managed" structure is common in the REIT industry. (56.1 ¶ 6.) ARCP investors testified during discovery that they understood that ARCP was externally managed and paid fees to the Advisor. (56.1 ¶ 19.)

Each of the AR Individuals served as an officer or director for ARCP during some or all of the relevant period. Mr. Schorsch served as the CEO of ARCP from its inception until he transitioned his CEO responsibilities in October 2014 to David Kay, and served as Chairman of ARCP until December 2014. (56.1 ¶ 8.) Mr. Weil served as President of ARCP from March 2012 until he transitioned his President responsibilities in December 2013 to Mr. Kay, and served as a director from March 2012 until June 2014. (56.1 ¶ 11.) Mr. Kahane served as a director from February 2013 to June 2014. (56.1 ¶ 10.) ARCP disclosed in its public filings that each of the AR Individuals had an ownership interest in AR Capital and its affiliates. (56.1 ¶ 18.)

At all times, the ARCP board of directors was comprised of a majority of disinterested directors who had no affiliation with, or financial interest in, AR Capital. Each of these outside and disinterested directors had significant business, financial reporting and board experience. (56.1 ¶ 20–31.) Each also qualified as independent under the applicable stock exchange guidelines. (56.1 ¶ 34.) And, as will be discussed below, each of these Board members oversaw, vetted and authorized the related-party transactions at issue. *See infra* Section II.

## II.    RELATED-PARTY TRANSACTIONS BETWEEN ARCP AND AR CAPITAL AND ITS AFFILIATES

The Amended Complaint alleges that the AR Individuals "directed over $900 million of ARCP's money to" entities they owned or controlled between 2012 and 2014. (AC ¶¶

146, 158, 164.)  But nowhere does it provide a detailed breakdown or explanation of this $900 million amount, nor does it attempt to identify in detail what payments were made to what entities for what purposes.  (*See id*. ¶¶ 34–40.)  So too, in discovery:  Plaintiff has identified scant evidence to support its conclusory allegations of improper related-party payments.  And in the limited instances where Plaintiff has attempted to adduce any evidence at all, it falls woefully short of establishing any actionable claim against the AR Individuals.

### A.      Promote Fees and Other Payments Made in Connection with the ARCT III and ARCT IV Mergers

Plaintiff's counsel has expended substantial effort in discovery inquiring about certain subordinated distributions, or "promote" fees, and other payments to AR Capital affiliates in the course of mergers between ARCP and ARCT III or ARCT IV.  Those transactions, including the promote fees, which were industry-standard arrangements, were subject to thorough governance processes, detailed disclosures, and approval by disinterested shareholders and directors, the latter assisted by experienced outside counsel and independent financial advisors.

### B.      Promotes are Standard in the REIT Industry and Presumptively Reasonable if They Do Not Exceed Fifteen Percent of Total Return

A subordinated distribution, known within the REIT industry as a "promote," is a fee to the REIT sponsor, the entity that establishes the company and raises the initial investments.  (56.1 ¶ 36.)  It is paid only upon the occurrence of certain events, such as a sale or merger of the REIT.  (56.1 ¶ 36.)  Importantly, it is paid *only* if investors in the REIT have received a substantial return on their investment.  Typically, the promote is defined as a percentage of the total return on investment delivered to investors *over and above* a contractually-determined return (56.1 ¶ 37)— in other words, a promote is paid *only* if, as a result of the sale or merger, REIT investors receive back their original investment *plus* an additional gain.  (56.1 ¶ 37.)  Once that total return is delivered, the REIT sponsor is entitled to a percentage of the remaining profits.  (56.1 ¶ 37.)

The governing agreements for the ARCT III and ARCT IV REITs provided that, upon certain events, their sponsors were entitled to fifteen percent of the total return delivered to investors over and above a contractually-determined return.  (56.1 ¶ 56, 100.)  This provision was entirely consistent with the convention in the REIT industry.  The North American Securities Administrators Association ("NASAA"), a respected industry organization, promulgates guidelines for promotes.  (56.1 ¶ 35.)  The NASAA Statement of Policy regarding REIT's provided that a promote based on "the gain from the sale of assets of the REIT" is "reasonable if it does not exceed 15% of the balance of such net proceeds."  (56.1 ¶ 38.)  Consistent with these industry standards, REIT industry publications reported that the overwhelming majority of REITs incorporate promote terms that entitle the sponsor to 15% of the net return.  (56.1 ¶ 39.)

Transactions in the REIT industry that deliver substantial returns to investors can often result in substantial promote fees.  For example, in early 2014, ARCP closed a merger with Cole Capital ("Cole"), an independent REIT that was not in any way affiliated with the AR Individuals or AR Capital.  (56.1 ¶ 40.)  That merger was considered a transformative transaction for ARCP that served the interests of its shareholders.  (56.1 ¶ 41.)  As a result of that transaction, the senior executives of Cole were paid more than $200 million in promote-related compensation.  (56.1 ¶ 42.)  Cole's independent director testified that, notwithstanding the size of these promotes, the fees were "in the best interest of the company shareholders" because they incentivized the Cole REIT's sponsor to deliver substantial value to investors in the REIT.  (56.1 ¶ 43.)  The promote structure in the Cole merger, which was a non-related party transaction, followed the same industry convention as the related-party mergers.

C.      **The ARCT III Transaction**

1.      **ARCP's Merger with ARCT III Served the Interests of Investors and Was Subject to a Thorough and Appropriate Governance Process**

In 2012, ARCP began to consider an acquisition of ARCT III.  (56.1 ¶ 45.)  ARCT III was a separate REIT that had been sponsored and managed by AR Capital subsidiaries.  (56.1 ¶ 44.)  The potential merger had significant benefits:  For ARCP's shareholders, a merger with ARCT III was expected to "enhance the credit quality of ARCP's real estate portfolio, immediately increase ARCP's funds from operations and further diversify ARCP's real estate portfolio."  (56.1 ¶ 46.)  Shareholders of the combined company following the merger were expected to benefit from an increased "capacity for growth" and a "more efficient cost structure."  (56.1 ¶ 46.)

The independent directors of the boards of ARCP and ARCT III were responsible for negotiating and approving the transaction on behalf of their respective shareholders. At this time, ARCP had three independent directors.  The lead independent director of ARCP was Mr. Leslie Michelson.  (56.1 ¶ 47.)  Mr. Michelson was an experienced corporate executive, having founded and then acted as Chairman and CEO of Private Health Management, Inc. since April 2007.  (56.1 ¶ 20.)  He served on the boards of various public companies unrelated to AR Capital or the AR Individuals before joining ARCP's board, including Catellus Development Corporation, Acurian, Inc., and Nastech Pharmaceutical Company.  (56.1 ¶ 20.)  In those roles he gained significant experience serving as an independent director and a member or the chair of public company audit committees.  (56.1 ¶ 20.)

In addition, Mr. Michelson served on the boards of other REITs sponsored by AR Capital.  (56.1 ¶ 32.)  At all times, Mr. Michelson was qualified as an independent director under applicable Nasdaq rules.  (56.1 ¶ 34.)  Given the unique characteristics of the REIT market, the

boards of REITs sponsored by AR Capital, including ARCP, substantially benefitted from having directors with significant REIT experience.

Mr. Michelson was accompanied on ARCP's board by Ms. Robin Ferracone and Dr. Walter Lomax.   Ms. Ferracone was the founder and Chief Executive Officer of Farient Advisors LLC, an independent corporate governance and executive compensation firm (56.1 ¶ 21), who had significant experience serving on the boards of public companies that were unaffiliated with AR Capital.  (56.1 ¶ 21.)  Dr. Lomax was a Philadelphia-based physician who founded several healthcare companies that were unaffiliated with AR Capital.  (56.1 ¶ 22.)  Ms. Ferracone and Dr. Lomax also had experience serving on other AR Capital-sponsored REIT boards (56.1 ¶ 33), and like Mr. Michelson, both qualified as independent under Nasdaq standards (56.1 ¶ 34.)

At the time, ARCT III similarly was overseen by three independent directors: Mr. Edward Rendell, the former Governor of Pennsylvania and Mayor of Philadelphia (56.1 ¶ 23, 48); Mr. Scott Bowman, an executive in the retail and luxury brand industry who served as an officer or director with several companies unaffiliated with AR Capital, such as Polo Ralph Lauren, Marc Jacobs and DFS Group (56.1 ¶ 24, 48); and Mr. David Gong, an attorney and investment manager who oversaw several funds unaffiliated with AR Capital.  (56.1 ¶ 25, 48.)  Each of Messrs. Rendell, Bowman and Gong had experience serving on the boards of other AR Capital-sponsored REITs (56.1 ¶ 33), and at all times qualified as independent under Nasdaq standards.  (56.1 ¶ 34.)

Each Board retained qualified and independent advisors in connection with the merger between ARCP and ARCT III.  The ARCP independent directors engaged Duane Morris LLP ("Duane Morris") as external M&A counsel, Venable LLP as Maryland counsel, and Merrill Lynch, Pierce, Fenner & Smith Inc. ("BAML") as an independent financial advisor.  (56.1 ¶ 49.) The ARCT III independent directors engaged Weil, Gotshal & Manges LLP ("Weil Gotshal") as

external M&A counsel, Miles & Stockbridge as Maryland counsel, and UBS Investment Bank ("UBS") as an independent financial advisor.  (56.1 ¶ 50.)

