UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

JOANNE WITCHKO, Derivatively on Behalf of
Nominal Defendant AMERICAN REALTY
CAPITAL PROPERTIES, INC.,

                Plaintiff,

v.

NICHOLAS S. SCHORSCH, et al.,

                Defendants,

    -and-

AMERICAN REALTY CAPITAL
PROPERTIES, INC.,

                Nominal Defendant.

Lead Case No. 1:15-cv-06043-AKH

(Consolidated with Case No.
1:15-cv-08563-AKH)

---

**PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT
OF MOTION FOR FINAL APPROVAL OF DERIVATIVE SETTLEMENT**

## TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ...................................................................................... iii

I. INTRODUCTION ....................................................................................... 1

II. FACTUAL AND PROCEDURAL BACKGROUND ........................................ 4

III. LEGAL STANDARD ................................................................................. 4

IV. FINAL APPROVAL OF THE DERIVATIVE SETTLEMENT
IS WARRANTED ....................................................................................... 5

    A.    The Derivative Settlement is Procedurally Fair .................................... 5

        1.    The Derivative Settlement Followed Extensive Litigation
            and Discovery ....................................................................... 6

        2.    The Proposed Settlement Is the Product of Adversarial Arm's-Length
            Negotiations ......................................................................... 7

    B.    The Derivative Settlement is Substantively Fair .................................. 9

        1.    The Benefits Achieved are Substantial and Support
            Final Approval ..................................................................... 9

            a.    The $286,500,000 Payment .......................................... 10

            b.    The Secondary Agreement Effectively Guarantees the $286.5
                Million Benefit ........................................................... 13

            c.    The Release of Counterclaims that Grant Thornton Assert
                Eliminates Significant Exposure to VEREIT ..................... 13

            d.    Termination of VEREIT's Litigation and Indemnification
                Obligations Estimated to be $100 million ........................ 14

        2.    The Likelihood of Success in Light of The Risks Posed by Continued
            Litigation Supports Final Approval ......................................... 15

            a.    Risks of Establishing Liability ...................................... 16

            b.    Risks of Proving Damages and Enforcing a Judgment ...... 20

i

        c.   Post-Trial Motions and Appeals ........................................................... 20

    3.      The Likely Duration and Cost of Continued Litigation Support Final Approval ...................................................................................................... 21

    4.      The Reaction of Shareholders Supports the Settlement.....................23

V.    NOTICE OF SETTLEMENT FULLY SATISFIES DUE PROCESS.....................24

VI.   CONCLUSION.............................................................................................................25

# TABLE OF AUTHORITIES

<u>Cases</u> <u>Page</u>

*Bell Atl. Corp. v. Bolger*,
    2 F.3d 1304 (3d Cir. 1993)...............................................................................24

*City of Detroit v. Grinnell Corp.*,
    495 F.2d 448 (2d Cir. 1974), *abrogated on other grounds*,
    *Goldberger v. Integrated Resources, Inc.*, 209 F.3d 43 (2d Cir. 2000).....................passim

*D'Amato v. Deutsche Bank*,
    236 F.3d 78 (2d Cir. 2001)................................................................................. 7

*In re AOL Time Warner S'holder Deriv. Litig.*,
    2006 WL 2572114 (S.D.N.Y. Sept. 6, 2006)..................................................passim

*In re AOL Time Warner, Inc. Sec. & ERISA Litig.*,
    2006 WL 903236 (S.D.N.Y. Apr. 6, 2006)..........................................................23

*In re Citigroup Inc. Bond Litig.*,
    296 F.R.D. 147 (S.D.N.Y. 2013) .......................................................................23

*In re FAB Universal Corp. S'holder Deriv. Litig.*,
    148 F. Supp. 3d 277 (S.D.N.Y. 2015)..................................................................11

*In re Johnson & Johnson Deriv. Litig.*,
    900 F. Supp. 2d 467 (D.N.J. 2012) .....................................................................11

*In re Metro. Life Deriv. Litig.*,
    935 F. Supp. 286 (S.D.N.Y. 1996)........................................................4, 5, 6, 21, 23

*In re Pac. Enters. Sec. Litig.*,
    47 F.3d 373 (9th Cir. 1995) ............................................................................. 16

*In re PaineWebber P'ships Litig.*,
    171 F.R.D. 104 (S.D.N.Y.), *aff'd*, 117 F.3d 721 (2d Cir. 1997)..............................5

*In re Pfizer Inc. S'holder Deriv. Litig.*,
    780 F. Supp. 2d 336 (S.D.N.Y. 2011)...........................................................passim

*In re Telik. Inc. Sec. Litig.*,
    576 F. Supp. 2d 570 (S.D.N.Y. 2008)...................................................................7

*Joel A. v. Giuliani*,
    218 F.3d 132 (2d Cir. 2000)...........................................................................9, 16

*Mathes v. Roberts*,
   85 F.R.D. 710 (S.D.N.Y. 1980) ................................................................. 5

*McReynolds v. Richards-Cantave*,
   588 F.3d 790 (2d Cir. 2009)..................................................................... 6

*Mullane v. Cent. Hanover Bank & Trust Co.*,
   339 U.S. 306 (1950).................................................................................25

*Schimmel v. Goldman*,
   57 F.R.D. 481 (S.D.N.Y. 1973) .......................................................... 5, 16

*Strougo v. Bassini*,
   258 F. Supp. 2d 254 (S.D.N.Y. 2003)................................................. 4, 23

*Velez v. Novartis Pharm.*,
   2010 WL 4877852 (S.D.N.Y. Nov. 30, 2010) .........................................21

*W. Va. v. Chas. Pfizer & Co.*,
   314 F. Supp. 710 (S.D.N.Y. 1970), *aff'd,* 440 F.2d 1079 (2d Cir. 1971) ................................21

*Wal-Mart Stores, Inc. v. Visa U.S.A. Inc.*,
   396 F.3d 96 (2d Cir. 2005)………………………………………………………5, 6

*Weinberger v. Kendrick*,
   698 F.2d 61 (2d Cir. 1982)................................................................... 4, 5

Statutes

   Md. Code § 2-419 ........................................................................... 18

   Md. Cts. & Jud.  Proc. § 5-418 ......................................................... 17

