UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| JOANNE WITCHKO, Derivatively on Behalf of Nominal Defendant AMERICAN REALTY CAPITAL PROPERTIES, INC.,<br><br>                Plaintiff,<br><br>    v.<br><br>NICHOLAS S. SCHORSCH, et al.,<br><br>                Defendants,<br><br>    -and-<br><br>AMERICAN REALTY CAPITAL PROPERTIES, INC.,<br><br>                Nominal Defendant. | Lead Case No. 1:15-cv-06043-AKH<br><br>(Consolidated with Case No. 1:15-cv-08563-AKH) |

**DECLARATION OF MATTHEW M. HOUSTON IN
SUPPORT OF PLAINTIFFS' MOTIONS FOR FINAL
APPROVAL OF DERIVATIVE SETTLEMENT AND AWARD
OF ATTORNEYS' FEES AND REIMBURSEMENT OF EXPENSES**

I, MATTHEW M. HOUSTON, declare as follows under 28 U.S.C. § 1746:

1.      I am a partner of Glancy Prongay & Murray LLP ("GPM"), Court-appointed Liaison Counsel for plaintiffs ("Derivative Plaintiffs") in the above-captioned shareholder derivative action (the "Derivative Action").[1]  I have personal knowledge of the matters set forth herein as I was directly involved in and/or responsible for every key aspect of prosecuting this Derivative Action.

2.      I submit this declaration together with the attached exhibits in support of Derivative Plaintiffs' Motion for Final Approval of the Derivative Settlement and the concurrently filed memorandum in support thereof (the "Final Approval Memorandum").  As set forth in the Final Approval Memorandum, Derivative Plaintiffs seek final approval of a settlement that provides for a payment of $286,500,000 for the benefit of VEREIT, Inc. ("VEREIT") (f/k/a American Realty Capital Properties, Inc. ("ARCP")), the execution of a secondary agreement providing for individual contribution even if an appeal is taken from approval of the derivative settlement, release of counterclaims against VEREIT, and the termination of VEREIT's future litigation and indemnity obligations had the class and derivative actions proceeded to trial.  ("Derivative Settlement")

3.      I also respectfully submit this declaration in support of Derivative Counsel's Motion for Award of Attorneys' Fees and Reimbursement of Expenses and the concurrently filed memorandum in support of the fee application (the "Fee Memorandum").[2]  As set forth in the Fee Memorandum, Derivative Counsel seeks an award of attorneys' fees in the amount of $22,920,000,

---

[1]      All capitalized terms, unless defined herein, have the meaning set forth in the Stipulation and Agreement of Settlement dated September 27, 2019 (the "Stipulation"), attached as Exhibit A.

[2]      The fee application is being made on behalf of all derivative counsel who brought derivative actions in this forum and elsewhere.

which represents 8% of the $286,500,000 obtained as part of the derivative settlement and is a 1.8x multiplier on Derivative Counsel's lodestar.  Derivative Counsel also sees reimbursement of out-of-pocket litigation expenses totaling $594,882.47.

4.     The Court preliminarily approved the proposed settlement of the Derivative Action by its Order entered on October 4, 2019 (the "Preliminary Approval Order") and directed that notice of the Derivative Settlement be made.  ECF No. 288.[3]  The notice plan has now been fully executed.  As of the date of this filing, Derivative Counsel is not aware of any objections to the Derivative Settlement that have been lodged with the Court.

## I.  INTRODUCTION

5.     In this Derivative Action, Derivative Plaintiffs, on behalf of VEREIT, alleged claims for breach of fiduciary duty under Maryland law arising from defendants' intentional misstatement of the Company's core operating metric, and several unfair related-party transactions that harmed VEREIT and benefited individual defendants.

6.     As set forth in the Stipulation, the Derivative Settlement will resolve all derivative claims in exchange for a payment of $286,500,000 (the "Settlement Amount") for the benefit of VEREIT by defendants Nicholas S. Schorsch ("Schorsch"), William M. Kahane ("Kahane"), Edward M. Weil ("Weil"), Brian S. Block ("Block"), and VEREIT's former independent auditor, Grant Thornton LLP ("Grant Thornton").

7.     In addition to payment of $286,500,000, the Derivative Settlement will provide additional valuable benefits to VEREIT.  First, the Settlement Amount is guaranteed by a secondary agreement providing that even in the unlikely event that final settlement approval is reversed on appeal, Settlement Amount would not be returned to Schorsch, Kahane, Weil, Block,

---

[3]     Citations to "ECF No. _" refer to docket entries in the *Witchko* Action.

3

and Grant Thornton but instead will be subject to VEREIT's control.  Second, the Derivative Settlement would terminate the Company's on-going legal fees and indemnification obligations to former directors, officers, and underwriters, a benefit that the Company avers is worth up to approximately $100 million in savings.  *See* American Realty Capital Properties Inc.'s Statement in Support of Plaintiffs' Unopposed Motion for Preliminary Approval of Derivative Settlement and Approval of Shareholder Notice ("VEREIT's Statement in Support of Settlement"), ECF No. 285, at 1, 7.  Third, the Derivative Settlement obtains the release from defendants, and Grant Thornton, of counterclaims that would have been brought against VEREIT if the Derivative Action continued.

8.      If approved by the Court, the Derivative Settlement will rank as one of the largest derivative action settlements and Derivative Plaintiffs believe it is the largest derivative settlement wholly funded by contributions from alleged wrongdoers, as opposed to insurance proceeds.  As set forth in his accompanying declaration, Professor James Cox, the Brainerd Currie Professor of Law at the Duke University School of Law, opined that the proposed Derivative Settlement "is not only fair and reasonable but that it is an exceptional result."  Professor James Cox's Declaration in Support of Derivative Plaintiffs' Motion for Final Approval of Derivative Action Settlement (the "Cox Declaration") at ¶ 26, annexed hereto as Exhibit B.

9.      The Derivative Settlement provides a substantial, certain, and immediate recovery, while avoiding the significant risk of continued indemnity for certain of the named individual defendants and the expense of the continued litigation itself which may have been protracted as a result of the trial itself and inevitable appeals.

10.     The Derivative Settlement was achieved after over four years of highly contested litigation, during which time Derivative Counsel became well-informed on the relative strengths

and weaknesses of VEREIT's claims and developed additional claims as discovery unfolded.  In prosecuting the Derivative Action, Derivative Counsel expended enormous efforts and resources on behalf of the Company including, *inter alia*:

     a.     Conducting a detailed investigation of facts and potential claims, including the standards applicable to officers and directors under Maryland law.

     b.     Drafting and serving a comprehensive litigation demand on VEREIT's Board of Directors ("Board") prior to filing a complaint and monitoring the status of the Board's response for seven months until the Board refused the demand.

     c.     After the Board refused the demand, drafting a detailed shareholder derivative complaint alleging that demand had been wrongfully refused and detailing a wide range of wrongdoing by numerous individual defendants.

     d.     Successfully opposing VEREIT's motion to dismiss the complaint under Rule 23.1 for failure to sufficiently allege wrongful demand refusal, and the individual defendants' motions to dismiss under Rule 12(b)(6) for failure to state a claim.

     e.     Successfully obtaining the dismissal by the Second Circuit Court of Appeals of an interlocutory appeal filed by several of the individual defendants from this Court's denial of the motions to dismiss.

     f.     Investigating and filing a detailed amended complaint incorporating this Court's directions following denial of the motions to dismiss pursuant to Rule 23.1.

     g.     Avoiding a third attempt to halt prosecution of the claims by VEREIT's management after it convened a special committee, issued a new report responding to the demands, and moved to stay the Derivative Action.

h.     Avoiding two attempts to stay the Derivative Action by the office of the U.S. Attorneys for the Southern District of New York.

i.     Conducting comprehensive written discovery which resulted in the production of millions of pages of documents from defendants, the Company, Grant Thornton, and third parties.

j.     Operating a highly organized, multi-year document review program that classified and categorized hundreds of thousands of documents through targeted reviews and a detailed reporting protocol.

k.     Deposing each of the seven defendants, six witnesses from Grant Thornton, and twenty-two former VEREIT employees, directors, and other third parties.

l.     Monitoring related litigation, including the criminal trial of Brian Block, litigation filed by certain individual defendants against VEREIT to compel payment of their attorneys' fees, and a Securities and Exchange Commission ("SEC") probe into the Company and several individual defendants.

m.     Participation in an initial two-day mediation session in March 2017 before a nationally-recognized mediator.

n.     Retention of a corporate governance expert and a forensic accounting/valuation expert to testify and aid in the prosecution of the Derivative Action.

o.     Drafting and filing two affirmative motions for summary judgment against individual defendants Block and Lisa McAlister ("McAlister").

p.     Simultaneously successfully opposing four motions for summary judgment filed by defendants Schorsch, Kahane, Weil, Block, Lisa Beeson ("Beeson"), and David Kay ("Kay").

q.     Conducting significant additional work with the mediator, including a private presentation to him regarding damages and a second mediation session in July of 2019, which ended without a resolution.

r.     Participating in two meetings to discuss potential resolutions of the Derivative Action with VEREIT's current Chief Executive Officer, General Counsel, and the Company's defense counsel in the Securities Class Action.

s.     Negotiation of the Derivative Settlement and memorandum of understanding.

t.     Negotiation of the Stipulation of Settlement.

u.     Successfully moving for preliminary approval of the Derivative Settlement.

11.     Based on the foregoing efforts, Derivative Counsel are well-informed of the strengths and weakness of claims and defenses raised in the Derivative Action and believe the Derivative Settlement is a favorable outcome for VEREIT and is in the Company's best interests. For all the reasons set forth in Derivative Plaintiffs' Final Approval Memorandum and accompanying declarations, Derivative Plaintiffs respectfully submit that the Derivative Settlement is "fair, reasonable, and adequate" in all respects, and that the Court should grant final approval pursuant to Federal Rule of Civil Procedure 23.1.

12.     Derivative Counsel seeks approval of its request for attorneys' fees and reimbursement of expenses as set forth in the Fee Memorandum. The requested fee of $22,920,000 is 8% of the Derivative Settlement amount and represents 1.8 times the collective lodestar of Derivative Counsel. The requested fee is fair, reasonable, and warranted in light of the extent and quality of work performed to achieve the substantial result, risks faced by Derivative Counsel, and the benefits obtained on behalf of VEREIT.

13.     Derivative Counsel retained the services of Geoffrey P. Miller, the Stuyvesant P. Comfort Professor of Law at the New York University School of Law, to review Derivative Counsel's fee application.   Professor Miller is of the opinion that the fee sought by Derivative Counsel is fair and indeed less than other fees awarded for similar derivative litigation based on a review of cases within this Circuit and elsewhere. The Declaration of Professor Geoffrey P. Miller in Support of Derivative Plaintiffs' Motion for Approval of Attorneys' Fees and Reimbursement of Expenses ("Miller Declaration") is attached hereto as Exhibit C.

14.     The Miller Declaration provides empirical research relating to attorneys' fees in class and derivative litigation against which the requested fee in this case may be measured.   For the seventy-eight cases from the Southern District of New York considered by Professor Miller, the award fee mean was 27% and the median was 31% -- far more than the 8% sought by Derivative Counsel.  Miller Declaration at ¶¶ 42-44.

15.     Accordingly, Derivative Counsel's request for attorneys' fees and reimbursement of expenses in the Derivative Action is fair and reasonable and should be approved.

## II.     PROSECUTION OF THE DERIVATIVE ACTION

### A.     Background

16.     VEREIT is a publicly traded REIT organized under Maryland law.   The Company makes income through rents received from its ownership of commercial properties, which are remitted to shareholders in the form of dividends.

17.     At all relevant times, VEREIT has reported a non-GAAP financial metric called "adjusted funds from operations," or "AFFO."   AFFO was VEREIT's most important operating metric – in terms of its bottom line, reported financial performance, and remuneration to its executive employees.   In essence, AFFO approximated the Company's long-term revenues by

excluding factors such as the acquisition and sale of properties and focusing on the cash-flow generated from the properties themselves.

18.     In October 28, 2014, the Company stunned the investing public when it announced that its financial reports for the full year 2013 and the first two quarters of 2014, and the AFFO results disclosed therein, could no longer be relied upon due to intentional misconduct on the part of Company senior management.    According to VEREIT's disclosure, it had identified "intentional" accounting errors in its first and second quarter 2014 Forms 10-Q, and the Chief Financial Officer, defendant Block and Chief Accounting Officer, defendant McAlister had resigned.  VEREIT stated that the Audit Committee of its Board was investigating the accounting manipulation and other matters, which investigation was ongoing.

19.     On March 2, 2015, VEREIT announced that the Audit Committee investigation had concluded and filed restated financial results.  In the restatement, VEREIT acknowledged that: (a) it had overstated AFFO for 2011, 2012, 2013 (including each fiscal quarter of 2013) and the first two quarters of 2014; (b) the overstatement had come to the attention of "senior management" prior to the release of the 2014 first quarter results; (c) senior management knowingly failed to correct the misreported AFFO figure; (d) senior management intentionally made improper adjustments to the 2014 second quarter results in order to cover up the prior AFFO misrepresentations; and (e) there were material weaknesses and widespread deficiencies in VEREIT's internal controls and disclosure controls and procedures.

20.     The Company further stated that the Audit Committee had identified payments made to entities controlled by AR Capital, LLC ("AR Capital"), a partnership owned by defendants Schorsch, Kahane, Weil, and Block, that were not sufficiently documented or otherwise warranted scrutiny.  Due to the Audit Committee investigation, the Company had recovered approximately

$8.5 million from AR Capital due to these transactions.  Notably, the Audit Committee did not recover any funds from AR Capital, Schorsch, Block, Kahane, or Weil for the significantly larger improper related-party transactions, discussed below, that later became issues in the Derivative Action.

21.     Ultimately, VEREIT's entire Board was replaced, as well as all of senior management, and corporate governance changes were enacted in March of 2015.

22.     On September 7, 2016, the U. S. Attorney for the Southern District of New York filed an indictment against Block in this District, which asserted six counts against Block based on false and misleading statements in the Company's 2014 Second Quarter Report and 2014 Second Quarter 8-K: (1) securities fraud; (2) false statements in filings with the SEC regarding VEREIT's 2014 Second Quarter Report; (3) false statements in filings with the SEC regarding VEREIT's 2014 Second Quarter 8-K; (4) false certification of disclosure filed with the SEC; (5) false certifications filed with the SEC (18 U.S.C. § 1350); and (6) conspiracy to commit securities fraud, to make false filings with the SEC, and to falsify books and records.

23.     Also, on September 8, 2016, the U.S. Attorney for the Southern District of New York issued a press release announcing the unsealing of an indictment against defendant Block and revealing that defendant McAlister had pled guilty to charges including securities fraud and was cooperating with the government.

24.     After a three-week trial in June 2017, a jury convicted Block of all six counts, including securities fraud.

25.     In July 2019, the SEC entered consent agreements with defendants Schorsch, Block, and AR Capital.  The SEC consent judgment resulted in the disgorgement by Schorsch,

Block, and AR Capital of a portion of their ill-gotten gains from certain unauthorized related-party transactions at issue in the Derivative Action.

**B.     Comprehensive Investigation Of Claim And Litigation Demand**

26.     Shortly following the Company's announcement of intentional financial manipulation on October 28, 2014, plaintiff Witchko directed her counsel to evaluate whether shareholders had potential claims against VEREIT insiders.  Witchko's counsel, Glancy Prongay & Murray LLP, f/k/a Harwood Feffer LLP, conducted a thorough investigation of the publicly-available facts at the time by, among other things, reviewing and analyzing VEREIT's public SEC filings, press releases, earnings calls, investor conference presentations, and other statements on behalf of the Company related to: (1) the October 28, 2014 announcement of intentional AFFO manipulation; (2) AFFO results as historically reported, and its importance to VEREIT's business strategy; (3) government and regulatory investigations of the AFFO manipulation; (4) compensation of VEREIT's current and former executives; (5) related-party transactions and other payments to VEREIT's former manager; (6) the role of VEREIT's independent auditor in issuance of AFFO disclosures; (7) Maryland law on fiduciary obligations and exculpation of fiduciary breaches; and (8) standards for demand futility and demand refusal under Maryland law.

27.     Following their pre-demand investigation, Witchko's counsel determined that Maryland law required a pre-suit litigation demand on VEREIT's Board because the Maryland standard for demand futility was not fulfilled.

28.     On November 17, 2014, Witchko served a litigation demand pursuant to Maryland law on the Board asking it to investigate alleged wrongdoing by certain of VEREIT's officers, directors, and third parties and take legal action against the wrongdoers.  The demand specifically identified defendants Schorsch, Block, McAlister, and the former external manager of VEREIT,

an entity owned and controlled by AR Capital, and requested the Board investigate potential wrongdoing by them.

