UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| JOANNE WITCHKO, Derivatively on Behalf of Nominal Defendant AMERICAN REALTY CAPITAL PROPERTIES, INC., | Lead Case No. 1:15-cv-06043-AKH |
| Plaintiff, | (Consolidated with Case No. 1:15-cv-08563-AKH) |
| v. | |
| NICHOLAS S. SCHORSCH, et al., | |
| Defendants, | |
| -and- | |
| AMERICAN REALTY CAPITAL PROPERTIES, INC., | |
| Nominal Defendant. | |

## PLAINTIFFS' MEMORANDUM IN SUPPORT OF MOTION FOR ATTORNEYS' FEES AND REIMBURSEMENT OF EXPENSES

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ..................................................................................... ii

INTRODUCTION ................................................................................................... 1

FACTUAL BACKGROUND ....................................................................................4

ARGUMENT ...........................................................................................................4

I.      DERIVATIVE COUNSEL IS ENTITLED TO A REASONABLE FEE FOR THE
        RESULTS ACHIEVED .................................................................................4

II.     A FEE AWARD EQUAL TO 8% OF THE $286.5 MILLION RECOVERED ON
        BEHALF OF VEREIT IS FAIR AND REASONABLE ...................................5

        A.      The Court Should Apply the Percentage-of-the-Recovery Approach ...................5

        B.      The Requested 8% Fee is Reasonable Under the *Goldberger* Factors, as ...............
                Confirmed by a Lodestar Cross-Check ..................................................6

                1.      The Fee is Reasonable in Relation to the Financial Benefit to VEREIT .....6

                2.      The Significant Risks of This Litigation Support the Requested Fee ........10

                        a.      The Risks of Establishing Liability Support the Requested Fee....11

                        b.      The Risks of Establishing Damages Support the Requested Fee ..13

                        c.      The Contingent Nature of Derivative Counsel's
                                Representation Supports the Requested Fee ..................................15

                3.      The Magnitude and Complexity of the Litigation Support
                        Derivative Counsel's Requested Fee .......................................17

                4.      The Quality of Representation Supports the Requested Fee ....................20

                5.      Public Policy Considerations Support Derivative Counsel's
                        Requested Fee .........................................................22

                6.      The Requested Attorneys' Fees are Fair and Reasonable
                        in Light of the Time and Labor Expended by Counsel.............................23

                7.      No Shareholder Has Objected..................................................................28

i

III.   DERIVATIVE COUNSEL'S REQUEST FOR REIMBURSEMENT OF
       OUT-OF-POCKET EXPENSES NECESSARY TO THE PROSECUTION
       OF THIS ACTION SHOULD BE GRANTED ................................................................29

CONCLUSION ..............................................................................................................................31

# TABLE OF AUTHORITIES

**Cases**                                                                                                                          **Page**

*Alaska Elec. Pension Fund v. Bank of Am. Corp.*,
   2018 WL 6250657 (S.D.N.Y. Nov. 29, 2018) ..........................................................................7

*Allapattah Servs., Inc. v. Exxon Corp.*,
   454 F. Supp. 2d 1185 (S.D. Fla. 2006) .....................................................................................9

*Anwar v. Fairfield Greenwich Ltd.*,
   No. 1:09-cv-00118 (S.D.N.Y.) .................................................................................................7

*Bd. of Trustees of the AFTRA Ret. Fund v. JPMorgan Chase Bank, N.A.*,
   2012 WL 2064907 (S.D.N.Y. June 7, 2012)...........................................................................25

*Blum v. Stenson*,
   465 U.S. 886 (1984)................................................................................................................28

*Boeing Co. v. Van Gemert*,
   444 U.S. 472 (1980)..................................................................................................................6

*City of Detroit v. Grinnell Corp.*,
   495 F.2d 448 (2d Cir. 1974)......................................................................................10, 15, 28

*Cohn v. Nelson*,
   375 F. Supp. 2d 844 (E.D. Mo. 2005)................................................................................25, 29

*Cornwell v. Credit Suisse Grp.*,
   No. 08-cv-03758 (VM) (S.D.N.Y. July 18, 2011) .................................................................25

*Cruz v. Local Union No. 3, IBEW*,
   34 F.3d 1148 (2d Cir. 1994)....................................................................................................28

*DeBoer v. Metton Mortgage Co.*,
   64 F.3d 1171 (8th Cir. 1995)...................................................................................................29

*Goldberger v. Integrated Res, Inc.*,
   209 F.3d 43 (2d Cir. 2000)............................................................................................. *passim*

*In re AIG, Inc. Sec. Litig.*,
   2010 WL 5060697 (S.D.N.Y. Dec. 2, 2010) .........................................................................17

*In re AMF Bowling Sec. Litig.*,
   334 F. Supp. 2d 462 (S.D.N.Y 2004)......................................................................................29

*In re Am. Bank Note Holographics, Inc.*,
  127 F. Supp. 2d 418 (S.D.N.Y. 2001) ................................. .............................................15-16

*In re Am. Express Fin. Advisors Sec. Litig.*,
  No. 04 Civ. 1773 (DAB), (S.D.N.Y. July 18, 2007) .............................................................25

*In re AOL Time Warner Sec. Litig.*,
  2006 WL 2572114 (S.D.N.Y. Oct. 25, 2006) ................................................................................

*In re AOL Time Warner, Inc. Sec. Litig.*,
  2006 WL 3057232 (S.D.N.Y. Oct. 25, 2006) ......................................................................25

*In re Arakis Energy Corp., Sec. Litig.*,
  2001 WL 1590512 (E.D.N.Y. Oct. 31, 2001) ......................................................................29

*In re BankAtlantic Bancorp, Inc.*,
  2011 WL 1585605 (S.D. Fla. Apr. 25, 2011) ......................................................................16

*In re Beacon Assocs. Litig.*,
  2013 WL 2450960 (S.D.N.Y. May 9, 2013) ..........................................................................7

*In re Cardinal Health Inc. Sec. Litig.*,
  528 F. Supp. 2d 752 (S.D. Ohio 2007) ...............................................................................23

*In re Cendant Corp. Deriv. Action Litig.*,
  232 F. Supp. 2d 327 (D.N.J. 2002) .....................................................................................25

*In re Colgate-Palmolive Co. ERISA Litig.*,
  36 F. Supp. 3d 344 (S.D.N.Y. 2014) ...................................................................................25

*In re Comverse Tech., Inc. Sec. Litig.* ,
  2010 WL 2653354 (E.D.N.Y. June 24, 2010). ...........................................................8, 23, 25

*In re Credit Default Swaps Antitrust Litig.*,
  2016 WL 2731524 (S.D.N.Y. Apr. 26, 2016) ......................................................................24

*In re Deutsche Telekom AG Sec. Litig.*,
  2005 WL 7984326 (S.D.N.Y. June 9, 2005) .......................................................................25

*In re EVCI Career Colls. Holding Corp. Sec. Litig.*,
  2007 WL 2230177 (E.D.N.Y. Oct. 31, 2007). ......................................................6, 25, 29, 30

*In re Flag Telecom Holdings, Ltd. Sec. Litig.*,
  2010 WL 4537550 (S.D.N.Y. 2010) ............................................................................ 16-17, 22

*In re Global Crossing Sec. & ERISA Litig.*,
  225 F.R.D. 436 (S.D.N.Y. 2004) ............................................................................... 10, 20, 29

*In re Indep. Energy Holdings PLC Sec. Litig.*,
  2003 WL 22244676 (S.D.N.Y. Sept. 29, 2003)............................................13-14

*In re Initial Public Offering Sec. Litig.*,
  671 F. Supp. 2d 467 (S.D.N.Y. 2009).........................................................7

*In re JDS Uniphase Corp. Sec. Litig.*,
  2007 WL 4788556 (N.D. Cal. Nov. 7, 2007)..............................................16

*In re Lloyd's Am. Trust Fund Litig.*,
  2002 WL 31663577 (S.D.N.Y. Nov. 26, 2002).............................................6

*In re Lucent Tech., Inc. Sec. Litig.*,
  327 F. Supp. 2d 426 (D.N.J. 2004) ...........................................................25

*In re Marsh & McLennan Cos., Inc. Sec. Litig.*,
  2009 WL 5178546 (S.D.N.Y. Dec. 23, 2009) ........................................23, 24

*In re NASDAQ Market-Makers Antitrust Litig.*,
  187 F.R.D. 465 (S.D.N.Y. 1998).................................................................25

*In re Oxford Health Plans, Inc. Sec. Litig.*,
  2003 U.S. Dist. LEXIS 26795 (S.D.N.Y. June 12, 2003).............................7

*In re Pac. Enters. Sec. Litig.*,
  47 F.3d 373 (9th 1995)...............................................................................17

*In re Pfizer Inc. S'holder Deriv. Litig.*,
  780 F. Supp. 2d 336 (S.D.N.Y. 2011)..................................................5, 6, 7, 15

*In re Pfizer Inc. Sec. Litig.*,
  No. 04-cv-09866 (LTS)O (S.D.N.Y. Dec. 21, 2016)..................................7

*In re Sumitomo Copper Litig.*,
  74 F. Supp. 2d 393 (S.D.N.Y. 1999)..........................................................25

*In re Tricor Direct Purchaser Antitrust Litig.*,
  No. 05-cv-00340 (D. Del. Apr. 23, 2009) .................................................8

*In re U.S. Foodservice, Inc. Pricing Litig.*,
  No. 07-md-1894 (D. Conn. Dec. 9, 2014) .................................................7

*In re Veeco Instruments, Inc. Sec. Litig.*,
  2007 WL 4115808 (S.D.N.Y. Nov. 7, 2007).........................................29, 30

*In re Walt Disney Co. Deriv. Litig.*,
  907 A.2d 693 (Del. Ch. 2005), *aff'd*,
  906 A.2d 27 (Del. 2006) ...........................................................................................16

*In re Wash. Public Power Supply Sys. Litig.*,
  19 F.3d 1291 (9th Cir. 1994).....................................................................................15

*In re Williams Sec. Litig.*,
  No. 02-cv-072-SPF-FHM (N.D. Okla. Feb. 12, 2007) ..............................................8

*In re WorldCom Inc., Sec. Litig.*,
  388 F. Supp. 2d 319 (S.D.N.Y. 2005)................................................................22, 25

*Johnson v. Georgia Highway Express. Inc.*,
  488 F2d 714 (5th Cir. 1974) .......................................................................................5

*Kamen v. Kemper Fin. Serv., Inc.*,
  500 U.S. 90 (1991)....................................................................................................21

*Lucent Tech., Inc. Sec. Litig.*,
  327 F. Supp. 2d 426 (D.N.J. 2004) ..............................................................................