On November 2, 2012, ARCT III's independent directors sent the ARCP Board a letter of interest proposing a merger and requesting an exclusivity period in which to negotiate. (56.1 ¶ 52.)  The letter was considered by the independent directors of ARCP in consultation with Duane Morris and then by ARCP's full board, which agreed (with the AR Individuals abstaining) to sign a non-disclosure agreement on November 18, 2012. (56.1 ¶ 53.)  In the weeks that followed, representatives from Duane Morris and BAML conducted due diligence on ARCT III and made multiple presentations and recommendations to the ARCP independent directors as they considered and ultimately approved terms of a potential transaction.  (56.1 ¶ 54.)  Representatives from Weil Gotshal and UBS did the same for the ARCT III independent directors.  (56.1 ¶ 55.)

### 2.  The ARCT III Promote Was Extensively Reviewed by the Independent Directors in the Course of Merger Negotiations

Because the merger was expected to produce substantial returns to ARCT III investors, a promote was anticipated.  The ARCT III promote was governed by the terms of the limited partnership agreement for ARCT III.  (56.1 ¶ 56.)  That agreement provided that the ARCT III Sponsor, a subsidiary of AR Capital, was entitled to fifteen percent of the net returns provided to ARCT III investors *only* once those investors received back their original investment *plus* a six-percent annual return, sometimes referred to as a "hurdle."  (56.1 ¶ 56.)  The terms of that agreement were publicly disclosed in the ARCT III prospectus.  (56.1 ¶ 57.)

The terms of the merger between ARCP and ARCT III provided that each ARCT III investor would receive 0.95 shares of ARCP stock for each ARCT III share.  (56.1 ¶ 70.)  As a result, if the price of ARCP's stock increased between the time that the merger was announced and closed, so would the value an ARCT III shareholder received.  Because the promote was calculated

as fifteen percent of the value returned to ARCT III shareholders above the "hurdle" (56.1 ¶ 56), the precise amount of the promote would not be known until closing.

The promote, including its calculation, was subject to a thorough discussion and review by the independent directors of ARCP and ARCT III.   Outside counsel prepared detailed legal memoranda discussing various related-party fees, including the promote (56.1 ¶ 60)—which have been produced in this litigation.   The independent directors were presented with estimated calculations of the promote based on then-current stock prices (56.1 ¶ 62), and received presentations from their financial advisors that discussed key terms of the proposed transaction, including the promote.  (56.1 ¶ 59, 62.)  Executive sessions that did not include the AR Individuals were held in which the independent directors discussed related-party fees, including the promote, with their independent financial advisors and legal counsel.   (56.1 ¶ 61.)   And the promote calculation was shared with ARCP's outside auditors, who reviewed it "for reasonableness in accordance with the agreement to ensure amounts were not erroneously awarded," in the context of auditing ARCP's 2013 10-K.  (56.1 ¶ 81.)  The auditors raised no concerns.  (56.1 ¶ 81.)

As a result of this process, the independent directors understood that the final amount of the ARCT III promote would depend upon an unknown variable: ARCP's future public stock price.  For example, early board presentations presented varying calculations of the promote based on different notional ARCP stock prices.  (56.1 ¶ 59, 62.)  ARCP's lead independent director, Mr. Michelson testified that the "promote fee would . . . increase" if ARCP's stock price increased, and that he "knew that when [he was] an independent director evaluating" the proposed merger between ARCP and ARCT III.  (56.1 ¶ 77.)  And, as the closing approached, the independent directors received an updated analysis showing that, as a result of the significant increase in ARCP's stock price, the estimated promote had risen above $90 million at that time.  (56.1 ¶ 77.)

### 3.    ARCP's Merger with ARCT III, including Delivery of the Promote, Was Approved by the Company's Independent Directors

On December 14, 2012, after extensive negotiations and thorough diligence, the independent directors of ARCP and ARCT III approved the proposed merger.  (56.1 ¶ 67.)  This included approvals of ancillary agreements authorizing delivery of the promote at closing.  (56.1 ¶ 68.)  The AR Individuals on the ARCP or ARCT III boards at the time were recused and did not participate in the vote to approve the proposed merger terms and documentation.  (56.1 ¶ 69.)

In approving the merger, the independent directors determined that the merger, as a whole, was in the best interests of ARCP and ARCT III, respectively.  (56.1 ¶ 66.)  Those determinations were supported by fairness opinions delivered by the independent financial advisors to each of ARCP and ARCT III that the transaction was fair to the shareholders of each company from a financial perspective.  (56.1 ¶ 65.)

Not only did the ARCP and ARCT III disinterested directors engage in a robust review process before approving the transaction, they also demonstrated their independence by extracting meaningful economic concessions from AR Capital affiliates.  (56.1 ¶ 63.)  For example, the Advisor agreed to lower the base annual fee paid by ARCP to the Advisor for management of the combined Company, which was potentially worth tens of millions of dollars per year.  (56.1 ¶ 63.)  In addition, the management agreement between the Advisor and ARCP provided for a fee for property dispositions that could have totaled $48 million in the merger, but the Advisor agreed to waive that fee in its entirety.  (56.1 ¶ 63.)

### 4.    The Promote Was Fully Disclosed and the Merger Between ARCP and ARCT III Was Overwhelmingly Approved by Shareholders

The merger agreement was first publicly announced on December 17, 2012.  The ARCP 8-K announcing the merger prominently described key terms of the proposed transaction, including the promote.  (56.1 ¶ 71.)  In particular, it provided an estimate of the promote fee at that

time of approximately $59 million, based on ARCP's then-current public stock price of $12.90. (56.1 ¶ 71.)  The 8-K cautioned investors that the actual promote fee (i) "cannot be determined" until closing, (ii) could be "significantly different than described," and (iii) the estimate provided was "for illustrative purposes only."  (56.1 ¶ 71.)  In addition to the 8-K, the promote separately was highlighted during an investor call regarding the merger held that same day.  (56.1 ¶ 72.)

The promote also was disclosed in the proxy soliciting votes for approval of the merger.  References to the promote appeared no fewer than seven times (56.1 ¶ 73, 74), including:

> [T]he ARCT III Advisor . . . will receive subordinated distributions of net sales proceeds from the ARCT III OP in an amount estimated to be equal to approximately $59.0 million, assuming an implied price of ARCT III common stock of $12.26 per share in the merger (which assumes 70% of the merger consideration is ARCP common stock based on a per share price of $12.90, the closing price of ARCP common stock on the last trading day before the public announcement of the merger, and 30% of the merger consideration is cash).  Such subordinated distributions of net sales proceeds is to be finalized based on the closing price of ARCP common stock on the day immediately prior to the closing of the merger. . . .

(56.1 ¶ 74.)  The proxy separately provided a second estimate of nearly $70 million for the promote based on an ARCP stock price of $13.42.  (56.1 ¶ 74.)  Cautionary language appeared throughout the proxy, including that the estimates were for illustrative purposes and that the actual promote value could not be determined before closing and could be substantially different.  (56.1 ¶ 74.)

On February 26, 2013, more than 97% of voting ARCP shareholders, and more than 98% of voting ARCT III shareholders, voted to approve the merger.  (56.1 ¶ 76.)  As a result, the merger closed on February 28, 2013.  (56.1 ¶ 76.)  Following the closing of the merger, Messrs. Bowman and Rendell, who had served as independent directors on the board of ARCT III, joined the ARCP board as independent directors.  (56.1 ¶ 82.)

### 5.      The ARCT III Promote Was Consistent with Industry Standards

Between the December 17, 2012 announcement of the proposed merger and the February 28, 2013 closing, ARCP's public stock price increased from $12.74 to nearly $14.00 per share.  (56.1 ¶ 77.)  As a result, the total return to ARCT III investors, who were entitled to receive ARCP stock in the merger, was approximately $650 million.  (56.1 ¶ 79.)  Under the terms of the limited partnership agreement, the ARCT III Sponsor was entitled to a promote of $98.6 million (56.1 ¶ 79), approximately fifteen percent of the value returned to investors above the "hurdle."

Although the ARCT III Sponsor was entitled to receive the promote in cash or securities (56.1 ¶ 58), it agreed to receive the promote in the form of ARCP operating partnership units ("OP Units"), which could be converted to ARCP common stock after an agreed-upon one-year holding period.  (56.1 ¶ 80.)  The promote fee thus took the form of a long-term equity interest in ARCP, aligning the interests of the recipients with ARCP shareholders.  The ultimate amount of the promote was publicly disclosed shortly after the merger closed.  (56.1 ¶ 80.)  There is no evidence that any ARCP director or shareholder objected to the transaction in response to the announcement of the final promote calculation.