Rules

   Fed. R. Civ. P. 23.1 .................................................................. 4, 24, 25

iv

## I.     INTRODUCTION

After almost five years of intense litigation, plaintiffs Joanne Witchko ("Witchko"), Edward Froehner, and Jeffrey Turner as trustee for Michele Graham Turner 1995 Revocable Trust (collectively, "Derivative Plaintiffs") achieved an exceptional settlement of this shareholder derivative action (the "Derivative Action") on behalf of VEREIT, Inc. f/k/a American Reality Properties Capital, Inc. ("VEREIT" or the "Company") and its shareholders.[1]  The proposed settlement of the Derivative Action (the "Derivative Settlement") confers the following substantial benefits on VEREIT: (1) a $286.5 million financial benefit paid directly by the AR Capital Parties, Brian Block, and VEREIT's former independent auditor, Grant Thornton LLP ("Grant Thornton") (together, the "Contributing Parties"); (ii) a Secondary Agreement guaranteeing that the $286.5 million benefit will remain with VEREIT even if the Derivative Settlement is overturned on appeal; (iii) termination of VEREIT's continuing legal fees and indemnification obligations, estimated to cost the Company an additional $100 million through trial of the Class Action; and (iv) release of all potential counterclaims against VEREIT, including counterclaims that Grant Thornton "intended to assert" in the Derivative Action.

These terms make the Derivative Settlement "remarkable when measured against the outcomes of other derivative suits as well as the complaint leveled at shareholder litigation that such suits do not generally result in tangible benefits for the company."  Professor James Cox's Declaration in Support of Derivative Plaintiffs' Motion for Final Approval of Derivative Action Settlement (the "Cox Declaration") at ¶ 1, attached as Exhibit B to the Houston Declaration.

---

[1]     All capitalized terms, unless otherwise defined, have the meaning set forth in the Declaration of Matthew M. Houston in Support of Plaintiffs' Motions for Final Approval of Derivative Settlement and Award of Attorneys' Fees and Reimbursement of Expenses ("Houston Declaration"), submitted herewith.

Professor Cox, the Brainerd Currie Professor of Law at the Duke University School of Law, is a leading expert on shareholder derivative litigation and has authored numerous authoritative articles and treatises on the topic.  Having analyzed the Derivative Settlement, Professor Cox concludes that the financial benefit to VEREIT makes this one of the largest reported derivative recoveries. Cox Declaration at ¶¶ 13-17, 19.   Additionally, the Derivative Settlement "is a significant milestone in modern-day shareholder litigation" because "the settlement funds come from the pockets" of the Contributing Parties and no part of the settlement consideration comes from an insurance policy or third party, such as an acquisition partner.  Cox Declaration at ¶¶ 18, 20.   As a result, the Derivative Settlement is "beyond being criticized, as so much of shareholder litigation is criticized today, on the grounds of 'circularity.'"  *Id*. at ¶ 22.  Professor Cox further opines, that the non-monetary benefits of the Derivative Settlement, the guaranteed benefit even if successfully appealed, termination of indemnification obligations, release of counterclaims, and certainty provided by the global resolution, all significantly benefit VEREIT.  *Id*. at ¶¶ 23-25.  The proposed settlement is therefore, "significant among contemporary derivative suit settlements" and is "not only fair and reasonable but is an exceptional result."  *Id*. at ¶¶ 11, 26.

"[B]ut for" resolution of the Derivative Action, the Contributing Parties would not have made "any contribution" to the global resolution and Grant Thornton would not have released the counterclaims that it intended to assert against the Company.  Houston Declaration at ¶ 173 (quoting Stipulation at § III).  VEREIT's current management "believes that the [class] plaintiffs would require the same aggregate payment regardless of its source."  *See* American Realty Capital Properties Inc.'s Statement in Support of Plaintiffs' Unopposed Motion for Preliminary Approval of Derivative Settlement and Approval of Shareholder Notice ("VEREIT's Statement in Support

of Settlement"), ECF No. 285, at 3.[2]  Without these contributions, VEREIT either would have been required to pay $286.5 million more to settle the Class Action or would have been unable to resolve the Class Action, to the Company's significant financial detriment. *Id*. at 5, 7;  Stipulation at § III.  As a result, the $286.5 million paid by the Contributing Parties reduced VEREIT's expense to settle the Class Action by the same amount. *Accord* Cox Declaration at ¶ 19.

VEREIT's management agrees that the payments of the Contributing Parties confer substantial benefits on the Company, and confirms that in its opinion, the settlement confers substantial benefits on the Company by terminating on-going litigation and indemnity costs.  The Company expended approximately $180 million in "out-of-pocket" litigation costs from fall 2014 to settlement, and that the expenses would amount to an additional $100 million through trial.  VEREIT's Statement in Support of Settlement at 7.  On several occasions, VEREIT's CEO has publicly described the benefits to the Company's business position from the Derivative Settlement.  *See id* at 9.  For all these reasons, the settlement "was clearly in VEREIT's best interest."  *Id*. at 2.

On October 4, 2019, the Court preliminarily approved the settlement and ordered the publication of notice to VEREIT stockholders (the "Preliminary Approval Order").  ECF No. 288.  Pursuant to the Preliminary Approval Order, on October 8, 2019, VEREIT published summary notice of the settlement in *Investor's Business Daily*, and on October 15, 2019, VEREIT issued a press release containing the Long Form Notice and referring stockholders to VEREIT's investor relations webpage, and filed Form 8-K with the Securities and Exchange Commission ("SEC") referencing the press release.  Houston Declaration at ¶¶ 4, 184.  As of the date of this filing, the parties have received no shareholder objections.  *See* Houston Declaration at ¶¶ 4, 185.

---

[2]      Citations to "ECF No. _" refer to docket entries in the Derivative Action.

The Derivative Settlement is an outstanding resolution of this complex derivative litigation, particularly in light of the challenges to establishing liability and proving and recovering damages, and the substantial time and resources further litigation would demand from the parties, the Court, and VEREIT, the real party in interest. For these reasons and those that follow, Derivative Plaintiffs respectfully request that the Court grant final approval of the Derivative Settlement as fair, reasonable, and adequate to VEREIT and its shareholders.

## II.      FACTUAL AND PROCEDURAL BACKGROUND

The Court is respectfully referred to the Houston Declaration for a detailed discussion of the background of the action (¶¶ 16-25); procedural history (¶¶ 26-81); a summary of the work performed by Derivative Counsel (¶ 10(a)-(u)), including a detailed discussion of discovery (¶¶ 82-105); work with experts; (¶¶ 106-112); summary judgment briefing (¶¶ 113-127); and mediation (¶¶ 128-141).