29.     On December 19, 2014, the Company's former general counsel, Richard Silfen, responded by letter confirming receipt of the demand, requesting additional proof of plaintiff Witchko's ownership of VEREIT stock, soliciting additional factual allegations, and stating that VEREIT would inform plaintiff of the Board's decision regarding the demand.

30.     On February 10, 2015, Witchko's counsel forwarded the additional proof of ownership, directing the Company to the allegations in the public record for additional factual support, and inquiring whether the Board planned to take action in response to the demand.

31.     Having not received a response, on March 6, 2015, Witchko's counsel again wrote the Company requesting information regarding the Board's response to the demand.

32.     By letter dated March 12, 2015, the Company informed Witchko's counsel that the Board had engaged outside counsel to advise in review of the demand.

33.     On April 3, 2015, counsel from Saul Ewing LLP ("Saul Ewing") sent Witchko a letter that Saul Ewing had been retained as independent outside counsel for the Board and would advise when the Board had decided regarding the demand.

34.     On April 22, 2015, Witchko's counsel wrote to Saul Ewing describing additional factual developments since the demand was originally served approximately five months earlier. The letter demanded the Board investigate compensation paid to Schorsch upon his resignation, as well as "the extent to which compensation paid in previous years" to Schorsch and others, "was either obtained through self-dealing or was paid while they were breaching their fiduciary duties. These funds should be returned to ARCP." The letter also identified additional subjects for investigation including: (1) the Board's procedure for addressing management conflicts of interest;

(2) conflicts among directors; (3) the expanded restatement announced in March 2015; and (4) damage to VEREIT's business caused by the accounting restatement and intentional manipulation of AFFO.  By letter dated May 1, 2015, counsel from Saul Ewing confirmed receipt of the April 22, 2015 letter.

35.     The Board refused the demand on June 18, 2015.  According to the refusal, the entire conflicted ARCP Board, including directors alleged to have engaged in wrongdoing, reviewed and rejected the demand, not an independent committee.  The only information relied on by the Board in considering the demand were two reports that did not address the particular claims, facts, legal standards, or procedure involved in bringing the type of litigation at issue in the demand.  These were reports by: (a) Weil, Gotshal & Manges ("Weil Gotshal"), the Audit Committee's counsel, produced for the Audit Committee's investigation into "accounting practices and other matters"; and (b) Milbank, Tweed, Hadley & McCloy LLP ("Milbank"), outside counsel to ARCP "concerning the Audit Committee Investigation and ongoing federal securities litigation" and the multiple governmental investigations facing the Company.  Neither of these reports addressed the pending derivative actions alleging demand futility, *see infra* ¶ 42, let alone Witchko's demand itself.  The Board concluded that:

> two factors deserved especially great weight in the Board's consideration of the Demand and would outweigh any considerations in favor of pursuing the Claims at this time: (i) the likely negative impact on the Ongoing Litigation and Governmental Investigations of pursuing the Claims at this time, assuming only for the sake of argument that the Claims have merit, and (ii) the likelihood that the Ongoing Litigation and Governmental Investigations would yield more information concerning the Claims before the statute of limitations for bringing the Claims would expire.  The Board noted that the plaintiffs in the Ongoing Litigation allege much of the same wrongdoing alleged in the Demand and seek very significant damages from ARCP and other defendants. The Board also considered that pursuing claims against any of ARCP's officers and directors named in the Demand at this time might jeopardize defenses that ARCP could raise in the Ongoing Litigation and Governmental Investigations.

Based on these considerations, the Board determined that, even if the allegations in the Demand and the Ongoing Litigation had merit, it would not be in the best interests of ARCP and its stockholders to initiate litigation at this time because any such action might well compromise ARCP's position in the Ongoing Litigation and the Governmental Investigations and expose ARCP and its stockholders to significant impairment in the value of their ARCP stock.  Moreover, to prevail against any of ARCP's officers and directors named in the Demand, ARCP would need to allege and prove facts similar to those that the plaintiffs in the Ongoing Litigation and that governmental agencies in the Governmental Investigations will be required to establish to be successful in their cases. The Board concluded that none of these outcomes would serve the best interests of ARCP and its stockholders.

36.    Following the refusal, on June 24, 2015, Witchko's counsel wrote Saul Ewing and requested copies of the reports relied on by the Board in its consideration of the demand.

37.    On June 29, 2015, counsel from Saul Ewing responded on behalf of the Board and refused to provide any further information "in light of [the] detailed June 18, 2015 letter refusing the demand."

## C.    Commencement Of The Derivative Action And Preparation Of The Complaint

38.    Following refusal of the demand, Witchko's counsel conducted further comprehensive investigation including: (1) the Company's expanded restatement; (2) a lawsuit filed by defendant McAlister against VEREIT and certain other defendants; (3) the hundreds of millions of dollars' worth of related-party transactions between VEREIT and the AR Capital defendants; (4) the Company's admission that an incentive compensation plan had been manipulated to the benefit of insiders; (5) the ongoing government and regulatory investigations; (6) the substance of the demand refusal; (7) Maryland law regarding demand refusal, breach of fiduciary duty, and other claims; and (8) the standards for non-exculpable breaches of fiduciary duty under Maryland law.

39.     On July 31, 2015, Witchko filed her detailed 78-page complaint asserting claims including breach of the fiduciary duties of loyalty, good faith, and candor and alleging that the Board had improperly refused her litigation demand.  Among other things, the complaint alleged that the individual defendants breached their duties owed to VEREIT by causing the Company to enter into hundreds of millions of dollars of improper related-party transactions with entities they owned and controlled.  Further, the complaint alleged that the individual defendants participated in a scheme to fraudulently inflate the Company's reported AFFO and that the Company's AFFO was misrepresented during every quarter since its initial public offering.

40.     The complaint also alleged that the Board had improperly refused Witchko's demand under Maryland law, and alleged that the procedural indicia of the refusal raised a reason to doubt that the refusal was a valid exercise of business judgment.

41.     On October 15, 2015, defendants and VEREIT moved to dismiss the complaint pursuant to Rules 23.1 and 12(b)(6).  In the motions pursuant to Rule 23.1, VEREIT was represented by its counsel in the Securities Class Action, Milbank.  ECF Nos. 28, 29.

**D.     Other Derivative Actions And Appointment Of Liaison Counsel**

42.     Beginning on November 17, 2014, at around the same time Witchko was serving her litigation demand, three VEREIT shareholders filed derivative actions in this Court arising from the same October 28, 2014 disclosure, but alleging that it would have been futile to make a pre-suit demand on the VEREIT Board.  *Turner Trust v. Schorsch, et al.,* C.A. No. 1:14-cv-09140-AKH, *Froehner v. Schorsch, et al.,* C.A. No. 1:14-cv-09444-AKH, and *Serafin v. Schorsch, et al.,* C.A. No. 1:14-cv-9672-AKH, which were subsequently consolidated (together, the "Federal Demand Futility Actions").  Defendants moved to dismiss the Federal Demand Futility Actions on

April 3, 2015.   After the completion of briefing, on June 24, 2015, the Court granted defendants' motions to dismiss for failure to adequately allege demand futility.

43.     After dismissal of their case, the plaintiffs in the Federal Demand Futility Actions served a litigation demand on the Board to bring suit against and then filed a second derivative action on September 17, 2015.  *Serafin et al. v. Schorsch et al.,* C.A. No. 1:15-cv-08563-AKH.

44.     Thereafter, another VEREIT shareholder filed a third action in this Court alleging that her litigation demand had been ignored.  *Kosky v. Rufrano, et al.,* C.A. 1:15-cv-09318-AKH.

45.     Following the filing of the *Serafin* and *Kosky* actions, the parties agreed that defendants and the Company would withdraw their motions to dismiss so the cases could be consolidated and counsel could be organized, after which defendants and VEREIT would reassert their motions to dismiss.

46.     On December 15, 2015, the Court conducted a hearing during which it consolidated the *Serafin* with the Derivative Action and appointed Witchko's counsel, as "liaison counsel" to lead the prosecution of the Derivative Action.  At this hearing, counsel for the plaintiff in the *Kosky* action told the Court that she would be dismissing her complaint, and, on December 28, 2015, did so.

47.     During the hearing, the Court also disqualified VEREIT's counsel in the Securities Class Action from representing the Company in the Derivative Action.  After inquiring which law firm would be representing VEREIT in the Derivative Action, the Court was told that Milbank, the firm defending VEREIT in the class action and opt-out actions, would also be representing the Company in the Derivative Action.  December 15, 2015 Hearing Transcript, at 13:24.[4]  The Court told attorneys from Milbank that the firm "can't" represent the Company in the derivative action,

---

[4]     The transcript of the December 15, 2015 hearing is available on the docket in the Securities Class Action, C.A. No. 1:15-mc-00040-AKH, ECF No. 176.

"because you're looking to eliminate liability or reduce liability against the company; whereas, in the derivative lawsuits, the interest is to enhance recovery [for] the company." *Id*. at 14:19-22. Counsel from Milbank protested the Court's direction that the Company be represented by a "separate lawyer" (*Id*. at 15:11-13), in the following colloquy:

| | |
|---|---|
| MR. EDELMAN: | The company in this situation is taking all of these issues very seriously.  We have a board that is actively investigating the claims that it may have against third parties. |
| | There's an active board that's involved, and our firm is spearheading both the defense of the class actions and the investigation of whether there are third-party claims? |
| THE COURT: | Third-party claims by the company? |
| MR. EDELMAN: | By the company. We would take the position that – |
| THE COURT: | You're in a conflict. |
| MR. EDELMAN: | Your Honor, I think the company has an interest in both defending against the claims brought against it and in -- |
| THE COURT: | You're fielding a demand. |
| MR. EDELMAN: | Yes. |
| THE COURT: | That means that you have to be absolutely neutral and unbiased in fielding the demand.  If you're looking as defense counsel, you can't be unbiased and independent. |
| | You're, in effect, confessing to the point that has been made that this is a futile demand situation because the company can't independently field the demand. |

*Id*. at 15:23 – 16:19.

48.    Following the Court's determination that VEREIT's counsel in the securities actions was conflicted and could not represent the Company in the Derivative Action, counsel from Saul Ewing entered an appearance on behalf of VEREIT on January 29, 2016.

**E.    Defendants' Motions To Dismiss, Briefing, And Order**

49.    On January 5, 2016, Derivative Plaintiffs designated Witchko's initial complaint as the operative complaint in the Derivative Action.

50.    On February 12, 2016, VEREIT and each of the defendants named in the operative complaint moved to dismiss the Derivative Action pursuant to Fed. R. Civ. P. 23.1 for failure sufficiently alleged improper refusal of demand, and under Fed. R. Civ. P. 12(b)(6) for failure to state a claim.   In the renewed motions to dismiss, VEREIT's brief was signed by Saul Ewing. Defendants' 55-page brief argued that the Board had properly refused the demand and its decision not to prosecute the claims on behalf of VEREIT was entitled to the business judgment presumption of Md. Code Ann., Corps. & Ass'ns § 2-405.1 for two primary reasons: (1) the Board did not lack disinterest and independence; and (2) the Board's decision not to litigate the claims was protected by the business judgment rule.   Defendants also moved to dismiss the substantive claims under Rule 12(b)(6).

51.    More specifically, defendants argued that the Board's decision not to pursue the claims would serve the best interests of VEREIT and its shareholders.   That decision was entitled to deference, defendants argued, because pursuit of the claims might compromise VEREIT's position in the Securities Class Action and government investigations, developments in the securities litigation and government investigations would further inform the Board about the actions and events underlying the claims, and "[a]mple time remains before the statutes of limitations would run on claims [VEREIT] might bring."   ECF No. 62 at 3.   Highlighting the difficulty for plaintiffs in surviving a motion to dismiss under Rule 23.1 where demand has been refused under Maryland law, defendants argued that "[f]ew, if any, plaintiffs surmount [this] obstacle."   [at 4 (citations and internal quotations omitted).

52.     Defendants further argued that even if the Court were to decide that demand had been wrongfully refused, the complaint failed to state claim.  In particular, defendants argued that under Maryland Corporations and Associations Section 2-418 state law claims required allegations active and deliberate dishonesty or retention of an improper benefit.  The allegations did not plausibly allege wrongdoing rising to a non-exculpable level under state law, they asserted. Therefore, even if the nearly impossible obstacle of surviving a motion to dismiss pursuant to Rule 23.1 were overcome, defendants contended that the Derivative Action could not proceed because the Company had no substantive claims.

53.     On March 15, 2016, Derivative Plaintiffs filed their 56-page opposition to the motions to dismiss.  ECF No. 68.  Derivative Plaintiffs argued that Board improperly refused the demand because it did not act independently in refusing the demand and its purported investigation of the Company's claims was neither reasonable nor a valid exercise of business judgment.

54.     Regarding whether the Board had independently responded to the demand, Derivative Plaintiffs observed that under Maryland law, unlike under Delaware law, a shareholder does not concede Board disinterest by serving a demand.  After receiving plaintiff Witchko's demand, the Board had declined to create an independent committee to investigate and respond to the demand, as is common in Maryland corporations.  As a result, the full Board, including alleged wrongdoers, directors who sat on the Boards of other AR Capital-controlled entities, and inside directors had participated in the vote to refuse the demand.  Derivative Plaintiffs argued that, the failure to follow the clear path under Maryland law and appoint a disinterested committee to review the demand was, itself evidence that the Board did not act independently in its response to the demand.

55.     Derivative Plaintiffs further argued that the Board refused the demand without ascertaining whether the claims could succeed, citing the theoretical negative impact on other pending litigation against the Company.  Further, Derivative Plaintiffs argued, the Board relied on conflicted legal advice to assess potential impact on pending litigation, advice rendered by counsel that was at the time representing the Company and individual defendants in pending securities fraud actions and the dismissed Demand Futility Actions.  Finally, Derivative Plaintiffs argued that the refusal letter raised reason to doubt that the decision was a valid exercise of business judgment because no witnesses were interviewed or documents reviewed by any counsel other than conflicted counsel, the Board did not document its reasoning or conclusions, and there is no evidence the Board even properly identified the claims at issue.

56.     With respect to the substantive claims, Derivative Plaintiffs argued that Schorsch, Block, and McAlister had conceded that the complaint stated claims against them for breach of fiduciary under Maryland law, and that the remaining contested claims were sufficiently alleged pursuant to the pleading standards of Rules 12(b)(6) and 8(a).

57.     On April 5, 2016, the Company and Individual Defendants filed their replies.

58.     On June 2, 2016, the Court heard oral argument on the motions to dismiss the Derivative Action.  During the argument, the Court questioned defense counsel about the Board's decision not to prosecute the claims raised in the demand.  In particular, the Court inquired whether, if the Board's decision to refuse the demand were honored, the statute of limitations might run for claims for self-dealing raised in Witchko's demand.  On behalf of VEREIT's then-current management, counsel from Saul Ewing stated that the Board had considered tolling agreements with defendants and had *declined* to enter them but would reconsider the issue as the statute of limitations period approached.

59.     During the hearing the Court also asked defense counsel to explain the Board's rationale for the assertion in the demand refusal that the Company's claims would not be prejudiced by waiting to decide whether to assert them while watching developments in the Securities Class Action.  June 2, 2016 Hearing Transcript, ECF No. 76, at 20 – 21.  The Court asked precisely how VEREIT's management would "watch" the development of the Securities Class Action, "Does that mean they send someone to every deposition?  Does that party have standing to attend the depositions?"  *Id.* at 21:2-5.  Defense counsel responded, "The company is a defendant in the litigation."  *Id.* at 21:6-7.  The Court again described its concern about conflicted representation: "But now the company is in the position of a potential plaintiff.  There's a conflict….  The representatives of the company as a defendant is in conflict with the interest of the company as a plaintiff."  *Id.* at 21:8-13.  Defense counsel responded that the Company's claims in the Derivative Action were represented by separate counsel, Saul Ewing, and that Saul Ewing could attend depositions in the Securities Class Action.  *Id.* at 21:14-24.  The Court asked how Saul Ewing could attend depositions in the Securities Class Action if it did not represent a party in that action.  *Id.* at 21:25 – 22:7.

60.     Counsel from Saul Ewing argued that VEREIT's management could rely on counsel defending the Company in the securities class action to inform it regarding developments in that action.  *Id.* at 22:19 – 23:7.  The Court responded:

> Wouldn't a derivative plaintiff be in a better situation since he's not conflicted in any way? … You're as good as your principal.  Your principal is conflicted and it's looking with an eye to saving liability potential…. It doesn't give him an opportunity to consider, especially since he's not valued any of these claims, how good a claim he has against Mr. Schorsch and company.

*Id.* at at 23:8-19.

61.     At conclusion of the hearing, the Court reserved decision but scheduled a conference, "for the purpose of discussing the relationship of this lawsuit with the class action lawsuits and other litigation with which the company is involved." *Id.* at 47:23 – 48:1.

62.     On June 9, 2016, the Court issued an opinion and order denying the motion to dismiss pursuant to Fed. R. Civ. P. 23.1 because the operative complaint sufficiently alleged that plaintiff Witchko's demand had been improperly denied, and granted with leave to amend the motions to dismiss pursuant to Rule 12(b)(6) (the "June 9 Order").  ECF. No. 75.