*Maley v. Del Global Tech. Corp.*,
  186 F. Supp. 2d 358 (S.D.N.Y. 2002)..............................................................20-21, 22

*Manor Country Club v. Flaa*,
  387 Md. 297, 313 (2005) .............................................................................................5

*Mathes v. Roberts*,
  85 F.R.D. 710 (S.D.N.Y. 1980) ..........................................................................10, 17

*McDaniel v. County of Schenectady*,
  595 F.3d 411 (2d Cir. 2010)........................................................................................5

*Mills v. Elec. Auto-Lite Co.*,
  396 U.S. 375 (1970)....................................................................................................4

*Roberts v. Texaco, Inc.*,
  979 F. Supp. 185 (S.D.N.Y. 1997)............................................................................25

*Schlimmel v. Goldman*,
  57 F.R.D. 481 (S.D.N.Y. 1973) ................................................................................17

*Velez v. Novartis Pharms*. Corp.,
  2010 WL 4877852 (S.D.N.Y. Nov. 30, 2010) ......................................................5, 7

*Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.*,
 396 F.3d 96 (2d Cir. 2005) ........................................................................5, 6, 23, 24

*Woburn Ret. Sys. v. Salix Pharm., Ltd*.,
 2017 WL 3579892 (S.D.N.Y. 2017) .........................................................................24

**Miscellaneous**

Herbert M. Kritzer,
 *Seven Dogged Myths Concerning Contingency Fees*,
 80 Wash. U.L.Q. 739 (2002) ........................................................................................9

Richard Posner,
 *Economic Analysis of Law*, § 21.9 (3d ed. 1986) .....................................................15

Theodore Eisenberg, Geoffrey Miller & Roy Germano,
 *Attorneys' Fees in Class Actions: 2009*-2013, 92 N.Y.U.  L. Rev. 937 (2017) ........8

**Statutes & Regulations**

Maryland Code Annotated

Corps. & Ass'ns Code § 2-419 ....................................................................................12

Cts. & Jud. Proc. Code §§ 5-418(a)(1)-(2) ...............................................................11

## **INTRODUCTION**

Derivative Counsel respectfully requests that the Court award attorneys' fees of $22,920,000, which is 8% of the $286.5 million financial benefit conferred on VEREIT by the Derivative Settlement.[1]  This fee request represents a 1.8 multiplier on Derivative Counsel's lodestar of $12,740,618.  Derivative Counsel also requests reimbursement of out-of-pocket expenses in the amount of $594,882.

After almost five years of intense litigation, Derivative Counsel achieved an exceptional settlement on behalf of VEREIT, Inc. f/k/a American Reality Properties Capital, Inc. ("VEREIT" or the "Company") and its shareholders.  The Derivative Settlement confers a $286.5 million financial benefit on VEREIT paid directly by the AR Capital Parties, Brian Block, and VEREIT's former independent auditor, Grant Thornton LLP (together, the "Contributing Parties").  The Derivative Settlement also releases all potential counterclaims against VEREIT, including counterclaims that Grant Thornton "intended to assert" in the Derivative Action, terminates VEREIT's continuing indemnification obligations and litigation expenses, a benefit that VEREIT's management estimates to be nearly $100 million through trial in the Class Action, and guarantees that the $286.5 million benefit will remain with VEREIT even if the settlement is overturned on appeal.

The Derivative Settlement is "remarkable when measured against the outcomes of other derivative suits as well as the complaint leveled at shareholder litigation that such suits do not generally result in tangible benefits for the company."  Professor James Cox's Declaration in Support of Derivative Plaintiffs' Motion for Final Approval of Derivative Action Settlement (the "Cox Declaration") ¶ at 1, attached as Exhibit B to the Houston Declaration.  In addition to being

---

[1]      Unless otherwise defined, capitalized terms have the meanings set forth in the concurrently filed Declaration of Matthew M. Houston in Support of Derivative Plaintiffs' Motions for Final Approval of Derivative Settlement and Award of Attorneys' Fees and Reimbursement of Expenses (the "Houston Declaration").

one of the largest recoveries secured in a derivative action, the Derivative Settlement "is a significant milestone in modern-day shareholder litigation" because "the settlement funds come from the pockets" of the Contributing Parties and no part of the settlement consideration comes from an insurance policy or acquisition partner.  Cox Declaration at ¶¶ 18, 20.   As a result, the Derivative Settlement is "beyond being criticized, as so much of shareholder litigation is criticized today, on the grounds of 'circularity,'" is "significant among contemporary derivative suit settlements," and is "not only fair and reasonable but is an exceptional result."  *Id*. at ¶¶ 11, 22, 26.

This exceptional result did not come easily or quickly.  Derivative Counsel dedicated in excess of 20,000 hours to litigating this action, devoting years of attorney time to its prosecution, and advancing over $500,000 in out-of-pocket expenses on a fully contingent basis.  Derivative Counsel overcame several dispositive motions, reviewed and analyzed millions of pages of documents, and took over thirty depositions, the significant majority of which occurred over multiple days.  Very few law firms, or groups of law firms, are willing or able to dedicate such resources knowing that they may never be compensated.

This particular action, moreover, was fraught with risk.  It is a truism that derivative litigation is notoriously complex and risky and the Derivative Action was orders of magnitude more complex and riskier than the average derivative suit.  Derivative Counsel knew from the outset that this would be an extremely costly and complicated action against well-financed defendants represented by some of the best defense attorneys in the United States.  As defendants themselves argued early in the action, few if any derivative plaintiffs adequately allege demand refusal sufficient to overcome a motion to dismiss.  Even after Derivative Plaintiffs overcame that significant hurdle, they obtained dismissal of an interlocutory appeal, avoided a Board committee's attempt to halt prosecution of the claims, and survived four motions for summary judgment filed by defendants.  Even following the Court's denial of the summary judgment motions, defendants

were free to renew their motions at any time.  Substantial risks remained because even if Derivative Plaintiffs prevailed on renewed summary judgment motions, they had the burden of proving their allegations at trial.  Since initial service of Witchko's litigation demand, VEREIT's management attempted to prevent or halt prosecution of the derivative claims several times and Derivative Counsel bore the constant risk that management would again intervene and attempt to halt the litigation, this time successfully.

Derivative Counsel is responsible for the benefits conferred on VEREIT by the Derivative Settlement.  On several occasions the Court cautioned VEREIT that conflicted counsel could not prosecute the Company's claims while simultaneously defending the Company in the Class Action and government probes and asked "[w]ouldn't a derivative plaintiff be in a better situation since he's not conflicted in any way?"  *See* Houston Declaration at ¶ 60.  Derivative Counsel bore the tremendous risk and responsibility of prosecuting the Company's claims in a situation where management and its counsel repeatedly attempted to undermine the derivative claims to gain an advantage in the Class Action.  The Court had disqualified VEREIT's defense counsel in the Class Action from representing the Company in the Derivative Action, and the parade of other law firms the Board retained never appeared at a deposition or participated in any way in the prosecution of the Company's claims once discovery had commenced.  When the Contributing Parties state that "but for" resolution of the Company's derivative claims, they would not have made "any contribution" to the global resolution, the savings to VEREIT from their payments is due the work of Derivative Counsel.  The work of Derivative Counsel saved VEREIT $286.5 million in the global resolution, $100 million in ongoing litigation and indemnification expenses, and conferred other non-monetary benefits.

An award of 8% of the financial benefit obtained for VEREIT, equivalent to a lodestar multiplier of 1.8, properly reflects the many risks that Derivative Counsel faced, the work

performed over more than four years, and the excellent result achieved in this hard-fought and difficult litigation.  Empirical analysis of attorneys' fees awarded in class and derivative litigation in this District and Circuit shows that Derivative Counsel's fee request is well below the mean fee awarded in similar cases both as a percentage of the benefit and as a multiplier of lodestar.  *See* Declaration of Professor Geoffrey P. Miller, attached to the Houston Declaration as Exhibit C.  For these reasons and those that follow, Derivative Counsel respectfully submits that its fee request is reasonable and asks that the Court award attorneys' fees of $22,920,000 and expenses in the amount of $594,882.