### 6.      In Connection with the Merger, ARCP Agreed to Purchase Certain Assets Used by ARCT III's Manager to Operate the Properties

Before the merger, ARCT III, like ARCP, was externally managed (56.1 ¶ 44), meaning that it paid a separate AR Capital subsidiary a fee, based on its total assets, to manage the REIT and its properties.  (56.1 ¶ 44.)  In connection with the merger, ARCP entered into an Asset Purchase and Sale Agreement (the "ARCT III APSA") in which it agreed to pay $5.8 million to purchase assets and equipment associated with the management of ARCT III from ARCT III's external manager.  (56.1 ¶ 83.)  The $5.8 million payment was less than one-half of one percent of the total transaction, valued at more than $2 billion (56.1 ¶ 70), and thus an immaterial portion of

the total deal value.  These assets included, among other items, computer software and equipment utilized by certain employees of the ARCT III external manager who became ARCP employees following the merger.  (56.1 ¶ 85, 86.)  The ARCT III APSA was reviewed and approved by ARCP's independent directors (56.1 ¶ 84) with the AR Individuals recused.  (56.1 ¶ 84.)  The APSA was publicly disclosed (56.1 ¶ 84), and detailed schedules were prepared to support the underlying accounting (56.1 ¶ 87), which the Company's auditor reviewed.  (56.1 ¶ 87.)

### D.    The ARCT IV Transaction

In discovery, Plaintiffs have adduced little to no evidence regarding payments, such as the promote fee, made in connection with ARCP's merger with ARCT IV in early 2014, and it is unclear if they intend to challenge payment of that promote at all.  Accordingly, while the undisputed facts concerning the merger are set forth in Mr. Schorsch's Rule 56.1 statement accompanying this memorandum, key points are only briefly summarized below.

*First*, like the merger between ARCP and ARCT III, the merger between ARCP and ARCT IV was the result of a substantial governance process.  (56.1 ¶ 91–99.)  Negotiations were led by the independent directors of each REIT, assisted by experienced outside counsel and independent financial advisors.  (56.1 ¶ 91–94.)  The merger was approved by the independent directors of ARCP and ARCT IV, with the AR Individuals recused and not participating.  (56.1 ¶ 106–14.)  Those directors concluded that the merger was in the interest of shareholders of the respective REITs (56.1 ¶ 108)—conclusions supported by fairness opinions delivered by the respective independent financial advisors.  (56.1 ¶ 107.)

*Second*, a promote fee was fully earned, disclosed and approved.  Like ARCT III, the limited partnership agreement for ARCT IV provided that the ARCT IV Sponsor was entitled to fifteen percent of the return on investment *over and above* the contractually-determined rate of return.  (56.1 ¶ 100.)  The independent directors received draft calculations of the promote (56.1 ¶

103, 105), and discussed the promote in executive sessions with their legal counsel and financial advisors.  (56.1 ¶ 104.)  They then approved merger documentation authorizing delivery of the promote upon closing.  (56.1 ¶ 99.)  After the merger was announced, multiple estimates of the ARCT IV promote, between $62.7 and $65.2 million were publicly disclosed.  (56.1 ¶ 112, 113.) The final promote fee of $63.2 million was delivered upon closing of the merger (56.1 ¶ 116), based on the delivery of more than $350 million in value to ARCT IV shareholders.  (56.1 ¶ 116.) The promote fee once again took the form of OP Units, which were subject to a two-year lock-up (56.1 ¶ 117), ensuring continued alignment between the recipients and ARCP shareholders.

*Third*, ARCT IV, like ARCT III before it, had been externally managed before the merger.  (56.1 ¶ 88.)  In connection with the merger, ARCP entered into an Asset Purchase and Sale Agreement (the "ARCT IV APSA") in which it agreed to pay $5.8 million to purchase certain assets used by ARCT IV's external manager in managing its operations.  (56.1 ¶ 120.)  The $5.8 million asset payment was less than one-half of one percent of the total transaction, valued at more than $2 billion (56.1 ¶ 114), and thus an immaterial portion of the total deal value.  The ARCT IV APSA was reviewed and approved by the ARCP independent directors while the AR Individuals abstained from voting.  (56.1 ¶ 121.)  It was publicly disclosed (56.1 ¶ 121), and detailed schedules were prepared by accounting staff to support the accounting for the underlying assets.  (56.1 ¶ 123.)  Those schedules were provided to and reviewed by the auditors.  (56.1 ¶ 123.)

### E.    The Acceleration of the 2013 Outperformance Plan LTIP Units

In early 2013, ARCP entered into the 2013 Advisor Multi-year Outperformance Agreement (the "2013 OPP") with the Advisor.  (56.1 ¶ 124.)  The purpose of the 2013 OPP was "to provide the Advisor with the incentive compensation described in [the] Agreement . . . and thereby provide additional incentive for the Advisor to promote the progress and success of the business of [ARCP] and its affiliates, including the [ARCP OP]."  (56.1 ¶ 125.)  To that end, the

Advisor was granted 8,241,101 long-term incentive plan, or LTIP, units, which were subject to forfeiture or vesting depending on ARCP's performance in future periods.  (56.1 ¶ 126.)  The 2013 OPP thus aligned the interests of the Advisor with the interests of shareholders.  The final 2013 OPP was the result of careful review by ARCP's independent directors. (56.1 ¶ 127–29.)   It also reflected input from an independent advisor, FTI Consulting, Inc. ("FTI"), which provides advisory services related to executive compensation.  (56.1 ¶ 127.)

The Amended Complaint does not contain any specific allegations regarding the 2013 OPP.  In discovery, however, Plaintiff's counsel inquired about the 2013 OPP, and in particular the acceleration and payment of the 2013 OPP awards to the Advisor.  The undisputed facts are that the 2013 OPP was adopted by ARCP's independent directors—with advice from an independent compensation consultant—in an effort to incentivize management, and that the awards issued thereunder were appropriately accelerated in connection with ARCP's transition to self-management in early 2014.

In particular, in August 2013, ARCP announced that "its board of directors ha[d] determined that it [was] in the bests interests of [ARCP] and its stockholders to become self-managed" or, in REIT-industry parlance, "internalize" its management.  (56.1 ¶ 132.)  ARCP's independent directors believed that internalization was in the best interests of the Company (56.1 ¶ 134), and would result in an increase in stock price.  (56.1 ¶ 132–34.)  The announcement was positively received by ARCP shareholders.  (56.1 ¶ 135–36.)

As a result of internalization, ARCP would directly employ personnel to manage its day-to-day operations rather than pay a management fee to the Advisor.  (56.1 ¶ 133.)  ARCP would thus terminate its management agreement with the Advisor.  (56.1 ¶ 140.)  The existing management agreement between ARCP and the Advisor, however, did not permit ARCP to

unilaterally terminate.  (56.1 ¶ 140–41.)  Absent termination for cause (56.1 ¶ 141), any separation

between ARCP and the Advisor had to be negotiated.

To reach agreement on the termination of the management agreement and

compensate the Advisor for future lost fees, which would have total hundreds of millions of dollars

(56.1 ¶ 139), ARCP's independent directors agreed to accelerate and immediately award the LTIP

units previously granted to the Advisor under the 2013 OPP.  (56.1 ¶ 140–43.)  The resolution

approving the acceleration of the LTIP units provided as follows:

> [A]fter due and careful consideration and pursuant to Section 4(c)
> of the [2013 OPP] the independent directors of the Board
> comprising the Compensation Committee deem it in the best
> interests of the Corporation and hereby reaffirm, ratify and authorize
> that, upon termination of the Management Agreement on the Self-
> Management Commencement Date, any and all LTIP Units (as
> defined in the [2013 OPP]) granted to the ARCP Advisor pursuant
> to [the 2013 OPP] shall be vested in full and payable to the ARCP
> Advisor pursuant to their terms . . . .

(56.1 ¶ 145.)  That resolution was approved by the Company's independent directors at the time,

who included Mr. Michelson and Mr. Bowman.  (56.1 ¶ 146.)  The AR Individuals on the board

were recused and did not participate in the vote.  (56.1 ¶ 146.)  The accelerated vesting of the LTIP

units also was memorialized in a separate acknowledgement of the termination, which provided

that "upon termination of the Agreement, the [Advisor's] long-term incentive plan units ("LTIP

Units") of ARC Properties Operating Partnership, L.P. (the "OP") granted pursuant to the [2013

OPP] . . . shall be vested in full."  (56.1 ¶ 147.)  As a result, the LTIP units were converted to OP

Units and issued to the Advisor in January 2014.  (56.1 ¶ 153.)  As further consideration for the

acceleration, AR Capital also entered into an agreement that it would not, through other REITs it

sponsored, compete with ARCP in the triple net lease space.  (56.1 ¶ 144.)

In February and March of 2014, discussions between ARCP accountants and the

Company's outside auditor raised questions about whether the LTIP units could be "converted"

into OP Units based on the language of the original resolution approving the acceleration.  (56.1 ¶ 148.)  In an effort to resolve any uncertainty, on March 26, 2013, an ARCP in-house attorney emailed the ARCP board setting out the original resolution and a second resolution, explaining that a "clarification is required for accounting purpose with respect to the terminated OPP."  (56.1 ¶ 149.)  The independent directors subsequently approved a written consent confirming that "the independent directors of the Board comprising the Compensation Committee hereby reaffirm and ratify that, effective on . . . January 8, 2014, all LTIP Units granted to the ARCP Advisor under [the 2013 OPP] were vested in full, earned and convertible into OP Units."  (56.1 ¶ 150.)  Mr. Michelson, who had approved the original resolution, responded approving the revised resolution, noting that "[t]his is just a very technical language change."  (56.1 ¶ 151.)  The other independent directors, who now included Mr. William Stanley, separately approved.  (56.1 ¶ 152.)