## III.      LEGAL STANDARD

Federal Rule of Civil Procedure 23.1 provides that this action may only be settled with the Court's approval. *See Strougo v. Bassini*, 258 F. Supp. 2d 254, 257 (S.D.N.Y. 2003). On a hearing for final approval of a derivative settlement, "'[t]he central question is whether the compromise is fair, reasonable and adequate.'" *In re Pfizer Inc. S'holder Deriv. Litig.*, 780 F. Supp. 2d 336, 340 (S.D.N.Y. 2011) (quoting *Weinberger v. Kendrick*, 698 F.2d 61, 73 (2d Cir. 1982); *In re Metro. Life Deriv. Litig.*, 935 F. Supp. 286, 291 (S.D.N.Y. 1996)). Final approval is warranted if "the compromise 'fairly and adequately serves the interests of the corporation on whose behalf the derivative action was instituted.'" *In re AOL Time Warner S'holder Deriv. Litig.*, 2006 WL 2572114, at *2 (S.D.N.Y. Sept. 6, 2006).

Public policy strongly favors settlements of complex litigation, and of shareholder derivative litigation in particular, because is it "'notoriously difficult and unpredictable.'" *AOL*, 2006 WL 2572114, at *3; *Schimmel v. Goldman*, 57 F.R.D. 481, 487 (S.D.N.Y. 1973) (same). Additional "weighty justifications" for the general public policy favoring settlements include "the reduction of litigation and related expenses." *Weinberger*, 698 F.2d at 73.

Consistent with these policies, the Court's role is to determine whether the Derivative Settlement is "'fair, reasonable and adequate,'" *In re Metro. Life*, 935 F. Supp. at 291, and "'fairly and adequately serves the interests of the corporation on whose behalf the derivative action was instituted.'" *Mathes v. Roberts*, 85 F.R.D. 710, 713 (S.D.N.Y. 1980). There is a "strong initial presumption" that a proposed settlement negotiated at arm's-length is fair and reasonable. *Strougo*, 258 F. Supp. 2d at 257; *see also Wal-Mart Stores, Inc. v. Visa USA, Inc.*, 396 F.3d 96, 116 (2d Cir. 2005). Similarly, the recommendation of informed, experienced counsel to approve a settlement reached at arm's-length is entitled to "great" or "considerable" weight. *In re PaineWebber Ltd. P'ships Litig.*, 171 F.R.D. 104, 125 (S.D.N.Y. 1997); *AOL*, 2006 WL 2572114, at *3 (giving "considerable weight" to counsel's recommendation to approve settlement).

As such, to determine whether to finally approve a derivative settlement, Courts consider both procedural and substantive fairness. *See AOL*, 2006 WL 2572114, at *3; *Pfizer*, 780 F. Supp. 2d at 340 (S.D.N.Y. 2011). For the following reasons, the Derivative Settlement is both procedurally and substantively fair, and should be finally approved.

## IV.    FINAL APPROVAL OF THE DERIVATIVE SETTLEMENT IS WARRANTED

### A.    The Derivative Settlement is Procedurally Fair

Procedural fairness refers to the process by which a settlement was reached. In this respect, courts in the Second Circuit "pay close attention to the negotiating process, to ensure that the

settlement resulted from arm's-length negotiations and that plaintiffs' counsel . . . possessed the [necessary] experience and ability, and have engaged in the discovery, necessary to effective representation of the [corporation's] interests." *McReynolds v. Richards-Cantave*, 588 F.3d 790, 804 (2d Cir. 2009) (citation and internal quotation marks omitted; second bracketing added); *accord AOL*, 2006 WL 2572114, at *3 (same); *Wal-Mart Stores, Inc.* 396 F.3d at 116 (same); *In re Metro. Life*, 935 F. Supp. at 294 (same).

### 1. The Derivative Settlement Followed Extensive Litigation and Discovery

Although the parties first attempted to resolve the Derivative Action in March 2017, the made no progress until just before summary judgment briefs were due.  After one individual defendant's solicitation of a settlement demand in December 2018, it took ten more months of hard-fought litigation and adversarial negotiation to resolve the Derivative Action.  That the Derivative Settlement follows years of active litigation and extensive discovery further supports its procedural fairness.  Houston Declaration at ¶¶ 26-95.  *See, e.g.*, *Pfizer*, 780 F. Supp. 2d at 340 (settlement procedurally fair where "[o]nly after [] motion practice and discovery had revealed the parties' relative strengths and weaknesses did plaintiffs enter into serious settlement negotiations."); *AOL*, 2006 WL 2572114, at *3 (settlement procedurally fair where negotiations followed "significant discovery, which bolstered the parties' assessment of the strengths and weaknesses of their positions and informed their negotiation strategies.").  The history of litigation in the Derivative Action therefore weighs heavily in favor of the procedural fairness of the Derivative Action.  Houston Declaration at ¶¶ 26-141.

Witchko filed the Derivative Action more than four years ago and the parties vigorously litigated the claims during that time period.  *Id.*  By the time of progress toward settlement, Derivative Plaintiffs had a clear view of the strengths and weaknesses of their claims.  Prior to

discovery, Derivative Plaintiffs survived motions to dismiss, successfully opposed an appeal to the Second Circuit, and prevailed when VEREIT's new management attempted to halt prosecution of the derivative claims through a special committee procedure. During discovery, Derivative Counsel reviewed millions of pages of documents, and deposed the seven individual defendants, six witnesses from Grant Thornton, and twenty-two additional witnesses, including former employees and directors of VEREIT. In tandem with discovery, Derivative Plaintiffs worked closely with highly respected experts in the fields of forensic accounting, damages and corporate governance to evaluate their theories of liability and damages. Derivative Plaintiffs also became well informed about the claims and defenses in the Class Action and Direct Actions due to the coordinated discovery process. Using the evidence developed in discovery, the parties briefed and argued cross motions for summary judgment.

By the conclusion of summary judgment briefing in April 2019, the parties had developed significant evidence and thoroughly tested their claims and defenses in discovery and motion practice. The extensive litigation that preceded the Derivative Settlement weighs in favor of the procedural fairness of the Derivative Settlement and supports final approval.

### 2. The Proposed Settlement Is the Product of Adversarial Arm's-Length Negotiations

The parties engaged in protracted, arm's-length negotiations facilitated by an experienced and well respected neutral over a period of years.[3] Distinguished former federal Judge Layn R. Phillips first mediated the settlement negotiations during a two-day mediation in March 2017.