63.     In denying the motions to dismiss under Rule 23.1, the Court held that the complaint carried Derivative Plaintiffs' burden to show that the Board's decision to refuse the demand was not an adequate exercise of business judgment.  Specifically, the Court concluded that the refusal, "does not suggest that the Board weighed the potential recovery from the lawsuit in any detail, in a way that would allow them to compare it to the costs."  The refusal did not suggest that the Board had considered the "specific merits" of bringing suit against any of the defendants.  "Indeed, it appears that the Board did not even investigate the merits of a lawsuit against Schorsch and his confederates, neither directly nor through counsel."  The Court further held that while the Board was not required to form an independent committee to respond to the demand, its failure to do so raised doubts about its exercise of business judgment in refusing the demand.  The Court held that, "the extent to which the Board relied on the presentations and advice of other law firms, which represent the company and various individual defendants in the related securities class action" raised a reason to doubt the refusal.

64.     With respect to the substantive claims, the Court dismissed with prejudice plaintiffs' claims for violations of section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a) and denied with leave to amend the state law claims.  In evaluating the state law claims, the Court

22

examined the allegations in light of the requirements of Maryland Corporations and Associations Section 2-418.  After acknowledging that Schorsh and Block had conceded the complaint stated state law claims against them, the Court divided the remaining defendants into two groups, the outside director defendants, consisting of Thomas Andruskevich, Scott Bowman, Bruce Frank, Leslie Michelson, William Stanley, and Edward Rendell; and the insider defendants consisting of Kay, Beeson, McAlister, Kahane, and Weil.  With respect to the outside director defendants, the Court stated that complaint failed to allege non-exculpated wrongdoing under Maryland law because there was no plausible allegation that any outside director had received an improper benefit in money or acted with active and deliberate dishonesty.  However, with respect to defendants Kahane, Weil, Kay, Beeson, and McAlister, the Court stated that the allegations could be sufficient to state non-exculpable state law claims if amended to "show[] plausibly, for each defendant who is named, how the claim against them satisfies the Maryland statute limiting claims to improper benefits or profits, or active and deliberate dishonesty."  June 9 Order at 19.

65.     The June 9 Order directed Derivative Plaintiffs to file an amended complaint consistent with the Court's decision by June 30, 2016, directed defendants to "answer or otherwise move" by July 22, 2016, and set a case management conference for September 8, 2016.  *Id.*

66.     Following the June 9 Order, and despite its assertions that it would apprise the Board of the status of litigation in the Derivative Action, Saul Ewing did not play an active role in the prosecution of the Derivative Action.  For example, Saul Ewing never appeared at a deposition and did not submit or sign any summary judgment briefing.

**F.     Derivative Plaintiffs File Their Amended Complaint And Defendants Answer**

67.     On June 30, 2016, Derivative Plaintiffs filed the amended complaint.  ECF No. 87. The amended complaint alleged the same core facts as the initial complaint, but incorporated the

Court's directions from June 9 Order in several ways.  First, after thorough additional investigation of the public record, SEC filings, and media reports, Derivative Plaintiffs determined that at the time they were unable to plausibly allege in greater detail that the outside director defendants had committed non-exculpable breaches of their fiduciary duties.  As a result, the amended complaint did not name the outside director defendants.  Second, the Derivative Plaintiffs determined that they could plausibly allege non-exculpable claims against Schorsch, Block, Kahane, Weil, McAlister, Kay, and Beeson (the "Individual Defendants").  To address the Court's direction to clearly allege how each defendant's conduct was non-exculpable, the amended complaint alleged a separate count against each of these seven individual defendants, which expressly alleged the particular conduct that defendant was accused of, and how that conduct was non-exculpable.

68.     The amended complaint additionally added new events and greater detail regarding the original factual allegations.  To that end, and to comply with the Court's directions, the amended complaint alleged fiduciary breaches in two categories: (1) conduct involving active and deliberate dishonesty, primarily arising from the AFFO fraud; and (2) conduct by which the Individual Defendants obtained for themselves improper benefits at the Company's expense due to the hundreds of millions of dollars of wrongful related-party transactions at issue.

69.     On July 22, 2016, the Individual Defendants and VEREIT declined to move again to dismiss and filed answers to the Amended Complaint.

**G.     Certain Individual Defendants' Interlocutory Appeal and Dismissal of Appeal by the Second Circuit**

70.     On July 11, 2016, after the amended complaint was filed but before they had answered, defendants Kahane and Weil noticed an interlocutory appeal from the denial of the motion to dismiss.  *Witchko v. Schorsch*, C.A. No. 16-2499 (2d Cir.).  Thereafter, defendants

Schorsch, Block, and McAlister noticed tag-along appeals (together with the appeal of Kahane and Weil, the "Appeals").  C.A. Nos. 16-2595, 16-2599, 16-2607.

71.     Following the notices of the Appeals, Derivative Counsel conducted to a meet-and-confer with counsel for Kahane and Weil to inquire into the rationale for the appeal because Kahane and Weil had not moved this Court for leave to file a interlocutory appeal prior to doing so.   Counsel for Kahane and Weil stated that although the appeal had been noticed as "interlocutory" it would in fact be lodged under the "collateral order doctrine," and therefore was considered an appeal from a final order under 28 U.S.C. § 1291.   The collateral order doctrine is typically invoked when defendants are government officials and involves "a small class of interlocutory rulings that are too important to be denied review and too independent of the cause itself to require that appellate consideration be deferred until the whole case is adjudicated." *Fischer v. New York State Dep't of Law*, 812 F.3d 268, 273 (2d Cir. 2016).

72.     On July 20, 2016, the Derivative Plaintiffs moved to dismiss the Appeals for lack of appellate jurisdiction.  C.A. No. 16-2499, ECF Nos. 9-16.  Derivative Plaintiffs argued that the appeal should be dismissed for two alternate reasons.  First, appellants neither sought nor obtained certification of this Court prior to noticing the interlocutory appeals, as they were required to under 28 U.S.C. § 1292(b) in order to avail themselves of appellate jurisdiction.  Second, the collateral order doctrine is only available where the order appealed from fits three conjunctive requirements, that it: (i) conclusively determined the disputed question; (ii) resolved an important issue completely separate from the merits of the action; and (iii) was effectively unreviewable on appeal from a final judgment.  In support of their motion, Derivative Plaintiffs cited Second Circuit authority holding that the collateral order doctrine was not available in an appeal from denial of a

motion to dismiss under Rule 23.1 in a derivative action alleging demand futility. *Papilsky v. Berndt*, 503 F.2d 554 (2d Cir. 1974).

73.     On August 1, 2016, Kahane and Weil filed their opposition to the motion to dismiss the Appeals for lack of appellate jurisdiction. C.A. No. 16-2499, ECF No. 62.  In their opposition, Kahane and Weil argued that the Court's order denying the motions to dismiss deprived VEREIT of its right to be immune from litigation where an unconflicted board refused a demand.  In support of this argument, appellants emphasized that few if any of the Derivative Plaintiffs are able to overcome a motion to dismiss under Rule 23.1 where a demand has been refused.  Kahane and Weil argued that *Papilsky* was distinguishable because it involved demand futility allegations as opposed to allegations of wrongful refusal.

74.     On August 8, 2016, Derivative Plaintiffs filed their reply, arguing that Rule 23.1 does not confer immunity or a right not be tried, the three factors necessary to obtain review under the collateral order doctrine were not fulfilled, and that *Papilsky* was controlling.  C.A. No. 16-2499, ECF Nos. 67.

75.     On August 11, 2016, Kahane and Weil filed a motion for leave to file a sur-reply or, in the alternative, strike Derivative Plaintiff's motion to dismiss the Appeals.  C.A. No. 16-2499, ECF Nos. 101-02.  On August 12, 2016, the Derivative Plaintiffs filed an opposition to Kahane and Weil's motion for leave to file a sur-reply or strike.  C.A. No. 16-2499, ECF No. 107.

76.     On November 15, 2016, the U.S. Court of Appeals for the Second Circuit granted the Derivative Plaintiffs' motion to dismiss the Appeals for lack of appellate jurisdiction.  C.A. No. 16-2499, ECF No. 130.  In its short opinion granting the motions to dismiss, the court concluded that *Papilsky* did control and that the collateral order doctrine did not apply.  The court then *sua sponte* dismissed the consolidated appeals.

**H.     VEREIT Convenes A Special Committee And Attempts Again To Halt Prosecution Of The Derivative Action**

77.     In the second week of July 2016, Derivative Counsel, in coordination with plaintiffs in the Securities Class Action and the Direct Actions[5] attempted to schedule an initial Rule 26(f) discovery conference.  On July 20, 2016, counsel for the Company in the Securities Class Action, Milbank, informed Derivative Plaintiffs that they did not believe it was appropriate for the Derivative Plaintiffs to participate in the Rule 26(f) conference and reserved all rights to object to the Derivative Plaintiffs' participation in discovery.

78.     The parties in the coordinated actions thereafter conducted several rule 26(f) telephone conferences in which Derivative Plaintiffs participated notwithstanding Milbank's objection.

79.     On September 1, 2016, counsel from Saul Ewing informed Derivative Plaintiffs that the Company believed that discovery in the Derivative Action should not go forward.  The same day, VEREIT's management moved to stay the Derivative Action.  ECF Nos. 115-117. Representing VEREIT on the motion to stay was yet another outside law firm, Morvillo Abramowitz Grand Iason & Anello PC ("Morvillo Abramowitz").  In the brief in support of the

---

[5]     The Direct Actions are: *Jet Capital Master Fund, L.P., et al. v. American Realty Capital Properties, Inc.*, et al., No. 1:15-cv-00307-AKH; *Pentwater Equity Opportunities Master Fund Ltd., et al. v. American Realty Capital Properties, Inc.*, et al., No. 1:15-cv-08510-AKH; *Clearline Capital Partners LP, et al. v. American Realty Capital Properties, Inc., et al.*, No. 1:15-cv-08467-AKH; *BlackRock ACS US Equity Tracker Fund, et al. v. American Realty Capital Properties, Inc.*, et al., No. 1:15-cv-08464-AKH; *PIMCO Funds: PIMCO Diversified Income Fund, et al. v. American Realty Capital Properties, Inc., et al.*, No. 1:15-cv-08466-AKH; *Twin Securities, Inc., et al. v. American Realty Capital Properties, Inc., et al.*, No. 1:15-cv-01291-AKH; *HG Vora Special Opportunities Master Fund, Ltd. v. American Realty Capital Properties, Inc., et al.*, No. 1:15-cv-04107-AKH; *Archer Capital Master Fund, L.P., et al. v. American Realty Capital Properties, Inc., et al.*, No. 1:16-cv-05471-AKH; *Atlas Master Fund, Ltd., et al. v. American Realty Capital Properties, Inc., et al.*, No. 1:16-cv-05475-AKH; *Eton Park Fund, L.P., et al. v. American Realty Capital Properties, Inc., et al.*, No. 1:16-cv-09393-AKH; *and Reliance Standard Life Ins. Co., et al. v. American Realty Capital Properties, Inc., et al.*, No. 1:17-cv-02796-AKH

motion to stay, VEREIT's current management argued that facts had materially changed since the Board considered plaintiff Witchko's demand and the Board had denied the motions to dismiss. VEREIT management now argued that the Board should be allowed to reassert control over whether to litigate the claims for three reasons: (1) the Board's composition had changed and it was unequivocally independent; (2) in November 2015 and June 2016, the Board had obtained tolling agreements with defendants Schorsch, Kahane, Weil, Block, Kay, McAlister, and Beeson; and (3) following denial of the motions to dismiss, the Board had appointed an independent special committee to evaluate, again, whether to prosecute the claims in the Derivative Action.  The new special committee, referred to as the Subcommittee, had retained Morvillo Abramowitz and engaged in a comprehensive review of potential claims and whether to assert them.  According to the motion to stay, Morvillo Abramowitz had, on numerous occasions, met with VEREIT's senior executives, and counsel, including the general counsel and outside counsel from Milbank in support of its advice to the Subcommittee.  The Subcommittee itself also received briefings from VEREIT's in-house counsel and Milbank.  The Subcommittee's process and conclusions were documented in a report effectively the same as would be created by a Special Litigation Committee.   Following its comprehensive review, VEREIT management, through the Subcommittee, again declined to prosecute the claims.

80.    At the Court's previously scheduled status conference on September 8, 2016, counsel from Morvillo Abramowitz presented the motion to stay.  Derivative Plaintiffs had not yet filed their opposition to the motion.  During the presentation, counsel from Morvillo Abramowitz told the Court that if the motion to stay was denied, Morvillo Abramowitz would represent the Company in the Derivative Action going forward.  In support of the stay, counsel argued that the Company could not prosecute the lawsuit at the time because any allegations made against

Individual Defendants would be construed as admissions against the Company. At conclusion of the presentation, the Court denied the motion to stay from the bench and indicated that the Derivative Action would be coordinated for discovery purposes with the other pending VEREIT-related litigation, the Securities Class Action and the Direct Actions (together with the Derivative Action, the "Coordinated Actions").

### I.     U.S. Attorney's Office Attempts To Stay The Derivative Action

81.     In 2017, the U.S. Attorneys' Office for the Southern District of New York was preparing for the criminal trial of defendant Block. On two separate occasions, the first in January and the second in May, the U.S. Attorney's office moved to stay the Derivative Action, and the other Coordinated Actions, until the conclusion of defendant Block's criminal trial. On both occasions, the Court denied the government's motions.

### J.     Comprehensive Written Discovery

82.     During September and October 2016, Derivative Plaintiffs and the other parties in the Coordinated Actions served their first requests for the production of documents and their responses and objections, and the parties filed with the Court a proposed protective order governing discovery. In November 2016, VEREIT made its first production of documents. In December 2016, Derivative Plaintiffs made their first production of documents. Additional document requests were served thereafter.

83.     During document discovery in the Coordinated Actions, over seventy parties and non-parties produced more than 846,000 documents totaling several million pages. VEREIT produced over 264,600 separate documents, AR Capital produced over 242,500 documents, and Grant Thornton produced over 117,013 documents. Derivative Counsel maintained this

production in a secure online document repository for which they incurred significant monthly fees.

84.    Between the commencement of document production and summary judgment, Derivative Counsel obtained and strategically reviewed/analyzed hundreds of thousands of individual documents, comprised of millions of pages, produced by defendants and third parties. The documents were hosted on an internet-based document database allowing access remotely, in particular to attorneys traveling around the country for depositions.  This technologically advanced review platform includes numerous features designed to increase the efficiencies of reviewing attorneys, such as automatically identifying duplicate documents, different versions of the same document, and families of related documents.  To use the documents effectively in prosecuting the claims, these millions of pages were reviewed, analyzed, and distilled into a workable set of "hot" documents.  In reviewing the documents, attorneys were tasked with making several analytical determinations as to their importance and relevance.  Specifically, they determined whether the documents were "hot," "relevant," or "irrelevant."  Where a document was coded as "hot" or "relevant," the project attorneys would then identify which issue in the action the documents related to, including, for example, "AFFO," promote payments to related-party advisors, or the Company's outperformance plans.

85.    During the review process, project attorneys were given batches of documents to review, and in many cases, the task of reviewing documents responsive to targeted searches by custodian, date, and/or keyword, among other things.  Where a particularly "hot" document was discovered, project attorneys would circulate the document in real time to the entire team of counsel.  Throughout the document review process, project attorneys would submit weekly reports characterizing the documents they had reviewed that week, attaching "hot" documents even if

already circulated, and providing other details regarding their review that week. All project attorneys and counsel received the weekly review reports and used them to discuss emerging issues in the case, documents that were sought that had not yet been encountered, and how to avoid duplication of efforts in light of the many duplicate documents produced.

86.     During document review and depositions, Derivative Counsel created a central repository of key documents organized by issue. Important documents related to Derivative Plaintiffs' claims were arranged by custodian and chronologically. This repository was regularly updated as additional key documents were discovered and coded. Creating this repository of key documents allowed attorneys to easily access and analyze the key documents related to any theory of damages or claim in the action without independently compiling them. This allowed the attorneys to efficiently prepare for depositions, provide to the forensic accounting expert, and quickly locate evidence in support of fact-based submissions to the Court in connection with summary judgment briefing.

**K.     Extensive Deposition Discovery**

87.     During October 2017, Derivative Plaintiffs met and conferred several times with the plaintiffs in the Coordinated Actions, and defendants, regarding the scheduling of depositions in the Coordinated Actions. As they had previously, the Company's attorneys in the Securities Class Action attempted to prevent Derivative Plaintiffs from litigating VEREIT's claims, this time by asserting that Derivative Plaintiffs should not be permitted to conduct their own examinations.