## FACTUAL BACKGROUND

The Court is respectfully referred to the Houston Declaration for a detailed discussion of the background of the action (¶¶ 16-25); procedural history (¶¶ 26-81); a summary of the work performed by Derivative Counsel (¶ 10(a)-(u)), including a detailed discussion of discovery (¶¶ 82-105); work with experts; (¶¶ 106-112); summary judgment briefing (¶¶ 113-127); mediation (¶¶ 128-141); and additional information on the factors that support the fee request (¶¶ 186-219).

## ARGUMENT

### I.   DERIVATIVE COUNSEL IS ENTITLED TO A REASONABLE FEE FOR THE RESULTS ACHIEVED

It is well established that counsel that prosecutes and settles a derivative action conferring a "substantial benefit" on a corporation is entitled to an award of attorneys' fees and costs.  *Mills v. Elec. Auto-Lite Co.*, 396 U.S. 375, 395 (1970).  As the Supreme Court has explained, a corporation "may receive a 'substantial benefit' . . . justifying an award of counsel fees, regardless of whether the benefit is pecuniary in nature."  *Id*.  Here, Derivative Counsel succeeded in securing a settlement which confers several significant benefits on VEREIT: (i) payments totaling $286.5 million for the benefit of VEREIT from the Contributing Parties, which is an unprecedented contribution from individuals to a derivative settlement; (ii) the release of counterclaims against

VEREIT; (iii) the termination of ongoing litigation and indemnification costs estimated to be in excess of $100 million through early 2020; and (iv) guarantee that the benefit of those funds will remain with VEREIT even if the settlement is overturned on appeal.

## II.   A FEE AWARD EQUAL TO 8% OF THE $286.5 MILLION RECOVERED ON BEHALF OF VEREIT IS FAIR AND REASONABLE

### A.   The Court Should Apply the Percentage-of-the-Recovery Approach

The Second Circuit permits courts to award attorneys' fees under either of two methods, the "percentage-of-the-fund" method or the "lodestar" method. *McDaniel v. County of Schenectady*, 595 F.3d 411, 417 (2d Cir. 2010).   While courts have the discretion to choose whichever method is appropriate to the circumstances of a case, the "trend in this Circuit is toward the percentage method," with the lodestar serving only as a "cross-check" on the resulting fee. *Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.*, 396 F.3d 96, 121 (2d Cir. 2005); *Velez v. Novartis Pharms., Corp.*, 2010 WL 4877852, at *20 (S.D.N.Y. Nov. 30, 2010).   Under either approach, courts in this Circuit apply the *Goldberger* factors to determine whether the fee request is reasonable:

> (1) the time and labor expended by counsel; (2) the magnitude and complexities of the litigation; (3) the risk of the litigation; (4) the quality of representation; (5) the requested fee in relation to the settlement; and (6) public policy considerations.

*Goldberger v. Integrated Res., Inc.*, 209 F.3d 43, 50 (2d Cir. 2000); *see also In re Pfizer Inc. S'holder Deriv. Litig.*, 780 F. Supp. 2d 336, 343 (S.D.N.Y. 2011) (applying *Goldberger* factors in derivative action involving Delaware corporation and awarding fee using percentage method with lodestar cross-check).[2]

---

[2]   The reasonableness inquiry is also used under Maryland law.  *See Manor Country Club v. Flaa*, 387 Md. 297, 313 (2005) (applying factors from *Johnson v. Georgia Highway Express. Inc.*, 488 F2d 714, 717-19 (5th Cir. 1974)).

In representative litigation, the percentage method is "the most efficient means of rewarding the work of class action attorneys and avoids the wasteful and burdensome process – to both counsel and the courts – of preparing and evaluating fee petitions." *In re Lloyd's Am. Trust Fund Litig.*, 2002 WL 31663577, at *25 (S.D.N.Y. Nov. 26, 2002); *see also In re EVCI Career Colls. Holding Corp. Sec. Litig.*, 2007 WL 2230177, at *16 (E.D.N.Y. Oct. 31, 2007) (percentage method "does not waste judicial resources analyzing thousands of hours of work, where counsel obtained a superior result"). This is because, "where used as a mere cross-check, the hours documented by counsel need not be exhaustively scrutinized by the district court." *Goldberger*, 209 F.3d at 50. The lodestar method, by contrast, "create[s] an unanticipated disincentive to early settlements, tempt[s] lawyers to run up their hours, and compel[s] district courts to engage in a gimlet-eyed review of line-item fee audits." *Wal-Mart*, 396 F.3d at 121.

Derivative Counsel respectfully submits that the Court should apply the percentage of the recovery method in this case, evaluating the reasonableness of the fee primarily in relation to the financial benefit conferred on VEREIT, while using the lodestar as a cross-check in conjunction with the remaining *Goldberger* factors.

**B.      The Requested 8% Fee is Reasonable Under the *Goldberger* Factors, as Confirmed by a Lodestar Cross-Check**

The requested fee is plainly reasonable under the percentage of the recovery approach. In fact, it is well below the average percentage fee award for similar settlements. Application of the remaining *Goldberger* factors confirms the reasonableness of an 8% fee award.

**1.      The Fee is Reasonable in Relation to the Financial Benefit to VEREIT**

The Supreme Court has long recognized that "a litigant or a lawyer who recovers a common fund for the benefit of persons other than himself or his client is entitled to a reasonable attorney's fee from the fund as a whole." *Boeing Co. v. Van Gemert*, 444 U.S. 472, 478 (1980). *See also Pfizer*, 780 F. Supp. 2d at 343 (awarding attorneys' fees in derivative action involving cash

6

recovery).  Where a court awards fees based on the percentage of the recovery method, the key *Goldberger* factor is "the [amount of the] requested fee in relation to the settlement."  209 F.3d at 50.  When determining whether a fee request is reasonable in relation to a settlement amount, the court compares the fee application to fees awarded in similar settlements of comparable value. *Pfizer*, 780 F. Supp. at 343 (fee request of $22 million on $75 million derivative recovery was "within the accepted range of common fund fee awards in this District," collecting authorities awarding 25% or more).  A comparison of Derivative Counsel's fee application to fees awarded in similar settlements strongly favors Derivative Counsel's fee request.

Courts in this district regularly award fees in the range of 25% to 33% in securities and other complex litigation settlements of comparable size.  Miller Declaration at ¶ 42. "District courts in the Second Circuit routinely award attorneys' fees that are 30 percent or greater."  *Velez*, 2010 WL 4877852, at *21 (collecting authorities while awarding 25% of $152.5 million recovery); *see also, e.g.*, *In re Pfizer Inc. Sec. Litig.*, No. 04-cv-09866 (LTS), ECF No. 727 at 2 (S.D.N.Y. Dec. 21, 2016) (awarding 28% of $486 million); *In re Initial Public Offering Sec. Litig.*, 671 F. Supp. 2d 467, 516 (S.D.N.Y. 2009) (awarding 33⅓% of $510 million); *In re Oxford Health Plans, Inc. Sec. Litig.*, 2003 U.S. Dist. LEXIS 26795, at *13 (S.D.N.Y. June 12, 2003) (awarding 28% of $300 million); *Anwar v. Fairfield Greenwich Ltd.*, No. 1:09-cv-00118 (S.D.N.Y.) (awarding 28.8% of $235.25 million);[3] *Alaska Elec. Pension Fund v. Bank of Am. Corp.*, 2018 WL 6250657 (S.D.N.Y. Nov. 29, 2018) (awarding 26% of $486 million); *see also In re Beacon Assocs. Litig.*, 2013 WL 2450960, at *5 (S.D.N.Y. May 9, 2013) ("In this Circuit, courts routinely award attorneys' fees that run to 30% and even a little more of the amount of the common fund.").[4]

---

[3]     Four separate fee orders were entered in *Anwar* on March 28, 2013, November 22, 2013, November 20, 2015 and May 6, 2016 (ECF Nos. 1099, 1233, 1457, 1569).

[4]     These amounts comport with fee awards in similarly sized settlements by other district courts in the Second Circuit and around the country.  *See, e.g.*, *In re U.S. Foodservice, Inc. Pricing Litig.*, No. 07-md-1894, ECF No. 521 at ¶13 (D. Conn. Dec. 9, 2014) (awarding 33.33% of $297

A well-known, recently updated, empirical study of class and derivative action attorneys' fee awards supports the reasonableness of Derivative Counsel's 8% fee request. Theodore Eisenberg, Geoffrey Miller & Roy Germano, *Attorneys' Fees in Class Actions: 2009-2013*, 92 N.Y.U. L. Rev. 937 (2017). Professor Miller's study found that "the mean fee percentage award was 27%" in this District. Miller Declaration at ¶ 42. Similarly, for 116 settlements in the Second Circuit, the mean fee was 28% and the median fee was 30%. *Id.* Professor Miller's study also supports the reasonableness of the fee request in comparison to other large recoveries: the average percentage fee award for cases in the $200-$300 million range, like this one, is 24.6%. *Id.* at ¶¶ 43-44. Based on Professor Miller's empirical research, the "8% fee requested in this case is in line with these mean and median figures." *Id.* at ¶ 58.