The acceleration of the 2013 OPP awards was disclosed in ARCP's first-quarter 2014 10-Q, which stated: "Pursuant to the previous authorization of [ARCP's] board of directors, as a result of the termination of the Management Agreement, all 8,241,101 LTIP Units became fully earned, vested and convertible into OP Units upon the consummation of the Company's transition to self-management on January 8, 2014."  (56.1 ¶ 153.)  In connection with this disclosure, the acceleration of the 2013 OPP awards was reviewed by ARCP's outside auditor, who concluded that there had been an "acceleration of the service period caused by management being internalized" (56.1 ¶ 154), as well as a separate audit firm (PwC), which was consulted on the matter.  (56.1 ¶ 155.)  And a separate engagement team from the outside auditor later also "reassessed and confirmed" the appropriateness of the acceleration.  (56.1 ¶ 156.)

### F.    Asset Purchases In Connection with Internalization

As part of internalization, ARCP grew from 12 employees to more than 400, including dozens of former AR Capital employees that were previously responsible for ARCP's

management as part of the Advisor, as well as former Cole employees that became employees of the Company after the Cole merger.  (56.1 ¶ 158.)  To facilitate this transition, ARCP entered into an Asset Purchase and Sale Agreement (the "Internalization APSA") in which it agreed to pay $10 million to purchase certain assets and equipment used by employees of the former Advisor, including office space, computer software and equipment.  (56.1 ¶ 159.)

The $10 million payment was negotiated among representatives for ARCP, AR Capital and Cole (56.1 ¶ 160), which was engaged in active merger negotiations with ARCP at the time.  As part of those negotiations, a $10 million cap was put in place.  (56.1 ¶ 160.)  ARCP's own independent directors expressly recognized the benefits of this cap, noting, when approving the Internalization APSA, that it provided finality regarding what "payment or fee shall be payable to the ARCP [former manager] in connection with, or resulting from or arising out of, the termination of the Management Agreement."  (56.1 ¶ 161.)  Potentially interested parties, including the AR Individuals, were recused from and did not participate in the vote on approval of the Internalization APSA.  (56.1 ¶ 161.)  The Internalization APSA was disclosed.  (56.1 ¶ 162.)

## G.    The 2014 Outperformance Plan and LTIP Units

As part of internalization and the expansion of its management team, including a new President and new Chief Operating Officer (56.1 ¶ 164), ARCP entered into a replacement outperformance plan (the "2014 OPP") with its new and existing senior executive officers, including Mr. Schorsch.  (56.1 ¶ 164.)  Plaintiff alleges in the Amended Complaint that certain of those officers were responsible for "unilaterally altering the plan" to increase the total awards under the 2014 OPP from $120 million to more than $220 million.  (AC ¶ 41.)  The evidence developed in discovery has shown that this allegation is entirely unfounded.

On October 3, 2013, ARCP's Compensation Committee, comprised of its four independent directors at the time—Mr. Michelson, Mr. Lomax, Mr. Bowman and Mr. Rendell

(56.1 ¶ 165)—met to discuss the Company's ongoing internalization planning.  (56.1 ¶ 165.)  As part of that meeting, the independent directors received recommendations from outside executive compensation consultants at FTI regarding the 2014 OPP.  (56.1 ¶ 165.)  FTI explained that the proposed 2014 OPP terms were "well within peer group standards" and would be "contingent on the extent to which [ARCP] outperforms the plan hurdles."  (56.1 ¶ 165.)  Under the terms of the draft 2014 OPP, the maximum total award would be 5% of the market capitalization of ARCP (56.1 ¶ 166), which was defined as the total outstanding shares of the Company multiplied by the public stock price of the Company.  (56.1 ¶ 166.)  At that same meeting, the independent directors were provided an estimate of that total award of approximately $120 million.  (56.1 ¶ 167.)

At the same time the independent directors were considering implementation of the 2014 OPP, the Company was negotiating its merger with ARCT IV.  (56.1 ¶ 106–08.)  Shortly after the independent directors considered and approved preliminary terms for the 2014 OPP, the final merger agreement between ARCP and ARCT IV was executed.  (56.1 ¶ 109, 168.)  As a result of the merger, the Company's market capitalization was projected to increase substantially following the related issuance of numerous additional shares of public stock.  (56.1 ¶ 111.)

At a December 29, 2013 ARCP board meeting, the independent directors reviewed and approved the final terms of the 2014 OPP.  At that meeting, the final 2014 OPP agreement was presented to the board.  (56.1 ¶ 169.)  Under the terms of that agreement, the maximum total award under the 2014 OPP was defined as five percent of the "Initial Market Cap" (56.1 ¶ 170), which in turn was defined as "the VWAP multiplied by . . . the Initial Shares outstanding on the Effective Date."  (56.1 ¶ 170.)  The 2014 OPP agreement defined "VWAP" as $12.43 (56.1 ¶ 170), "Initial Shares" as 350,851,427 shares (56.1 ¶ 170), and the "Effective Date" as the date on which ARCP completed internalization.  (56.1 ¶ 170.)  Under these terms, the maximum award under the

2014 OPP was five percent of $12.43 multiplied by 350,851,427, or approximately $220 million. (56.1 ¶ 170.)  ARCP's independent directors approved a resolution at the meeting to "reaffirm, ratify and authorize" entry into the final 2014 OPP agreement and authorizing issuance of the awards "upon the Corporation's transition to self-management."  (56.1 ¶ 169.)

ARCP completed its internalization on January 8, 2014 (56.1 ¶ 171), five days after the closing of the ARCT IV merger.  (56.1 ¶ 171.)  At that time, the total number of ARCP shares outstanding was approximately 350 million (56.1 ¶ 171), resulting in a total award pool of approximately $220 million under the 2014 OPP.  (56.1 ¶ 171.)  Awards consistent with that total award pool were issued on that same day: January 8, 2014.  (56.1 ¶ 172.)

ARCP fully disclosed the final terms of the 2014 OPP.  The Company's 2013 10-K highlighted the key terms of the 2014 OPP, including the total maximum award.  (56.1 ¶ 173.) And in a public proxy issued in April 2014 again reiterated the total maximum value of the 2014 OPP awards of approximately $220 million, which was "equal to approximately 5% of our equity market capitalization . . . at the time of the Compensation Committee's approval of the" 2014 OPP. (56.1 ¶_173.)  That same proxy stated all four independent directors on the Committee "reviewed and discussed" the disclosures and "recommended" that they be disclosed.  (56.1 ¶ 173.)

H.    **The RCS Advisory Fees**

The Amended Complaint highlights certain fees paid to RCS or its subsidiaries. (*see, e.g.*, *id.* ¶ 38.)  The AR Individuals were officers or directors of RCS (56.1 ¶ 174), which itself was a public company with its own shareholders and independent directors.  (56.1 ¶ 174.) RCS was an established financial services holding company with an investment banking division, a wholesaler broker-dealer serving retail clients, a transaction management services business, and a transfer agent business.  (56.1 ¶ 175.)  It employed more than 10,000 individuals who provided retail advice, investment banking services, proxy assistance, and other financial services to

participants in the REIT industry.  (56.1 ¶ 175, 76.)  RCS was a leading strategic advisor in the space (56.1 ¶ 177), and was ranked the number 2 real estate financial advisor by deal value, ahead of UBS, Deutsche Bank, and Morgan Stanley, by a 2012 industry publication.  (56.1 ¶ 177.)

The retention of RCS by ARCP was the result of substantial review processes by the Company's independent directors.  Those directors frequently discussed RCS's engagements outside the presence of the AR Individuals (56.1 ¶ 178, 179), and were satisfied the engagements were both "needed" and "fair to the company and fair to shareholders."  (56.1 ¶ 178, 179.)  They evaluated RCS's proposed compensation to ensure that it was not higher than compensation that would have been paid to unaffiliated parties.  (56.1 ¶ 181.)  ARCP's independent directors found that RCS possessed "very specific and in-depth knowledge of the real estate industry and the types of properties that ARCP was interested in and the kinds of companies that would be best suited to merge or transact business with ARCP."  (56.1 ¶ 180.)  And they approved engagements only after determining "that RCS was providing a valuable service at an appropriate fee."  (56.1 ¶ 181.)  The AR Individuals, meanwhile, recused themselves from such approvals.  (56.1 ¶ 182.)

Payments to RCS and other related parties were also thoroughly disclosed.  ARCP's 2013 10-K, for example, contains several pages of financial notes detailing the exact dollar amounts paid to RCS and describing the services RCS provided in exchange.  (56.1 ¶ 183.)  The Company's outside auditors reviewed those disclosures prior to filing to ensure that they were accurate and that they were supported by adequate documentation.  (56.1 ¶ 184.)