---

[3] The participation of an experienced mediator bolsters the presumption of procedural fairness. A "mediator's involvement in . . . settlement negotiations helps to ensure that the proceedings were free of collusion and undue pressure." *D'Amato v. Deutsche Bank*, 236 F.3d 78, 85 (2d Cir. 2001); *In re Telik Sec. Litig.*, 576 F. Supp. 2d 570, 576 (S.D.N.Y. 2008) (collecting cases). "

Houston Declaration at ¶ 128.  At the time of the initial mediation, discovery had only just begun, and the mediation session failed to produce a resolution because the parties sharply disagreed about the merits of the claims and the requirements for a settlement.

The parties intensely litigated for nearly two more years without any renewed attempt to resolve the Derivative Action.  In December 2018, near the end of depositions, counsel for one of the individual defendants contacted Derivative Counsel through the mediator, Judge Phillips.  That individual defendant's counsel requested that Derivative Plaintiffs provide him or her with a settlement demand targeted at that individual alone.  *Id.* at ¶ 131.  Following significant preparation, including with Derivative Plaintiffs' damages expert, in February 2019, Derivative Counsel met for several hours with Judge Phillips and presented to him their analysis of damages in the Derivative Action.  At the conclusion of the meeting, Judge Phillips indicated he would convey the information provided by Derivative Counsel to counsel for certain of the individual defendants.  *Id.* at ¶ 134.

After summary judgment briefing and the Court's May 2019 order denying the cross-motions for summary judgment without prejudice, settlement negotiations increased.  The parties attended a mediation in August 2019 before Judge Phillips that again failed to produce a resolution. However, over the following weeks, Derivative Counsel, VEREIT's defense counsel in the Class Action, and counsel for the individual defendants and Grant Thornton engaged in further arm's-length negotiations regarding the terms of a potential resolution of the Derivative Action.  These negotiations culminated in the parties entering into a memorandum of understanding to settle the Derivative Action on September 6, 2019, nearly ten months after the initial request for a settlement demand.  *Id.* at ¶¶ 137-140.

The settlement is the product of a fair and vigorous arm's-length negotiation by experienced counsel,[4] following years of hard-fought litigation and is procedurally fair.

**B.      The Derivative Settlement is Substantively Fair**

The Second Circuit has established factors for the consideration of whether class action settlements are substantively fair.  *City of Detroit v. Grinnell Corp*., 495 F.2d 448, 462 (2d Cir. 1974).  Courts evaluating the substantive fairness of a derivative settlement adapt the *Grinnell* factors to the following: "(1) the reasonableness of the benefits achieved by the settlement in light of the potential recovery at trial; (2) the likelihood of success in light of the risks posed by continued litigation; (3) the likely duration and cost of continued litigation; and (4) any shareholder objections to proposed settlement."  *Pfizer*, 780 F. Supp. 2d at 340 (quoting *AOL*, 2006 WL 2572114, at *3); *see also Joel A. v. Giuliani*, 218 F.3d 132, 138 (2d Cir. 2000) (applying *Grinnell* factors in shareholder derivative action).  The relevant *Grinnell* factors strongly support final approval of the Derivative Settlement.

**1.      The Benefits Achieved are Substantial and Support Final Approval**

The Derivative Settlement confers substantial benefits on VEREIT.  "[T]here is a range of reasonableness with respect to a settlement – a range which recognizes the uncertainties of law and fact in any particular case and the concomitant risks and costs necessarily inherent in taking any litigation to completion."  *AOL*, 2006 WL 2572114, at *4 (quoting *Newman v. Stein,* 464 F.2d 689, 693 (2d Cir. 1972)).  Here, the benefits achieved by the Derivative Settlement clearly warrant final approval.  As explained by Professor Cox:

---

[4]      There is no question that all parties were represented by qualified, experienced counsel. Derivative Counsel has significant experience prosecuting derivative claims, and all defendants, VEREIT, and Grant Thornton were represented by senior attorneys from large law firms.  Houston Declaration at ¶¶ 162, 165.

The proposed settlement reached in *Witchko v. Schorsch, et al.*, Case No. 1:15-cv-06043, and related derivative actions in other jurisdictions (collectively "*Witchko*") provides substantial monetary benefits to VEREIT, Inc ("VEREIT" f.k.a. American Realty Capital Properties, Inc.) and, as set forth below, is remarkable in many ways. Indeed, the derivative settlement is all the more remarkable when measured against the outcomes of other derivative suits as well as the complaint leveled at shareholder litigation that such suits do not generally result in tangible benefits for the company. The magnitude of the *Witchko* settlement is in the upper range of derivative suit settlements and the settlement is carefully drafted to assure that the Non-VEREIT Settling Defendants,[5] including the individual defendants who enriched themselves through their misconduct, contributed $286,500,000 to the settlement fund instead of VEREIT.

Cox Declaration at ¶ 1.

Having evaluated the components of the Derivative Settlement and compared them to other noteworthy settlements and scholarship on derivative litigation, Professor Cox avers, "it is my opinion that the settlement reached in this matter not only is in the best interests of VEREIT but is itself significant among contemporary derivative suit settlements." *Id.* at ¶ 11. The Derivative Settlement provides several valuable benefits to VEREIT, each of which supports final approval. Weighed against the substantial risk that continued litigation would yield no benefit while imposing onerous costs on VEREIT, the recovery here is plainly fair, reasonable, and adequate. *See Grinnell*, 495 F.2d at 462; *In re AOL Time Warner*, 2006 WL 2572114, at *4 ("the benefits incorporated into the Settlement are reasonable in light of the substantial difficulties that would frustrate a potential trial recovery.").

### a.      The $286.5 Million Payment

Compared to other reported settlements of derivative actions, Professor Cox opines that the $286.5 million recovered in the Derivative Action is "exceptional." Cox Declaration at ¶ 12.

---

[5]      The Non-VEREIT Settling Defendants is a term defined in the Stipulation and includes Nicholas S. Schorsch, William M. Kahane, Edward M. Weil, Brian S. Block, Lisa McAlister, David Kay, Lisa Beeson, and Grant Thornton LLP ("Grant Thornton")

Upon final approval of the Derivative Settlement, VEREIT will receive a $286.5 million financial benefit from a payment by the Contributing Parties into the global resolution, which payment reduced VEREIT's obligation in the Class Action settlement by the same amount. *See* Cox Declaration at ¶ 19. As explained by VEREIT's current management, "VEREIT believes that the [class] plaintiffs would require the same aggregate payment regardless of its source." VEREIT's Statement in Support of Settlement. ECF No. 285 at 3. Without the $286.5 million payment by the Contributing Parties, VEREIT either would have been required to pay $286.5 million more to settle the Class Action or would have been unable to resolve the Class Action, to the Company's significant financial detriment. *Id.* at 5, 7; Stipulation at ¶ 2.1. "But for" the Derivative Action, the Contributing Parties would not have made "any contribution" to the global resolution. *Id.* As a result, the contributions obtained in the Derivative Settlement confer two significant benefits on VEREIT: (1) they are $286.5 million dollars that VEREIT would have had to raise and pay to settle the Class Action that it did not; and (2) they allowed the Company to finally conclude nearly five years of costly litigation. *See* Cox Declaration at ¶¶ 23-25.[6]

The benefit to VEREIT from Contributing Parties' payments is particularly significant because they are made "by the parties responsible for the misconduct" and are "not from any insurance policy maintained for the benefit of VEREIT." Cox Declaration at ¶¶ 2(B)-(C), 19.