88.     At status conferences in November and December 2017, the Court established a protocol for depositions in the Coordinated Actions: plaintiffs in the Securities Class Action would be given a full day to examine with each witness on global issues and issues specifically related to the Securities Class Action, thereafter, Derivative Plaintiffs and Op-Out plaintiffs would have the

right to ask non-duplicative questions relevant to their distinct claims.  Plaintiffs in the Coordinated Actions informed the Court that they planned to depose forty-five witnesses, and the Derivative Plaintiffs reserving the right to call an additional twelve if necessary, in order to address issues unique to the claims in the Derivative Action.  The Court agreed that the depositions should involve all the Coordinated Actions, as well as an action pending in the U.S. District Court for the District of Arizona brought by Vanguard Funds, and that each deposition would continue for as long as necessary so that each group of plaintiffs and defendants would have the opportunity to conduct examinations relevant to their cases.  The Court, however, warned against duplication of efforts and directed that as to common issues, "a deposition taken by one is the same as a deposition taken by all."

89.    Between January and December 2018, Derivative Counsel deposed thirty-five witnesses, including all seven Individual Defendants named in the complaint, six witnesses from Grant Thornton, and twenty-two former VEREIT and AR Capital employees, VEREIT directors, and other third-party witnesses.  Most depositions occurred over multiple days, with counsel in the Securities Class Action and Direct Actions focusing on AFFO and accounting questions, while Derivative Plaintiffs examined the witnesses regarding the related-party transactions, executive compensation payments, and corporate governance at issue in the Derivative Action.

90.    Prior to each deposition, Derivative Counsel developed deponent memos identifying relevant documents produced in discovery for the particular witness and categorizing the documents by topic of relevance and importance.  To prepare for the depositions, many of which were "double tracked," so that two or more deponents would be deposed on overlapping days, Derivative Counsel synthesized prior witness testimony and developed an outline of questions and potential exhibits to be used during Derivative Plaintiffs' examination.

Simultaneously, Derivative Counsel had project attorneys tasked with aggregating and categorizing all exhibits marked during depositions and organizing them so that they could be easy searched and accessed for future depositions and summary judgement briefing.

### 1.    Depositions of Defendants

91.    Derivative Plaintiffs deposed each of the defendants named in the amended complaint.  During their depositions, defendants Block and McAlister refused to answer questions, asserting their fifth amendment privilege against self-incrimination in response to all substantive questions.  During the depositions of defendants Kay and Beeson, Derivative Plaintiffs conducted non-duplicative examinations regarding their knowledge and participation in the AFFO plug and presentation of information to VEREIT's Audit Committee.  During the depositions of Schorsch, Kahane, and Weil, Derivative Plaintiffs examined the witnesses about topics including their roles in the improper related-party transactions, their knowledge of the terms of the relevant agreements, and related matters.  The depositions occurred on the following dates in New York:

     i.    Lisa McAlister, June 5 and 6, 2018.

    ii.    Lisa Beeson, October 10 and 11, 2018.

   iii.    Brian Block, November 6 and 7, 2018.

   iv.    Edward Weil, November 12 and 13, 2018.

    v.    Nicholas Schorsch, December 10 and 11, 2018.

   vi.    William Kahane, December 12 and 13, 2018.

  vii.    David Kay, December 18 and 19, 2018.

### 2.    Depositions of Grant Thornton Witnesses

92.    Derivative Plaintiffs deposed six witnesses from Grant Thornton.  The Grant Thornton depositions were particularly important to Derivative Plaintiffs' development of relevant evidence, and attendance at the Grant Thornton depositions provided valuable insight into potential

counterclaims that Grant Thornton might have against VEREIT.  The Grant Thornton depositions occurred as follows:

      i.      Michael Pramberger, on January 24, 25, and 26, 2018, in New York.

      ii.      Jessica Estrada, on April 4, 5, and 6, 2018, in Chicago.

      iii.      Zachary Smith, on August 29 and 30, 2018, in Chicago.

      iv.      Richard LaFleur, on September 26, 27, and 28, 2018 in Chicago.

      v.      Michael Cairns, on October 9 and 10, 2018, in New York.

      vi.      Nishit Mehta, on November 7 and 8, 2018, in New York.

### 3.      Fact Depositions of VEREIT Employees and Directors

93.      In addition to depositions of defendants, Derivative Plaintiffs deposed [twenty-seven] third-party witnesses between January 2018 and December 2018.  The twenty-seven witnesses were primarily, former VEREIT or AR Capital employees, former directors of VEREIT, and auditors from Grant Thornton.  The following witnesses were deposed on the following dates:

      i.      Brandon Rudd, on January 22 and 23, 2018, in New York.

      ii.      Susan Manning, on March 6 and 7, 2018, in Philadelphia.

      iii.      Adam Armiger, on March 14, 15, and 16, 2018, in New York.

      iv.      Governor Edward Rendell, on April 12 and 13, 2018, in New York.

      v.      Michael Reiter, on April 24 and 25, 2018, in New York.

      vi.      William Gribbin, on May 7, 8, and 9, 2018, in New York.

      vii.      Ryan Steel, on May 21 and 22, 2018, in New York.

      viii.      Bruce Frank, on May 22, 23, and 24, 2018, in New York.

      ix.      Paul Ingrassia, on May 30, 2018, in New York.

      x.      Richard Lucarini, on June 5 and 6, 2018, in Philadelphia.

      xi.      Sathana Semonsky, on June 13, 2018, in New York.

xii.      Richard Silfen, on June 25, 2018, in New York.

xiii.     Matthew Peel, on July 9, 2018, in Phoenix.

xiv.      Scott Bowman, on September 17, 2018, in New York.

xv.       Jens Thomas Jung, on September 24, 2018, in New York.

xvi.      Peter Budko, on October 2, 2018, in New York.

xvii.     Leslie Michelson, on October 3 and 4, 2018, in New York.

xviii.    Scott Sealy, on October 17, 2018, in Atlanta.

xix.      Thomas Andruskevich, on November 28, 2018, in New York.

xx.       William Stanley, on December 5, 2018, in New York.

xxi.      Casey Wilson, on December 5 and 6, 2018, in New York.

xxii.     Kevin Siko, on December 18, 2018, in New York.

94.      Each deposition involved extensive preparation by Derivative Counsel, including detailed review of defendants' and third-parties' document productions, review of prior testimony related to the witness or topics of which the witness had knowledge, witness-specific research, and a close analysis of the issues about which the witness would be able to testify. Project attorneys prepared extensive deposition materials, including identifying relevant documents in which a witness's name appeared, and detailed witness memoranda specific to each deponent.

95.      By the end of fact depositions, well over 2,000 exhibits had been entered into the record. To develop and organize the evidence in the record, Derivative Counsel undertook an extensive process in which they categorized exhibits and testimony by topic, and created a searchable database of all exhibits in the record tagged with relevant information such as: (1) description of document; (2) Bates Range, if any on document; (3) deposition marked in; (4) introducing attorney; (5) citation to record where exhibit introduced; (6) citation to record where exhibit later discussed in same or any other depositions; (7) names of any parties or third-parties

appearing in document; (8) relevance of document; and (9) attachments to document if any.  Using these tools, Derivative Counsel conducted regular team meetings in person and telephonically to coordinate questioning in the depositions where frequently the same attorney could not participate in successive depositions due to overlapping dates.

      **L.**     **Evidence Developed During Discovery**

96.      As a result of their extensive investigation of ARCP's public filings, analysis of documents produced in discovery, and deposition examinations, Derivative Counsel developed substantial evidence that defendants Schorsch, Kahane, Weil, and Block breached their fiduciary duties by causing VEREIT to engage in unauthorized and unfair related-party transactions with their partnership, AR Capital.  The details of this category of wrongdoing was never publicly disclosed and, therefore, was not at issue in the Securities Class Action or the Direct Actions. While the Audit Committee investigation conducted by VEREIT's Board identified and obtained reimbursement for certain smaller related-party transactions with AR Capital, Derivative Counsel identified two large transactions that the Audit Committee apparently never evaluated and did not obtain reimbursement for.

97.      Generally, the evidence developed by Derivative Plaintiffs demonstrates that Schorsch, Kahane, Weil, and Block obtained for themselves improper benefits in the form of limited partnership interests in the Company's subsidiary, ARC Properties Operating Partnership, L.P. ("OP Units").  According to the Company's annual report filed with the SEC on Form 10-K on February 24, 2016, approximately 23.8 million OP Units were outstanding as of December 31, 2015. These OP Units are convertible into an equal number of shares in common stock. *See* VEREIT's Form 10-K filed with the SEC on February 24, 2016, at F-86.  The value of the

Company's common stock at close of trading on November 26, 2019, was $9.70. Thus, the total approximate current value of these limited partnership interests is about $230.8 million.

98.     While not all of the OP Units owned by Schorsch, Kahane, Weil, and Block were wrongfully obtained, Derivative Plaintiffs developed evidence supporting that a majority of them were due to the following two transactions:

### 1.     ARCT III Promote

99.     In late 2013, VEREIT announced that it would acquire another REIT in the AR Capital empire, American Realty Capital Trust IIII, Inc. ("ARCT III") for approximately $2.3 billion. Due to their control of AR Capital, Schorsch, Kahane, Weil, and Block were entitled to a payment referred to as a promote fee, upon the sale of the ARCT III, paid in OP Units of VEREIT. When the transaction closed at the end of February 2014, Schorsch, Kahane, Weil, and Block received a promote fee payment of approximately $98 million. Through their review of relevant documents and deposition examinations, Derivative Counsel established that the ARCT III Promote was miscalculated in such a way as to significantly increase this payment to the Individual Defendants.

100.    The promote fee was supposed to be calculated using a formula set out in ARCT III's limited partnership agreement. Rather than calculating the promote fee in accordance with the formula, the Individual Defendants departed from the formula in multiple ways, each with the effect of increasing the payment. Had the payment been calculated in accordance with the relevant documents approved by VEREIT's Board, it would have been materially less. With the assistance of their forensic accountants, Derivative Plaintiffs estimated that overpayment by VEREIT could have been the entire $98 million paid to Schorsch, Kahane, Weil, and Block.

101.     Supporting that the overpayment was intentional, Derivative Counsel identified evidence that several days before the shareholder vote to approve the ARCT III transaction and cause payment of the promote fee, certain of the Individual Defendants knew the promote fee would be 20% - 30% more than had been previously disclosed in proxy materials.  However, no corrective disclosure was made, and shareholders approved the acquisition not knowing that the amount of a fee paid to a related party had been understated by tens of millions of dollars.

### 2.     2013 OPP Acceleration

102.     In 2012, VEREIT's Board adopted an incentive compensation plan called the 2013 Multi-Year Outperformance Plan ("2013 OPP").  Pursuant to the 2013 OPP, the AR Capital partners, including Schorsch, Kahane, Weil, and Block, would earn incentive compensation tied to the level of VEREIT's performance.  Under the 2013 OPP, they would earn equity awards based on a formula calculating total return to shareholders annually at the end of 2013, 2014, and 2015.  The 2013 OPP had a termination provision that provided that if the external manager's service was terminated before the end of 2015, the annual total shareholder return calculations would continue on December 31 of any remaining plan years.

103.     In late 2013, the Company was preparing to become internally managed, and the external manager's service were no longer required.  The Compensation Committee of the Board resolved to terminate the 2013 OPP pursuant to the termination provision in the plan.  Pursuant to this Board authorization, the only awards that could be distributed immediately were those earned based on VEREIT's 2013 performance.  Schorsch, Kahane, Weil, and Block would be entitled to additional awards at the end of 2014 and 2015 depending on VEREIT's performance.  However, in early January 2014, in direct contravention of the plan and the Board's authorization, defendants

Schorsch, Kahane, Weil, and Block converted all equity available during the life of the plan and distributed them into their individual names.

104.    Supporting that the conversion of all 8.2 million plan units in January 2014 was wrongful, when the Company filed its 2013 Form 10-K at the end of February, signed by Schorsch, Block, and each of the directors who voted to terminate the 2013 OPP, it made no mention of all the awards being converted and distributed. In fact, the Form 10-K stated that the only portion of the plan awards that were locked in was awards earned in 2013, and that all other awards would be forfeitable if unearned. Schorsch and Block signed this disclosure notwithstanding that they already had personally received distributions worth several million dollars from the conversion of all plan units and therefore knew the disclosure to be false. At their depositions, the directors who had voted to terminate the 2013 OPP testified that they believed the Form 10-K to accurately describe their action.

105.    Accordingly, during discovery, Derivative Plaintiffs developed significant evidence that the acceleration of the full 2013 OPP for a benefit of approximately $104,300,000 to Schorsch, Kahane, Weil, and Block, was unauthorized by the Board, violated the plan documents, and was concealed from the public.

**M.    Plaintiffs' Retention Of And Work With Experts**

106.    Given the complexity of the allegations in the Derivative Action, Derivative Plaintiffs determined it would be necessary to their prosecution of the claims to retain highly qualified experts to provide support for their claims of liability and damages. Derivative Counsel worked extensively with highly experienced experts to inform them of the claims and evidence, analyze the evidence, and assist the experts in the preparation of their reports in this action. Expert reports in the Derivative Action were not scheduled to be exchanged among the parties until after

resolution of the Securities Class Action.  Nonetheless, Derivative Plaintiffs retained the following individuals as experts in the following fields, both of whom were identified in a November 15, 2018 filing with the Court:

### 1.    Carl S. Saba, MBA, CVA

107.    Mr. Saba is a partner at Heming Morse LLP, a firm specializing in forensic and financial consulting.  Mr. Saba is an expert in business valuation, valuation of intellectual property, and other intangible assets, and valuation of options and other derivatives.  He has served as an expert and testified on civil litigation issues, including economic damages, shareholder actions, buyout disputes, business interruption, and fraud claims.

108.    Using evidence developed in discovery, Mr. Saba and his team worked with Derivative Counsel to create detailed analyses of the harm caused to VEREIT by the related-party transactions identified in discovery, as well as by the manipulation of AFFO.  Mr. Saba's analyses of these categories of damages including fully modeling the costs incurred by VEREIT due to the AFFO fraud and Audit Committee investigation, and valuing the consideration obtained by Schorsch, Kahane, Weil, and Block as a result of the 2013 OPP conversion and the inflated ARCT III Promote payment.  Derivative Plaintiffs used these analyses during the deposition process to refine their examinations, in opposing the summary judgment motions, and during settlement negotiations.

109.    Mr. Saba was prepared to author a report opining on damages in the Derivative Action, and to sit for a deposition and testify at trial if necessary.

### 2.    Deborah A. DeMott, David F. Cavers Professor of Law at Duke University School of Law

110.    Professor DeMott is a nationally-known corporate governance expert who has provided expert services in numerous high-profile derivative actions.  Professor DeMott focuses

her scholarship and teaching on the law of agency, business organizations, and fiduciary obligation.   In addition to numerous articles, Professor DeMott is the author of a treatise, *Shareholder Derivative Actions*, initially published in 1987 and updated annually and a casebook, *Fiduciary Obligation, Agency and Partnership*, published in 1991.

111.   Professor DeMott assisted counsel for the Derivative Plaintiffs in focusing on the obligations owed by directors and officers of Maryland corporations and the basis for violation of such duties.  Derivative Counsel remained in close communication with Professor DeMott regarding VEREIT's corporate governance deficiencies at issue in the Derivative Action.

112.   Professor DeMott was prepared to author a report opining on corporate governance issues in the Derivative Action, and to sit for a deposition and testify at trial if necessary.

### N.    Summary Judgment Briefing and Decision

113.   As depositions progressed, the Court conducted several status conferences during which it set the schedule for the Derivative Action moving forward.  On June 11, 2018, the Court set a trial date in the Securities Class Action, but stated that while "[i]t's useful to have [the Derivative Action and Securities Class Action] coordinated for discovery … there are different issues presented."  June 11, 2018 Status Conference Transcript at 17:2-5.  The Court explained that, as a result, the Derivative Action would be severed from the Securities Class Action for trial purposes.  However, at a status conference on November 29, 2018, the Court explained that summary judgment briefing in the Derivative Action would remain on the same schedule as the Coordinated Actions.  Under the schedule, opening briefs would be due on February 8, 2019.

114.   Notwithstanding that briefing dates were set over two months prior, on February 1, 2019, defendants filed a letter with the Court requesting that summary judgment briefing in the Derivative Action be deferred until after a ruling on the summary judgment or other final judgment

in the Securities Class Action.  ECF No. 175.  Notably, the letter stated that *again* VEREIT's management requested to defer prosecution of the Derivative Action and supported defendants' request.  On February 4, 2018, Derivative Plaintiffs filed a letter with the Court opposing defendants' request to defer briefing and requesting that the Court maintain the existing schedule for summary judgment briefing in the Derivative Action.  On February 5, 2018, the Court denied defendants' request and ordered that the summary judgment briefing schedule remain in place.

115.    On February 8, 2019, the Derivative Plaintiffs filed motions for summary judgment against Block and McAlister.  The same day, all seven Individual Defendants filed summary judgment motions against the Derivative Plaintiffs in five separate briefs.