Further, the "[e]mpirical research in attorneys' fees provides evidence that fee awards in class action and derivative cases are positively correlated with the risk of the litigation." Miller Declaration at ¶ 28. "The higher fees awarded in high-risk cases reflect the fact that attorneys need to be compensated for the possibility that the case will wash out with no fee at the end of the day." *Id.* In this respect, derivative litigation such as the Derivative Action "poses special risks for counsel – risks unknown to other sorts of litigation." *Id.* at ¶ 29. Not only must derivative counsel overcome the onerous requirements of Rule 23.1, they invest resources and time in the litigation of a derivative action constantly under threat that notwithstanding survival of a motion to dismiss under Rule 23.1, the corporation's management will convene a special litigation committee. *Id.* at ¶ 31 (describing a special litigation committee as an "existential threat" to a derivative plaintiff). In the Derivative Action, VEREIT's management did in fact resort to a special Board committee,

---

million); *In re Converse Tech, Inc. Sec. Litig.*, 2010 WL 2653354, at *6 (E.D.N.Y. June 24, 2010) (awarding 25% of $225 million); *In re Tricor Direct Purchaser Antitrust Litig.*, No. 05-cv-00340, ECF No. 543 at ¶ 11 (D. Del. Apr. 23, 2009) (awarding one-third of $250 million); *In re Williams Sec. Litig.*, No. 02-cv-072-SPF-FHM, ECF No. 1638, at ¶2 (N.D. Okla. Feb. 12, 2007) (awarding 25% of $311 million).

effectively a special litigation committee, after its motion to dismiss under Rule 23.1 was denied. *Id*. ¶ at 32; Houston Declaration at ¶ 79.  Throughout the litigation, Derivative Counsel believed that management might, at some time, again attempt to stop prosecution of the action.  The requested 8% fee is thus even more reasonable in light of the significant risks faced by Derivative Counsel that they would never be compensated for their investment in the prosecution of the Derivative Action.

If, in response to the demand, VEREIT's Board had decided to prosecute the derivative claims and negotiated a contingent fee agreement with some counsel of its choosing, it almost certainly would have paid a higher percentage of the recovery than the 8% requested by Derivative Counsel.[5]  Negotiated contingency fee agreements typically call for fees of 30% to 40%.  *See* Herbert M. Kritzer, *Seven Dogged Myths Concerning Contingency Fees*, 80 Wash. U.L.Q. 739, 760 (2002) (discussing RAND study finding rates of 33% over half the time, less than 33% about a quarter of the time, and more than 33% in the remainder); *Allapattah Servs., Inc. v. Exxon Corp.*, 454 F. Supp. 2d 1185, 1212 (S.D. Fla. 2006) ("'Substantial empirical evidence indicates that a one-third fee is a common benchmark in private contingency fee cases.'").

Derivative Counsel's requested fee of 8% is also reasonable in light of the substantial quantifiable benefits conferred on VEREIT in addition to the $286.5 million savings: the termination of litigation and indemnity costs, estimated by VEREIT to be $100 million through early 2020 when trial was scheduled in the Class Action.  If that additional savings is included in calculating the monetary benefit to VEREIT, the total benefit to the Company would be $386.5 million, of which Derivative Counsel's fee request would represent less than 6%.

---

[5]    As discussed below section II.B.6, had VEREIT retained a law firm on an hourly basis to prosecute the derivative claims, the Company likewise would almost certainly have spent significantly more than the fee requested by Derivative Counsel.

For all these reasons, Derivative Counsel respectfully submits that attorneys' fees equal to 8% of the $286.5 million recovery on behalf of VEREIT are well-below the typical attorneys' fees awarded in this District and Circuit and are reasonable and fair.

### 2.    The Significant Risks of This Litigation Support the Requested Fee

The fee request is also reasonable because Derivative Counsel obtained an outstanding result in the face of enormous risks.  The Second Circuit has identified "the risk of success as 'perhaps the foremost' factor to be considered in determining [a reasonable award of attorneys' fees]." *Goldberger*, 209 F.3d at 54.  "No one expects a lawyer whose compensation is contingent upon his success to charge, when successful, as little as he would charge a client who in advance had agreed to pay for his services, regardless of success."  *City of Detroit v. Grinnell Corp.*, 495 F.2d 448, 470 (2d Cir. 1974).  In applying this factor, " 'litigation risk must be measured as of when the case is filed,' rather than with the hindsight benefit of subsequent events."  *In re Global Crossing Secs. & ERISA Litig.*, 225 F.R.D. 436, 467 (*quoting Goldberger*, 209 F.3d at 55).  The many substantial risks that Derivative Counsel faced in prosecuting this action more than justify the requested fee.

Numerous courts have recognized that "shareholder derivative actions are notoriously difficult and unpredictable." *Mathes v. Roberts*, 85 F.R.D. 710, 713 (S.D.N.Y. 1980) (citation and internal quotation marks omitted).  The Derivative Action was no exception.  From the outset, Derivative Counsel understood they were embarking on a complex, expensive, and likely lengthy litigation with no guarantee of ever being compensated for the substantial investment of time and money the case would require.  Measured from commencement of the action, Derivative Counsel faced almost insurmountable risks including satisfying Rule 23.1, avoiding management's attempts to halt prosecution of the claims, and establishing damages under the onerous standards of

Maryland law.  By the time of the Derivative Settlement, Derivative Counsel had overcome several difficult hurdles and faced many more were litigation to continue.

> **a.      The Risks of Establishing Liability Support the Requested Fee**

To prove liability, Derivative Plaintiffs would need to establish breaches of fiduciary duty under Maryland law.  In addition to proving the elements of breaches of fiduciary duty, Maryland law requires Derivative Plaintiffs to prove that the breaches were not exculpable under VEREIT's charter, which limits liability to the extent allowed by Maryland law.  As a result, even if proven, the individual defendants' breaches of their fiduciary duties would have been exculpated unless Derivative Plaintiffs proved that the individual defendants "actually received an improper benefit" or engaged in "active and deliberate dishonesty."  June 9, 2016 Order on Motions to Dismiss, ECF No. 75; Md. Cts. & Jud. Proc. Code §§ 5- 418(a)(1)-(2); Houston Declaration at ¶ 63.

Every step of the way, defendants argued that Derivative Plaintiffs would be unable to establish liability.  Derivative Plaintiffs expected that defendants would again assert these arguments in renewed summary judgment motions, regardless of the outcome of the trial in the Securities Class Action.  *See* Houston Declaration at ¶ 143.  While Derivative Plaintiffs believed that they could and would establish liability, they faced significant risk that the individual defendants would convince the Court to rule in their favor on one or more of these arguments, which would have resulted in complete dismissal of the case or narrowing of the claims and reduction in potential damages.

Because the expert reports and expert discovery in the Derivative Action were timed to follow the Class Action, Derivative Plaintiffs were still to file their reports and submit their experts to discovery by the individual defendants absent settlement.  *Id*. at ¶ 144.  Defendants likely would have attempted to disqualify one, if not both, of Derivative Plaintiffs' experts.  If defendants were

able to convince the Court that one or both experts should be excluded, Derivative Plaintiffs' ability to prove liability and damages would be seriously harmed.

Derivative Plaintiffs faced the real risk that defendant Schorsch, the individual defendant with the deepest pockets to pay a judgment, would convince the factfinder at trial that he lacked knowledge of the AFFO misstatements. *Id*. at ¶ 147. Even if they proved that Schorsch had breached his fiduciary duties, Maryland law required Derivative Plaintiffs to prove that his breaches were committed with active and deliberate dishonesty, effectively actual knowledge of falsity. Throughout this litigation, Schorsch argued that he lacked actual knowledge of the AFFO fraud, and at his deposition he denied directing the second quarter 2014 AFFO plug. A factfinder could have determined that Schorsch's testimony was credible and that he did not act with active and deliberate dishonesty in connection with the AFFO misstatements. Such a finding would have prevented Derivative Plaintiffs from establishing non-exculpable wrongdoing by Schorsch in connection with a major category of wrongdoing at issue in the action.

Derivative Plaintiffs also faced significant risks to establishing liability for the related party transactions. As they argued in their summary judgment motions, Schorsch, Kahane, Weil, and Block would likely assert at trial that the transactions were subject to the Maryland safe harbor, Md. Code § 2-419, they were substantively fair to VEREIT, and that there was no improper benefit. Derivative Plaintiffs developed a significant factual record supporting their allegation that related party transactions, especially the ARCT III Promote and the 2013 OPP, were unauthorized and facially violated the applicable governing documents. *Id*. at ¶¶ 96-105. However, significant risk existed that a factfinder would conclude that the transactions were shielded by the safe harbor, and if the safe harbor applied, proving that the individual defendants retained improper benefits would be nearly impossible. If Derivative Plaintiffs succeeded in avoiding the safe harbor, the individual defendants could still prove that the transactions were fair to VEREIT. *Id*. at ¶ 151. A factfinder

could determine that even though the related party transactions were not authorized by the Board and violated the applicable contracts, they nevertheless were substantively fair to the Company, throwing into substantial doubt whether any benefits could have been improper.

At trial, the individual defendants would likely raise many of the defenses they raised in summary judgment briefing in the Derivative Action.  In particular, VEREIT's restated financial statements are important evidence of the harm to the Company at issue in the Derivative Action. The individual defendants would likely argue that the quantification of financial errors and other disclosures regarding the Audit Committee investigation in VEREIT's public filings could not be admitted against them at trial because they had been deprived discovery of the Audit Committee investigation due to a the Court's ruling that the Company could assert privileges and avoid producing Audit Committee investigation materials in discovery.  *Id*. at ¶ 160.  Although the same ruling prevented Derivative Plaintiffs from accessing the Audit Committee investigation materials, the claims at issue in a trial would be on the Company's behalf, and it the individual defendants would likely argue that Derivative Plaintiffs were using the Audit Committee results as a sword while the Company simultaneously refused to produce the underlying materials.