To take just one example, ARCP engaged certain RCS subsidiaries to provide proxy and transfer agent services in connection with a merger.  (56.1 ¶ 185.)  The proposed engagement letter was emailed to the independent directors for review, with the exact dollar amount highlighted in the cover email.  (56.1 ¶ 186.)  At the subsequent board meeting, ARCP's independent directors

determined that the engagement was "fair and reasonable, advisable, and in the best interests of ARCP and the Stockholders and that such terms and conditions are no less favorable to ARCP than those available from unaffiliated third parties." (56.1 ¶ 187.) Those directors unanimously approved the engagement, while Mr. Schorsch abstained and Messrs. Kahane and Weil were not present. (56.1 ¶ 187.) The specific engagement was subsequently disclosed. (56.1 ¶ 188.)

ARCP received valuable services in connection with such engagements. RCS and its subsidiaries performed complex and significant investment banking work for ARCP, including: advising the Board on mergers; developing financial models of target companies; creating complex financial analyses of merging entities; assisting with presentations to ARCP's board about key transaction terms; and other financial services. (56.1 ¶ 189.) When asked how much time RCS expended performing advisory services on a single transaction, the former Head of Investment Banking and Chief Financial Officer of RCS testified that it was "hundreds and hundreds of hours . . . per individual." (56.1 ¶ 189.) RCS also provided legal services to ARCP, including the drafting of free writing prospectuses, the submission of public filings to the SEC, and the preparation and review of various contracts. (56.1 ¶ 189.) RCS personnel attended board meetings to explain the merits of the various transactions ARCP was contemplating and to advise the Board on shareholder interactions. (56.1 ¶ 189.) Finally, a RCS subsidiary provided services directly to investors by helping them understand proxy materials. (56.1 ¶ 189.)

## LEGAL STANDARDS

Summary judgment is appropriate when there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). A genuine issue of material fact exists only "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). If the movant, such as the AR Individuals, carries the burden to establish

a prima facie case that no genuine issue of material fact exists, the burden shifts to the nonmovant to adduce sufficient, specific evidence that would support a verdict in its favor. *Matsushita Elec. Industrial Co.* v. *Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).

## ARGUMENT

## I.   THE AR INDIVIDUALS ARE ENTITLED TO SUMMARY JUDGMENT ON ALL CLAIMS IN THIS CASE ARISING FROM ALLEGED AFFO MISSTATEMENTS

The AR Individuals are entitled to summary judgment on all claims arising from the Company's AFFO disclosures for two independent reasons. *First*, Plaintiff's sole claim of breach of fiduciary duty is not actionable as a matter of Maryland law. *Second*, as ARCP acknowledges in its motion for summary judgment in the Class Action, there were no AFFO misstatements or bad faith conduct associated with the presentation of AFFO. The AR Individuals are entitled to summary judgment here based on those same arguments and undisputed facts.

### A.   The Amended Complaint Alleges a Single Claim for "Breach of Fiduciary Duty" That is Not a Recognized Cause of Action Under Maryland Law

Plaintiff's original complaint alleged several causes of action, including theories of unjust enrichment and breach of fiduciary duty, in addition to federal law claims. The Court dismissed certain of these claims and specifically instructed Plaintiff to file an amended complaint that set forth, as required by Maryland law, allegations showing how each remaining defendant engaged in "active and deliberate dishonesty" or received "improper benefits." Plaintiff nonetheless filed an amended pleading that asserted a single claim for breach of fiduciary duty against each defendant, including the AR Individuals. At the time, the Court's schedule did not envision a second round of briefing on motions to dismiss in this case. But now, as the time for summary judgment briefing has arrived, the plain legal deficiency in the Amended Complaint is ripe to be addressed: breach of fiduciary duty is not a cognizable claim for relief under Maryland law, and the AR Individuals therefore are entitled to summary judgment.

In *Kann v. Kann*, the Maryland Court of Appeals held that "there is no universal or omnibus tort for the redress of breach of fiduciary duty."  344 Md. 689, 713 (1997).  Since *Kann*, Maryland courts repeatedly have held that "Maryland law does not recognize an independent cause of action for damages in connection with an alleged . . . breach of fiduciary duty."  *Hundt v. Snedegar*, No. 1854, 2015 WL 6112290, at *15 (Md. Ct. Spec. App. Aug. 21, 2015); *see also Blondell v. Littlepage*, 968 A.2d 678, 695 (Md. Ct. Spec. App. 2009) ("Maryland does not recognize a generic cause of action for breach of fiduciary duty."); *Duty Free Americas, Inc. v. Legg Mason Wood Walker, Inc.*, No. 24-C-04-005696, 2005 WL 914395, at *3 (Md. Cir. Ct. Jan. 13, 2005) ("[B]reach of fiduciary duty . . . is not recognized as a tort in Maryland.").

Federal courts applying Maryland law repeatedly have dismissed claims for breach of fiduciary duty on this basis.  *See, e.g.*, *Gorby v. Weiner*, No. 13 Civ. 3276, 2014 WL 4825962, at *11 (D. Md. Sep. 23, 2014) ("Because Maryland does not recognize the independent tort of breach of a fiduciary duty, Count VII is dismissed with prejudice."); *Mayes v. Bd. of Educ.*, No. 13 Civ. 3770, 2014 WL 3973930, at *7 (D. Md. Aug. 12, 2014) (dismissing breach of fiduciary duty claim because "it is generally understood that breach of a fiduciary duty cannot be plead as a separate cause of action in Maryland"); *MEE Direct LLC v. Tran Source Logistics, Inc.*, No. 13 Civ. 455, 2014 WL 585637, at *8 (D. Md. Feb. 14, 2014), *aff'd*, 584 F. App'x 120 (4th Cir. 2014) (granting summary judgment as to breach of fiduciary duty claim because "breach of fiduciary duty is not a valid cause of action in Maryland"); *Boiardi v. Freestate*, No. 11 Civ. 1676, 2013 WL 5410131, at *7 (D. Md. Sep. 25, 2013) (holding that the alleged breach of fiduciary duty claim "simply does not give rise to a cause of action of its own").

The same outcome is appropriate here, and summary judgment should be entered in favor of the AR Individuals.  *See PPI Enterps. v. Del Monte Foods Co.*, No. 99 Civ. 3794, 2000

WL 1425093 at *10–11 (S.D.N.Y. Sep. 26, 2000) (granting motion for judgment on the pleadings on breach of fiduciary duty claim because "[t]he task of creating a new cause of action under the corporation law of Maryland is something for the Maryland courts or legislature to do rather than a federal court sitting in New York in diversity jurisdiction").

### B.    The AR Individuals Are Entitled to Judgment in This Action on the Same Grounds that Summary Judgment Should be Granted in the Class Action

In the consolidated Class Action, ARCP takes the unequivocal position that its pre-July 29, 2014 AFFO disclosures were: transparent (*e.g.*, ARCP MSJ at 18–32); accurate (*e.g.*, *id.* at 9–18); the result of good-faith deliberations by its directors, officers and employees (*e.g.*, *id.* at 33); not made with any intent to deceive (*e.g.*, *id.* at 57–64); and believed to be accurate at the time. (*E.g.*, *id.* at 50–57.)  Plaintiff, who asserts claims on behalf of the Company, cannot possibly establish by clear and convincing evidence that the same AFFO disclosures were misleading, inaccurate or the result of purported bad faith because Plaintiff is acting on behalf of the Company and may not advance a contrary position.[3]   In any event, the AFFO-related claims here are unsustainable for the same substantive reasons that the Class Action claims are not sustainable. Indeed, the applicable standard under Maryland law—clear and convincing evidence of intentional wrongdoing—is higher than those that apply in the Class Action.  The AR Individuals thus are entitled to summary judgment here if summary judgment is granted in the Class Action.

Maryland law strictly limits the circumstances in which officers or directors may be personally liable for damages.  Specifically, a corporation is authorized to "include any

---

[3]   *See Hurt v. City of New York*, No. 15 Civ. 7612, 2018 WL 6616474, at *2 (S.D.N.Y. Dec. 18, 2018) ("A clear, unambiguous and unequivocal statement of fact set forth in a party's Rule 56.1 Statement may qualify as a binding admission.").  This is particularly true here, where Plaintiff is not pursuing claims in an individual capacity in some distinct litigation; "the corporation is the real party in interest in a derivative case." *In re Wal-Mart Stores, Inc. Del. Deriv. Litig.*, CA No. 7455, 2016 WL 2908344, at *17 (Del. Ch. May 13, 2016).

provision" in its corporate charter "limiting the liability of directors and officers," subject to exceptions where that officer or director "actually received an improper benefit" or engaged in "active and deliberate dishonesty." Md. Cts. & Jud. Pro. § 5–418(a)(1)–(2). Under this standard, a plaintiff must establish that the defendant engaged in "deliberate dishonesty" or received an "improper benefit" to demonstrate personal liability. *Goldstein v. Berman*, No. 12 Civ. 2507, 2014 WL 824050, at *3 (D. Md. Feb. 28, 2014). This is a high bar, as evidence "of breaches of fiduciary duty alone are not sufficient" to establish a plaintiff's right to monetary relief. *Id.* at *4; *see also Hayes v. Crown Central Petroleum Corp.*, 78 Fed. App'x 857, 863 (4th Cir. 2003) (upholding dismissal because the complaint did not include specific allegations establishing receipt of improper benefits or active and deliberate dishonesty by directors).