---

[6]     Settlements of derivative actions are routinely approved by courts in this District in the absence of a monetary recovery, making the substantial benefits conferred by the Derivative Settlement all the more evident. "[I]in derivative actions where the harm done is to the corporation, a monetary benefit is not necessary for settlement approval.'" *In re FAB Universal Corp. S'holder Deriv. Litig.*, 148 F. Supp. 3d 277, 281 (S.D.N.Y. 2015) (citing *Mills v. Electric Auto–Lite Co*., 396 U.S. 375, 395 (1970) ("[A] corporation may receive a 'substantial benefit' from a derivative suit ... regardless of whether the benefit is pecuniary in nature." (collecting citations)). *See also In re Johnson & Johnson Deriv. Litig.*, 900 F. Supp. 2d 467, 480 (D.N.J. 2012) ("an empirical study of shareholder derivative actions concluded that the overwhelming majority of settlements result solely in corporate governance changes …").

This results "in VEREIT being compensated for the harm the Non-VEREIT Settling Defendants caused the company.  This is a paramount objective of imposing fiduciary obligations on the individual defendants and for requiring professionals such as Grant Thornton to perform the audit with the skill and care called for by their profession." *Id*. at ¶ 19.  Because the Contributing Parties are making payments that lessen VEREIT's financial burden, the Derivative Settlement causes the Contributing Parties to "contribute mightily" to those harmed by their misconduct, namely VEREIT and its stockholders.  *Id*.  That the Derivative Settlement requires the Contributing Parties to use their own funds to compensate VEREIT "sends a strong deterrence message to directors and officers of public companies:  those who engage in willful self-enriching behavior at the corporation's expense will be held personally accountable." *Id*. at ¶ 20.  Due to this unique component, "the *Witchko* settlement is a significant milestone in modern-day shareholder litigation." *Id*. at ¶¶ 20-22.

Independently, the amount recovered from the Contributing Parties serves VEREIT's interests because it is sufficient to compensate the Company for important categories of damages in the Derivative Action. Houston Declaration at ¶ 174.  The $286.5 million benefit equals the entire amount spent by the Company on the Audit Committee investigation, indemnification of certain defendants, and expenses for related matters, *plus* a significant percentage of the largest related-party transactions at issue in the Derivative Action.  *Id*.  Derivative Plaintiffs submit that the recovery of such a substantial sum, each dollar of which represents a savings for the Company, significantly benefits VEREIT and its shareholders by compensating the Company for wrongdoing alleged in the Derivative Action. *Id*. at ¶ 176.

### b. The Secondary Agreement Effectively Guarantees the $286.5 Million Benefit

The Secondary Agreement provides that even if approval of the Derivative Settlement were reversed on appeal, the $286.5 million payment from the Contributing Parties would be repaid to VEREIT.  Houston Declaration at ¶¶ 7, 178.  While Derivative Plaintiffs believe there is no basis to appeal an order finally approving the Derivative Settlement, the amount of the Contributing Parties' payment is sufficiently large that VEREIT would be substantially harmed if it were required to repay that amount into the Class Action settlement fund from Company coffers.  Such a result would either cause VEREIT to incur an additional $286.5 million payment to resolve the Class Action, or would cause the Class Action settlement, which is contingent on the Derivative Settlement, to collapse.  The Secondary Agreement therefore substantially benefits VEREIT by providing certainty that the Company will retain the benefit regardless of any successful appeal. *See* Cox Declaration at ¶ 24.

### c. The Release of Counterclaims that Grant Thornton Intended to Assert Eliminates Significant Exposure to VEREIT

If the Court approves the Derivative Settlement, the Individual Defendants and Grant Thornton will release counterclaims that they could have asserted against VEREIT.  Of particular benefit to the Company, in addition to its payment of $49 million, Grant Thornton has agreed to release counterclaims that it "intended to assert" against VEREIT in the Derivative Actions.  While the potential liability to VEREIT from Grant Thornton's counterclaims is of course unknown, Derivative Counsel are confident that the Company's exposure would be at least in the tens of millions of dollars given the litigation to date and the amount Grant Thornton contributed to the Derivative Settlement.

Due to discovery in the Coordinated Actions, Derivative Plaintiffs made an informed assessment of the liability that VEREIT might face should Grant Thornton pursue such counterclaims. Derivative Counsel reviewed hundreds of thousands of pages of documents produced by Grant Thornton and participated in the depositions of a half-dozen current and former Grant Thornton employees and partners, examining each of those witnesses. In the coordinated depositions, Derivative Counsel also observed examinations by Grant Thornton's counsel of over two dozen former VEREIT employees, directors, and officers, including individuals who may have lied to Grant Thornton auditors during audits. Based on the foregoing, Derivative Counsel believes that VEREIT had significant exposure to counterclaims asserted by Grant Thornton, including whether VEREIT employees made lied to Grant Thornton during audits about accounting issues at issue in this litigation.

The assertion of such counterclaims by Grant Thornton is not merely a hypothetical: Grant Thornton "*intended* to assert" them if not for the Derivative Settlement. Houston Declaration, Exhibit A, Stipulation at § 2.1. As a result, the release of Grant Thornton's counterclaims is a substantial benefit to VEREIT.

### d.   Termination of VEREIT's Litigation and Indemnification Obligations Estimated to be $100 Million

The Derivative Settlement also benefits VEREIT by relieving it of the significant expense of continued indemnification of certain of the individual defendants' and underwriters' legal costs in connection with the Derivative Action, the Class Action, and government criminal and regulatory investigations. Under the Agreement of Limited Partnership of VEREIT's Operating Partnership and relevant employment agreements, VEREIT is required to indemnify certain Individual Defendants for "expenses (including reasonable legal fees and expenses), judgments,

fines, settlements, and other amounts arising from any and all claims, demands, actions, suits or proceedings, civil, criminal, administrative, or investigative." Houston Declaration, Exhibit R at 8-9.