116.    In their motion for summary judgment against Block, Derivative Plaintiffs argued that due to his conviction by a jury, Block was collaterally estopped from denying the conduct of which he was convicted.  As a result, there was no genuine issue of material fact that each of the elements of the breach of fiduciary duty claims against him were fulfilled.  As to the first element, whether a duty existed, Block was VEREIT's Chief Financial Officer, there was no question that he was a corporate fiduciary.  In order to establish a non-exculpated breach of his duties, Derivative Plaintiffs were required to establish that he had acted with active and deliberate dishonesty or retained an improper benefit.  The conduct of which Block was convicted, filing false statements with the SEC and committing securities fraud, fulfilled the active and deliberate dishonesty requirement.  Finally, Derivative Plaintiffs argued, there was no genuine question whether the Company had been harmed by Block's conduct.

117.    In their motion against defendant McAlister, Derivative Plaintiffs argued that she too was estopped from contesting the conduct to which she had pled guilty.  Specifically, in her guilty plea and allocution before this Court, McAlister admitted to participating in the insertion of

a false, "plugged" number into the Company's second quarter 2014 AFFO table, and admitted that prior to the filing of the Company's first quarter 2014 results, she knew the first quarter AFFO results were erroneously inflated.  Derivative Plaintiffs asserted that McAlister clearly owed fiduciary duties to the Company as its Chief Accounting Officer.  The conduct to which she had admitted was definitionally active and deliberate dishonesty, and the public record and financial statements were replete with evidence that VEREIT had been harmed by the AFFO fraud.

118.    Of the Individual Defendants' motions filed against Derivative Plaintiffs, the most comprehensive was the brief filed by defendants Schorsch, Kahane, and Weil, styled the motion for summary judgment of the "AR Individuals."  In their brief, the AR Individuals argued that they were entitled to summary judgment on all claims arising from alleged AFFO misstatements, and, separately, that they were entitled to summary judgment on Derivative Plaintiffs' unique self-dealing and related-party transactions claims.  As a global matter, the AR Individuals asserted that no stand-alone breach of fiduciary duty claim exists under Maryland law, and so the entire Derivative Action should be dismissed on that basis, citing *Kann v. Kann*, 690 A.2d 509, 521 (Md. 1997).

119.    Additionally, the AR Individuals argued that the related-party transactions at issue were all subject to Maryland's safe harbor statute, under which related-party transactions approved by an informed majority of disinterested directors are insulated from attack.  Further, even if the safe harbor was inapplicable, there was no genuine issue of material fact that the transactions were fair to the Company.  The AR Individuals identified the several related-party transactions that they argued could not have been breaches of fiduciary duties, including: (1) the ARCT III Promote; (2) the 2013 OPP; (3) certain allegedly fraudulent agreements for the purchase by VEREIT of assets;

(4) payments made to a related party of VEREIT, RCS Capital; and (5) a separate incentive performance plan called the 2014 Outperformance Plan.

120.    The respective summary judgment motions of Kay and Beeson argued that Derivative Plaintiffs could not adduce legally sufficient evidence that Kay acted with active and deliberate dishonesty or received an improper benefit.  Kay and Beeson also both parroted the AR Individuals' argument that stand-alone breach of fiduciary duty claims do not exist under Maryland law.

121.    Finally, although he had no hope of prevailing on summary judgment, defendant Block filed a three-page brief in support of his motion for summary judgment primarily joining in the arguments of the AR Individuals.  ECF No. 189.

122.    On March 16, 2019, the parties filed their oppositions to the motions for summary judgment.  Defendant Block argued, as the AR Individuals had, that Derivative Plaintiff's stand-alone claim for breach of fiduciary duty was not recognized under Maryland law, that he could not be "entirely" estopped from contesting his conduct in manipulating the second quarter 2014 AFFO results, and that VEREIT, the nominal defendant in the Derivative Action, should not be permitted to recover for its own purported wrongdoing.  McAlister also argued that Derivative Plaintiffs' claims were not recognized under Maryland law.  In the alternative, she argued that she was not estopped from contesting her conduct in the first quarter of 2014 or whether VEREIT had been harmed, apparently conceding that she could not deny her conduct in the second quarter of 2014 was active and deliberate dishonesty.

123.    In opposition to the motion filed by the AR Individuals, Derivative Plaintiffs argued that derivative claims for stand-alone breach of fiduciary duty do occur under Maryland law, as demonstrated by case authority and Md. Code Ann., Corps. & Ass'ns § 2-405.1.  Derivative

Plaintiffs argued that the AR Individuals misconstrued *Kann* and that subsequent Maryland Court of Appeals cases applying it clearly established that stand-alone claims for breach of fiduciary duty exist under Maryland law.  Derivative Plaintiffs argued that the AR Individuals failed to carry their burden on the motion to dismiss AFFO-related claims because their argument consisted of no more than referring to their brief filed in the Securities Class Action and did not address how a reasonable jury could not possibly conclude that they had breached their fiduciary duties.

124.    With respect to the AR Individuals' motions regarding the related-party transactions, Derivative Plaintiffs argued that the related-party transactions were not protected by the Maryland statutory safe harbor.  Critically, the ARCT III Promote miscalculation, the Asset Purchase & Sale Agreements, and the improper 2013 OPP acceleration violated the terms that had been approved by the Board and could not possibly avail themselves of the safe harbor.  Moreover, Derivative Plaintiffs argued, even if the Board had approved the AR Individuals' conduct, there were no disinterested directors on the Board at the time because each director sat on other AR Capital-affiliated boards.

125.    Opposing defendant Beeson's motion, Derivative Plaintiffs referred to evidence in the record that Beeson learned of AFFO calculation errors during the second quarter of 2014 and learned that the first quarter 2014 AFFO results were incorrect but allowed the Company to issue the incorrect second quarter 2014 results.  Derivative Plaintiffs argued that this evidence raised, at a minimum, a genuine issue of material fact regarding as to whether she had acted with active and deliberate dishonesty.

126.    Likewise, in opposing defendant Kay's motion, Derivative Plaintiffs referred to evidence that Kay learned VEREIT had been reporting incorrect AFFO results, directed employees to leave known errors uncorrected, and communicated on several occasions with Block and

Schorsch on the night Block and McAlister inserted the fraudulent second quarter 2014 AFFO plug.

127.    During summary judgment briefing in the Derivative Action, the parties collectively filed with the Court over 1,000 pages of briefing and related papers, and 600 separate exhibits.  The Court heard argument on the summary judgment motions on April 17, 2019.  On May 10, 2019, the Court denied all summary judgment motions in the Derivative Action without prejudice, allowing the parties to reassert such motions at a later time.

### O.    Mediation Efforts, Settlement Negotiations, And Preliminary Approval Of The Settlement

#### 1.    Initial Mediation

128.    On March 16 and 17, 2017, the Parties conducted a mediation session with the Honorable Layn R. Phillips, United States District Judge (Ret.), an experienced mediator of complex disputes.  In advance of the mediation session, Derivative Plaintiffs dedicated substantial efforts to preparing a comprehensive and persuasive mediation statement setting forth the facts relevant to the claims, analyzing applicable law, and measuring potential damages based on the limited information available at the time.  Derivative Plaintiffs retained an accounting expert to aid in the development of a damages model.  The Derivative Plaintiffs submitted a confidential mediation statement to Judge Phillips on February 16, 2017, and a reply mediation statement on March 2, 2017.  At the request of Judge Phillips, on March 10, 2017, the Derivative Plaintiffs additionally submitted a draft settlement term sheet.

129.    At the time of the initial mediation, discovery had only just begun in the Coordinated Actions.  In total, there were dozens of parties represented by different counsel present at the mediation.  Although the many actions were all technically separate from one another, they involved varying levels of factual overlap.  Due this complex dynamic, and the fact that the

government criminal and regulatory probes were ongoing, significant progress toward settlement was elusive. Although the parties expended significant time and effort preparing for and attending the two-day mediation, the session ended without a resolution.

130. Nearly two years of intense litigation passed without any renewed attempt to resolve the Derivative Action.

## 2.   One Individual Defendant Requests A Settlement Demand

131. In December 2018, near the end of depositions, Derivative Counsel was contacted by counsel for one of the Individual Defendants through the mediator, Judge Phillips. That Individual Defendant's counsel requested that Derivative Plaintiffs provide him or her with a settlement demand targeted at that individual alone. Judge Phillips made clear that this request was to be held confidential.

132. Following this contact, Derivative Counsel, in coordination with their forensic accounting expert, Carl Saba, worked to create a comprehensive damages analysis. One of several complex issues presented by the request for an individual settlement demand, was that under Maryland law, defendants in a derivative action may be held joint and severally liable, making the issue of apportioning liability among defendants for settlement demand purposes more difficult. For this reason, among others, Derivative Counsel determined that Derivative Plaintiffs could not make a settlement demand to one Individual Defendant alone because it would be impossible to only settle with one individual unless the settlement payment represented an amount sufficiently large as to settle the entire action.

133. In January 2019, while Derivative Counsel were working with Mr. Saba to develop the damages model in preparation for their meeting with Judge Phillips, they were contacted by attorneys from Milbank, VEREIT's counsel in the Securities Class Action. Milbank inquired

whether Derivative Plaintiffs were engaged in any settlement discussions with any of the Individual Defendants, and stated that if there were settlement discussions, VEREIT's current management would like the opportunity to provide input. The attorneys from Milbank conceded that Derivative Plaintiffs were responsible for prosecuting the Company's claims, but stated current management also had an interest in obtaining a good outcome. Derivative Counsel was bound by the agreement to keep the solicitation for the settlement demand in confidence, and had not yet responded to the inquiry, or even confirmed that they would, and therefore did not confirm the existence of any negotiation with Individual Defendants.

134. On February 2, 2019, Derivative Counsel met for several hours with Judge Phillips and presented to him their analysis of damages in the Derivative Action. This analysis, prepared with significant input from Mr. Saba, identified several categories of damages suffered by VEREIT due to the wrongdoing alleged in the Derivative Action. For each category, the analysis identified the maximum achievable number if all valuation assumptions were made in favor of Derivative Plaintiffs, the minimum achievable number, if all valuation assumptions were made in favor of defendants, and an estimated reasonable recovery for each category applying a litigation risk discount based on factors, including the strength of evidence in the record, which party would have the burden at trial, and the remedies available under Maryland law. During the meeting with Judge Phillips, Derivative Counsel gave a detailed presentation, and Judge Phillips asked questions. Following the presentation, Judge Phillips asked if he could convey the information provided by Derivative Counsel to counsel for certain of the Individual Defendants and was told he could.

135. In early July 2019, Derivative Counsel was contacted again by VEREIT's counsel in the Securities Class Action regarding whether there had been any material progress toward settlement in the Derivative Action, which there had not been. After speaking by phone on

multiple occasions, Milbank and Derivative Counsel agreed that it would be productive for Derivative Counsel to meet with VEREIT's current management and discuss damages in the Derivative Action.

136.    On July 16, 2019, Derivative Counsel met with VEREIT's Chief Executive Officer, General Counsel, and outside counsel from Milbank.   Derivative Counsel made a detailed presentation regarding the claims alleged in the Derivative Action and Derivative Plaintiffs' calculation of damages.   During the meeting, Derivative Counsel, answered questions from VEREIT's CEO, General Counsel, and outside counsel regarding particular theories of harm and the calculation of damages.  At the conclusion of Derivative Counsel's presentation, the attendees engaged in a frank discussion regarding the harm incurred by the Company due to the facts at issue in the Derivative Action and VEREIT's interest in resolving the Derivative Action and other pending litigation.

137.    On August 15, 2019, Derivative Counsel attended a second mediation session before Judge Phillips at which counsel for the Company and each of the defendants were present. While the mediation session lasted into the night, it concluded without a resolution of the Derivative Action. Marginal progress occurred however, as it became clear there could be no resolution of the Securities Class Action if there was not also a resolution of the Derivative Action.

138.    Following the mediation, on Saturday, August 17, 2019, VEREIT's current management requested to meet with Derivative Counsel.  On August 18, 2019, Derivative Counsel met for a second time with VEREIT's CEO, General Counsel, and counsel from Milbank.  During the meeting, the parties discussed the structure of a potential resolution of the Derivative Action in which the Individual Defendants provided a payment into a global settlement that would significantly reduce the amount VEREIT would be required to pay to settle the Securities Class

Action.  During the meeting, there was a discussion of business justifications for such a settlement, whether such a structure would be achievable, and potential harm to the Company if it was required to continue litigating the Securities Class Action.

139.    Over the following weeks, Derivative Counsel, VEREIT's counsel, and counsel for the Individual Defendants engaged in further arm's-length negotiations regarding the terms of a potential resolution of the Derivative Action.  These negotiations culminated in the parties entering into a memorandum of understanding to settle the Derivative Action on September 6, 2019.

140.    Following additional negotiations, the parties exchanged multiple drafts of and ultimately executed the Stipulation and Agreement of Settlement on September 27, 2019. Derivative Plaintiffs filed their unopposed motion for preliminary approval of settlement on September 30, 2019.

141.    On October 4, 2019, the Court entered an order preliminarily approving the Derivative Settlement.  ECF No. 282-84.

## III.    THE RISKS OF CONTINUED LITIGATION

142.     The Derivative Settlement provides immediate and certain benefits to VEREIT in the form of the $286,500,000 benefit, guaranteed by the supplemental agreement, the release of counterclaims, and the termination of onerous indemnification obligations.  There were significant risks that VEREIT might recover substantially less than $286,500,000 - or nothing at all - if the case did not settle and proceeded on to a trial, followed by inevitable appeals.  The result of which would have been that VEREIT would have been required to raise more capital to meet its obligation in the class settlement.  Prior to trial and a litigated verdict, the Derivative Plaintiffs faced immediate risks related to the completion of expert discovery, counterclaims that Grant Thornton intended to assert against the Company in the Derivative Action, and the possibility that

the Individual Defendants would renew their motions for summary judgment, which the Court had denied without prejudice.  In renewed summary judgment motions and at trial, defendants would have raised formidable challenges to liability and damages in this case.  Thus, absent the Derivative Settlement, there was no guarantee that the Derivative Plaintiffs would later achieve *any* recovery for VEREIT, let alone one providing greater benefits than the Derivative Settlement.

### A.   Renewed Summary Judgment Motions

143.   When the Court denied the Individual Defendants' motions for summary judgment, it did so without prejudice to their renewal at a later date.  The Individual Defendants were likely to renew their motions, arguing, as they did in their original motions: (1) Maryland law does not recognize a stand-alone breach of fiduciary duty claim; (2) the related-party transactions were shielded by the Maryland safe harbor; and (3) even if the safe harbor didn't apply, the transactions were substantively fair to VEREIT.  While Derivative Plaintiffs believe they were likely to prevail on these motions, they faced significant risk that the Individual Defendants would convince the Court to rule in their favor on one or more of these arguments, which would have resulted in complete dismissal of the case or narrowing of the claims and reduction in potential damages.

### B.   Expert Discovery And Daubert

144.   Because the Court delayed the filing of expert reports and expert discovery in the Derivative Action, Derivative Plaintiffs would still be required to file their reports and submit their experts to discovery by the Individual Defendants.  The Individual Defendants likely would have attempted to disqualify one, if not both, of Derivative Plaintiffs' experts.  If the Individual Defendants were able to convince the Court that one or both experts should be excluded, Derivative Plaintiffs' ability to prove liability and damages would have been significantly harmed.

### C. Renewed Attempts To Take Control Of The Derivative Action By Management

145. VEREIT's management opposed prosecution of the Derivative Action since the action was first filed. On three separate occasions, VEREIT's management attempted to prevent Derivative Plaintiffs from prosecuting the claims, arguing that their prosecution would harm the Company: (1) when it refused the demand; (2) when it moved to dismiss pursuant to Rule 23.1; and (3) when it created a special litigation committee and attempted to stay the action. VEREIT's management was never successful in regaining control over the Derivative Action, but Derivative Plaintiffs believe management could likely have attempted before trial to halt to the prosecution of the claims. If management were to convince the Court that management should be allowed to stop the prosecution or settle the claims, Derivative Plaintiffs would have lost the benefit of nearly five years of litigation.

### D. Risks Of Proving Liability At Trial

146. In addition to the major hurdle of withstanding any renewed summary judgment motions, Derivative Plaintiffs faced several substantial risks establishing defendants' liability at trial.

#### 1. Risks of Proving Knowledge of AFFO Misstatements

147. Derivative Plaintiffs faced the real risk that defendant Schorsch, the Individual Defendant with the deepest pockets to pay a judgment, would be able to convince the factfinder at trial that he lacked knowledge of the AFFO misstatements. Even if they proved that Schorsch had breached his fiduciary duties, Maryland law required Derivative Plaintiffs to prove that his breaches were committed with active and deliberate dishonesty, effectively actual knowledge of falsity. Throughout this litigation, Schorsch argued that he lacked actual knowledge of the AFFO fraud, and in his deposition, he denied directing the second quarter 2014 AFFO plug.