Similarly, the individual defendants would likely argue that the Company's claims against them were barred by the *in pari delicto* doctrine because VEREIT was a defendant in the Class Action and therefore akin to a co-conspirator.  *Id*. at ¶ 161.  While Derivative Plaintiffs believe there is a clear exception to the *in pari delicto* doctrine for derivative actions, a risk existed that some or all of the claims for wrongdoing alleged on behalf of the Company in the Derivative Action could have been precluded under the doctrine.

### b.    The Risks of Establishing Damages Support the Requested Fee

Significant additional risks existed in establishing derivative damages.  Proving damages "is always difficult and invariably requires expert testimony which may, or may not be, accepted

by a jury." *In re Indep. Energy Holdings PLC Sec. Litig.*, 2003 WL 22244676, at *3 (S.D.N.Y. Sept. 29, 2003).  Establishing damages in this case would have involved expert testimony and considerable uncertainty, including that damage models would be subject to *Daubert* challenges.

If Schorsch were to convince the factfinder that his conduct in connection with the AFFO misstatements or related party transactions was exculpated, Weil and Kahane would likely have been successful in doing the same because each of them had less direct involvement with the alleged wrongdoing.   *Id*. at ¶ 149.   The failure to establish non-exculpable wrongdoing by Schorsch, Kahane, and Weil would have created a situation where, even had Derivative Plaintiffs prevailed against the other individual defendants, collectively they would have been unable to satisfy a judgment likely to be several hundred million dollars.

Even assuming that Derivative Plaintiffs overcame the risks and successfully established liability as to all individual defendants, they would have confronted considerable challenges in establishing their damages calculations at trial.  *Id*. at ¶¶ 156-59.  The Derivative Action alleged a complex set of harms arising from the AFFO fraud and the unauthorized related-party transactions. Calculating the amounts of the harm to the Company would involve a complex model resting on numerous valuation assumptions.  The parties developed and would have presented competing evidence on these issues, including competing expert evidence.   While Derivative Plaintiffs believed they had the better arguments, the risk remained that Defendants could have defeated certain categories of damages, or significantly diminished damages.

Even if Derivative Plaintiffs succeeded in obtaining a judgment at trial, the individual defendants almost certainly would have pursued post-trial motions to overturn the verdict and an appeal.  The individual defendants are well funded and represented by experienced counsel who would continue to mount a zealous and thorough defense to the Company's claims for relief not only before and during a full trial on the merits, but afterward, through post-trial motions and

appeals. *Id*. at ¶ 162. On their inevitable appeal, the individual defendants would have an opportunity not only to seek to overturn the judgment on the verdict (assuming that Derivative Plaintiffs succeeded at trial) but also to revisit the legal issues they had raised in their earlier dispositive motions. Derivative Plaintiffs therefore faced the risk that after the significant cost, time, and expense of litigating through a favorable verdict at trial, the individual defendants would delay payment of any judgment to the Company during appeals, potentially for years. Derivative Plaintiffs also faced the risk that by their appeals the individual defendants would avoid or narrow their liability on appeal or reduce the damages.

### c. The Contingent Nature of Derivative Counsel's Representation Supports the Requested Fee

In addition to the risks of establishing liability and damages, Derivative Counsel also faced the risk of total non-payment for any of its substantial efforts in pursuing this litigation, because the representation was on a fully contingent basis. Houston Declaration at ¶ 195. The Second Circuit recognizes that the risk associated with a litigation undertaken on a contingent fee basis is significant factor supporting a fee award:

> No one expects a lawyer whose compensation is contingent upon his success to charge, when successful, as little as he would charge a client who in advance had agreed to pay for his services, regardless of success. Nor, particularly in complicated cases producing large recoveries, is it just to make a fee depend solely on the reasonable amount of time expended.

*Grinnell*, 495 F.2d at 470;[6] *see also Pfizer*, 780 F. Supp. 2d at 343 (the risks of litigation "were accentuated by the fact that plaintiffs' counsel pursued the action on a fully contingent basis"); *In re Am. Bank Note Holographics, Inc.*, 127 F. Supp. 2d 418, 433 (S.D.N.Y. 2001) (concluding it is

---

[6]  *See also In re Wash. Pub. Power Supply Sys. Litig.*, 19 F.3d 1291, 1299-1300 (9th Cir. 1994) ("It is an established practice in the private legal market to reward attorneys for taking the risk of non-payment by paying them a premium over their normal hourly rates for winning contingency cases.") (citing Richard Posner, *Economic Analysis of Law* § 21.9, at 534-35 (3d ed. 1986)).

"appropriate to take this [contingent fee] risk into account in determining the appropriate fee to award").  Plaintiffs' Liaison Counsel was responsible for leading the prosecution of the derivative claims in its Court-appointed role.  From the outset, Liaison Counsel and all other Derivative Counsel understood that they were embarking on a complex, expensive and lengthy litigation with no guarantee of ever being compensated for the substantial investment of time and money the case would require.  Notwithstanding this risk, Derivative Counsel at all times dedicated sufficient resources to this action's prosecution, and ensured funds were available to compensate staff and to cover the considerable costs that prosecution of an action like this one requires.

The risk of no recovery in complex litigation of this type is very real.  In numerous actions, especially including derivative actions, plaintiffs' counsel expends thousands of hours and advances significant out-of-pocket expenses prosecuting the claims, yet receives no remuneration whatsoever.  *See, e.g., In re Walt Disney Co. Deriv. Litig.*, 907 A.2d 693 (Del. Ch. 2005), *aff'd*, 906 A.2d 27 (Del. 2006) (no fee award because derivative plaintiffs lost at trial after years of litigation and several pre-trial appeals); *In re BankAtlantic Bancorp, Inc.*, 2011 WL 1585605 (S.D. Fla. Apr. 25, 2011) (court granted defendants' motion for a judgment as a matter of law following jury verdict mostly in plaintiffs' favor); *In re JDS Uniphase Corp. Sec. Litig.*, 2007 WL 4788556 (N.D. Cal. Nov. 7, 2007) (jury verdict for defendants).

The only certainty from the outset of this entirely contingent litigation was that Derivative Counsel would receive no fee without a successful result, and that such a result would be realized only after a long and arduous litigation.  Nevertheless, Derivative Counsel assumed the risks associated with pursuing this case, zealously represented the best interests of VEREIT, and obtained substantial benefits for the Company.  Under these circumstances, the financial burden on contingent fee counsel is far greater than on a defense firm that is paid on an ongoing basis.  As this Court summarized:

> Lead Counsel undertook this Action on a wholly contingent basis, investing substantial amounts of time and money to prosecute this litigation with no guarantee of compensation or even the recovery of out-of-pocket expenses. Unlike counsel for Defendants, who are paid substantial hourly rates and reimbursed for their expenses on a regular basis, Lead Counsel have not been compensated for any time or expenses since this case began.

*In re Flag Telecom Holdings, Ltd. Sec. Litig.*, 2010 WL 4537550, at *27 (S.D.N.Y. 2010).

Derivative Counsel respectfully submits that the risks it undertook by prosecuting the Derivative

Action on a contingent basis supports the fairness and reasonableness of the fee request.

### 3. The Magnitude and Complexity of the Litigation Support Derivative Counsel's Requested Fee

The "magnitude and complexities of the litigation" confirm the reasonableness of the fee.

*Goldberger*, 209 F.3d at 50.   Courts have repeatedly recognized that derivative actions are

"notoriously difficult and unpredictable."  *In re AOL Time Warner Sec. Litig.*, 2006 WL 2572114,

at *3 (S.D.N.Y. October 25, 2006) (citing *Mathes,* 85 F.R.D. at 713 (quoting *Schimmel v. Goldman*,

57 F.R.D. 481, 487 (S.D.N.Y. 1973)); *In re Pac. Enters. Sec. Litig.*, 47 F.3d 373, 378 (9th Cir.

1995) ("the odds of winning [a] derivative lawsuit [a]re extremely small").  If derivative litigation

in general is complex and unpredictable, the Derivative Action was of a much larger scale, with

more adverse parties, and more complex issues than most derivative actions.  *See In re AIG, Inc.*

*Sec. Litig.*, 2010 WL 5060697, at *3 (S.D.N.Y. Dec. 2, 2010) (court's findings regarding the

complexity, expense and likely duration of the litigation under *Grinnell* also satisfy this prong of

the *Goldberger* analysis).

From a procedural perspective, the Derivative Action was exceptionally complex, even in

comparison to other derivative litigation.  Prosecution of this action involved legal and factual

issues arising from a coordinated litigation containing over one dozen separate actions, dozens of

parties, third parties, and related entities, defendants who were adverse to each other, and a nominal

defendant with management that repeatedly attempted to interfere in the prosecution of the

derivative claims.  *See* Houston Declaration at ¶¶ 51, 77-80, 87, 114.  These procedural complexities resulted in a massive and convoluted factual record.  During document discovery, over seventy parties and non-parties produced more than 846,000 documents totaling several million pages.  *Id.* at ¶ 83.  Ever mindful of the Court's direction not to pursue duplicative examinations, Derivative Counsel pursued Derivative Plaintiffs' discrete theories at thirty-five depositions and remained focused on fiduciary claims throughout the review of millions pages of documents reviewed in the Derivative Action alone. *Id.* at ¶¶ 91-95.  During depositions, well over one thousand exhibits were entered into the record. *Id.* at ¶ 200.  In addition to actively prosecuting the Derivative Action, Derivative Counsel closely observed and analyzed prosecution of the Class Action and Direct Actions, as well as the criminal prosecution and trial of Brian Block, and the SEC enforcement actions.