In ruling on the motions to dismiss, this Court recognized that ARCP's charter limits liability to the furthest extent permitted by Maryland law. (Order, ECF No. 75, at 18; *see also* ARCP Charter § 8.01.) Accordingly, this Court held at the time that Plaintiff "must allege an improper benefit or active and deliberate dishonesty." (Order, ECF No. 75, at 18.)

This Court further observed that to establish active and deliberate dishonesty or improper benefit under Maryland law, Plaintiff must allege, and ultimately must establish, that a fraud was committed on the Company. (*See* Order, ECF No. 75, at 17 ("Maryland courts have held that the term dishonesty involves lying or the intent to commit fraud . . . and the Fourth Circuit has held that active and deliberate dishonesty requires allegations of fraud" (internal quotations and citations omitted)).) That ruling was consistent with the Fourth Circuit's opinion in *Hayes*, in which it was held that a complaint could not, as a matter of law, satisfy Maryland law because it "specifically exclude[d] allegations of fraud." 78 Fed. App'x at 865. It also is consistent with case law construing the phrase "active and deliberate dishonesty" in the insurance context, where

it commonly appears in clauses referred to as "fraud exclusions." *Assoc. Elec. & Gas Ins. Serv., Ltd. v. Rigas*, 382 F. Supp. 2d 685, 694 (E.D. Pa. 2004).

Under Maryland law, the burden of proof for claims involving fraud is clear and convincing evidence. *Gourdine v. Crews*, 955 A.2d 769, 791 (Md. 2008) (fraud); *Beall v. Holloway-Johnson*, 130 A.3d 406, 421 (Md. 2016) (actual malice). And it is well established that Plaintiff must adduce such evidence at the summary judgment stage. *E.g.*, *Rockman v. Union Carbide Corp.*, No. CV RDB-16-1169, 2017 WL 2687787, at *5 (D. Md. June 22, 2017) (granting summary judgment because "[p]laintiff has not come close to reaching the 'clear and convincing' standard of proof necessary to prevail on a fraud claim under Maryland law"). "To be clear and convincing, evidence should be 'clear' in the sense that it is certain, plain to the understanding, and unambiguous and convincing in a sense that it is so reasonable and persuasive as to cause you to believe it." *Attorney Grievance Comm'n of Md. v. Levin*, 91 A.3d 1101, 1105 (Md. 2014). Thus, to survive summary judgment, Plaintiff must submit plain and unambiguous evidence that is sufficiently convincing and persuasive so as to cause a reasonable juror to believe that the AR Individuals engaged in active and deliberate dishonesty or received an improper benefit.

The Class Action briefing on summary judgment establishes that the class plaintiffs cannot meet their burden to establish securities law violations by a preponderance of the evidence. (*See generally* ARCP MSJ, ARC Parties MSJ, and Schorsch MSJ.) Based on this same record and for those same reasons, Plaintiff in this Derivative Action cannot meet the burden of establishing wrongdoing by clear and convincing evidence in connection with ARCP's AFFO disclosures.[4] The AR Individuals therefore are entitled to summary judgment on all AFFO-related claims.

---

[4]     Nor can Plaintiff prove *any* claims as to Messrs. Kahane and Weil arising from reported AFFO in ARCP's second-quarter-2014 10-Q, as both had resigned from the board (56.1 ¶ 10, 11), and thus no longer had any responsibilities for ARCP's filings.

## II.     THE AR INDIVIDUALS ARE ENTITLED TO SUMMARY JUDGMENT ON PLAINTIFF'S ADDITIONAL CLAIMS

In addition to the AFFO-related claims, Plaintiff's Amended Complaint alleges that more than $900 million in fees were improperly paid in the course of various, largely unidentified, related-party transactions.   In discovery, Plaintiff's counsel has focused on a few specific transactions, which do not come close to the alleged $900 million.   Regardless, the AR Individuals are entitled to summary judgment with respect to these transactions.

### A.     Plaintiff Fails to State a Cognizable Claim Under Maryland Law

As an initial matter, all such claims fail for the same reason Plaintiff's AFFO-related claims fail: breach of fiduciary duty is not an actionable claim under Maryland law, and the AR Individuals therefore are entitled to summary judgment.  *See supra* Section I.A.

### B.     Each of the Challenged Related-Party Transactions is Not Actionable Under Maryland Law Because Each Was Reviewed and Approved by Disinterested Directors, Disinterested Shareholders, or Was Fair and Reasonable to ARCP

Maryland law also precludes liability because the evidence demonstrates that each transaction was reviewed and approved by disinterested directors and/or shareholders, or otherwise was fair to ARCP.  Such transactions cannot be challenged under Maryland law.

Maryland law provides protections for claims arising from transactions that were subject to appropriate review and approval or were otherwise fair and reasonable.  Section 2–419 of Maryland Corporations law provides that a transaction between a corporation and an interested director "is not void or voidable" in two circumstances: *first*, where (a) the interested director's interest "is disclosed or known" and (b) the "majority of disinterested directors" or shareholders "authorize[], approve[] or ratif[y] the contract or transaction"; *second*, where the "transaction is fair and reasonable."  Md. Corp. & Ass'n Code § 2–419(b).

There can be no liability for an interested director where either of these circumstances is present. *See Doppelt* v. *Denahan*, No. 642447-13, 2015 WL 3461082, at \*6 (N.Y. Sup. Ct. 2015) (applying Maryland law and explaining that interested director liability is extinguished for related-party transactions "if the requirements of Section 2–419 are met") (discussing Maryland law. Courts have invoked Section 2–419 to enter judgment for director-defendants where the evidence established that the challenged transaction was publicly disclosed and approved by shareholders. *See Wittman* v. *Crooke*, 707 A.2d 422, 425–26 (Md. Ct. Spec. App. 1998) (entering judgment on behalf of defendant-director where the challenged merger transaction was disclosed via proxy and approved by shareholder vote). Similarly, claims against directors have been rejected where the evidence demonstrated that "the interested director inform[ed] the corporation and its directors of the conflict of interests and g[ave] the board an opportunity to approve the transaction." *Storetrax.com, Inc*. v. *Gurland*, 915 A.2d 991 (Md. App. Ct. 2007). In addition, claims against directors are dismissed where the evidence establishes that the challenged transaction is fair because "the material terms of the transaction [we]re within the range that might have been agreed to by economically motivated disinterested persons negotiating at arms' length" and that it was reasonable because "it ma[de] sense for the corporation to enter into the transaction." *Indep. Distribs. v. Katz*, 637 A.2d 886, 895 (Md. Ct. Spec. App. 1994) (citations omitted); *see also Tobacco Tech., Inc. v. Taiga Int'l N.V.*, 626 F. Supp. 2d 537, 551 (D. Md. 2009) (transaction need not represent "the ideal business decision").

Here, the undisputed facts establish that each of the challenged transactions was approved by a majority of disinterested directors who knew of the interests of the AR Individuals (who were recused and did not participate in such votes):

- **ARCT III Promote**. The ARCT III promote was a disclosed, contractual term of the merger between ARCP and ARCT III. (56.1 ¶ 56, 57.) That merger was

35

reviewed and approved by each set of independent directors *and* each set of shareholders of ARCP and ARCT III.  (56.1 ¶ 59–76.)

- **ARCT IV Promote**.  The ARCT IV promote was a disclosed, contractual term of the merger between ARCP and ARCT IV.  (56.1 ¶ 100, 101.)  That merger was approved by each company's independent directors.  (56.1 ¶ 103–10.)

- **2013 OPP Acceleration**.  The acceleration of the 2013 OPP awards was authorized by two separate board resolutions, each of which was approved by ARCP's independent directors.  (56.1 ¶ 143–52.)

- **Asset Purchase & Sale Agreements**.  Each of the ARCT III APSA, ARCT IV APSA and Internalization APSA were presented to, and approved by, the ARCP independent directors.  (56.1 ¶ 84, 121, 161.)

- **2014 OPP**.  The final 2014 OPP agreement, including terms providing for a maximum award of $220 million (56.1 ¶ 169, 170), was presented to and approved by ARCP's independent directors.  (56.1 ¶ 169, 173.)

- **RCS Fees**.  Agreements under which ARCP would pay fees for services to RCS and its subsidiaries were reviewed and approved by the Company's independent directors (56.1 ¶ 178–82, 185–87.)

On these undisputed facts, the AR Individuals are entitled to summary judgment.

In opposition, Plaintiff's counsel may suggest, as has been hinted at in discovery, that ARCP's independent directors—who were dismissed from this case because Plaintiff had not pleaded their involvement in any wrongdoing—are not disinterested.  That contention is meritless.  Directors "are entitled to a *presumption* that they were faithful to their fiduciary duties."  *Beam ex rel. Martha Stewart Living Omnimedia, Inc. v. Stewart*, 845 A.2d 1040, 1048 (Del. 2004) (emphasis in original).  That is particularly true where, as here, the independent directors qualified under governing Nasdaq rules, which "seek to advance similar goals" as state-law principles of independence.  *In re Ezcorp Inc. Consulting Agreement Derivative Litig.*, No. CA 9962, 2016 WL 301245, at *36 (Del. Ch. Jan. 25, 2016).  And it is particularly appropriate in this case, given the independent directors' qualifications and experience.  (56.1 ¶ 20–28.)