Since approximately November 2014, VEREIT has been required to advance tens of millions of dollars in legal fees to certain of the AR Capital Parties, including Schorsch, Kahane, and Weil pursuant to indemnity agreements. The Company expended approximately $180 million in "out-of-pocket" litigation costs from fall 2014 to settlement, and VEREIT's management estimates those costs to be an additional $100 million through trial in the Class Action in early 2020. VEREIT's Statement in Support of Settlement at 1, 7. Further, under the terms of the indemnification provision, these individuals can compel VEREIT to indemnify them for amounts paid to settle the Class Action or amounts owed due to judgment in that action. The enforceability of the indemnification provisions was litigated during 2017 and 2018 in an action filed in the Delaware Court of Chancery by certain AR Capital Parties, and the provision was found by that court to be enforceable. Houston Declaration at ¶ 181. Termination of the ongoing indemnification obligations and VEREIT's own defense costs due to the Class Action therefore confers a benefit on VEREIT of approximately $100 million through the trial in the Class Action, which was set for early 2020.

2.    **The Likelihood of Success in Light of The Risks Posed by Continued Litigation Supports Final Approval**

The foregoing benefits are all the more substantial in light of the considerable risks to Derivative Plaintiffs and VEREIT's derivative claims of "continued and costly litigation." *Pfizer*, 780 F. Supp. 2d at 342 (citing *Grinnell*, 495 F. 2d at 463). To conduct this analysis, "'the Court need only assess the risks of litigation against the certainty of recovery under the proposed settlement.'" *AOL*, 2006 WL 2572114, at *5 (quoting *In re Global Crossing*, 225 F.R.D. at 459).

Here, as in *Pfizer*, against each of the individual defendants, Derivative Plaintiffs asserted one remaining claim derivative claim for breach of fiduciary duty. *Pfizer*, 780 F. Supp. 2d at 342. While *Pfizer* arose under Delaware law, equally applicable here is the *Pfizer* court's determination that given "the daunting legal standard" for derivative breach of fiduciary duty claims, "plaintiffs would have faced very substantial risks in continuing to prosecute this action." *Id*.; *accord Joel A*., 218 F. 3d at 138, 144 (affirming approval of settlement where district court found that "the pending action presented many unsettled and complex legal issues, and a trial would… be 'extremely costly'").

Although Derivative Plaintiffs believe that the claims asserted in the Derivative Action have substantial merit, derivative actions are notoriously risky. *AOL*, 2006 WL 2572114, at *3 ("shareholder derivative actions are 'notoriously difficult and unpredictable.'" (quoting *Schimmel*, 57 F.R.D. at 487)); *In re Pac. Enters. Sec. Litig.*, 47 F.3d 373, 378 (9th Cir. 1995) ("the odds of winning [a] derivative lawsuit [a]re extremely small" and "'derivative lawsuits are rarely successful'"). Here, Derivative Plaintiffs faced significant risks to establishing liability and damages at trial. There was no guarantee that the Derivative Plaintiffs would later achieve *any* recovery for the Company, let alone one providing greater benefits than the Derivative Settlement. When compared to the certainty of the significant benefits conferred by the Derivative Settlement, these risks weigh heavily against further litigation, and support a determination that the settlement is fair, reasonable and adequate.

### a.      Risks of Establishing Liability

Derivative Plaintiffs faced several significant pre-trial risks. When the Court denied the individual defendants' motions for summary judgment, it did so without prejudice to their renewal at a later date. The individual defendants were likely to renew their motions. While Derivative

Plaintiffs believe they should prevail on these motions, they faced significant risk that the individual defendants would convince the Court to rule in their favor on one or more of the arguments, which would have resulted in complete dismissal of the case or narrowing of the claims and reduction in potential damages.

Because the Court set a later schedule for the filing of expert reports and expert discovery in the Derivative Action than the Class Action, Derivative Plaintiffs were still to file their reports and submit their experts to discovery by the individual defendants absent settlement.  Houston Declaration at ¶ 144.  Defendants likely would have attempted to disqualify one, if not both, of Derivative Plaintiffs' experts.  If Defendants were able to convince the Court that one or both experts should be excluded, Derivative Plaintiffs' ability to prove liability and damages would have been materially harmed.

Assuming they overcame these pre-trial risks, Derivative Plaintiffs faced significant risks to proving liability and damages at trial.  To prove liability, Derivative Plaintiffs had the burden to establish breaches of fiduciary duty under Maryland law.  In addition to proving the elements of a fiduciary breach, Maryland law requires Derivative Plaintiffs to prove that the breaches were not exculpable under VEREIT's charter, which limits liability to the extent allowed by Maryland law.  As a result, even if proven, the Individual Defendants' breaches of their fiduciary duties would have been exculpated unless Derivative Plaintiffs proved that the Individual Defendants "actually received an improper benefit" or engaged in "active and deliberate dishonesty." June 9, 2016 Order denying motion to dismiss, ECF No. 75; Md. Cts. & Jud. Proc. Code §§ 5- 418(a)(1)-(2);  Houston Declaration at ¶ 63.

Derivative Plaintiffs faced the real risk that defendant Schorsch, the individual defendant with the deepest pockets to pay a judgment, would convince the factfinder at trial that he lacked

knowledge of the AFFO misstatements. *Id.* at ¶ 147. Even if they proved that Schorsch had breached his fiduciary duties, Maryland law required Derivative Plaintiffs to prove that his breaches were committed with active and deliberate dishonesty, which is effectively actual knowledge of falsity. Throughout this litigation, Schorsch argued that he lacked actual knowledge of the AFFO fraud, and in his deposition, he denied directing the second quarter 2014 AFFO plug. A factfinder could have determined that Schorsch's testimony was credible and that he did not act with active and deliberate dishonesty in connection with the AFFO misstatements. Such a finding would have prevented Derivative Plaintiffs from establishing non-exculpable wrongdoing by Schorsch in connection with a major category of wrongdoing at issue in the action.

Derivative Plaintiffs also faced significant risks to establishing liability for the related party transactions. As they argued in their summary judgment motions, Schorsch, Kahane, Weil, and Block would likely assert at trial that the transactions were subject to the Maryland safe harbor, Md. Code § 2-419, they were substantively fair to VEREIT, and that there was no improper benefit.