52

148.    Although Derivative Plaintiffs uncovered significant evidence during discovery that supported a finding that Schorsch knew about both the AFFO miscalculations prior to the second quarter 2014, and the second quarter plug, defendants would have presented substantial facts and counterarguments in opposition.  For example, at his deposition, Schorsch testified that he did not understand the differences between the various methods of AFFO calculation employed by VEREIT and that he did not know Block had inserted the plug in the second quarter 2014 results.  A factfinder could have determined that Schorsch's testimony was credible and that he did not act with active and deliberate dishonesty in connection with the AFFO misstatements. Such a finding would have prevented Derivative Plaintiffs from establishing non-exculpable wrongdoing by Schorsch in connection with a major category of wrongdoing at issue in the Derivative Action.

149.    Were Schorsch to convince the factfinder that his conduct in connection with the AFFO misstatements was not active and deliberate dishonesty, Weil and Kahane would likely have been successful in doing the same because each of them had less direct involvement with AFFO at times when it was misstated.  The failure to establish non-exculpable wrongdoing by Schorsch, Kahane, and Weil would have created a situation where, even had Derivative Plaintiffs prevailed against the other Individual Defendants, collectively they would have been unable to satisfy a judgment likely to be several hundred million dollars.

### 2.    Risks of Proving Liability for Related-Party Transactions

150.    Derivative Plaintiffs faced significant risks to establishing liability for the related-party transactions.  In order to prove liability for the related-party transactions, Derivative Plaintiffs would have had to overcome three significant hurtles: (1) establishing that Individual Defendants were not shielded from liability for the transactions by Maryland's safe harbor statute,

Md. Code § 2-419; (2) even if the safe harbor was not available, the Individual Defendants could carry their burden to prove the transactions were fair to the Company; and (3) Maryland law would require Derivative Plaintiffs to prove that any benefit obtained was improper to avoid VEREIT's exculpatory charter provision.  As they argued in their summary judgment motions, Schorsch, Kahane, Weil, and Block would likely assert at trial that the transactions were subject to the safe harbor, they were substantively fair to VEREIT, and that there was no improper benefit.

151.    Derivative Plaintiffs developed a significant factual record supporting their allegation that the transactions, especially the ARCT III Promote and the 2013 OPP were unauthorized and facially violated the applicable governing documents.  However, Individual Defendants would argue that the transactions were properly approved.  Significant risk existed that a factfinder would conclude that the transactions were shielded by the safe harbor, and if the safe harbor applied, proving that the Individual Defendants retained improper benefits would be nearly impossible.

152.    If Derivative Plaintiffs succeeded in avoiding the safe harbor, the Individual Defendants could still prove that the transactions were fair to VEREIT.  Although Derivative Plaintiffs believe that substantial evidence exists to the contrary, the Individual Defendants would have argued that the fees were within the range of similar fees paid in the market and that they were substantively fair to VEREIT as a result.  If the transactions were fair to the Company, it would be very difficult for Derivative Plaintiffs to prove that the Individual Defendants received improper benefits as a result.  A factfinder could determine that even though the related party transactions were not authorized by the Board and violated the applicable contracts, they nevertheless were substantively fair to the Company, throwing into substantial doubt whether any benefits could have been improper.

### 3.       Risks Posed by Battle of Experts

153.    Due to the complex nature of the Derivative Action, Derivative Plaintiffs planned to rely on expert testimony to establish key elements of their allegations.  Derivative Plaintiffs would have used Professor DeMott's testimony, to among other things, establish the absence of a safe harbor due to the conflicts on VEREIT's Board, and Derivative Plaintiffs would rely on Mr. Saba's testimony to establish damages.

154.    Although the Individual Defendants identified no affirmative experts in the Derivative Action, they would likely have retained rebuttal experts to respond to the testimony of Mr. Saba and Professor DeMott.  Defendants' experts would likely have opined that VEREIT's governance and Board conflicts were within the normal practice of similarly sized REITs, and that the damages alleged by Derivative Plaintiffs were significantly less than opined by Mr. Saba.

155.     These competing and complex expert opinions would have led to a risky battle of the experts, with Derivative Plaintiffs' success at trial potentially hinging on which expert(s) the factfinder decided were most persuasive.  In a case such as the Derivative Action, where liability and damages could potentially turn on contradictory expert opinions, the inevitable battle of the experts posed real and substantial risks at trial.

### 4.       Risks of Proving Damages at Trial

156.     Even assuming that Derivative Plaintiffs overcame the risks and successfully established liability, they would have confronted considerable challenges in establishing their damages calculations at trial.  The Derivative Action alleged a complex set of harms arising from two categories of wrongdoing, the AFFO fraud, and the unauthorized related party transactions. Calculating the amount of the harm to the Company would rely on a complex model resting on numerous valuation assumptions.

157.    To quantify the damages to VEREIT from the AFFO fraud, Derivative Plaintiffs would look not only to amounts paid in securities fraud settlements, but also to harms to the Company flowing from the fraud.  These harms potentially included goodwill impairments and funds expended to investigate the fraud, respond to governmental investigations, and indemnify Individual Defendants for their defense costs.  Individual Defendants undoubtedly would have argued that these damages were not available for recovery in the Derivative Action for several reasons, including that they were too attenuated to have been directly caused by the fraud, and that these calculations relied on the Company's own disclosures of the harm and, as the effective plaintiff in the Derivative Action, the disclosures were unreliable and self-serving.

158.    To quantify damages to VEREIT from the related-party transactions, Derivative Plaintiffs would rely on the analysis of Mr. Saba.  Because much of the consideration paid to Individual Defendants in the related party transactions were in the form OP Units in VEREIT's limited partnership, valuing the consideration in current dollars would rely on complex valuation procedures.  Individual Defendants would likely argue that the valuations proffered by Derivative Plaintiffs were excessive or incorrect and that the true value of the wrongfully paid consideration was significantly less.

159.    The parties developed and would have presented competing evidence on these issues, including competing expert evidence.  While Derivative Plaintiffs believed they had the better arguments, the risk remained that Individual Defendants could have defeated certain categories of damages, or significantly diminished damages.

### 5.    The Individual Defendants' Defenses

160.    At trial, the Individual Defendants would likely raise many of the defenses they raised in the motion for summary judgment briefing in the Securities Class Action and the

Derivative Action.  In particular VEREIT's financial statement following the restatement are significant evidence of the harm to the Company at issue in the Derivative Action.  The Individual Defendants would likely argue that the quantification of financial errors and other disclosures regarding the Audit Committee investigation found in VEREIT's SEC filings could not be admitted against them at trial because they had been deprived discovery of the Audit Committee investigation due to a Court's ruling that the Company could assert privileges and avoid producing Audit Committee investigation materials in discovery.  Although the same ruling prevented Derivative Plaintiffs from accessing the Audit Committee investigation materials, the claims at issue in a trial would be on the Company's behalf, and the Individual Defendants would likely argue that Derivative Plaintiffs were using the Audit Committee's results as a sword on the Company's behalf while the Company simultaneously refused to produce the underlying materials.

161.    Similarly, the Individual Defendants would likely argue that the Company's claims against them were barred by the *in pari delicto* doctrine because VEREIT was a defendant in the Securities Class Action and therefore akin to a co-conspirator.  While Derivative Plaintiffs believe there is a clear exception to the *in pari delicto* doctrine for derivative actions, a risk existed that some or all of the claims for wrongdoing alleged on behalf of the Company in the Derivative Action could have been precluded under the doctrine.

### 6.    Post-Trial Motions and Appeals

162.    Even if Derivative Plaintiffs succeeded in obtaining a judgment at trial, the Individual Defendants almost certainly would have pursued post-trial motions to overturn the verdict and an appeal.  Individual Defendants are well-funded (through indemnity agreements obligating VEREIT for litigation costs) and represented by experienced counsel who would continue to mount a zealous and thorough defense to the Company's claims for relief not only

before and during a full trial on the merits, but afterward, through post-trial motions and appeals. On their inevitable appeal, the Individual Defendants would have an opportunity not only to seek to overturn the judgment on the verdict (assuming that Derivative Plaintiffs succeeded at trial) but also to revisit the legal issues they had raised in their earlier dispositive motions.

## IV.   SETTLEMENT IS REASONABLE IN LIGHT OF RISKS AND POTENTIAL RECOVERY

163.   Given the significant litigation risks described above, including the risks that the Derivative Plaintiffs would recover a lesser amount—or nothing at all—if the action were further litigated, Derivative Plaintiffs and Derivative Counsel believe that the Derivative Settlement balanced against such risks represents an excellent result for VEREIT.

164.   The Derivative Settlement obtained by Derivative Plaintiffs is an excellent result, reached after extensive, arm's-length negotiations that was not the product of any collusive agreement among counsel.  Further the Derivative Settlement was negotiated and overseen with the assistance of Judge Phillips, who is highly experienced in mediating complex disputes. As set forth above, the process that culminated in the Derivative Settlement was undeniably fair and was not the product of any collusive agreement amongst counsel.

165.   Derivative Counsel has decades of experience in shareholder representative litigation and their skills have been recognized by courts across the nation in dozens of appointments to act as lead counsel in shareholder derivative and class actions and orders approving settlements.  The credentials of all plaintiffs' firms are annexed as exhibits to the individual declarations filed by the firms and attached hereto as Exhibits D to Q.

166.   VEREIT, the Individual Defendants, and Grant Thornton were represented vigorously in the settlement negotiations by preeminent corporate defense firms.

167.    The parties' counsel thoroughly tested each other's factual and legal positions during every stage of the litigation. Significantly, by the time the parties agreed to the Derivative Settlement, the Derivative Action had been intensely litigated for over four years.  As set forth herein, by the time of the Derivative Settlement, Derivative Plaintiffs had survived numerous dispositive motions, secured the dismissal of an appeal to the U.S. Court of Appeals for the Second Circuit, successfully opposed three separate attempts by VEREIT's current management to half prosecution of the Derivative Action, conducted extensive document discovery and depositions, retained trial experts, and were prepared to try the Derivative Action.  Intimately familiar with the strengths and weaknesses of each side's position, Derivative Counsel used this knowledge to the advantage of their clients.

168.    In addition, the negotiation process that resulted in the Derivative Settlement was neither short nor simple. Negotiations between Derivative Counsel and counsel for VEREIT, Individual Defendants, and Grant Thornton occurred over an extended period, included multiple mediation sessions, in-person meetings, email exchanges, and telephone discussions, as well as the active exchange and negotiation of proposals. It was only after obtaining and securing the agreements by the Individual Defendants and Grant Thornton to collectively contribute $286.5 million towards a global settlement, enter the secondary agreement, release all potential counterclaims, and terminate ongoing indemnification obligations that Derivative Plaintiffs were prepared to settle this hard-fought litigation.

169.    Based upon their investigation into the claims and the underlying events alleged in the Derivative Action, legal research, extensive consultations with experts, as well as VEREIT's current management, and insight gained over the years of litigation, Derivative Plaintiffs and their

counsel concluded that the terms and conditions of the Derivative Settlement are fair, reasonable and adequate and in the best interests of the Company.

170.   VEREIT's current Board, none of whom is a defendant in the Derivative Action, and thus none of whom has a personal interest in the Derivative Settlement, with the advice of its counsel, Milbank and Wachtell, Lipton, Rosen & Katz, exercised its business judgment in determining that the Derivative Settlement serves VEREIT's best interests. *See* VEREIT's Statement in Support of Derivative Settlement at 2 ("After its due diligence, the Board determined that settlement, and the chance to focus on growing its business free of these litigations, was clearly in VEREIT's interest.").

171.   Derivative Counsel met twice with VEREIT's senior management and discussed with senior management the potential benefits to the Company of a resolution of the Derivative Action and the Securities Class Action.  VEREIT's management expressed to Derivative Counsel that numerous compelling business justifications exist for the Derivative Settlement, including that a global resolution will remove uncertainty in the market regarding the Company's exposure in the Coordinated Actions and that entering the global resolution now could provide significant financial benefits to VEREIT due to the options currently available for financing the global settlement. Accordingly, in the opinion of VEREIT's current management, the Derivative Settlement provides significant business benefits for VEREIT and its shareholders.

172.   The Derivative Settlement confers substantial benefits on VEREIT and its shareholders. First, upon final approval of the Derivative Settlement, VEREIT shall receive a financial benefit from a $286.5 million payment into the global settlement by the Individual Defendants and Grant Thornton. *See* Stipulation at §V.  Such a pecuniary recovery significantly exceeds the average recovery for a derivative action and is particularly noteworthy given the

litigation risks in this case. *See infra* ¶¶ 143-55.  Significantly, the Derivative Settlement represents the largest individually funded derivative settlement.  In comparison to amounts paid to resolve derivative claims in similarly large and complex actions, especially where no insurance was available, the consideration obtained in the Derivative Settlement is without precedent.  As VEREIT submitted to the Court, "While most class actions are settled with no contributions from individual defendants, in this case, non-VEREIT defendants shouldered over 25% of the cost of the settlement, or a total of $286.5 million." VEREIT's Statement in Support of Settlement at 2. Thus, this financial recovery represents an outstanding result for VEREIT.

173.    But for resolution of this Derivative Action, the Individual Defendants and Grant Thornton would not have agreed to any contribution to the settlement of the Securities Class Action.  Without these contributions, VEREIT would have been required to make a substantially larger payment to settle the Securities Class Action, and may not, in fact, have been able to reach resolution.  Stipulation, at § III.  "The Individual Defendants and Grant Thornton made clear throughout the settlement negotiations that but for resolution of VEREIT's claims at issue in the Derivative Actions, they would not agree to any contribution to the Class Settlement . . . and Grant Thornton would not agree to provide VEREIT with a release as to counterclaims Grant Thornton intended to assert against VEREIT in the Derivative Actions." *Id*.  The settlement of the Derivative Action was therefore the leverage by which the contributions of the Individual Defendants and Grant Thornton to the global resolution were secured.  The funds recovered from the Individual Defendants and Grant Thornton represent an offset against the much higher amount that VEREIT would have had to pay in order to resolve the Securities Class Action.  Each dollar paid by the Individual Defendants and Grant Thornton represents a savings to VEREIT compared to what VEREIT would have otherwise had to pay to resolve the Securities Class Action.

174.    Independently, the amount recovered by Derivative Plaintiffs serves VEREIT's interests because it is sufficient to compensate the Company for important categories of damages in the Derivative Action.  As part of its work with its forensic accounting team, Derivative Counsel identified maximum damages for VEREIT in excess of $1.2 billion, including: $180 million for audit, litigation, and indemnification costs; $98 million from the ARCT III Promote payment; $104 million for the acceleration of OP units pursuant to the 2013 Out Performance Plan; and $909 million for payment that VEREIT made to resolve the Class and Direct actions.[6]    The $286,500,000 payment by the Individual Defendants and Grant Thornton equals the entire amount spent by the Company on the Audit Committee investigation, indemnification of certain defendants, and expenses for related matters, *plus* a significant percentage of the largest related-party transactions at issue.

175.    As noted by Professor Cox, the Derivative Settlement is "exceptional" based on the empirical data that he marshalled and his experience with shareholder litigation.  Cox Declaration at ¶ 17.

176.    Derivative Plaintiffs submit that the recovery of such a substantial sum, each dollar of which represents a savings for the Company, significantly benefits VEREIT and its shareholders by compensating the Company for wrongdoing alleged in the Derivative Action.

177.    In addition to reducing the amount VEREIT is paying to settle the Securities Class Action, making the settlement of the Securities Class Action possible thereby, the Derivative Settlement also provides substantial benefits to VEREIT and Current VEREIT Stockholders by:

    i.    Securing releases from the Individual Defendants and Grant Thornton, especially from Grant Thornton, without which VEREIT would continue to

---

[6]    The ability to recover payments made by VEREIT to settle the Securities Class Action was in doubt as a result of the bar imposed by the Private Litigation Securities Act of 1995.  Derivative Counsel also identified potential damages related to intangible asset impairment.  However, further refinement of the damage analysis proved that to be unworkable.

bear litigation risk, which VEREIT sought to finally and fully resolve through the global settlement;

ii.    Removing the substantial cost of continued litigation and trial, the risks associated with the outcome of a trial and appeal, and the risk of uncollectable judgments in the event of a judgment favorable to VEREIT; and

iii.    Eliminating the risk of adverse judgments at trial, putting an end to timing uncertainties, and removing the burdens and costs of the Derivative Actions and the Securities Class Action.

*See* Stipulation at § III.