The Derivative Action was also substantively complex, implicating numerous theories of harm subject to various standards of proof and exculpation.  The derivative claims were developed through a painstaking analysis of the enormous discovery record, and the similarly large record of Block's trial. *Id.* at ¶ 10(l).  Notably, Derivative Counsel received no benefit from the Board's Audit Committee investigation because the Board repeatedly claimed privilege over any work conducted by that committee and refused to permit witnesses to testify about such work.  *Id.* at ¶ 201.  Claims arising from the AFFO fraud alone raised a host of complex issues.  For example, two types of AFFO misstatement occurred: (1) the fraudulent plug in the second quarter 2014 results; and (2) an error due to an improper calculation of AFFO that apparently occurred over several years.  While issues related to the AFFO plug were relatively straight forward because they involved the clearly fraudulent use of an unsupported number in VEREIT's financial statements, issues related to the improper calculation of AFFO were significantly more complicated.  There is

no standard on how to calculate AFFO, and even the terminology for describing the incorrect way of calculating the metric and the two equally correct ways of calculation was disputed.

While the complexity and magnitude of the accounting fraud at VEREIT is well known to the Court, Derivative Plaintiffs faced an added dimension of complexity arising from the enormous scale of unauthorized and improper related party transactions that were at issue only in the Derivative Action. During discovery, Derivative Plaintiffs identified claims for self-dealing including the unauthorized acceleration of the 2013 OPP and the ARCT III Promote. *See* Houston *Id*. at ¶¶ 93-105. Defendants' wrongdoing in connection with these two transactions had never been publicly disclosed.

Derivative Counsel uncovered the wrongdoing through their review of documents produced in discovery and created a comprehensive record of the impropriety of both transactions during deposition testimony. *Id*. at ¶¶ 93-95. The unauthorized nature of these transactions was not facially evident. Piecing together a complete record required detailed reviews of the numerous underlying contracts and side agreements, email correspondence related to the underlying contracts and the transactions, Board minutes during which the Board considered the transactions, and construction of a day-by-day timeline establishing what defendants knew, when they knew it, and when they took possession of their ill-gotten gains. *Id*. Derivative Counsel's financial expert calculated the individual defendants' potential exposure from only the ARCT III Promote and the 2013 OPP acceleration to be in excess of $202 million. *Id*. at ¶ 202. While plaintiffs in all the Coordinated Actions had the benefit of the other plaintiffs' deposition examinations to develop their AFFO theories, which themselves involved very complex accounting issues, the related party transactions were not at issue in any of the other Coordinated Actions and Derivative Plaintiffs alone shouldered the burden of developing those claims.

The Derivative Action was an extraordinarily complicated litigation of singular magnitude, and this factor supports Derivative Counsel's request for 8% of the financial benefit to VEREIT from the Derivative Settlement.

### 4. The Quality of Representation Supports the Requested Fee

The fourth factor to be considered with respect to the reasonableness of the fee request is the quality of the representation by Derivative Counsel, the standing of that counsel at the bar, and the quality of opposing counsel. *See Global Crossing*, 225 F.R.D. at 467. Derivative Counsel respectfully submits that the quality of representation that VEREIT received is best evidenced by the quality of the result obtained. *Id*. (the quality of representation "is evidenced by the recovery obtained..."). As set forth in the Cox Declaration, the Derivative Settlement is one of the largest derivative recoveries recorded and is unique because the entire financial benefit conferred on VEREIT comes directly from alleged wrongdoers and not from any insurance policy or through an acquisition price increase. Derivative Counsel's representation here obtained "a significant milestone in modern-day shareholder litigation." Cox Declaration at ¶ at 20.

It is a rare event when a derivative action settles for over $200 million, let alone $286.5 million. Cox Declaration at ¶ 17. For that amount to be paid directly by wrongdoers, rather than an insurance company, is unheard of. This result is due to Derivative Counsel's work to prevail on dispositive motions and repeatedly avoid VEREIT's attempts to prevent and halt prosecution of the derivative claims. *See* Houston Declaration at ¶¶ 51, 77-80, 87, 114. Derivative Counsel has successfully litigated these types of actions in courts throughout the country, and all firms have a successful track record in such cases. Houston Declaration, Exhibits D-Q. Derivative Counsel's individual declarations submitted herewith outline the experience and qualifications of the attorneys and their respective firms who worked on the action, the time expended in rendering their services, and the attorneys' standard hourly rates and a description of the work performed. *Id*.

The quality of work performed by Derivative Counsel in securing the Derivative Settlement should also be evaluated in the light of the quality of the opposition. "The quality of opposing counsel is also important in evaluating the quality of the services rendered by Plaintiffs' Class Counsel." *Maley v. Del Global Tech. Corp.*, 186 F. Supp. 2d 358, 373 (S.D.N.Y. 2002). Here, defendants were represented by a veritable "who's who" of the defense bar including Paul, Weiss, Rifkind, Wharton & Garrison LLP, Kellogg Hansen, Todd, Figel & Frederick P.L.L.C., Steptoe & Johnson LLP, Kirkland & Ellis LLP, Petrillo Klein & Boxer LLP, Zuckerman Spaeder LLP, Weil Gotshal & Manges LLP, and Sidley Austin LLP. The Company's outside counsel, Milbank LLP, who defended VEREIT in the Class Action, also was a formidable opponent in the context of the efforts to shut down the derivative litigation on multiple occasions. Similarly, VEREIT's management retained Saul Ewing Arnstein & Lehr LLP, Morvillo Abramowitz Grand Iason & Anello PC, and Wachtell, Lipton, Rosen & Katz in their attempts to prevent and halt prosecution of the derivative claims. Notwithstanding the skill and resources of defense counsel, Derivative Counsel nonetheless pressed theories that ultimately brought the Non-VEREIT Settling Defendants to the settlement table and obtained a very large financial benefit for VEREIT from those same defendants. Without the experience, skill, determination, and creativity displayed by Derivative Counsel during the prosecution of the Derivative Action, such a favorable recovery for VEREIT would not have been attained. The ability of Derivative Counsel to obtain such a favorable recovery for VEREIT in the face of such formidable opposition further reflects the superior quality of their work.

Throughout the litigation, Derivative Counsel acted in the utmost of good faith and in a sincere effort to represent the best interest of VEREIT and its shareholders and respectfully submit that this factor supports the fee request of 8% of the financial benefit to VEREIT.

21

5.      **Public Policy Considerations Support Derivative Counsel's Requested Fee**

The purpose of derivative litigation is "to place in the hands of the individual shareholder a means to protect the interests of the corporation from the misfeasance and malfeasance of 'faithless directors and managers.'"  *Kamen v. Kemper Fin. Serv., Inc.*, 500 U.S. 90, 95 (1991). The Derivative Action, which vindicated the interests of VEREIT and its shareholders after alleged misfeasance by individual defendants, would not have been possible if courts had not long recognized the societal interest in incentivizing specialized and experienced counsel to bring high-risk, high-stakes derivative actions.  *See, e.g., Flag Telecom*, 2010 WL 4537550, at *29 ("'[P]ublic policy concerns favor the award of reasonable attorneys' fees in class action securities litigation.'"); *In re WorldCom Inc., Sec. Litig.*, 388 F. Supp. 2d 319, 359 (S.D.N.Y. 2005) ("In order to attract well-qualified plaintiffs' counsel who are able to take a case to trial, and who defendants understand are able and willing to do so, it is necessary to provide appropriate financial incentives.").

Public policy supports granting attorneys' fees that are sufficient to encourage plaintiffs' counsel to bring securities class actions and derivative actions that supplement the efforts of the government regulators and help deter future wrongdoing.  *See Maley*, 186 F. Supp. 2d at 373 ("In considering an award of attorney's fees, the public policy of vigorously enforcing the federal securities laws must be considered.").  Derivative Counsel's willingness to assume the risks of this litigation resulted in substantial financial benefits to VEREIT.  Awarding Derivative Counsel attorneys' fees to compensate it will encourage counsel in future derivative cases to bargain for meaningful individual contributions to the corporation.

Public policy particularly favors the fee request because the Derivative Settlement avoids the "circularity" criticism frequently leveled against derivative settlements.  Cox Declaration at ¶ 22.  Certain academics and commentators have questioned the social value of shareholder class

and derivative litigation on the grounds that such litigation typically only obtains cash recoveries that ultimately are the product of the corporation itself through insurance. *Id.*  As Professor Cox explains, this "circularity" does not occur in the Derivative Settlement.  As a result, the Derivative Settlement sends a strong deterrence message to directors and officers of public companies and holds the alleged wrongdoers accountable for their actions. *Id.* at ¶¶ 21-22.  From the first unsuccessful mediation in March 2017 to their response to the individual defendant's request for a settlement demand in February 2019, through the ultimate resolution of the Derivative Action, Derivative Counsel insisted that any resolution would provide a substantial financial benefit to VEREIT and that such benefit would come from third-party sources.  That Derivative Counsel's efforts resulted in a socially useful settlement that specifically avoids the frequent criticisms of derivative litigation is a factor in favor of awarding the requested 8% fee.