Moreover, the evidence does not support any allegation that the disinterested directors acted inappropriately in connection with the challenged transactions. Plaintiff does not and cannot contend, for example, that the disinterested directors received any financial benefits from the challenged transactions, or failed to retain qualified financial advisors and lawyers to assist with the transactions, or failed to discharge their obligations to negotiate on behalf of shareholders. Indeed, the undisputed facts are that the independent directors took their roles seriously and put in place robust processes to ensure that mergers and other corporate decisions were appropriate and fair. These included: reviewing the transaction, consulting with their own counsel, engaging independent financial advisors, and asking questions of their advisors outside the presence of management. (56.1 ¶ 49–55.) There is ample evidence that the independent directors discussed key deal terms with their advisors to ensure "the best possible deal" for shareholders, and achieved concessions from AR Capital and its affiliates. (56.1 ¶ 29–31.)

Plaintiff's counsel appears to rely on the mere fact that Mr. Michelson, Mr. Rendell and other independent directors served on the boards of more than one REIT that had been sponsored by AR Capital, and that Mr. Michelson had a personal friendship with Mr. Schorsch. These types of attacks on director independence have been repeatedly rejected by courts as legally inadequate. *See In re Pfizer, Inc. Derivative Sec. Litig.*, 307 F. App'x 590, 595 (2d Cir. 2009) ("It is well established . . . that the number of years that defendants have served on a board or multiple boards together cannot suffice as a basis to successfully plead a lack of independence."); *Huff Energy Fund, L.P. v. Gershen*, CA No. 11116, 2016 WL 5462958, at *12 (Del. Ch. Sep. 29, 2016) (observing that the "law is clear that personal friendships, without more . . . are insufficient").

Finally, separate and apart from the disinterested approvals, the challenged transactions were demonstrably and indisputably in the interests of ARCP, and therefore are

immune from Plaintiff's challenge on that independent basis.  For example, the ARCT III and ARCT IV mergers resulted in ARCP acquiring extremely valuable properties (56.1 ¶ 65, 107), the uniform and unequivocal testimony of the board members and advisors was that the mergers were in the best interests of the Company (56.1 ¶ 66, 108), the merger itself was supported by fairness opinions in which independent financial advisors concluded that the transactions were fair and reasonable to ARCP (56.1 ¶ 65, 107), and shareholders testified that they were in favor.  The mergers thus were "within the range that might have been agreed to by economically motivated disinterested persons negotiating at arms' length."  *Katz*, 637 A.2d at 895.

Similarly, the acceleration of the 2013 OPP awards was approved in connection with the internalization of management, and in exchange for termination of a management agreement that otherwise would have required ARCP to pay hundreds of millions of dollars in fees in future years, as well as an agreement from AR Capital that it would not compete with ARCP in the triple-net lease space.  (56.1 ¶ 143, 144.)  That, too, served the interests of the Company.  *See Tobacco Tech., Inc. v. Taiga Int'l N.V.*, 626 F. Supp. 2d 537, 550–51 (D. Md. 2009) (upholding interested party transaction where it was fair because "it made sense" for the company to enter into it as "a cost-saving measure").  Indeed, were Plaintiff successful in challenging the acceleration, the Advisor likewise would be entitled to revisit its agreement to walk away from the hundreds of millions of dollars in management fees to which it otherwise was entitled.  (56.1 ¶ 139.)

For these reasons, Plaintiff's failure to adduce any specific evidence that any of the challenged transactions were not in the Company's interests provides an independent basis for entry of summary judgment in favor of the AR Individuals.

**C.**    **The AR Individuals Are Entitled to Summary Judgment Based on the Lack of Evidence of Active and Deliberate Dishonesty or Improper Benefit**

Finally, summary judgment is appropriate for the independent reason that Plaintiffs have not presented any evidence—and certainly not clear and convincing evidence—that the AR Individuals engaged in any active and deliberate dishonesty or actually received any improper benefit in connection with any of the challenged transactions.

**1.**    **ARCT III Promote**

The undisputed facts establish that the merger between ARCP and ARCT III was negotiated and approved through an extensive process overseen by the Company's independent directors, assisted by experienced outside counsel and independent financial advisors.  (56.1 ¶ 49–55.)  The AR Individuals, as inside directors, did not participate in executive sessions and were recused from voting on the transaction and related deal documentation.  (56.1 ¶ 61, 69.)  Indeed, while Mr. Schorsch and Mr. Weil were on ARCP's board when the ARCT III merger was proposed, they did not participate in the vote on the merger approval.  (56.1 ¶ 69.)  They thus could not have acted with active and deliberate dishonesty or caused anything "improper" to be paid.

Plaintiff's principal criticism of the ARCT III promote appears to be the difference between the disclosed estimates (of $59 million and $70 million) and the final calculation (of $98 million), and Plaintiff's counsel has suggested during discovery that the difference between these two amounts gives rise to a claim.  That contention is meritless as a matter of law and fact.

For one, the disclosures concerning ARCP's merger with ARCT III included multiple estimates based on different assumptions about the share prices (56.1 ¶ 71–74)—clearly communicating that the final promote would depend on an unknown variable: ARCP's stock price at closing.  The estimates also were accompanied by disclosures that they were "illustrative calculations" based on certain assumptions and that the final amounts "cannot be determined" until

closing.  (56.1 ¶ 71.)  Neither the Board nor shareholders could be misled in the face of such express cautionary language.  *See Shaev v. Hampel*, No. 99 Civ. 10578, 2002 WL 31413805, at *6–8 (S.D.N.Y. Oct. 25, 2002) (holding that "estimates" of the future value of stock options that were "derived . . . upon certain (enumerated) assumptions" cannot be misleading as a matter of law).[5]  During discovery, the Board members confirmed that they understood that the calculation would change as ARCP's stock price moved.  (56.1 ¶ 77.)  Moreover, the final amount of the ARCT III promote was publicly disclosed after closing (56.1 ¶ 80), and there is no evidence that a single Board member or shareholder raised any objections or concerns.

Nor is there any basis to conclude that delivery of the ARCT III promote was "improper."  The promote was a contractual term providing for payment to the ARCT III Sponsor. (56.1 ¶ 56.)  Plaintiff has adduced no evidence to call into question that the underlying limited partnership agreement gave rise to the fee, nor any evidence that the thresholds required to trigger the promote were not met—which clearly were met.  (56.1 ¶ 56, 79.)  Under these circumstances, Plaintiff cannot show that the promote was improper.[6]

---

[5]   Nor was there any independent duty to update ARCP's prior disclosures with a revised promote calculation.  The "duty to update," where it exists, does not extend to "expressions of opinion," such as forecasted estimates.  *In re Sanofi-Aventis Sec. Litig.*, 774 F. Supp. 2d 549, 562 (S.D.N.Y. 2011) (quotations omitted).  Here, the promote estimates were plainly labeled as "estimates" that were subject to change in the future and were not known at the time.  *See In re NovaGold Res. Inc. Sec. Litig.*, 629 F. Supp. 2d 272, 294 (S.D.N.Y. 2009) ("[C]haracterizing a cost figure as an 'estimate' . . . is inherently cautionary, as the word 'estimate' connotes uncertainty."); *cf. In re Delta Air Lines, Inc.*, 386 B.R. 518, 527 (Bankr. S.D.N.Y. 2008) (finding no duty to update a disclosures of estimates that are "inherently moving targets").

[6]   The absence of any improper conduct is underscored by the undisputed fact that the AR Individuals never sought to "cash in" or redeem the OP Units received in the merger between ARCP and ARCT III at any time before the purported "fraud" was revealed.  (*See* Schorsch MSJ at Argument Section III.A.)  That undercuts any suggestion of intentional wrongdoing. *See Reilly v. U.S. Physical Therapy, Inc.*, No. 17 Civ. 2347, 2018 WL 3559089, at *14 (S.D.N.Y. July 23, 2018) (holding that the absence of stock sales designed to capitalize on insider knowledge undermines existence of motive to support inference of scienter); *see also City of Brockton Ret. Sys. v. Shaw Group, Inc.*, 540 F. Supp. 2d 464, 475 (S.D.N.Y. 2008) (fact

### 2.     The ARCT IV Promote

In discovery, Plaintiff essentially ignored the ARCT IV promote.  Even the flawed argument concerning the ARCT III promote (namely, that disclosed estimates differed from the final amount) is not applicable to the ARCT IV promote since the estimated and actual amounts were similar.  Further, the disinterested board members who approved the ARCT IV promote—Mr. Michelson, Mr. Bowman, Mr. Rendell, Mr. Stanley, Ms. Tuppeny and Ms. Wenzel—unquestionably discharged their responsibilities to act independently (56.1 ¶ 103–09), and Plaintiff fails to identify any impropriety in their approval of the merger.  Because the merger was the result of a thorough process and the AR Individuals did not participate in any votes on the transaction (56.1 ¶ 110), there is no evidence of active and deliberate dishonesty or improper benefit.