Derivative Plaintiffs developed a significant factual record supporting their allegation that the related party transactions, especially the incentive payment to defendants as part of the American Realty Capital III transaction and the payment to individual defendants from the 2013 Out Performance Plan were unauthorized and facially violated the applicable governing documents. *Id.* at ¶¶ 96-105. However, significant risk existed that a factfinder would conclude that the transactions were shielded by the safe harbor, and if the safe harbor applied, proving that the Individual Defendants retained improper benefits would be nearly impossible. If Derivative Plaintiffs succeeded in avoiding the safe harbor, the individual defendants could still prove that the transactions were fair to VEREIT. *Id.* at ¶ 151. A factfinder could determine that even though the related party transactions were not authorized by the Board and violated the applicable

contracts, they nevertheless were substantively fair to the Company, throwing into substantial doubt whether any benefits could have been improper.

At trial, the individual defendants would likely raise many of the defenses they raised in the motion for summary judgment briefing in the Class Action and the Derivative Action.   In particular VEREIT's financial statement following the restatement are significant evidence of the harm to the Company at issue in the Derivative Action.   The individual defendants would likely argue that the quantification of financial errors and other disclosures regarding the Audit Committee investigation found in VEREIT's SEC filings could not be admitted against them at trial because they had been deprived discovery of the Audit Committee investigation, which was the basis for the restatement, due to a the Court's ruling that the Company could assert privileges and avoid producing Audit Committee investigation materials in discovery.  *Id.* at ¶ 160.  Although the same ruling prevented Derivative Plaintiffs from accessing the Audit Committee investigation materials, the claims at issue in a trial would be on the Company's behalf, and it the individual defendants would likely argue that Derivative Plaintiffs were using the Audit Committee results as a sword on the Company's behalf while the Company simultaneously refused to produce the underlying materials.

Similarly, the individual defendants would likely argue that the Company's claims against them were barred by the *in pari delicto* doctrine because VEREIT was a defendant in the Class Action and therefore akin to a co-conspirator.  *Id.* at ¶ 161.  While Derivative Plaintiffs believe there is a clear exception to the *in pari delicto* doctrine for derivative actions, a risk existed that some or all of the claims for wrongdoing alleged on behalf of the Company in the Derivative Action could have been precluded under the doctrine.

### b.    Risks of Proving Damages and Enforcing a Judgment

If Schorsch convinced the factfinder that his conduct in connection with the AFFO misstatements or related party transactions was exculpated, Weil and Kahane would likely have been successful in doing the same because each of them had less direct involvement with the alleged wrongdoing. *Id.* at ¶ 149.  The failure to establish non-exculpable wrongdoing by Schorsch, Kahane, and Weil would have created a situation where, even had Derivative Plaintiffs prevailed against the other individual defendants, collectively they would have been unable to satisfy a judgment likely to be several hundred million dollars.

Even assuming that Derivative Plaintiffs overcame the risks and successfully established liability as to all individual defendants, they would have confronted considerable challenges in establishing their damages calculations at trial.  *Id.* at ¶¶ 156-159.  The Derivative Action alleged a complex set of harms arising from the AFFO fraud and the unauthorized related-party transactions. Calculating the amounts of the harm to the Company would rely on a complex model resting on numerous valuation assumptions.  The parties developed and would have presented competing evidence on these issues, including competing expert evidence.  While Derivative Plaintiffs believed they had the better arguments, the risk remained that Defendants could have defeated certain categories of damages, or significantly diminished damages

### c.    Post-Trial Motions and Appeals

Even if Derivative Plaintiffs succeeded in obtaining a judgment at trial, the individual defendants almost certainly would have pursued post-trial motions to overturn the verdict and an appeal.  *Id.* at ¶ 162.  The individual defendants are well funded and represented by experienced counsel who would continue to mount a zealous and thorough defense to the Company's claims for relief not only before and during a full trial on the merits, but afterward, through post-trial

motions and appeals.   On their inevitable appeals, the individual defendants would have an

opportunity not only to seek to overturn the judgment on the verdict (assuming that Derivative

Plaintiffs succeeded at trial) but also to revisit the legal issues they had raised in their earlier

dispositive motions.   Derivative Plaintiffs therefore faced the risk that after the significant cost,

time, and expense of litigating through a favorable verdict at trial, the individual defendants would

prevail on appeal, or delay payment of any judgment to the Company during appeals, potentially

for years.

3.   **The Likely Duration and Cost of Continued Litigation Support Final Approval**

Derivative Plaintiffs survived several dispositive motions, reviewed millions of pages of

documents in discovery, deposed approximately three dozen witnesses and parties, and engaged

in on-again off-again settlement discussions over a period of years.   All of these preparations were

"merely the preliminary stages of what in all likelihood would be an arduous and drawn-out

litigation."   *AOL*, 2006 WL 2572114, at *5.   This action involves numerous defendants, complex

factual issues, and due to VEREIT's indemnification obligations, would cause the Company to

incur substantial costs if litigated through trial.   *Id*.; VEREIT's Statement in Support of Settlement,

ECF 285 at 1, 7.   One important purpose of settlement is to avoid the inherent uncertainty in

proceeding with the litigation.   *See Velez v. Novartis Pharm.*, 2010 WL 4877852, at *14 (S.D.N.Y.

Nov. 30, 2010); *see also W. Va. v. Chas. Pfizer & Co.*, 314 F. Supp. 710, 743-44 (S.D.N.Y. 1970),

*aff'd*, 440 F.2d 1079 (2d Cir. 1971) ("no matter how confident one may be of the outcome of the

litigation, such confidence is often misplaced").   Here, the complexity, expense, and duration of

further litigation weigh strongly in favor of final approval.   *See Grinnell*, 495 F.2d at 463; *In re*

*Metro. Life*, 935 F. Supp. at 294 ("In view of the effort and expense that would be required to take

21

this case to and through trial, settlement would undoubtedly be in the best interest of all the parties.").

As detailed above, the allegations in the Derivative Action involve complex related party transactions and specialized accounting issues that occurred as much as seven years ago. The next steps in the litigation would be expert reports and expert discovery, and the possible reassertion of summary judgment motions. At some point during the remaining pre-trial proceedings, Grant Thornton would have attempted to assert its counterclaims in the Derivative Action, which undoubtedly would have led to significant briefing and delay. Assuming the Court denied any reasserted summary judgment motions, resolution of the many factual disputes in the Derivative Action would involve pre-trial and *in limine* motions, and then a lengthy trial with numerous fact and expert witnesses, first to explain the complicated accounting issues and related party transactions, and then to explain the individual defendants' role in the wrongdoing. Following trial there would be post-trial briefing and appeals.