178.    The Secondary Agreement provides that even if approval of the Derivative Settlement by this Court were reversed on appeal, the $286.5 million payment from the Individual Defendants and Grant Thornton would not be returned. While Derivative Plaintiffs do not believe there is any basis to appeal an order that finally approves the Derivative Settlement, the amount of the Individual Defendants' and Grant Thornton's payment is sufficiently large that VEREIT would be substantially harmed were those funds required to be paid back to the Individual Defendants and Grant Thornton, and such a result would likely also cause the Securities Class Action settlement, which is contingent on the settlement of the Derivative Action, to collapse. As a result, the Derivative Settlement provides a substantial benefit to VEREIT and its shareholders by ensuring the payments of the Individual Defendants and Grant Thornton even in case of appeal.

179.    In addition, the Derivative Settlement provides for the agreement by Individual Defendants and Grant Thornton not to assert valuable counterclaims against the Company. If the Court approves the Derivative Settlement, the Individual Defendants and Grant Thornton will release counterclaims that they could have asserted against VEREIT. In particular, in addition to its payment of $49,000,000, Grant Thornton has agreed to release counterclaims that it intended to assert against VEREIT in the Derivative Action. Due to discovery in the Coordinated Actions,

Derivative Plaintiffs were able to make an informed assessment of the liability that VEREIT might

face should Grant Thornton pursue such counterclaims.  Derivative Counsel reviewed hundreds of

thousands of pages of documents produced by Grant Thornton and participated in the depositions

of a half-dozen current and former Grant Thornton employees, examining each of those witnesses.

Derivative Counsel also observed the questioning by Grant Thornton's counsel of former VEREIT

employees, directors, and officers at over two dozen other depositions.  Based upon their review

of the documents, their examination of the Grant Thornton deponents, the examination by other

plaintiffs of Grant Thornton deponents, and the examination by Grant Thornton of VEREIT-

affiliated deponents, Derivative Counsel believe that VEREIT had significant exposure to

counterclaims asserted by Grant Thornton, including whether VEREIT employees made

misrepresentations to Grant Thornton.  As set forth in the Stipulation, the assertion of such

counterclaims by Grant Thornton is not merely a hypothetical: GT *intended* to assert them if not

for the Derivative Settlement. *See* Stipulation, § III.  Based on the foregoing, Derivative Plaintiffs'

Counsel also believe that were Grant Thornton to assert such counterclaims against VEREIT in

the Derivative Action, the potential amount of VEREIT's liability might be significant. Stipulation,

§ III ("Without the release from GT, VEREIT would continue to bear litigation risk, which

VEREIT sought to finally and fully resolve through the global settlement.").

180.    The Derivative Settlement will also benefit VEREIT by relieving it of the

significant expense of continued indemnification of certain of the Individual Defendant's legal

costs in connection with the Derivative Action, the Securities Class Action, and government

criminal and regulatory investigations.  Similarly, the Derivative Settlement will relieve VEREIT

of potentially being required to indemnify certain Individual Defendants for amounts paid to settle

any of the pending Coordinated Actions and government matters, or in a judgment rendered in

those matters.  VEREIT's current management likewise believes that the Derivative Settlement is in the best interests of VEREIT for business reasons.

181.    Since approximately November 2014, VEREIT has been required to advance tens of millions of dollars in legal fees to Schorsch, Weil, Kahane, and Budko.  These legal fees were incurred not only in the defense of those individuals in the Coordinated Actions, but also in internal Company investigations, and federal and state regulatory investigations.  Further, under the terms of the indemnification provision, these individuals can compel VEREIT to indemnify them for amounts paid to settle the Securities Class Action or amounts owed due to judgment in that action. The enforceability of the indemnification provisions was litigated during 2017 and 2018 in an action filed in the Delaware Court of Chancery by certain of AR Capital Parties, and the provision was found by that court to be enforceable.  *See Weil, et al. v. VEREIT Operating Partnership, L.P.*, Court of Chancery of the State of Delaware, C.A. No. 2017-0613-JTL, Memorandum Opinion dated February 13, 2018, attached hereto as Exhibit R.  "It is thus difficult to quantify the financial risk the Company would face absent global resolution of the current litigation." *See* VEREIT's Statement in Support of Derivative Settlement at 8-9.

182.    Because the settlement of the Securities Class Action is contingent on the Derivative Settlement, the Derivative Settlement allows VEREIT to fully and finally put the wrongdoing at issue in the Coordinated Actions behind it and conclude almost five years of active civil litigation, allowing the Company to move forward and devote its focus on growing its business and generating value for VEREIT shareholders. *See In re AOL Time Warner*, 2006 WL 2572114, at *5.

183.    Balancing the numerous benefits, both financial and otherwise, against the risks posed by continuing to litigate, Derivative Plaintiffs were well-justified in agreeing to the terms of the Derivative Settlement.

## V.    DISSEMINATION OF NOTICE AND SHAREHOLDER RESPONSE

184.    The Stipulation entered into by the parties provided for the process of notice that was to be followed after the Court granted preliminary approval of the Derivative Settlement. Such process was followed and notice has been given to Current VEREIT Shareholders.  On October 15, 2019, nine days after the Court's entry of the Preliminary Approval Order, VEREIT caused a press release to be issued that contains the contents of the Long Form Notice, and referred the Current VEREIT Stockholders to VEREIT's Investor Relations webpage, located at http://ir.vereit.com/, for more information, as well as file a current report on Form 8-K with the Securities & Exchange Commission referencing such press release. VEREIT's Investor Relations webpage included a link to the afore-mentioned press release, this Stipulation, and the Preliminary Approval Order.  On October 8, 2019, four days after the Court's entry of the Preliminary Approval Order, VEREIT caused the Summary Notice to be published once in *Investor's Business Daily*.  Derivative Plaintiffs believe the contents of the Notice and the manner of the notice procedures constituted adequate and reasonable notice to Current VEREIT Stockholders pursuant to applicable law and due process.

185.    The Notice informed Current VEREIT Shareholders of their right to object to the proposed Derivative Settlement and Plaintiffs' Counsel Fee Award by December 31, 2019. As of the date of this Declaration, Plaintiffs' Counsel are not aware of any objections to the

proposed Derivative Settlement or Derivative Counsel's Fee Award. All later-filed objections will be addressed in briefs to be filed with the Court on January 14, 2020.

## VI.    THE FEE AND EXPENSE APPLICATION

186.    In addition to seeking final approval of the Derivative Settlement, Derivative Counsel is also applying for a fee award of $22,920,000, which is 8% of the cash recovery from the Non-VEREIT Settling Defendants and represents a 1.8x multiplier on the collective time incurred by all firms working on the Derivative Action.   Additionally, Derivative Counsel seeks the reimbursement of expenses in the amount of $594,882.47 that have been incurred in connection with the prosecution and resolution of the Derivative Action.   The total amount sought by Derivative Counsel is $23,514,882.  This amount is less than the $26 million in fees referenced in the Notice.

187.    The requested fee and expense award in the Derivative Action is justified in light of the extent and quality of counsel's work, the risks faced by Derivative Counsel, and the benefit secured for VEREIT.  The legal authorities supporting the requested fee and expense award are set forth in the accompanying Fee Memorandum.

188.    Derivative Counsel's fee and expense request has been reviewed by Professor Miller, one of the preeminent scholars in the nation on issues concerning class and derivative attorneys' fees.  The Miller Declaration (attached as Exhibit C) provides empirical data against which Derivative Counsel's fee request may be measured.

### A.    Derivative Counsel's Requested Fee Award Is Fair And Reasonable Under The Second Circuit's *Goldberger* Factors

189.    Based upon the extensive efforts undertaken on behalf of VEREIT over the course of nearly five years of litigation, the benefits of the Derivative Settlement, including  recovery for the $286.5 million benefit to VEREIT paid by the contributing parties, the termination of

VEREIT's continuing indemnification obligations and litigation expenses estimated to be $100 million through trial in the Securities Class Action, and the risks faced by Derivative Counsel working on a contingent basis, I respectfully submit that the both the law of the Second Circuit and the facts of the Derivative Action demonstrate that the request for attorneys' fees in the amount of 8% of the $286.5 million benefit to VEREIT, or $22,920,000, and expenses in the amount of $594,882.47 are justified and should be approved.

### 1.    The Fee is Reasonable in Relation to the Financial Benefit to VEREIT

190.    Derivative Counsel's requested fee of 8% is fair and reasonable.  Empirical evidence demonstrates that courts in this District regularly award fees in the range of 25% to 33% in securities and other complex litigation settlements of comparable size.  Miller Declaration at ¶¶ 42-44.  In fact, Professor Miller performed a comprehensive empirical study of class and derivative action attorneys' fee awards found that "the mean fee percentage award was 27%" in this District. Miller Declaration at ¶ 42.  Moreover, the average percentage fee award for cases in the $200-$300 million range, like this one, is 24.6%.  *Id.* at ¶ 43.  Derivative Counsel's request for 8% of the financial benefit to VEREIT is therefore below the percentage fees regularly awarded in this District and Circuit.

191.    Further demonstrating the reasonableness of the 8% fee request, as set forth herein, Derivative Counsel faced and overcame enormous risks prosecuting the Derivative Action.  These risks included the routine risks of litigation, the heightened risks inherent in derivative litigation, risks related to the complexity and magnitude of the Derivative Action, and the risk that VEREIT's management might eventually be successful in its repeated efforts to prevent and halt the prosecution of the derivative claims.

192.    Derivative Counsel's requested fee of 8% is even more reasonable in light of the substantial quantifiable benefits conferred on VEREIT in addition to the $286.5 million savings: the termination of litigation and indemnity costs, estimated by VEREIT to be $100 million through resolution of the Securities Class Action.  If that additional savings is included in calculating the monetary benefit to VEREIT, the total benefit to the Company would be up to $386.5 million, of which Derivative Counsel's fee request represents less than 6% of the total benefit.

193.    Finally, the 8% fee is reasonable because Derivative Counsel is responsible for the benefits conferred on VEREIT by the Derivative Settlement.  On several occasions the Court cautioned VEREIT that conflicted counsel could not prosecute the Company's claims while simultaneously defending the Company in the Securities Class Action and government probes and stated "[w]ouldn't a derivative plaintiff be in a better situation since he's not conflicted in any way."  As a result, Derivative Counsel bore the tremendous risk and responsibility of prosecuting the Company's claims in a situation where management and its counsel repeatedly attempted to undermine the Company's derivative claims to gain an advantage in the Securities Class Action. While the Court directed plaintiffs in the Coordinated Actions to cooperate in discovery to avoid duplication, and all plaintiffs' counsel studiously observed that direction, plaintiffs' counsel in the Securities Class Action and Direct Actions vigorously pressed their claims *against* VEREIT and the Individual Defendants.  Only Derivative Counsel pressed the Company's claims against the Individual Defendants.  The Court had disqualified VEREIT's defense counsel in the Securities Class Action, and the parade of other law firms the Board retained never appeared at any deposition or participated in any way in the prosecution of the Company's claims.  As a result, when the Contributing Parties state that "but for" resolution of the Company's derivative claims, they would not have made "any contribution" to the global resolution, the savings to VEREIT is due to the

work of Derivative Counsel.  The work of Derivative Counsel saved VEREIT $286.5 million in the global resolution, $100 million in ongoing litigation and indemnification expenses, and conferred other non-monetary benefits.

**2.  The Significant Risks of This Litigation Support the Requested Fee**

194.    The likely complexity, expense, and duration of further litigation, and the risk that it would produce no benefit for VEREIT support the fee request of 8%.  The risks of continued litigation in the absence of the Derivative Settlement are described in detail *supra*, Section III.

195.    In addition to the risks of establishing liability and damages, Derivative Counsel also faced the risk of total non-payment for any of their substantial efforts in pursuing this litigation, because of the work was done on a fully contingent basis.  The responsibility for conducting the litigation was entrusted to Plaintiffs' Liaison Counsel in their Court-appointed role. From the outset, Liaison Counsel and all other Derivative Counsel understood that they were embarking on a complex, expensive, and lengthy litigation with no guarantee of ever being compensated for the substantial investment of time and money the case would require.  To that end, Derivative Counsel were obligated to ensure that sufficient resources were dedicated to the Derivative Action's prosecution, and that funds were available to compensate staff and to cover the considerable costs that an action such as this requires.

196.    The risk of no recovery in complex cases of this type is very real.  I have personally been involved the prosecution of numerous actions, including complex derivative actions, where plaintiffs' counsel expended thousands of hours and advanced significant out-of-pocket expenses in pressing the litigation, yet received no remuneration whatsoever.

197.    The only certainty from the outset of this entirely contingent litigation was that Derivative Counsel would receive no fee without a successful result, and that such a result would

be realized only after expending a long and arduous effort.  Nevertheless, Derivative Counsel assumed the risks associated with pursuing this case, zealously represented the best interests of VEREIT, and brought about substantial benefits for the Company. Under these circumstances, the financial burden on contingent fee counsel is far greater than on a defense firm that is paid on an ongoing basis

198.    To date, Derivative Counsel has received no compensation for the prosecution of the Derivative Action and has dedicated more than 20,000 hours of time representing a lodestar of $12,740,618 and has incurred $594,882.47 in litigation expenses.  Derivative Counsel has thus borne the entirety of the outlay required to obtain the Derivative Settlement without the assurance of payment.  I respectfully submit that the risks of the prosecution of the Derivative Action support Derivative Plaintiffs' fee request.

### 3.    The Magnitude and Complexity of the Litigation Support Derivative Counsel's Requested Fee

199.    If derivative litigation in general is complex and unpredictable, the Derivative Action even more so based on the facts that it was a much larger scale, with more adverse parties, and more complex issues than most derivative actions.

200.    From a procedural perspective, the Derivative Action was exceptionally complex, even in comparison to other derivative litigation.  Prosecution of the Derivative Action involved legal and factual issues arising from a coordinated litigation containing over one dozen separate cases, dozens of parties, third parties, and related entities, Individual Defendants who were adverse to each other, and a nominal defendant with management that repeatedly attempted to interfere in the prosecution of the derivative claims.  These procedural complexities resulted in a massive and convoluted factual record.  During document discovery, over seventy parties and non-parties produced more than 846,000 documents totaling several million pages.  Ever mindful of the

Court's direction not to pursue duplicative lines of questions, Derivative Counsel pursued their discrete theories at thirty-five depositions and remained focused on fiduciary claims throughout the review of million pages of documents reviewed in the Derivative Action alone.   During depositions, well over one thousand exhibits were entered into the record.   In addition to actively prosecuting the Derivative Action, Derivative Counsel closely observed and analyzed prosecution of the Securities Class Action and Direct Actions, as well as the criminal prosecution and trial of Brian Block, and the SEC enforcement actions.

201.   The Derivative Action was also substantively complex, implicating numerous theories of harm subject to various standards of proof and exculpation. The derivative claims were developed through a painstaking analysis of the enormous discovery record, and the similarly large record of Block's trial.   Notably, Derivative Counsel received no benefit from the earlier conducted Audit Committee investigation as VEREIT's outside counsel repeatedly claimed privilege over any work conducted by that committee and refused to permit witnesses to testify about such work. Claims arising from the AFFO fraud alone raised a host of complex issues.   For example, two types of AFFO misstatement occurred: (1) the fraudulent plug in the second quarter 2014 results; and (2) an error due to an improper calculation of AFFO that apparently occurred over several years.   While issues related to the AFFO plug were relatively straight forward because they involved the clearly fraudulent use of an unsupported number in VEREIT's financial statements, the issues related to the improper calculation of AFFO were significantly more complicated.   There is no consensus on how to calculate AFFO, and even the terminology for describing the incorrect way of calculating the metric and the two equally correct ways of calculation was disputed.

202.   Derivative Plaintiffs faced an added dimension of complexity arising from the enormous scale of unauthorized and improper related-party transactions that were at issue only in

the Derivative Action.  During discovery, Derivative Plaintiffs identified claims for self-dealing including the unauthorized acceleration of the 2013 OPP and the ARCT III Promote.  Individual Defendants' wrongdoing in connection with these two transactions had never been publicly disclosed.  Derivative Counsel uncovered the wrongdoing through their review of documents produced in discovery and created a comprehensive record of both the impropriety of both transactions during deposition testimony.  The unauthorized nature of these transactions was not facially evident and piecing together a complete record required detailed reviews of the numerous underlying contracts and side agreements, email correspondence related to the underlying contracts and the transactions, Board minutes during which the Board considered the transactions, and construction of a day-by-day timeline establishing what the Individual Defendants knew, when they knew it, and when they took possession of their ill-gotten gains.  Derivative Counsel's financial expert calculated the Individual Defendants' potential exposure from only the ARCT III Promote and the 2013 OPP acceleration to be in excess of $202 million.  While plaintiffs in all the Coordinated Actions had the benefit of the other plaintiffs' deposition examinations to develop their AFFO theories, which themselves involved very complex accounting issues, the related-party transactions were not at issue in any of the other Coordinated Actions and Derivative Plaintiffs alone shouldered the burden of developing those claims.

203.    I respectfully submit that the Derivative Action was an extraordinarily complicated litigation of singular magnitude, and this factor supports Derivative Counsel's request for 8% of the financial benefit to VEREIT from the Derivative Settlement.