### 6.  The Requested Attorneys' Fees are Fair and Reasonable in Light of the Time and Labor Expended by Counsel

The "time and labor expended by counsel" confirms the reasonableness of the 8% fee request. *Goldberger*, 209 F.3d at 50.  Courts assess attorney time and labor using a "lodestar" that multiplies the hours reasonably expended by reasonable hourly rates. *Wal-Mart*, 396 F.3d at 121. Courts can then apply "a multiplier based on factors such as the riskiness of the litigation and the quality of the attorneys." *Id.*  "Under the lodestar method, a positive multiplier is typically applied to the lodestar in recognition of the risk of the litigation, the complexity of the issues, the contingent nature of the engagement, the skill of the attorneys, and other factors." *In re Marsh & McLennan Cos., Inc. Sec. Litig.*, 2009 WL 5178546, at *20 (S.D.N.Y. Dec. 23, 2009).[7]

---

[7]    *See also Converse*, 2010 WL 2653354, at *5 ("Where . . . counsel has litigated a complex case under a contingency fee arrangement, they are entitled to a fee in excess of the lodestar."); *In re Cardinal Health Inc. Sec. Litig.*, 528 F. Supp. 2d 752, 761 (S.D. Ohio 2007) ("[T]he Court rewards . . . lead counsel that takes on more risk, demonstrates superior quality, or achieves a greater settlement with a larger lodestar multiplier.").

As discussed above, where a court relies on the "percentage of recovery" method, it normally uses the lodestar only as a "cross-check" on the reasonableness of the percentage. *See Wal-Mart*, 396 F.3d at 123; *Goldberger*, 209 F.3d at 50. "Where the lodestar is used as a cross-check, the hours documented by counsel need not be exhaustively scrutinized by the district court." *Marsh*, 2009 WL 5178546, at *16. "Instead, the reasonableness of the claimed lodestar can be tested by the court's familiarity with the case." *Goldberger,* 209 F.3d at 50.

The lodestar method amply confirms the reasonableness of the fee request here. Derivative Counsel dedicated a total of 20,664 hours to the investigation, prosecutions, and resolution of the Derivative Action, with a resulting lodestar of $12,740,618. The requested fee of $22,920,000 is 8% of the financial benefit to VEREIT from the payments of the Contributing Parties and represents a 1.8 multiplier on the collective lodestar. The fee is even more reasonable in light of the estimated $100 million in additional savings conferred on VEREIT by the termination of continued litigation and indemnification obligations and the release of Grant Thornton's counterclaims.

A multiplier of 1.8 is well below the multipliers awarded in other recent complex class, derivative, and securities settlements in this Circuit. *See, e.g., Wal-Mart*, 396 F.3d. at 123 (affirming multiplier of 3.5); *Velez*, 2010 WL 4877852, at *23 (awarding a multiplier of 2.4 and noting that it "falls well within (indeed, at the lower end) of the range of multipliers accepted within the Second Circuit"); *In re Credit Default Swaps Antitrust Litig.*, 2016 WL 2731524, at *17 (S.D.N.Y. Apr. 26, 2016) (approving $253.8 million fee based on multiplier of "just over 6" in a case that settled *before* class certification and based on lodestar generated from *2016* partner rates of $834 to $1,125 and associate rates of $411 to $714 (ECF No. 482)); *Woburn Ret. Sys. v. Salix Pharm., Ltd*., 2017 WL 3579892, at *6 (S.D.N.Y. 2017) ("Although a lodestar multiplier of 3.14 for a settlement of $210 million is high, it is still within the range of lodestar multipliers approved

24

in this Circuit."); *In re Deutsche Telekom AG Sec. Litig.*, 2005 WL 7984326, at *4 (S.D.N.Y. June 9, 2005) (approving multiplier of 3.96 for settlement of $120 million); *see also EVCI*, 2007 WL 2230177, at **1, 17 (2.48 multiplier "is within the range found to be reasonable" despite settlement of only $7.7 million).[8]

Empirical evidence also demonstrates that the multiplier of 1.8 requested in this case is not only reasonable, it is low compared to similarly sized settlements. The mean lodestar multiplier for cases with recoveries in excess of $67.5 million is 2.72, and "[f]or cases with recoveries of more than $175.5 million, the mean multiplier was 3.18." Miller Declaration at ¶ 55. The 1.8 multiplier here is thus below the average for similarly sized cases:

> [A]s recoveries grow larger, so do multipliers for 35 cases with recoveries in excess of $67.5 million, the average multiplier reported in Eisenberg, Miller and Germano's study was 2.72 – in excess of the 1.84 multiplier requested in the present case. Moreover, because the trend is upward, a large case such as the present litigation can be expected to result in a multiplier even higher than 2.72. This study indicates that derivative counsel's requested multiplier is below what would be expected in a case of this dimension.

Miller Declaration at ¶ 54.

---

[8]     *See also Cohn v. Nelson*, 375 F. Supp. 2d 844, 862 (E.D. Mo. 2005) (awarding 2.9 multiplier in a corporate therapeutics derivative settlement); *In re Lucent Tech., Inc. Sec. Litig.*, 327 F. Supp. 2d 426, 462-63 (D.N.J. 2004) (1.67 multiplier for derivative counsel "is appropriate under the lodestar cross-check" even though results were "not extraordinary"); *In re Cendant Corp. Derivative Action Litig.*, 232 F. Supp. 2d 327, 341-42 (D.N.J. 2002) (awarding 2.59 multiplier, over objection, for corporate governance reforms and $54 million cash recovery); *In re NASDAQ Market-Makers Antitrust Litig.*, 187 F.R.D. 465, 489 (S.D.N.Y. 1998) (awarding multiplier of 3.97 on lodestar of $36.2 million and noting that "multipliers of between 3 and 4.5 have become common"); *In re Sumitomo Copper Litig.*, 74 F. Supp. 2d 393, 399 (S.D.N.Y. 1999) (awarding 27.5% fee on $134.6 million settlement and finding multipliers of 3 to 4.5 to be common); *Roberts v. Texaco, Inc.*, 979 F. Supp. 185, 197 (S.D.N.Y. 1997) (multiplier of 5.5); *In re Colgate-Palmolive Co. ERISA Litig.*, 36 F. Supp. 3d 344, 353 (S.D.N.Y. 2014) (multiplier of 5.2); *Cornwell v. Credit Suisse Grp.*, No. 08-cv-03758 (VM), ECF No. 117, at ¶ 9 (S.D.N.Y. July 18, 2011) (multiplier of 4.7); *In re AOL Time Warner, Inc. Sec. Litig.*, 2006 WL 3057232 (S.D.N.Y. Oct. 25, 2006) (multiplier of 3.7); *In re WorldCom*, 388 F. Supp. 2d at 354, 360 (multiplier of 4.0); *Bd. of Trustees of the AFTRA Ret. Fund v. JPMorgan Chase Bank, N.A.*, 2012 WL 2064907, at *3 (S.D.N.Y. June 7, 2012) (multiplier of 2.86); *Comverse*, 2010 WL 2653354, at *6 (multiplier of 2.78); *In re Am. Express Fin. Advisors Sec. Litig.*, No. 04 Civ. 1773 (DAB), ECF No. 170, at ¶ 16-17 (S.D.N.Y. July 18, 2007) (multiplier of 2.8 for settlement reached while motion to dismiss was pending).

The size of the lodestar reflects the exceptional amount of time and labor that this action required Derivative Counsel to expended prosecuting it and has been scrutinized closely by counsel during prosecution of the action and prior to submission to the Court.  Liaison Counsel carefully controlled which attorneys worked on which projects to efficiently manage time spent.  For example, if one attorney was assigned a deposition, it was the singular responsibility of that attorney to prepare (with the assistance of junior and staff attorneys) and conduct that deposition in order to control time.  No more than two attorneys from Derivative Counsel attended any deposition and for the majority of depositions, only one attorney attended and examined the witness.  In document review, senior attorneys limited their work to targeted and document specific searches, review of project attorney reports, and review of hot and noteworthy documents.  All of the day-to-day document review in the Derivative Action was conducted by project attorneys and associates with lower billable rates appropriate to their skill and experience levels.  Houston Decl. at ¶ 210.

Further, in calculating their lodestar for submission to the Court, Derivative Counsel reviewed and edited its' time for reasonableness using billing discretion.[9]  First, Derivative Counsel reviewed time records from the years of litigation for accuracy of reporting.  Second, Derivative Counsel determined that no time billed for case administration should be included in the lodestar submitted to the Court and removed such time.  Third, Derivative Counsel removed from the lodestar submitted to the Court all time billed for work on any derivative action that

---

[9]     For the convenience of the Court, in addition to individual declarations from each participating firm, the time, rates, average billing rates, and range of rates for each firm are set forth on Exhibit S to the Houston Declaration.  Each professional's billing rate is set forth in the firm declarations attached as Exhibits D-Q.  To aid the Court in understanding how that time was spent, Derivative Counsel also categorized their time into task-specific tranches as reflected in Exhibit T to the Houston Declaration.  For example, pleadings and motion practice constituted 22.5%, document review 30%, and depositions 19% of the total time spent in prosecution of the Derivative Action.

alleged demand futility.[10]   Instead, only time billed prosecuting the demand refusal actions is included in the derivative lodestar calculation.  Houston Declaration at ¶ 211.