### 3.     Acceleration of the 2013 OPP Awards

The undisputed facts establish that ARCP's independent directors approved, on two occasions, the full acceleration of all awards under the 2013 OPP.  (56.1 ¶ 145, 150–52.)  They did so in the context of internalizing management and negotiating a termination of the Advisor's management agreement, under which ARCP would otherwise have owed hundreds of millions of dollars.  (56.1 ¶ 139.)  In discovery, Plaintiff's counsel had the opportunity to elicit from any one of the several independent directors that they did not intend the full acceleration—or even some evidence (immaterial as it would have been) of retroactive regret.  Plaintiff's counsel did not obtain any such testimony.  This alone entitles the AR Individuals to summary judgment.

Plaintiff's counsel has suggested that ARCP's board was somehow misled into approving the acceleration because the initial December 29, 2013 resolution made reference to a

---

that defendant did not "sell his stock at the end of the putative class period when insiders would have 'rushed to cash out'" was evidence that "rebut[ted] any inference of fraud").

specific contractual provision in the 2013 OPP.  This theory—that the board somehow believed that it was required by the terms of the 2013 OPP to accelerate the LTIP units—is ridiculous:  Had the 2013 OPP provided for full acceleration of the awards by its own terms, there would have been no need for the board to authorize such an action to begin with.  Moreover, Plaintiff's apparent theory is also entirely unsubstantiated:  There is no evidence from the directors that they were misled (56.1 ¶ 157), no evidence from management of any effort to mislead (56.1 ¶ 151), and the Company's own financial filings affirm the 2013 OPP acceleration.  (56.1 ¶ 153.)

Even so, Plaintiff also has a more fundamental problem:  The second resolution authorizing acceleration of the 2013 OPP awards, dated March 26, 2014, clearly stated that the LTIP units granted by the 2013 OPP were "vested in full, earned, and convertible."  (56.1 ¶ 150–52.)  That resolution, approved by the independent directors, acted as a subsequent ratification and is an independent bar to any claim.  *See Bennett v. Damascus Cmty. Bank*, No. 267722-V, 2006 WL 2458718, at *9 (Md. Cir. Ct. Apr. 6, 2006) ("[D]irectors can ratify prior decisions when the prior decision was defective for some reason but within their *de jure* authority.").

The only additional evidence that Plaintiff has adduced is an email exchange that Mr. Schorsch had with Mr. Levit after Mr. Levit first circulated the revised resolution in March of 2014.  This communication does not remotely suggest any wrongdoing by Mr. Schorsch.  *See Burt Shearer Trustee v. Adams*, No. 09 Civ. 991, 2010 WL 3782162, at *6 (M.D. Tenn. Sep. 21, 2010) (holding that Maryland "active and deliberate dishonesty" standard is not met where there is no evidence that "any individual Defendant knew or believed" the alleged representation was incorrect).  Rather, the undisputed evidence shows that the updated resolution was proposed by Mr. Levit to resolve potential ambiguities raised by ARCP's in-house accountants and outside auditors about the original resolution (56.1 ¶ 148, 149.)  And the final resolution provided to the

Company's independent directors came from Mr. Levit (56.1 ¶ 150), ARCP legal counsel, who management was entitled to rely on to draft an appropriate resolution and to convey the purposes of that resolution. *See Hudson* v. *Prime Retail, Inc.*, No. 24-C-03-5806, 2004 WL 1982383, at *11 (Md. Cir. Ct. Apr. 1, 2004) (observing that, "in performing their duties directors may rely on information from . . . lawyers, CPAs, or other persons on matters the director reasonably believes to be within the person's professional or expert competence").

Finally, Plaintiff fails to show that any improper benefit was conferred.   The Advisor received the exact number of OP Units that it had been granted under the 2013 OPP (56.1 ¶ 126, 153)—no more and no less.  And the independent directors testified that this was their intent when authorizing the acceleration.  (56.1 ¶ 157.)  There was thus nothing "improper" at all.

### 4.      Payments to RCS

The AR Individuals are entitled to summary judgment as to Plaintiff's allegations that improper fees were paid by ARCP to RCS, for two reasons:

*First*, there is no evidence whatsoever of any active and deliberate dishonesty on the part of any of the AR Individuals.  To the contrary, the undisputed facts establish that the payments to related parties, including RCS, were transparent, were reviewed in detail by ARCP's independent directors, and were approved by those board members while the AR Individuals and other interested parties recused themselves from the process.  (56.1 ¶ 178–82.)  Indeed, as one such board member explained, the independent directors "paid particular attention to related-party . . . compensation" and there "was substantial structure and conversation around that and discussions amongst the board members and the advisors and legal counsel."  (56.1 ¶ 181.)

*Second*, Plaintiff cannot establish any actual receipt of any improper benefit.  A key element of that standard is *actual receipt* of the alleged benefit.  Here, however, the AR Individuals did not receive payments in the form of contractual fees—RCS did.  As one commentator has

observed: "'Actual receipt' does not include constructive or imputed receipt.  The director must actually receive it.  A court should be skeptical of any effort to characterize as actual receipt by a director the receipt of a benefit by a third party."  James J. Hanks, Jr., *Maryland Corporation Law* § 6.9 (2017 Supp.).  Indeed no case has been identified holding that a contractual payment made by a corporation to a separate, public company constituted actual receipt of an improper benefit by a director of that corporation.  Finally, it is undisputed that the independent directors took steps to ensure that payments to RCS were consistent with amounts that would have been paid to a third-party investment bank to provide the very same services (56.1 ¶ 178–81), which is further proof that such fees were not "improper."

### 5. The Asset Purchase and Sale Agreements

Summary judgment also should be granted for any claims concerning payments by ARCP in exchange for assets and other benefits to the former advisors of ARCT III, ARCT IV and ARCP itself under the ARCT III APSA, ARCT IV APSA or Internalization APSA.

For one, as detailed in their summary judgment brief submitted in the Class Action, the AR Individuals are entitled to summary judgment on any claim related to the APSAs based on the absence of any admissible evidence to establish that ARCP did not, in fact, receive full value in exchange for its payments.  (ARC Parties MSJ at Argument Section I.B.4.)  The evidence demonstrates that assets were, in fact, delivered, and there is not a shred of evidence in the record that ARCP did not receive fair value for its asset purchase.  Plaintiff therefore cannot establish by clear and convincing evidence that any improper benefit was received by the AR Individuals.

Nor is there any evidence that the AR Individuals engaged in any wrongful conduct in connection with these payments.  (*See id*.)

###### 6.    The 2014 Outperformance Plan

Summary judgment should also be granted for any claim concerning the LTIP Units that were awarded to Mr. Schorsch and other ARCP executives under the 2014 OPP.  As an initial matter, no such claim exists as to Messrs. Kahane and Weil, who were not responsible for approving the 2014 OPP and received no awards under that plan.  (56.1 ¶ 164.)

As to Mr. Schorsch, Plaintiff's has not adduced evidence to meet its burden under Maryland law to show either active and deliberate dishonesty or receipt of improper benefit.

*First*, the sole evidence Plaintiff has developed in discovery is that Mr. Schorsch received a calculation of the total maximum award under the 2014 OPP of $220 million.  But there is no evidence whatsoever that Mr. Schorsch believed there was anything improper about that calculation of the maximum pool.  (56.1 ¶ 173.)  Moreover, that $220 million is the same figure that was provided for by the terms of the final 2014 OPP agreement that was presented to and approved by ARCP's independent directors.  (56.1 ¶ 169, 170.)  Mr. Schorsch cannot possibly be accused of dishonesty or impropriety by virtue of having reviewed *the exact same terms* that were presented to and approved by the Company's independent directors.

*Second*, even were the awards under the 2014 OPP somehow construed as improper benefits—and they were not—those LTIP units allocated to Mr. Schorsch were voluntarily relinquished by him and the other senior executives upon departure from ARCP.  (56.1 ¶ 9.)  Mr. Schorsch thus received no *actual* benefit, proper or otherwise, from the 2014 OPP.

## <u>CONCLUSION</u>

For the reasons set forth above, the AR Individuals respectfully request that the

Court enter summary judgment on their behalf as to all claims in the Derivative Action.

Dated:  New York, New York
        February 8, 2019

Respectfully submitted,

PAUL, WEISS, RIFKIND,
WHARTON & GARRISON LLP

By:  */s/ Audra J. Soloway*
      Theodore V. Wells Jr.
      Daniel J. Kramer
      Lorin L. Reisner
      Audra J. Soloway
      Christopher L. Filburn

1285 Avenue of the Americas
New York, NY  10019-6064
(212) 373-3000
asoloway@paulweiss.com

*Counsel for Defendant Nicholas S. Schorsch*

KELLOGG, HANSEN, TODD
FIGEL & FREDERICK, P.L.L.C

By:  */s/ Andrew E. Goldsmith*
      Reid M. Figel
      Andrew E. Goldsmith
      Rebecca A. Beynon (pro hac vice)
      Bradley Oppenheimer (pro hac vice)
      Cody Herche

1615 M Street, NW, Suite 400
Washington, DC 20036
(202) 326 7900
agoldsmith@kellogghansen.com

*Counsel for Defendants William M. Kahane
and Edward M. Weil*