A prolonged period of continued litigation presented significant downsides to the Company, which has already exhausted its directors' and officers' insurance coverage and would be indemnifying the individual defendants. VEREIT has incurred approximately $180 million in litigation and indemnification costs to date and would likely incur another $100 million more by conclusion of a trial in the Class Action in early 2020. Derivative Plaintiffs do not know what portion of the $180 million was paid to indemnify individual defendants and what portion to pay the Company's own legal costs, but as the docket in this action and the Class Action reflects, each defendant is represented by senior attorneys at renowned defense firms, and VEREIT itself has paid at least five different defense firms to represent the Company or Board since fall of 2014. Additionally, Derivative Plaintiffs' counsel has already incurred nearly $13 million in time and

approximately $600,000 in expenses to prosecute the Derivative Action. The reasonable inference is that the parties would incur several tens of millions of dollars in additional expenses to take this action through trial and appellate review. *See AOL*, 2006 WL 2572114, at *6 ("the prosecution of this action would require the Company to incur substantial costs" and approving the settlement "will allow the Company to direct its full attention to its substantive business"); *In re Metro. Life*, 935 F. Supp. at 294 ("In view of the effort and expense that would be required to take this case to and through trial, settlement would undoubtedly be in the best interest of all the parties ….").

### 4.      The Reaction of Shareholders Supports the Settlement

The deadline for VEREIT stockholders to object to the Derivative Settlement is December 31, 2019. To date, counsel have not heard from any shareholder indicating that they are not satisfied with the Derivative Settlement. Houston Declaration at ¶¶ 184-185. This factor weighs heavily in favor of final approval. *See Grinnell*, 495 F.2d at 463 ("reaction of the class to the settlement" can support approval); *AOL*, 2006 WL 2572114, at *6 ("'lack of objections may well evidence the fairness of the Settlement'"); *Strougo*, 258 F. Supp. 2d at 258 ("It has been repeatedly held that 'one indication of the fairness of a settlement is the lack of or small number of objectors.'"). This is also significant considering that VEREIT is owned by thousands of stockholders, including sophisticated institutions. *See In re Citigroup Inc. Bond Litig.*, 296 F.R.D. 147, 156 (S.D.N.Y. 2013) (shareholder reaction supported settlement where "not one of the objections or requests for exclusion was submitted by an institutional investor"); *In re AOL Time Warner, Inc. Sec. & ERISA Litig.*, 2006 WL 903236, at *10 (S.D.N.Y. Apr. 6, 2006) ("small number of objections … strongly favor[s] the Settlement" where "not a single institutional Class

Member objected to the Settlement").[7]  According to VEREIT, "[i]nvestors have already responded favorably to the settlements' announcement."  VEREIT's Statement in Support of Derivative Settlement at 4.

## V.   NOTICE OF SETTLEMENT FULLY SATISFIES DUE PROCESS

As directed by the Court, notice was disseminated by VEREIT in the manner set forth in the Preliminary Approval Order.  The Preliminary Approval Order, which was entered on October 4, 2019, provided for notice in the following manner: within ten (10) days after the entry of the Preliminary Approval Order, VEREIT would: (1) issue a press release that contained the contents of the Long Form Notice and referred Current VEREIT Stockholders to VEREIT's Investor Relations webpage; (2) file a current report on Form 8-K with the SEC referencing the press release; (3) include a link to the aforementioned press release, the Stipulation, and the Preliminary Approval Order on the Company's Investor Relations webpage; and (4) cause the Summary Notice to be published once in *Investor's Business Daily*.  *See* Preliminary Approval Order, ¶ 4. On October 8, 2019, VEREIT caused the Summary Notice to be published in the *Investor's Business Daily*, and on October 15, 2019, VEREIT caused the Notice to be filed in accordance with (1) through (3) above.  Houston Declaration at ¶ 184.  The Notice informed shareholders that the deadline to object to the Derivative Settlement is December 31, 2019.

Federal Rule of Civil Procedure 23.1 requires notice to be given to shareholders in a derivative action "in such manner as the court directs."  The notice program set forth in the Preliminary Approval Order, which was carried out as detailed herein, satisfies the requirements

---

[7]   Later-filed objections, if any, will be addressed in briefs to be filed on January 14, 2020. Houston Declaration at ¶ 185.

set forth by Rule 23.1 and otherwise fulfills the due process rights of VEREIT shareholders in that adequate notice was received, since it informed shareholders of the Derivative Settlement's terms, "the availability of further information from the court, and the right . . . to object and be heard." *Bell Atl. Corp. v. Bolger*, 2 F.3d 1304, 1317 (3d Cir. 1993). Moreover, the notice was "reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the [settlement] and afford them an opportunity to present their objections." *Mullane v. Cent. Hanover Bank & Trust Co.,* 339 U.S. 306, 314 (1950).

**VI.    CONCLUSION**

For the foregoing reasons, Derivative Plaintiffs respectfully request that the Court grant final approval of the Derivative Settlement.

Dated: December 17, 2019                         Respectfully submitted,

**GLANCY PRONGAY & MURRAY LLP**

Robert I. Harwood
Matthew M. Houston
Benjamin I. Sachs-Michaels
712 Fifth Avenue, 31st Floor
New York, NY 10019
Tel: (212) 935-7400

*Liaison Counsel for Derivative Plaintiffs*

Timothy Brown
THE BROWN LAW FIRM, P.C.
240 Townsend Square
Oyster Bay, NY 11771
Tel: (516) 922-5427

Robert C. Schubert
Willem F. Jonckheer
SCHUBERT JONCKHEER & KOLBE LLP
Three Embarcadero Center, Suite 1650
San Francisco, CA 94111
Tel: (415) 788-4220


Jeffrey M. Norton
NEWMAN FERRARA LLP
1250 Broadway, 27th Floor
New York, NY 10001
Tel: (212) 619-540

Corey D. Holzer
Marshall P. Dees
HOLZER & HOLZER, LLC
1200 Ashwood Parkway, Suite 410
Atlanta, GA 30338
Tel: (770) 392-0090

Curtis V. Trinko
LAW OFFICES OF CURTIS V. TRINKO, LLP
16 West 46th Street, 7th Floor
New York, NY 10036
Tel: (212) 490-9550

Alfred G. Yates, Jr.
Gerald L. Rutledge
LAW OFFICE OF ALFRED G. YATES JR PC
519 Allegheny Building
300 Mt. Lebanon Blvd, Suite 206-B
Pittsburgh, PA 15219
Tel: (412) 391-5164

*Counsel for Derivative Plaintiffs*

26