### 4.    The Quality of Representation Supports the Requested Fee

204.    Derivative Counsel respectfully submits that the quality of representation the VEREIT received is best evidenced by the quality of the result obtained.  As set forth in the Cox

Declaration, the Derivative Settlement is one of the largest derivative recoveries recorded and is unique in that the entire financial benefit conferred on VEREIT comes directly from alleged wrongdoers and not from any insurance policy or through an acquisition price increase. Derivative Counsel's representation here obtained "a significant milestone in modern-day shareholder litigation." This result is due to Derivative Counsel's work to repeatedly prevail on dispositive motions and avoid VEREIT's attempts to prevent and halt prosecution of the derivative claims. Derivative Counsel have successfully litigated these types of actions in courts throughout the country, and all firms have a successful track record in such cases.

205.    Derivative Counsel's individual declarations submitted herewith outline the experience and qualifications of the attorneys and their respective firms who worked on the Derivative Action, the time expended in rendering their services, and the attorneys' standard hourly rates, and a description of the work performed. *See* Firm Resumes for Derivative Counsel, attached as Exhibits D through Q.

206.    The quality of work performed by Derivative Counsel in securing the Derivative Settlement may also be evaluated in the light of the quality of the opposition. Here, Individual Defendants were represented by a veritable "who's who" of the defense bar including Paul, Weiss, Rifkind, Wharton & Garrison LLP, Kellogg Hansen, Todd, Figel & Frederick P.L.L.C., Steptoe & Johnson LLP, Kirkland & Ellis LLP, Petrillo Klein & Boxer LLP, Zuckerman Spaeder LLP, Weil Gotshal & Manges LLP, and Sidley Austin LLP. The Company's outside counsel, Milbank, who defended VEREIT in the Securities Class Action, also was a formidable opponent in the context of the efforts to shut down the Derivative Action on multiple occasions. Similarly, VEREIT retained the firms Saul Ewing Arnstein & Lehr LLP, Morvillo Abramowitz Grand Iason & Anello PC, and Wachtell, Lipton, Rosen & Katz in their attempts to take control of the litigation from

Derivative Counsel. In the face of skilled defense counsel, Derivative Counsel was nonetheless able to press theories that ultimately brought the Non-VEREIT Settling Defendants to the settlement table and obtained a very large cash contributions from those same defendants. Without the experience, skill, determination, and creativity displayed by Derivative Counsel during the prosecution of the Derivative Action, such a favorable recovery for VEREIT would not have been attained. The ability of Derivative Counsel to obtain such a favorable recovery for VEREIT in the face of such formidable legal opposition further reflects the superior quality of their work.

### 5. Public Policy Considerations Support Lead Counsel's Requested Fee

207. Courts have consistently recognized that it is in the public interest to have experienced and able counsel enforce the fiduciary obligations of corporate officers and directors in public companies. Vigorous private enforcement of fiduciary obligations only occurs if there is compensation for experienced counsel to step forward and litigate such claims. Relatedly, it is long-recognized public policy that settlement is to be encouraged, including the resolution of fee applications that fairly and adequately compensate the counsel who bears the risk and dedicates the time, financial investment, and expertise necessary to achieve those settlements.

### 6. The Requested Attorneys' Fees are Fair and Reasonable in Light of the Time and Labor Expended by Counsel

208. The lodestar method amply confirms the reasonableness of the fee request here. Derivative Counsel dedicated a total of 20,664 hours to the investigation, prosecutions, and resolution of the Derivative Action, with a resulting lodestar of $12,740,618. The fee request of 8% is $22,920,000, which represents a 1.8x multiplier on the collective lodestar.

209. Empirical evidence also demonstrates that the multiplier of 1.8 requested in this case is not only reasonable, it is low compared to similarly sized settlements. Miller Declaration

at ¶¶ 54-56.  The mean lodestar multiplier for cases with recoveries in excess of $67.5 million is 2.72, and "[f]or cases with recoveries of more than $175.5 million, the mean multiplier was 3.18." Miller Declaration at ¶ 55.

210.   The size of the lodestar reflects the exceptional amount of time and labor that the Derivative Action required Derivative Counsel to expended prosecuting it and has been scrutinized closely by Derivative Counsel during prosecution of the Derivative Action and prior to submission to the Court.  Liaison Counsel carefully controlled which attorneys worked on which projects to efficiently manage time spent.  For example, if one attorney was assigned a deposition, it was the principal and singular responsibility of that attorney to prepare (with the assistance of junior and staff attorneys) and conduct that deposition in order to control time.  No more than two attorneys from Derivative Counsel attended any deposition and for the majority of depositions, only one attorney attended and examined the witness.  In document review, senior attorneys limited their work to targeted and document-specific searches, review of project attorney reports, and review of hot and noteworthy documents.  All of the day-to-day document review in the Derivative Action was conducted by project attorneys and associates with lower billable rates appropriate to their skill and experience levels.

211.   Further, in calculating their lodestar for submission to the Court, Derivative Counsel reviewed and edited its time for reasonableness using billing discretion.[7]  First, Derivative Counsel reviewed time records from the years of litigation for accuracy of reporting.  Second, Derivative Counsel determined that no time billed for case administration should be included in

---

[7]   For the convenience of the Court, in addition to individual declarations from each participating firm, the time, rates, average billing rates, and range of rates for each firm are set forth in Exhibit S attached hereto.  Each professional's billing rate is set forth in the firm declarations attached as Exhibits D-Q.

the lodestar submitted to the Court and removed such time.  Third, Derivative Counsel removed

from the lodestar submitted to the Court all time billed for work on any derivative action that

alleged demand futility.[8]  Instead, only time billed prosecuting the demand refusal actions is

included in the derivative lodestar calculation.

212.    Nevertheless, Derivative Counsel's lodestar reflects that it spent many thousands

of hours to investigating the underlying conduct, overcoming the motions to dismiss, and taking

extensive discovery from dozens of parties.  Derivative Counsel's work included, among other

things: (i) researching specific Maryland fiduciary law and accounting measures relating to

publicly-traded real estate investment trusts and institution of the Derivative Action; (ii)

prosecuting the Derivative Action despite attempts by VEREIT's management's multiple attempts

to halt prosecution of the claims; (iii) defeating motions to dismiss and prevailing on a related

appeal to the Second Circuit; (iv) developing claims against Schorsch, Kahane, Weil, and Block

that were wholly-independent from the Securities Class Action and based on previously unexposed

conduct; (v) working with both corporate governance and valuation experts to develop theories of

liability and damages; (vi) conducting extensive document and deposition discovery, including the

review of several million pages and the depositions of all seven Individual Defendants, six

witnesses from Grant Thornton, and over twenty other witnesses including former VEREIT

employees and directors; (vii) moving for summary judgment against two Individual Defendants

and opposing four summary judgment motions brought six Individual Defendants; (viii) preparing

for and participating into two separate in-person mediation sessions and additional meetings with

---

[8]    Several of Derivative Plaintiffs other than Witchko initially filed suit without a pre-suit
demand, alleging that demand was futile.  After the Court dismissed the demand futility actions,
these plaintiffs submitted demands to VEREIT's board and refiled their actions alleging wrongful
demand refusal.  Because the demand futility actions were dismissed, time billed prosecuting them
has been excluded.

the Mediator; and (ix) negotiating settlement of the Derivative Action with both VEREIT and the Non-VEREIT Settling Defendants.

213.    The work undertaken by Derivative Counsel in investigating and prosecuting the Derivative Action has been time-consuming and challenging. The goal of any well-run litigation is to achieve best result possible while doing so in a controlled and efficient manner.  Numerous attorneys, including partners, associates, and project attorneys, dedicated significant time to: (i) researching specific Maryland fiduciary law and accounting measures relating to publicly traded real estate investment trusts and institution of the Derivative Action; (ii) maintaining control over the Derivative Action despite attempts by Company counsel to take over the derivative claim on multiple occasions; (iii) defeating motions to dismiss and prevailing on the related appeal to the Second Circuit; (iv) development of claims against Non-VEREIT Defendants that were wholly-independent from the Securities Class Action; (v) working with both corporate governance and valuation experts to develop derivative claims; (vi) intensive written and oral discovery, including the review of more than one million pages and the depositions of 35 individual deponents; (vii) prosecution of two direct summary judgment motions and oppositions to four sets of summary judgment motions brought by certain of the Non-VEREIT Settling Defendants; (viii) participating into two separate mediation sessions and additional meetings with the Mediator; and (ix) negotiating settlement of the Derivative Action with both VEREIT and the Non-VEREIT Settling Defendants.

214.    Annexed as Exhibit Q is a chart that summarizes the lodestar information by firm, listing the total reported hours expended, hourly rates, corresponding lodestar amounts, and litigation expenses for each firm, based on data provided in each firm's declaration. In addition to certain reductions for billing discretion taken by the derivative firms, all time pertaining to case

administration has been eliminated from this summary. Likewise, no time expended in preparing the application for fees and reimbursement of expenses has been included.

215. Exhibit S also shows the firms' average rate and rates for partners and associates. The average hourly rate for all attorneys working on this case is $624. Partner hourly rates across the firms range between $675 and $960. Associate hourly rates range between $350 and $675. The hourly rates set forth for attorneys from Derivative Counsel firms are consistent with hourly rates in other derivative, class action, and complex contingent-fee litigation that have been approved by other courts, including by courts in this Circuit and are indeed less than rates charged by defense firms. Miller Declaration at ¶ 46.

216. As noted in the Miller Declaration, Derivative Counsel's billing rates are well-within the range of reasonable rates based upon the empirical data presented. *Id*. at ¶¶ 49-51.

217. Attached as Exhibits D to Q hereto are the individual firm declarations in support of the request for an award of attorneys' fees and reimbursement of litigation expenses. Through the declarations, each firm is reporting its own attorneys' time and billing rates. These declarations report the amount spent on this case by each attorney and professional staff employed by each firm and the lodestar is based on current billing rates. For attorneys or staff who are no longer employed at the firms, the lodestar calculations are based upon the billing rates for such person in his or her final year of employment.

218. In order to provide additional insight into the calculation of the derivative lodestar, and to aid the Court in understanding how that time was spent, Derivative Counsel also categorized their time into task-specific tranches as reflected in Exhibit T attached hereto. For example, pleadings and motion practice constituted 22.5%, document review 30%, and depositions 19% of the total time spent in prosecution of the Derivative Action.

### 6.      Reaction of Current VEREIT Shareholders

219.    Notice has been given to current VEREIT shareholders advising them that Derivative Counsel would seek a fee up to $26 million plus expenses.  To date no objections to the request for attorneys' fees has been received.  Should any objections be received, they will be addressed in Derivative Counsel's reply papers to be filed on January 14, 2020.

### B.      Requested Expense Reimbursement Is Reasonable

220.    Attached as Exhibit U is a chart that summarizes the expenses reported by each firm in their individual declarations in support of the fee and expense award.  Derivative Counsel seek payment of $594,882.47.  This expense request is less than the costs actually incurred by the firms because in-houses expenses such as photocopying, first class postage, and telephone have been deducted by each firm prior to submission for reimbursement.  The remaining unreimbursed litigation expenses necessarily and directly were incurred in connection with the prosecution of the Derivative Action.

221.    According to the attached declarations of Derivative Counsel, these expenses are reflected on the respective books and records maintained by each firm, which are prepared from expense vouchers, check registers, invoices, and other source material and which accurately record the expenses incurred. Derivative Counsel's fee and expense schedules also break down their respective expenses incurred by category (*e.g.* expert costs, mediation fees, electronic legal research, etc.).

222.    One of the largest categories of expenses were payments to experts retained by Derivative Counsel including Hemming Morse LLP (valuation); Professor Deborah DeMott of Duke University School of Law (corporate governance standards); and Professor James Cox of Duke University School of Law (settlement). Collectively, Plaintiffs' Derivative Counsel

expended $158,928 in payment for the experts' services.  Derivative Counsel also incurred an additional $30,000 in payment to Professor Miller of New York University School of Law. However, reimbursement is not sought for this payment as his work addressed the fairness of Derivative Counsel's fee and was not of direct benefit to VEREIT or its shareholders.

223.    Another large portion of the expenses was payment for the document repository of the voluminous production made in this case.  The total cost of the document repository was shared with Securities Class Counsel, but Derivative Counsel was required nonetheless to pay more than $217,805 for charges associated with the document repository.

224.    Other aspects of the discovery also proved to be a large expense for Derivative Counsel. Because of the many depositions taken in this case, costs associated with the stenographers and videographers were substantial.  Derivative Counsel advanced $121,840 as part of the oral discovery process.

225.    It is respectfully submitted that, as set forth in the Fee Memorandum, the expense for which reimbursement is sought were reasonably necessary to the prosecution of the action and are the type that Derivative Counsel typically incur in similar derivative actions.

## VII.    CONCLUSION

226.    For all the reasons set forth above, I respectfully submit that the Derivative Settlement should be approved as fair, reasonable, and adequate.  I further submit that the requested fee in the amount of 8% of the financial benefit conferred on VEREIT, $22,920,000, should be approved as fair and reasonable and the request for litigation expenses in the amount of $594,882.47 should also be approved.

I declare under the penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on December 17, 2019 in New York, New York.

Matthew M. Houston

## <u>INDEX OF EXHIBITS</u>

Exhibit A            Stipulation of Settlement in the Derivative Action

Exhibit B            Professor James Cox's Declaration in Support of Derivative Plaintiffs' Motion for Final Approval of Derivative Action Settlement

Exhibit C            Declaration of Professor Geoffrey P. Miller in Support Of Derivative Plaintiffs' Motion for Approval of Attorneys' Fees and Reimbursement of Expenses

Exhibit D            Declaration of Benjamin I Sachs-Michaels in Support of Derivative Plaintiffs' Motions for Final Approval of Derivative Settlement and Award of Attorneys' Fees and Reimbursement of Expenses

Exhibit E            Declaration of Willem F.  Jonckheer in Support of Derivative Plaintiffs' Motions for Final Approval of Derivative Settlement and Award of Attorneys' Fees and Reimbursement of Expenses

Exhibit F            Declaration of Jeffrey M. Norton in Support of Derivative Plaintiffs' Motions for Final Approval of Derivative Settlement and Award of Attorneys' Fees and Reimbursement of Expenses

Exhibit G            Declaration of Timothy Brown in Support of Derivative Plaintiffs' Motions for Final Approval of Derivative Settlement and Award of Attorneys' Fees and Reimbursement of Expenses

Exhibit H            Declaration of Corey D. Holzer in Support of Derivative Plaintiffs' Motions for Final Approval of Derivative Settlement and Award of Attorneys' Fees and Reimbursement of Expenses

Exhibit I            Declaration of Curtis V. Trinko in Support of Derivative Plaintiffs' Motions for Final Approval of Derivative Settlement and Award of Attorneys' Fees and Reimbursement of Expenses

Exhibit J            Declaration of Thomas J. McKenna in Support of Derivative Plaintiffs' Motions for Final Approval of Derivative Settlement and Award of Attorneys' Fees and Reimbursement of Expenses

Exhibit K            Declaration of William B. Federman in Support of Derivative Plaintiffs' Motions for Final Approval of Derivative Settlement and Award of Attorneys' Fees and Reimbursement of Expenses

| | |
|---|---|
| Exhibit L | Declaration of Cynthia L. Leppert, Esquire in Support of Derivative Plaintiffs' Motions for Final Approval of Derivative Settlement and Award of Attorneys' Fees and Reimbursement of Expenses |
| Exhibit M | Declaration of Michael J. Hynes in Support of Derivative Plaintiffs' Motions for Final Approval of Derivative Settlement and Award of Attorneys' Fees and Reimbursement of Expenses |
| Exhibit N | Declaration of J. Brandon Walker in Support of Derivative Plaintiffs' Motions for Final Approval of Derivative Settlement and Award of Attorneys' Fees and Reimbursement of Expenses |
| Exhibit O | Declaration of Nikoletta S. Mendrinos in Support of Derivative Plaintiffs' Motions for Final Approval of Derivative Settlement and Award of Attorneys' Fees and Reimbursement of Expenses |
| Exhibit P | Declaration of Lynda Grant in Support of Derivative Plaintiffs' Motions for Final Approval of Derivative Settlement and Award of Attorneys' Fees and Reimbursement of Expenses |
| Exhibit Q | Declaration of Aaron Brody in Support of Derivative Plaintiffs' Motions for Final Approval of Derivative Settlement and Award of Attorneys' Fees and Reimbursement of Expenses |
| Exhibit R | *Weil, et al. v. VEREIT Operating Partnership, L.P.*, Court of Chancery of the State of Delaware, C.A. No. 2017-0613-JTL, Memorandum Opinion dated February 13, 2018 |
| Exhibit S | Derivative Counsel Global Lodestar Chart |
| Exhibit T | Derivative Counsel Global Time Categorization Chart |
| Exhibit U | Derivative Counsel Global Expense Chart |