Nevertheless, Derivative Counsel's lodestar reflects the many thousands of hours spent investigating the underlying conduct, overcoming the motions to dismiss, and taking extensive discovery from dozens of parties.  As set forth in greater detail in the Houston Declaration, counsel's work included, among other things: (i) researching specific Maryland fiduciary law and accounting measures relating to publicly-traded real estate investment trusts and institution of the Derivative Action; (ii) submitting the demand and overcoming motions to dismiss; (iii) defeating prevailing on a related appeal to the Second Circuit; (iv) developing claims against Schorsch, Kahane, Weil, and Block that were wholly-independent from the Class Action and based on previously unexposed conduct; (v) working with both corporate governance and valuation experts to develop theories of liability and damages; (vi) conducting extensive document and deposition discovery, including the review of several million pages and the depositions of all seven individual defendants, six witnesses from Grant Thornton, and over twenty other witnesses including former VEREIT employees and directors; (vii) moving for summary judgment against two individual defendants and opposing four summary judgment motions brought six individual defendants; (viii) preparing for and participating into two separate in-person mediation sessions and additional meetings with the Mediator; and (ix) negotiating settlement of the Derivative Action with both VEREIT and the Non-VEREIT Settling Defendants.  Houston Declaration at ¶ 10(a) – (u).

Further, Derivative Counsel's hourly rates are reasonable.  In determining the propriety of a firm's hourly rates, Courts compare "those [rates] prevailing in the community for similar

---

[10]     Several of the Derivative Plaintiffs other than Witchko initially filed suit without a pre-suit demand, alleging that demand was futile.  After the Court dismissed the demand futility actions, these plaintiffs submitted demands to VEREIT's board and refiled their actions alleging wrongful demand refusal.  Because the demand futility actions were dismissed, time billed prosecuting them has been excluded.

services of lawyers of reasonably comparable skill, experience, and reputation." *Cruz v. Local Union No. 3, IBEW*, 34 F.3d 1148, 1159 (2d Cir. 1994) (quoting *Blum v. Stenson*, 465 U.S. 886, 896 n.11 (1984)).  Here, Derivative Counsel's rates are the competitive hourly rates in its legal community for litigating complex cases of this type.  Derivative Counsel's rates range from a low of $350/hour for junior attorneys to $960/hour rates for the senior-most attorneys.  A study in the *ABA Journal* published in 2016 found that billing rates of senior partners at the large New York firms now "nudg[e] $1,500 per hour."  Miller Declaration at ¶ 50.  As explained by Professor Miller, Derivative Counsel's rates are "tellingly are less than the rates reported for firms that have represented VEREIT and the individual defendants in the present case."  Miller Declaration at ¶ 51.  The comparison to hourly rates charged by large defense firms supports the reasonableness of Derivative Counsel's rates and lodestar.  *See Grinnell*, 495 F.2d at 470 (observing that contingent fees normally result in a higher hourly rate than hourly retentions because of the risk of non-compensation).

The significant time incurred by Derivative Counsel on a purely contingent basis is well-within the parameters of a reasonable fee award and is more than reasonable given the substantial benefits achieved and the complexity of the issues presented.

### 7.      No Shareholder Has Objected

Pursuant to the Preliminary Approval Order in this action, VEREIT filed an SEC Form 8-K with a copy of the Notice of Settlement and posted the same Notice on its website.  The Notice advised current VEREIT shareholders of the terms of the Derivative Settlement and that Plaintiffs' Counsel would request up to $26 million in fees in addition to expense reimbursement.  Houston Declaration at ¶ 219.  The Notice provided that the deadline for making objections to the fee request is December 31, 2019.  *Id*.  As of the date of this filing, December 17, 2019, no shareholder – whether individual or institutional – has objected to the settlement or the requested attorneys' fees

and expenses.  *Id.*  Courts regard the fact that there are few or no objections to a settlement as an important factor in approving a settlement and awarding fees.  *See DeBoer v. Metton Mortgage Co.,* 64 F.3d 1171, 1178 (8th Cir. 1995) ("The fact that only a handful of class members objected to the settlement . . . weighs in its favor.").

## III.   DERIVATIVE COUNSEL'S REQUEST FOR REIMBURSEMENT OF OUT-OF-POCKET EXPENSES NECESSARY TO THE PROSECUTION OF THIS ACTION SHOULD BE GRANTED

It is "well established that counsel who create a common fund are entitled to the reimbursement of expenses that they advance to a class." *In re Veeco Instruments, Inc. Sec. Litig.*, 2007 WL 4115808, at *10 (S.D.N.Y. Nov. 7, 2007).  "Courts in the Second Circuit normally grant expense requests in common fund cases as a matter of course." *In re EVCI*, 2007 WL 2230177, at *18 (quoting *In re Arakis Energy Corp., Sec. Litig.*, 2001 WL 1590512, at *17 n. 12 (E.D.N.Y. Oct. 31, 2001)).  *See also Cohn*, 375 F. Supp. 2d at 866.

Here, Derivative Counsel seeks a total of $594,882 in unreimbursed costs. For the Court's convenience, Exhibit U to the Houston Declaration provides a summary of the expenses sought for reimbursement.  Derivative Counsel was motivated to and did in fact minimize the outlay of expenses because the Derivative Action was prosecuted on a fully contingent basis.  Derivative Counsel were well aware that they might not be any recovery of expenses.

Derivative Counsel has excluded from this request office related expenses including in-house copying and telephone/fax expenses.[11] *See Global Crossing*, 225 F.R.D. at 468 ("The expenses incurred—which include investigative and expert witnesses, filing fees, service of

---

[11]   These expenses include no amounts for "general overhead" items within the meaning of A.B.A. Formal Opinion 93-379 (e.g., maintaining a library, securing malpractice insurance, the cost of office space, or utilities), and they include no "surcharges" (or failure to pass on any discounted prices) over and above amounts actually billed to Derivative Counsel for goods and services provided directly in connection with this litigation. *See In re AMF Bowling Sec. Litig.*, 334 F. Supp. 2d 462, 469-70 (S.D.N.Y. 2004) (requiring submission of supplemental expense information in accordance with ABA Formal Opinion 93-379 (1993)).

process, travel, legal research and document production and review—are the type for which 'the paying, arms' length market' reimburses attorneys [and] [f]or this reason, they are properly chargeable to the Settlement fund.").

These significant expenses were incurred because they were essential to the effective prosecution of this action.  For example, $217,805, or approximately 37% of Derivative Counsel's total expenses, was incurred in connection with the electronic document repository for documents produced in discovery, $121,840, or 20% of total expenses, was for court reporting fees, and $158,928.38, or approximately 27% of the total expenses, was in payment of Derivative Counsel's expert witnesses, who worked closely with counsel during discovery and settlement negotiations. Houston Declaration at ¶¶ 222-24; Exhibit U.  These three categories alone consisted 84% of Derivative Counsel's outlay of expenses.  *See EVCI*, 2007 WL 2230177, at *18 (80% of expenses were incurred in connection with damages expert and legal and factual research, all of which "were essential to the successful prosecution and resolution of this Action"); *Veeco*, 2007 WL 4115808, at *11 (reimbursing expenses where 70% of expenses were related accounting and damages experts).

## CONCLUSION

For all of these reasons, Derivative Plaintiffs respectfully request that the Court award Derivative Counsel attorneys' fees in the amount of $22,920,000 million, plus reimbursement of expenses in the amount of $594,882.

Dated:  December 17, 2019

Respectfully submitted,

GLANCY PRONGAY & MURRAY LLP

Robert I. Harwood
Matthew M. Houston
Benjamin I. Sachs-Michaels
712 Fifth Avenue, 31st Floor
New York, NY 10019
Tel: (212) 935-7400

*Liaison Counsel for Plaintiffs*

Robert C. Schubert
Willem F. Jonckheer
SCHUBERT JONCKHEER & KOLBE LLP
Three Embarcadero Center, Suite 1650
San Francisco, CA 94111
Tel: (415) 788-4220

Jeffrey M. Norton
NEWMAN FERRARA LLP
1250 Broadway, 27th Floor
New York, NY 10001
Tel: (212) 619-540

Timothy Brown
THE BROWN LAW FIRM, P.C.
240 Townsend Square
Oyster Bay, NY 11771
Tel: (516) 922-5427

31

Timothy Brown
THE BROWN LAW FIRM, P.C.
240 Townsend Square
Oyster Bay, NY 11771
Tel: (516) 922-5427

Corey D. Holzer
Marshall P. Dees
HOLZER & HOLZER, LLC
1200 Ashwood Parkway, Suite 410
Atlanta, GA 30338
Tel: (770) 392-0090

Curtis V. Trinko
LAW OFFICES OF CURTIS V. TRINKO,
LLP
16 West 46th Street, 7th Floor
New York, NY 10036
Tel: (212) 490-9550

Alfred G. Yates, Jr.
Gerald L. Rutledge
LAW OFFICE OF ALFRED G. YATES JR
PC
519 Allegheny Building
300 Mt. Lebanon Blvd, Suite 206-B
Pittsburgh, PA 15219
Tel: (412) 391-5164

*Counsel for Plaintiffs*