UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| JOANNE WITCHKO, Derivatively on Behalf of Nominal Defendant AMERICAN REALTY CAPITAL PROPERTIES, INC., | Lead Case No. 1:15-cv-06043-AKH |
| Plaintiff, | (Consolidated with Case No. 1:15-cv-08563-AKH) |
| v. | |
| NICHOLAS S. SCHORSCH, et al., | |
| Defendants, | |
| -and- | |
| AMERICAN REALTY CAPITAL PROPERTIES, INC., | |
| Nominal Defendant. | |

**AMERICAN REALTY CAPITAL PROPERTIES, INC.'S MEMORANDUM OF LAW IN OPPOSITION TO DERIVATIVE PLAINTIFFS' MOTION FOR ATTORNEYS' FEES AND REIMBURSEMENT OF EXPENSES**

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................................ 1

BACKGROUND ................................................................................................................. 7

    A.    Procedural History of This Action. ....................................................... 7

    B.    The Derivative Actions in Other Jurisdictions. ..................................... 10

        1.    The *Kosky* Actions. ................................................................... 10

        2.    The *Frampton* Action. ............................................................. 11

        3.    The *Meloche* Action. ................................................................ 11

    C.    The Settlement Is Largely the Result of the Company's—Not Derivative Counsel's—Investigative Efforts, Preservation of Claims, and Negotiation Efforts. ................................................................................... 12

        1.    Derivative Counsel's Complaint Is Largely Lifted from the Company's Restatement and Public Filings. ............................................. 12

        2.    The Company's Actions—Not Derivative Counsel's—Put Pressure on the Derivative Defendants to Settle the Derivative Claims. ................ 15

ARGUMENT .................................................................................................................... 17

I.    MARYLAND LAW GOVERNS THE FEE AWARD IN THIS DIVERSITY ACTION, AND MARYLAND LAW FAVORS APPLICATION OF THE LODESTAR METHOD, NOT THE PERCENTAGE RECOVERY METHOD PUT FORTH BY DERIVATIVE COUNSEL. .................................................... 17

II.    APPLICATION OF THE PERCENTAGE RECOVERY METHOD WOULD BE INAPPROPRIATE HERE. ..................................................................... 18

    A.    The Precise Value of the Derivative Settlement Is Impossible to Ascertain. ....... 19

    B.    The Settlement Is Largely the Result of the Company's—Not Derivative Counsel's—Investigative Efforts, Preservation of Claims, and Negotiation Efforts. ................................................................................... 23

III.    DERIVATIVE COUNSEL'S LODESTAR CANNOT BE ACCURATELY CALCULATED BECAUSE THEY DID NOT SUBMIT DETAILED BILLING RECORDS AND BECAUSE THE PROPOSED LODESTAR IS INFLATED BY EXCESSIVE AND DUPLICATIVE BILLING. .............................................. 25

    A.    Derivative Counsel's Failure to Provide Detailed, Contemporaneous Billing Records Requires Denial of Their Fee Request. ....................................... 25

B.     At a Minimum, Derivative Counsel's Lodestar Must Be Substantially
       Reduced..................................................................................................... 28

       1.     Consideration of the Relevant Factors under Maryland Law
              Requires Substantial Reduction of the Proposed Lodestar. ..................... 28

       2.     It Is Clear That the Work Performed by Fifteen Law Firms
              Involved Substantial Duplication and Excess Billing............................... 30

C.     A Multiplier Is Not Warranted................................................................... 34

IV.    DERIVATIVE COUNSEL'S REQUEST FOR EXPENSES IS UNSUPPORTED
       AND EXCESSIVE. ............................................................................................ 36

A.     Derivative Counsel Fail to Provide Sufficient Documentation of Expenses......... 36

B.     Plaintiffs Seek Reimbursement of Unnecessary and Excessive Expert
       Costs............................................................................................................. 37

CONCLUSION.................................................................................................... 38

# **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Boyd v. Coventry Health Care Inc.*,
    299 F.R.D. 451 (D. Md. 2014)..................................................................................5, 27

*CA, Inc. v. Wang*,
    2013 WL 12366073 (E.D.N.Y. Mar. 26, 2013) ...................................................18

*Diamond Point Plaza Ltd. P'ship v. Wells Fargo Bank, N.A.*,
    400 Md. 718 (2007) ..........................................................................................25, 28

*Dotson v. Bell Atl.-Md., Inc.*,
    2003 WL 23508428 (Md. Cir. Ct. Nov. 13, 2003) ...........................................6, 34

*Flores v. Mamma Lombardi's of Holbrook, Inc.*,
    104 F. Supp. 3d 290 (E.D.N.Y. 2015) ...................................................................35

*Friolo v. Frankel*,
    373 Md. 501 (2003) ..........................................................................18, 28, 29, 30

*Garcia v. Foulger Pratt Dev., Inc.*,
    155 Md. App. 634 (2003) .......................................................................................18

*Garza v. Mitchell Rubenstein & Assocs., P.C.*,
    2016 WL 7468039 (D. Md. Dec. 27, 2016)...........................................................33

*Globus v. Law Research Service, Inc.*,
    418 F.2d 1276 (2d Cir. 1969).........................................................................21, 23

*Goldberger v. Integrated Res., Inc.*,
    209 F.3d 43 (2d Cir. 2000).............................................................................34, 35

*In re Anthem, Inc. Data Breach Litig.*,
    2018 WL 3960068 (N.D. Cal. Aug. 17, 2018) ..............................................30, 36

*In re AOL Time Warner Shareholder Derivative Litig.*,
    2010 WL 363113 (S.D.N.Y. Feb. 1, 2010)............................................................19

*In re Assicurazioni Generali S.p.A. Holocaust Ins. Litig.*,
    2009 WL 762438 (S.D.N.Y. Mar. 24, 2009) .......................................................34

*In re Cablevision S'holders Litig.*,
    2009 WL 357459 (Sup. Ct. Nassau Cnty. Jan. 22, 2009).....................................33

*In re Pfizer Inc. S'holder Deriv. Litig.*,
 780 F. Supp. 2d 331 (S.D.N.Y. 2011) .................................................................18

*In re Star Scientific, Inc. Derivative Litig.*,
 2016 WL 4820637 (E.D. Va. Aug. 3, 2016) ................................................5, 27, 33

*In re Tremont Sec. Law, State Law & Ins. Litig.*,
 2019 WL 516148 (S.D.N.Y. Feb. 11, 2019) ......................................................35

*In re Wash. Mut. RESPA Fee Litig.*,
 2009 WL 749933 (E.D.N.Y. Mar. 17, 2009) ......................................................35

*In re World Trade Ctr. Disaster Site Litig.*,
 105 F. Supp. 3d 413 (S.D.N.Y. 2015) ............................................................5, 26

*Jerstad v. New York Vintners, LLC*,
 2019 WL 6769431 (S.D.N.Y. Dec. 12, 2019) .....................................................36

*Kabore v. Anchor Staffing, Inc.*,
 2012 WL 5077636 (D. Md. Oct. 17, 2012) .......................................................32

*Kaplan v. Rand*,
 192 F.3d 60 (2d Cir. 1999) ..........................................................................17

*King Fook Jewellry Grp. v. Jacob & Co. Watches, Inc.*,
 2019 WL 2535928 (S.D.N.Y. June 20, 2019) .....................................................36

*Kirsch v. Fleet St., Ltd.*,
 148 F.3d 149 (2d Cir. 1998) ......................................................................4, 25

*Levy v. Gen. Elec. Capital Corp.*,
 2002 WL 1225542 (S.D.N.Y. June 4, 2002) ......................................................33

*Mango v. BuzzFeed, Inc.*,
 397 F. Supp. 3d 368 (S.D.N.Y. 2019) .............................................................36

*McLaughlin v. IDT Energy*,
 2018 WL 3642627 (E.D.N.Y. July 30, 2018) .....................................................34

*Merryman v. JPMorgan Chase Bank, N.A.*,
 2019 WL 6245396 (S.D.N.Y. Nov. 22, 2019) ................................................30, 36

*Millea v. Metro-N. R.R. Co.*,
 658 F.3d 154 (2d Cir. 2011) .......................................................................6, 34

*Milliken v. Am. Realty Capital Hosp. Advisors, LLC*,
 2018 WL 3745669 (S.D.N.Y. Aug. 7, 2018) ......................................................17

*Rochkind v. Stevenson*,
 2016 WL 3961361 (Md. Ct. Spec. App. July 20, 2016) .......................................................33

*Rubery v. Caplan*,
 2013 WL 12327500 (S.D.N.Y. Oct. 3, 2013) .........................................................................19

*Scott v. City of New York*,
 626 F.3d 130 (2d Cir. 2010)...................................................................................................25

*Seinfeld v. Robinson*,
 2001 WL 36023241 (Sup. Ct. N.Y. Cnty. Mar. 8, 2001) .......................................................33

*SunTrust Bank v. Goldman*,
 201 Md. App. 390 (2011) .......................................................................................................29

*Wallace v. Fox*,
 7 F. Supp. 2d 132 (D. Conn. 1998)........................................................................5, 25, 27, 31

*Weichert Co. of Md. v. Faust*,
 191 Md. App. 1 (2010) ...........................................................................................................25

*Yamada v. Nobel Biocare Holding AG*,
 825 F.3d 536 (9th Cir. 2016) .................................................................................................19

*Zimmerman v. Portfolio Recovery Assocs., LLC*,
 2013 WL 6508813 (S.D.N.Y. Dec. 12, 2013) .................................................................35, 36

## Other Authorities

Fed. R. Civ. P. 7.........................................................................................................................31

Md. R. Prof. Conduct 1.5............................................................................................................28

Nominal Defendant American Realty Capital Properties, Inc. (n/k/a VEREIT, Inc.) ("ARCP" or the "Company"), by its undersigned attorneys, respectfully submits this memorandum of law in opposition to the motion for attorneys' fees and reimbursement of expenses (Dkt. No. 292) and memorandum of law in support (Dkt. No. 293) (the "Fee Motion") submitted by Plaintiffs (the "Derivative Plaintiffs") in the above-captioned action (the "Derivative Action"). As used herein, the term "Derivative Counsel" refers to the fifteen law firms seeking an award of fees and expenses in the Fee Motion.

## PRELIMINARY STATEMENT

In their Fee Motion, Derivative Counsel request an award of $22,920,000 in attorneys' fees and $594,882 in expenses for ***fifteen law firms*** in four derivative actions (including three actions in other jurisdictions that were stayed pending resolution of this action), representing a 1.8 multiplier on their purported lodestar of $12,740,618. Their request, submitted ***without any billing records***, is entirely unreasonable. Derivative Counsel try to justify this exorbitant request by pointing to the positive outcome for the Company that this settlement represents, but proper evaluation of Derivative Counsel's contributions to the resolution of these cases reveals that their fee request represents a significant overreach.

For the entirety of this action, Derivative Counsel were able to piggy-back off the work of others. Absent from Derivative Counsel's Fee Motion is any discussion of the critical efforts of the Company, the Class Plaintiffs, the U.S. Attorney's Office for the Southern District of New York, and the U.S. Securities and Exchange Commission (the "SEC") that culminated in the significant financial contributions made by certain of the Company's former officers, directors, and outside auditor Grant Thornton LLP ("Grant Thornton"). To wit:

The Company conducted the internal investigation that culminated in the restatement of its financial results, the public explanation of which formed the foundation of the Derivative Plaintiffs' allegations and provided a roadmap for them to assert their claims.

For more than four years, the Company (without any participation of Derivative Counsel) has refused to redeem limited partnership interests in the Company's operating partnership ("OP Units") held by Defendants Nicholas S. Schorsch, Brian S. Block, Edward M. Weil, Jr. and William M. Kahane (as well as non-defendant Peter M. Budko) and refused to pay dividends thereon, in light of potential claims that the Company threatened to bring against those individuals. The Company thereby preserved a pot of significant assets that was ultimately used to fund $225.3 million—the vast majority—of the Derivative Defendants'[1] contributions to the global settlement of the Class Action[2] and this action.

The Class Plaintiffs took the lead in all material respects in litigating the coordinated actions.

The United States Attorney's Office brought criminal actions and obtained a guilty plea and conviction against the Company's former Chief Financial Officer and Chief Accounting Officer. In doing so, the Government elicited testimony that formed the basis for certain of the Derivative Plaintiffs' claims.

The Company briefed the SEC as to related-party transactions that gave rise to claims against certain of the Derivative Defendants, some of which the Derivative Plaintiffs were aware of and others of which the Derivative Plaintiffs had not discovered.

---

[1] "Derivative Defendants" refers to Schorsch, Block, Budko, Kahane, Weil, David Kay, Lisa P. McAlister, Scott J. Bowman, Brian D. Jones, Lisa Beeson, Scott P. Sealy Sr., Thomas A. Andruskevich, Leslie D. Michelson, Edward G. Rendell, William G. Stanley, Bruce D. Frank, AR Capital, LLC, ARC Properties Advisors, LLC, and Grant Thornton.

[2] The "Class Action" refers to the consolidated class action pending before this Court under the caption *In re American Realty Capital Properties, Inc. Litigation*, No. 1:15-mc-00040 (AKH).

The SEC then brought civil charges against certain of the Derivative Defendants (assisted in part by the Company's cooperation), securing the return of OP Units worth approximately $32 million to the Company, which formed part of the Derivative Defendants' contribution of $286.5 million to the global settlement of the Class Action and this action (for which Derivative Counsel now seek to take credit).

**Derivative Counsel had nothing to do with any of these critical efforts and actions**.

Derivative Counsel likewise overstate their role in the global settlement of this action and the Class Action. Notably, their Fee Motion submissions do not describe any acts that Derivative Counsel undertook in the development of the complex and delicate settlement structure that enabled the global resolution of this action and the Class Action. That is because they cannot identify any such acts. Moreover, the settlement documents make clear that the $286.5 million contributed by the Derivative Defendants (and as to which Derivative Counsel seek to claim credit) was paid toward the global settlement of *both* the Class Action and this action. In fact, undermining any claim by Derivative Counsel that they should be credited for the entirety of that amount, the $286.5 million was, at the insistence of the Class Plaintiffs, *paid directly to the Class Plaintiffs* as part of the $1.025 billion settlement of that action. Notably, none of the settlement contributions were paid to the Derivative Plaintiffs or retained by the Company.

In spite of the foregoing, Derivative Counsel now seek an award of $22,920,000 in attorneys' fees, without submitting any billing records in support of their request, on the misleading premise that the amount sought is a mere 8% of the $286.5 million "contributed" by the Derivative Defendants toward the global settlement. ARCP's current shareholders have suffered enough as a result of the pendency, and settlement of, the related Class Action. Derivative Counsel's application should be rejected.

Maryland law—which governs in this diversity action—favors application of the lodestar method rather than the percentage recovery method advocated by Derivative Counsel, and application of the percentage recovery method would be particularly inappropriate in this case. *First*, as explained above, it would be inappropriate for Derivative Counsel to be given credit for the entirety of the $286.5 million paid by the Derivative Defendants (who are also defendants in the Class Action) toward the $1.025 billion global settlement because that $286.5 million is being paid to settle **both** the class and the derivative claims.  Derivative Counsel cannot establish that any portion was attributable to the settlement of the derivative claims rather than the class claims. *Second*, approximately $32 million of the $286.5 million contributed to the global settlement consists of amounts that the AR Capital Parties[3] agreed to pay to the Company **as part of a settlement with the SEC**, not due to any action taken by Derivative Counsel.  *Finally*, it would be improper to grant Derivative Counsel a recovery of 8% of the $286.5 million paid by the Derivative Defendants toward the global settlement when that contribution was almost entirely the result of efforts by the Company and its counsel—not Derivative Counsel—to investigate, preserve, and negotiate the settlement of the Company's claims against those parties.

Accordingly, the proper basis upon which this Court could grant attorneys' fees is the lodestar method favored by Maryland law.  However, the Fee Motion does not include any contemporaneous billing records to support Derivative Counsel's fee request.  Instead, the Fee Motion attaches only "summaries" of multiple years of billing by fifteen different law firms.  These bare-bones summaries, which on their face appear grossly excessive and duplicative, do not come close to providing the information necessary for the Company to evaluate, or for the Court to approve, any fee request.  *See Kirsch v. Fleet St., Ltd.*, 148 F.3d 149, 173 (2d Cir. 1998)

---

[3] The "AR Capital Parties" refers to Schorsch, Shelley Schorsch, Budko, Kahane, Weil, AR Capital, LLC, and ARC Properties Advisors, LLC.

("Applications for fee awards should generally be documented by contemporaneously created time records that specify, for each attorney, the date, the hours expended, and the nature of the work done."). ***Derivative Counsel's failure to submit time records is particularly telling because these same counsel have been criticized in a number of prior cases for just such a failure***. *See In re Star Scientific, Inc. Derivative Litig.*, 2016 WL 4820637, at *8 (E.D. Va. Aug. 3, 2016) (rejecting the same kind of submission that Derivative Counsel have made in this case, and reducing the proposed lodestar by 50% following Derivative Counsel's submission of detailed records in response to court's order); *Wallace v. Fox*, 7 F. Supp. 2d 132, 140 (D. Conn. 1998) (rebuking Derivative Counsel for their practice of refusing to submit "daily time records[,]" and reducing fee award to 53.7% of the proposed lodestar); *Boyd v. Coventry Health Care Inc.*, 299 F.R.D. 451, 468 (D. Md. 2014) ("This record, however, contains only the total hours spent by each attorney and other professional, with no specification of date or task.  Without that back-up detail, it is impossible to assess duplication of effort or unproductive time.").  Consistent with its practice in the past, this Court should likewise reject this tactic and deny the Fee Motion in its entirety or substantially reduce the requested fee award.  *See In re World Trade Ctr. Disaster Site Litig.*, 105 F. Supp. 3d 413, 417 (S.D.N.Y. 2015) (reducing fee award by 84% where counsel did not provide contemporaneous time records), *aff'd sub nom. Marion S. Mishkin Law Office v. Lopalo*, 646 F. App'x 49 (2d Cir. 2016).

Even if the Court were to consider the Fee Motion without supporting billing records—and it should not—it is obvious that the proposed lodestar must be substantially reduced.  While Derivative Counsel's failure to provide contemporaneous billing records prevents a proper examination of their fee request, even a cursory review of their one-page summaries reveals that they seek fees for work that involved substantial duplication and excess across multiple actions

involving fifteen law firms, including three actions in other jurisdictions that were stayed pending resolution of this action.  For example, Derivative Plaintiffs' liaison counsel billed ***2,485 hours*** to "Research/Complaint" (without providing any billing records to support that astronomical figure). The shocking nature of that figure is only made worse by the fact that the other 14 law firms seek fees for an additional ***1,056 hours*** for this same work.  These exorbitant figures are only further exacerbated by the seemingly redundant billing of ***4,660 hours*** to "Pleadings."  Derivative Counsel also seek fees for 6,052 hours of "Document Review", on top of 3,897 hours for "Depositions"—again, with no support offered for those figures.  It would be wholly inappropriate to award Derivative Counsel fees for those tasks performed by fifteen law firms when they have refused to submit any records to negate the common-sense notion that those billings are plagued by duplication and excess.

Derivative Counsel's request that they receive a "multiplier" of 1.8 on the already-inflated lodestar is particularly unreasonable.  Maryland law is "unsettled" on the use of multipliers in common fund cases, *Dotson v. Bell Atl.-Md., Inc.*, 2003 WL 23508428, at *9 (Md. Cir. Ct. Nov. 13, 2003), and the Company is not aware of any Maryland court awarding a multiplier in a common fund case.  But even if it were permissible to award a multiplier under Maryland law, this case does not present the "rare circumstances" that justify a multiplier, *Millea v. Metro-N. R.R. Co.*, 658 F.3d 154, 167 (2d Cir. 2011), in light of the fact that Derivative Counsel largely relied on the efforts of others in litigating this action and achieving settlement.

Finally, Derivative Counsel's request for reimbursement of $594,882 in expenses across fifteen law firms—submitted without any contemporaneous expense records—should be denied as they have not provided adequate support for those expenses.  At a minimum, their request for

reimbursement of $158,928 in expert costs for two experts, when the Court instructed them that experts were not necessary in their case, should be denied.

## BACKGROUND

A.    **Procedural History of This Action.**

On July 31, 2015, Plaintiff Joanne Witchko—represented by attorneys from Harwood Feffer LLP (who in May 2018 joined Glancy Prongay & Murray LLP) and the Law Office of Alfred G. Yates, Jr., P.C.—commenced this action by filing a complaint in this Court asserting shareholder derivative claims on behalf of ARCP against fifteen individual defendants. (Dkt. No. 1.) This action was later consolidated under the *Witchko* caption with another derivative action pending in this Court, *Serafin, et al. v. Schorsch, et al.*, No. 1:15-cv-08563-AKH, that had been brought by five law firms. (Dkt. No. 51.) Harwood Feffer LLP was appointed as liaison counsel. (*Id.*) On January 5, 2016, the Derivative Plaintiffs designated the *Witchko* complaint as the operative complaint. (Dkt. No. 52.)

On June 30, 2016, following the Court's rulings on a motion to dismiss and its dismissal of certain Defendants, the Derivative Plaintiffs filed an amended complaint asserting claims for breach of fiduciary duty under Maryland law against seven individual defendants: Schorsch, Block, Kay, Kahane, Weil, McAlister, and Beeson. (Dkt. No. 87.)

The Court coordinated discovery in this action with discovery in the related Class Action and opt-out actions that were before it. (*See* Class Action Dkt. No. 299.) Discovery in the actions commenced in September 2016. (*See id.*) Class Counsel took the lead in all material discovery matters. For example, Class Counsel took the lead in questioning witnesses at depositions, and none of the many discovery disputes litigated before this Court in the coordinated actions were brought by the Derivative Plaintiffs. (*See* Class Action Dkt. Nos. 308, 349, 389, 499, 533, 559, 563, 568, 578, 592, 611.)

In November 2018, the Court held a status conference to schedule expert discovery and summary judgment briefing in the Class Action, remaining opt-out action, and this action. During the conference, the Court indicated that it would be more efficient for the Derivative Plaintiffs to refrain from filing summary judgment motions, stating that "[i]t seems to me you should wait until everything is done with the class." (Ex. 1 at 19:23-24.)[4]  In addition, the Court indicated that the Derivative Plaintiffs did not need separate experts from the Class Plaintiffs, stating that "[t]here is no need for separate experts on your part" because "[a]ll this does is add expense" and "[t]here are no experts that are used for [the issue of a breach of fiduciary duty under Maryland law], it is a law issue." (*Id.* at 20:23-21:6.)

Notwithstanding those instructions from the Court, the Derivative Plaintiffs retained two experts (for whom they now seek reimbursement of fees and expenses, *see* Houston Decl., Ex. T[5]) and proceeded to file motions for summary judgment against Block and McAlister. (Dkt. Nos. 218, 221.)  On May 10, 2019, consistent with its prior comments, the Court entered an order denying the Derivative Plaintiffs' summary judgment motions "as premature without prejudice to renewal at the appropriate time." (Dkt. No. 269 at 11.)  The Fee Motion does not contain any information to allow the Company or the Court to determine how much time and expense was incurred in connection with these summary judgment motions, but it is clear from Derivative Counsel's submissions that they have included the work on the summary judgment motions in their lodestar calculation. (*See* Houston Decl., Dkt. No. 291, ¶ 212.)

---

[4] References to "Ex. __" are to exhibits to the Declaration of Jonathan Ohring in Support of American Realty Capital Properties, Inc.'s Memorandum of Law in Opposition to Derivative Plaintiffs' Motion for Attorneys' Fees and Reimbursement of Expenses, submitted contemporaneously herewith.

[5] "Houston Decl." refers to the Declaration of Matthew M. Houston in Support of Plaintiffs' Motions for Final Approval of Derivative Settlement and Award of Attorneys' Fees and Reimbursement of Expenses (Dkt. No. 291).

On September 8, 2019, the parties reached agreements in principle to settle the Class Action and this action.  On September 27, 2019, the parties executed the Stipulation and Agreement of Settlement.  (*Id.* ¶ 140.)  On September 30, 2019, the Derivative Plaintiffs filed an unopposed motion for preliminary approval of the derivative settlement and approval of shareholder notice ("Motion for Preliminary Approval"), and the Company filed a statement in support of the Motion for Preliminary Approval.  (Dkt. Nos. 282-287.)  On October 3, 2019, the Court held a conference to consider the Motion for Preliminary Approval, during which the Court questioned the value provided by the Derivative Plaintiffs:

> THE COURT:  If there had not been a derivative action, the amount of money paid by the defendants would perhaps have been exactly the same, the settlement [in the] class action.
>
> MR. HOUSTON:  It's entirely possibl[e], your Honor, but there was a derivative settlement.
>
> THE COURT:  I understand.  There had to be.  Otherwise there could not be a settlement.  But in my mind it's hard to figure out what exactly was the added value from the derivative suit.

(Ex. 2 at 27:14-22.)

On October 4, 2019, the Court entered an order granting the Motion for Preliminary Approval.  (Dkt. No. 288).  The Court scheduled a final approval hearing for January 21, 2020.  (*Id.* at 2.)

On December 17, 2019, Derivative Counsel filed the Fee Motion and their motion for final approval of the derivative settlement.  The Fee Motion does not attach contemporaneous billing records or itemized expense reports.  Rather, continuing a practice for which Derivative Counsel have been repeatedly criticized by courts in the past, *see infra* at Argument § III.A, the Fee Motion simply attaches declarations and exhibits with summary charts of the total number of hours and expenses billed by fifteen different law firms over more than four years.  (*See* Houston Decl., Dkt.

No. 291, Exs. D-Q, S, T, U.)  At various times both before and after the filing of the Fee Motion, counsel for the Company informed Derivative Counsel that the Company could not evaluate the propriety and reasonableness of the fees and expenses sought by Derivative Counsel unless they provided detailed billing records and itemized expense records to support their request.  (*See* Ex. 3.)  Derivative Counsel never provided this information to the Company, nor have they provided such information to the Court.

**B.     The Derivative Actions in Other Jurisdictions.**

In addition to Derivative Counsel in this action, counsel for plaintiffs in three other shareholder derivative actions brought on behalf of ARCP in other jurisdictions, which were stayed pending resolution of this action, seek fees and reimbursement of expenses in the Fee Motion. (*See* Houston Decl., Dkt. No. 291, Exs. J-Q, S, T.)  Specifically, $1,363,250.30 of the lodestar fees of $12,740,618.80 (or 10.7%) are fees sought by the eight law firms involved in the three stayed actions.

**1.     The *Kosky* Actions.**

On November 25, 2015—nearly four months after this action had been filed—plaintiff Frank Kosky Roth IRA, represented by TheGrantLawFirm, PLLC and Stull, Stull & Brody— commenced a shareholder derivative action on behalf of ARCP in this Court, captioned *Fran Kosky Roth IRA v. Rufrano, et al.*, No. 1:15-cv-09318 (AKH) (the "First *Kosky* Action").  On December 28, 2015, the plaintiff in the First *Kosky* Action voluntarily dismissed its complaint without prejudice.  (First *Kosky* Action, Dkt. No. 6.)

On June 10, 2016—nearly a year after this action had been filed—the plaintiff from the First *Kosky* Action, represented by the same counsel, commenced a shareholder derivative action on behalf of ARCP in the Supreme Court of the State of New York.  (Ex. 4.)  On October 6, 2016,

the parties in the *Kosky* Action filed a stipulation staying that action pending resolution of the Class Action in this Court.  (Ex. 5.)

No substantive proceedings have taken place in the *Kosky* Action.  Notwithstanding that fact, in the Fee Motion, two law firms representing the plaintiff in the *Kosky* Action have sought fees of $517,491.35 and reimbursement of $4,704.11 in expenses.  (*See* Houston Decl., Dkt. No. 291, Exs. P, Q, S, U.)

### 2.    The *Frampton* Action.

On December 3, 2015—more than four months after this action had been filed—a shareholder derivative action was filed on behalf of ARCP in the Circuit Court for Baltimore City in Maryland, captioned *Frampton v. Schorsch, et al.*, No. 24-C-15-006269 (the "*Frampton* Action").  (Ex. 6.)  On March 7, 2016, ARCP and the individual defendants filed a motion to stay the *Frampton* Action pending resolution of this action.  (Ex. 7.)  In an oral ruling on November 3, 2016, and subsequent written order dated November 4, 2016, the court in the *Frampton* Action granted the motion and stayed the *Frampton* Action pending the conclusion of proceedings in this action, concluding that it did not "see any factors that weigh in favor of permitting a duplicative set of litigation to proceed."  (Ex. 8 at 19:9-10; Ex. 9.)

No substantive proceedings have taken place in the *Frampton* Action.  Notwithstanding that fact, in the Fee Motion, three law firms representing the plaintiff in the *Frampton* Action have sought fees of $307,449 and reimbursement of $1,486.89 in expenses.  (*See* Houston Decl., Dkt. No. 291, Exs. M, N, O, S, U.)

### 3.    The *Meloche* Action.

On October 6, 2016—more than fourteen months after this action had been filed—a shareholder derivative action on behalf of ARCP was filed in the United States District Court for the District of Maryland, captioned *Meloche, et al. v. Schorsch, et al.*, No. 1:16-cv-03366 (ELH)

(the "*Meloche* Action").  (Ex. 10.)  On May 16, 2017, the parties entered into a stipulation staying

the Meloche Action pending resolution of this action.  (Ex. 11.)

No substantive proceedings have taken place in the *Meloche* Action.  Notwithstanding that

fact, in the Fee Motion, three law firms representing the plaintiffs in the *Meloche* Action have

sought fees of $538,310.05 and reimbursement of $3,209.38 in expenses.  (*See* Houston Decl.,

Dkt. No. 291, Exs. J, K, L, S, U.)

> **C.    The Settlement Is Largely the Result of the Company's—Not Derivative
> Counsel's—Investigative Efforts, Preservation of Claims, and Negotiation
> Efforts.**

Although Derivative Counsel suggest in the Fee Motion that the resolution of the

Company's claims against the Derivative Defendants was entirely due to their efforts, in reality,

settlement of those claims was only possible due to the efforts of the Company, the Class Plaintiffs,

the U.S. Attorney's Office, and the SEC—most notably, the comprehensive efforts by the

Company to investigate possible claims against the AR Capital Parties, preserve those claims,

cooperate with regulators, and negotiate a complex and delicate settlement structure.

> **1.    Derivative Counsel's Complaint Is Largely Lifted from the Company's
> Restatement and Public Filings.**

Before any lawsuits were filed related to the matters underlying the Class Action and this

action, the Audit Committee of the Company's Board of Directors, advised by outside counsel at

Weil Gotshal & Manges LLP and forensic accounting experts at Ernst & Young LLP, began a

lengthy and thorough internal investigation in response to a whistleblower complaint in September

2014 regarding accounting practices and other matters.  (Ex. 12 at 3.)  On October 29, 2014, the

Company announced the preliminary findings of the investigation.  (Ex. 13 (the "October 2014

Form 8-K").)  The October 2014 Form 8-K disclosed:

> [B]ased on the preliminary findings of the investigation, the Audit Committee
> believes that the Company incorrectly included certain amounts related to its non-

controlling interests in the calculation of adjusted funds from operations ("AFFO"), a non-U.S. GAAP financial measure, for the three months ended March 31, 2014 and, as a result, overstated AFFO for this period. The Audit Committee believes that this error was identified but intentionally not corrected, and other AFFO and financial statement errors were intentionally made, resulting in an overstatement of AFFO and an understatement of the Company's net loss for the three and six months ended June 30, 2014.

(*Id.*)  The October 2014 Form 8-K also announced that the Company's former Chief Financial Officer, Brian Block, and former Chief Accounting Officer, Lisa McAlister, had been terminated. (*Id.*)

As the investigation continued, on December 15, 2014, the Company announced the resignation of its remaining legacy executives:  Nicholas Schorsch, Executive Chairman of the Board of Directors; David Kay, Chief Executive Officer and director; and Lisa Beeson, President and Chief Operating Officer.   (Ex. 14.)   In connection with the resignations, the Company negotiated and secured the relinquishment or clawback of valuable awards to its former executives, including (a) Block's relinquishment of all of his equity awards related to the Company's management internalization; (b) Schorsch's relinquishment of all of his equity awards related to the Company's management internalization, other than 1,000,000 shares of restricted stock that were subject to clawback by the Company if Schorsch was found to have breached his fiduciary duty of loyalty or was found to have committed or admitted to fraud or misconduct in connection with his responsibilities as a director or officer of the Company; and (c) rescission of Kay's fully vested shares of the Company's common stock equal in value to $2 million, and all dividends paid with respect thereto.  (Ex. 12 at 3; Ex. 14.)  In aggregate, the Company's efforts resulted in its former executives relinquishing approximately 2.7 million shares of Company stock as well as all outstanding interests in the Company's 2014 Outperformance Plan.  (Ex. 12 at 6.)

After several more months of investigation, on March 2, 2015, the Company announced the conclusion of the internal investigation and restated its financial statements for FY 2013 and

2012, the first two quarters of 2014 and 2013, and the third quarter of 2013.  (Ex. 15.)  The Restatement revealed that the Company had successfully pursued the recoupment of payments that the Company had previously made to related parties which were not sufficiently documented or otherwise warranted scrutiny, including nearly $8.5 million in consideration previously paid to the Company's former manager, ARC Properties Advisors, LLC (which was not even named as a defendant in this action).  (Ex. 12 at 3.)  The Company also announced that it was considering whether it had a right to seek recovery for any other such payments and, if so, its alternatives for seeking recovery.  (*Id.*)  Further, the Restatement announced that agreements relating to equity awards made to Schorsch and Block in connection with the transition from external to internal management contained provisions that, as drafted, were more favorable to them than the Compensation Committee of the Company's Board of Directors had authorized, and that awards should have been capped at $120.0 million, not $222.1 million.  (*Id.* at 3, 109.)

The October 2014 Form 8-K and the Restatement formed the primary basis for the allegations in this action, as well as all the other derivative actions.  The Amended Complaint quotes extensively from the Company's October 2014 Form 8-K and accompanying press release (Am. Compl. ¶¶ 67-69) and the Company's March 2, 2015 Restatement (*id.* ¶¶ 90-94).  The section of the Amended Complaint titled "Reasons Why ARCP's Financial Statements Were Inaccurate and Misleading" lists ten allegedly "improper and illegal accounting practices" that are taken directly from the Restatement.  (*Id.* ¶ 97; Ex. 12 at F-11, F-12).  The Amended Complaint also alleges that the individual defendants "increased the Outperformance Plan by $100 million by unilaterally altering the plan and stating in public filings that the maximum award value of the Plan was $222.1 million[,]" an allegation that again is taken from the Restatement.  (Am. Compl. ¶ 41; Ex. 12 at 109.)  Each Count of the Amended Complaint also relies on the Restatement to

support its allegations of breaches of fiduciary duty, including related to AFFO reporting, related-party transactions, and executive compensation.  (Am. Compl. ¶¶ 145-46; 151-52; 157-58; 163-64; 169-70; 175-76; 181-82.)

### 2. The Company's Actions—Not Derivative Counsel's—Put Pressure on the Derivative Defendants to Settle the Derivative Claims.

Throughout the past five years, the Company has cooperated with government prosecutors and regulators, identifying potential claims against the Derivative Defendants.  In October 2014, the Audit Committee reported the preliminary findings of its investigation to the enforcement staff of the SEC prior to making a public disclosure regarding the matter.  (Ex. 16, ¶ 6.)  Since 2014, the Company has assisted in the investigation and prosecution of former members of its management team at significant expense to the Company.  (*Id.* ¶ 7.)

The Company also undertook critical efforts to prevent Schorsch, Block, and their associates from redeeming hundreds of millions of dollars of OP Units in the Company's operating partnership, ARC Properties Operating Partnership, L.P., and from obtaining distributions relating to such units.  Specifically, notwithstanding demands to redeem their OP Units, and to provide them with cash or liquid ARCP shares in exchange, the Company refused to redeem the OP Units or pay dividends on the OP Units pending resolution of the Company's claims against them. (Ex. 17 at 41.)  The Company did this ***before*** the Derivative Action was filed.  When those individuals objected to the refusal to redeem and threatened litigation against the Company,[6] the Company informed them that it had drafted a detailed complaint, and that it was prepared to commence litigation against them regarding the OP Units and other issues.  As a result, those individuals agreed to enter into tolling agreements with the Company, and to defer their

---

[6] As a part of the global settlement, the Derivative Defendants released all claims against the Company, including any claims arising from the Company's failure to redeem OP Units or pay dividends on those OP Units.  (Dkt. No. 287, Ex. 1 to Houston Decl. at § 4.3.)

redemption requests.  All such negotiations took place, and tolling agreements were executed, **before** this Court gave the Derivative Plaintiffs control of this action.

The Company disclosed in its Form 10-Q for Q2 2015 and subsequent filings that it would not honor the redemption requests, and starting in Q3 2015, that it would not pay dividends on the disputed OP Units.  (Ex. 18 at 41; Ex. 17 at 41.)  Of the $237.5 million contributed by the AR Capital Parties and Block, approximately ***$225 million was satisfied by the forfeiture to the Company of OP Units and associated dividends***.  ***Derivative Counsel had absolutely nothing to do with the Company's critical decision and continuing efforts to ensure that those assets remained in the Company's control so as to be available to fund the ultimate settlement of the Class Action***.

Indeed, Derivative Counsel apparently tried and failed to settle the derivative claims without the Company's involvement.  As Derivative Counsel acknowledge, they failed to negotiate a settlement with the Derivative Defendants in early 2019.  (Houston Decl., Dkt. No. 291, ¶¶ 131-34.)  Indeed, Derivative Counsel aver that they determined that the Derivative Plaintiffs could not settle the action at that time because they were unable to negotiate a settlement for the entire action. (*Id.* ¶ 132.)

It was only after the Company—through outside counsel and including personal involvement by the Company's CEO and General Counsel—stepped in that this action and the Class Action reached a global resolution.  Notably, Derivative Counsel's Fee Motion submissions do not describe any acts that Derivative Counsel undertook to develop the complex and delicate settlement structure that enabled the global resolution.  That is because they cannot identify any such acts.

Included in the global settlement is a contribution by the AR Capital Parties of $32 million of OP Units that they agreed to return to the Company in connection with their settlement of a civil action brought against them by the SEC. (Dkt. No 283, Ex. 1 to Houston Decl. at ¶ 2.2(ii).) This contribution was facilitated by the Company's cooperation with the SEC and presentation to the SEC Staff of valuable claims that the Company believed it had against the AR Capital Parties, including previously undisclosed claims that Derivative Counsel never uncovered or pursued. ***Derivative Counsel had absolutely nothing to do with this.***

## ARGUMENT

I. **MARYLAND LAW GOVERNS THE FEE AWARD IN THIS DIVERSITY ACTION, AND MARYLAND LAW FAVORS APPLICATION OF THE LODESTAR METHOD, NOT THE PERCENTAGE RECOVERY METHOD PUT FORTH BY DERIVATIVE COUNSEL.**

Although Derivative Counsel cite to Second Circuit cases in discussing whether the lodestar approach or percentage recovery approach is the more appropriate one, they appear to acknowledge—albeit in a footnote—that Maryland law actually governs the reasonableness of attorneys' fees in this diversity action. (*See* Fee Motion at 5 n.2 (stating that "[t]he reasonableness inquiry is also used under Maryland law[,]" and citing Maryland cases).

As the Second Circuit has observed, where a shareholder derivative action is a "diversity action grounded in state law claims . . . state law governs the issue of counsel fee availability." *Kaplan v. Rand*, 192 F.3d 60, 70 (2d Cir. 1999). "In a diversity action, a federal court applies the choice of law rules of the forum state. New York law looks 'to the law of the state of incorporation in adjudicating a corporation's internal affairs,' including questions relating to shareholder derivative actions." *Milliken v. Am. Realty Capital Hosp. Advisors, LLC*, 2018 WL 3745669, at *4 (S.D.N.Y. Aug. 7, 2018) (citing *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941); *NAF Holdings, LLC v. Li & Fung (Trading) Ltd.*, 772 F.3d 740, 743 n.2 (2d Cir. 2014)).

Accordingly, because the Company is incorporated in Maryland (*see* Am. Compl., Dkt. No. 87, ¶ 13), Maryland law governs any fee award. *Cf., e.g.*, *In re Pfizer Inc. S'holder Deriv. Litig.*, 780 F. Supp. 2d 331, 334 (S.D.N.Y. 2011) (applying Delaware law to determine fee award in derivative litigation brought on behalf of Delaware corporation); *CA, Inc. v. Wang,* 2013 WL 12366073, at *2 (E.D.N.Y. Mar. 26, 2013) (same).

The Maryland Court of Appeals—the highest court in Maryland—has held that "***the lodestar approach is ordinarily the appropriate one to use in determining a reasonable counsel fee***." *Friolo v. Frankel*, 373 Md. 501, 504-05 (2003) (emphasis added); *see also Garcia v. Foulger Pratt Dev., Inc.*, 155 Md. App. 634, 674 (2003) ("Although *Friolo* applied to all Maryland fee-shifting statutes, rather than the common-fund doctrine, we see no reason to depart from the *Friolo* analysis . . . ."). That is all the more appropriate in this case, because the percentage recovery method is inappropriate here.

## II.     APPLICATION OF THE PERCENTAGE RECOVERY METHOD WOULD BE INAPPROPRIATE HERE.

Separate and apart from what Maryland law requires, the percentage recovery method would be inappropriate in this case for two reasons, each explained more fully below. *First*, as this Court quickly recognized, the precise value of the derivative settlement is impossible to ascertain in light of the fact that the derivative claims were settled as part of a global settlement with the Class Action and there was no specific amount paid by the Derivative Defendants to settle only the derivative claims. *Second*, the settlement of the derivative claims was largely the result of the **Company's**—not Derivative Counsel's—efforts to investigate, preserve, and negotiate settlement of the Company's claims against the Derivative Defendants, meaning that using the percentage recovery method would provide Derivative Counsel with an unjustified windfall.

A.      **The Precise Value of the Derivative Settlement Is Impossible to Ascertain.**

Although the settlement and final resolution of the derivative actions is important to the Company, its value is difficult, if not impossible, to quantify.  Courts have recognized that the percentage recovery method is particularly inappropriate where the precise value of a derivative settlement is impossible to ascertain.  *See Yamada v. Nobel Biocare Holding AG*, 825 F.3d 536, 546 (9th Cir. 2016) ("The 'lodestar method' is appropriate in class actions where the relief sought and obtained is not easily monetized. . . ."); *Rubery v. Caplan*, 2013 WL 12327500, at *1 (S.D.N.Y. Oct. 3, 2013) (using the lodestar method where "the value of the settlement" was "difficult, if not impossible, to quantify"); *In re AOL Time Warner Shareholder Derivative Litig.*, 2010 WL 363113, at *5 (S.D.N.Y. Feb. 1, 2010) (using the lodestar method where the value of the settlement was "speculative at best").  Here, a number of factors make it wholly inappropriate for Derivative Counsel to seek a percentage of the $286.5 million figure.

*First*, it would be inappropriate for Derivative Counsel to take credit for the entirety of the $286.5 million paid by the Defendants toward the $1.025 billion global settlement because that $286.5 million is being paid to settle ***both*** the class and the derivative claims, and Derivative Counsel have no ability to disentangle what was attributable to the settlement of the derivative claims rather than the class claims.  The settlement documents make clear that the Derivative Defendants paid the $286.5 million amount directly to the ***Class Plaintiffs***, not the Derivative Plaintiffs.  (*See* Class Action Dkt. No. 1272 at § 2.2-2.3.)  Notably, the Class Plaintiffs' motion for final approval of the settlement takes credit for the entirety of the $1.025 billion global settlement (inclusive of the $286.5 million contributed by the Derivative Defendants).  (*See* Class Action Dkt. No. 1283 at 11 ("Lead Counsel obtained a $1.025 billion cash recovery").)  And the derivative settlement stipulation itself makes clear that the Company's claims pending against the Defendants were ***a*** factor leading to their contributions to the global settlement, not the sole factor:

The Settling Parties agree that the claims in the Derivative Actions, as well as potential counterclaims that could be brought against VEREIT, were *a* central issue in the negotiations regarding the amounts that the AR Capital Parties, Block, and GT would contribute to the global settlement. Specifically, VEREIT believes the claims being pursued in the Derivative Actions had significant value to VEREIT and that those claims were a **substantial** factor behind the willingness of the AR Capital Parties, Block and GT to make the settlement payments that they agreed to make. The AR Capital Parties, Block and GT made clear throughout the settlement negotiations that but for resolution of VEREIT's claims at issue in the Derivative Actions, they would not agree to any contribution to the settlement of the Class Action, and that GT would not agree to provide VEREIT with a release as to counterclaims GT intended to assert against VEREIT in the Derivative Actions . . . . Consistent with the foregoing, VEREIT believes that the claims at issue in the Derivative Actions played **a significant role** in securing the settlement contributions from the AR Capital Parties, Block and GT, as well as the releases, which VEREIT believes are in the best interest of VEREIT and its stockholders."

(Dkt. No. 287, Ex. 1 to Houston Decl. at 23-24 (emphasis added).) The Company stands by its stipulation. Notably, however, the Company never agreed (as Derivative Counsel now implausibly claim) that the Company's claims were the sole factor behind the contributions of the Derivative Defendants. Likewise, the Company never agreed that Derivative Counsel's efforts or work (as opposed to the existence of the claims themselves) were a substantial factor behind the willingness of the Derivative Defendants to make their payments.

Based on its supervision of the Class Action, this Court is well aware that that the Class Plaintiffs asserted significant, and potentially highly valuable, claims against the Derivative Defendants. And as a result of the Court's denial of summary judgment, those claims were proceeding to trial absent a settlement.

The Class Plaintiffs asserted claims against the AR Capital Parties and Block under Sections 11 and 15 of the Securities Act of 1933 and Sections 10 and 20 of the Securities Exchange Act of 1934. Any judgment against those defendants resulting from a finding of fraud would be non-indemnifiable under the Company's Charter and applicable law. Moreover, any judgment against those defendants under the securities laws would be non-indemnifiable, as contrary to

public policy, under *Globus v. Law Research Service, Inc.*, 418 F.2d 1276 (2d Cir. 1969).   In addition, the Class Plaintiffs asserted claims under Section 11 of the Securities Act against Grant Thornton, as to which Grant Thornton had no contractual right to indemnification.   Given that the Class Plaintiffs were seeking billions of dollars in damages, the Derivative Defendants therefore faced a real possibility of hundreds of millions of dollars or more of liability in the Class Action.

Indeed, at the preliminary approval hearing, this Court correctly commented on the global nature of the settlement in light of the simultaneous settlement of the Class Action:

> THE COURT:  Some of these, all of the defendants being sued by VEREIT in the derivative suit are defendants in the class action as well.
>
> MR. HOUSTON:  Yes, they are.
>
> THE COURT: So they are paying out a certain amount of money, and dividing that payout into the class action and into the derivative action.  So I don't know that there would have been a difference.
>
> MR. HOUSTON:  There would have been a difference because of the fact that, without it being a global settlement of all claims, there wouldn't have been any payment by the individuals.  That's stated in the stipulation.  Representations have been given to us that they would not have settled.
>
> THE COURT:  If there had not been a derivative action, the amount of money paid by the defendants would perhaps have been exactly the same, the settlement [in the] class action.
>
> MR. HOUSTON:  ***It's entirely possible, your Honor***, but there was a derivative settlement.
>
> THE COURT:  I understand.  There had to be.  Otherwise there could not be a settlement.  But in my mind it's hard to figure out what exactly was the added value from the derivative suit.

(Ex. 2 at 26:25-27:22 (emphasis added).)

*Second*, approximately $32 million of the $286.5 million contributed to the global settlement consists of amounts that the AR Capital Parties agreed to pay the Company in the form of forfeited OP Units ***as part of a settlement with the SEC*** based on information that the Company—not Derivative Counsel—presented to the SEC.  (Ex. 19 at 3; Ex. 20 at 4, Ex. 21 at 4.)

- 21 -

Notably, part of the SEC settlement resolved claims regarding certain transactions that Derivative Counsel failed to even recognize as presenting viable claims in this action.  (*Compare* Ex. 22 at ¶¶ 25-81 (discussing an incentive fee paid in connection with the ARCT III and ARCT IV mergers), *with* Fee Motion at 19 (discussing an incentive fee paid in connection with the ARCT III merger, but not the ARCT IV merger).)  As a result, in substantial part based on ARCP's cooperation with respect to the ARCT IV merger, the SEC was able to make a case against the AR Capital Parties for that merger, which had never previously been a part of the Derivative Plaintiffs' claims.  There is no reason that Derivative Counsel should get credit for the $32 million paid by the AR Capital Parties as part of the SEC settlement.

*Finally*, Derivative Counsel attempt to take credit for "terminat[ion] of VEREIT's continuing indemnification obligations and litigation expenses, a benefit that VEREIT's management estimates to be nearly $100 million[.]"  (Fee Motion at 1.)  This argument makes no sense.   While avoidance of $100 million in additional expenses is a benefit to ARCP, it is not a benefit for which Derivative Counsel can reasonably take credit.   Indeed, if anything, the Derivative Plaintiffs' duplicative litigation resulted in additional unnecessary costs to ARCP.  For example, as a result of Derivative Counsel's decision to file summary judgment motions, ARCP was obligated to advance legal fees for Block and McAlister to oppose those motions.   In any event, the $100 million in indemnification obligations and litigation expenses referenced in the Company's Statement of Support was the Company's estimate of fees and expenses that would be incurred **in connection with the Class Action**, not this action, which was essentially stayed pending the outcome of the Class Action trial—a fact that Derivative Counsel appear to acknowledge (*see* Fee Motion at 1 ("a benefit that VEREIT's management estimates to be nearly $100 million **through trial in the Class Action**" (emphasis added))).

**B.** **The Settlement Is Largely the Result of the Company's—Not Derivative Counsel's—Investigative Efforts, Preservation of Claims, and Negotiation Efforts.**

Contrary to the impression given by the Fee Motion, the resolution of the Company's claims against the Derivative Defendants was largely a product of the ***Company's*** actions— including critical actions taken ***before*** this action was filed and ***before*** Derivative Counsel was even appointed—and not those of Derivative Counsel.

The Company conducted a comprehensive internal investigation and took decisive action to address the accounting and other matters underlying this litigation even before the Derivative Action commenced, including the termination of the Company's entire senior management.  (*See supra*, Background § C.1.)  The findings announced by the Company in the October 2014 Form 8-K and the Restatement provided the foundation for the Derivative Plaintiffs' claims.  (*See id*.)

The Company also recovered highly valuable contributions from its former management, including relinquishment of certain benefits previously provided to Schorsch, Block, and Kay. (*See supra*, Background § C.2.).  This valuable recovery to the Company was secured, again, before this action was filed, and the public announcement of those efforts was a basis for the Derivative Plaintiffs' claims.

Critically, the Company also engaged in the investigation and preservation of claims against the Derivative Defendants that, along with maintaining control of the OP Units, ultimately, ***directly funded*** the global settlement of the Class Action and this action.  Specifically, even before this action was filed, the Company refused to redeem OP Units held by the AR Capital Parties or to pay associated dividends in light of potential claims it had against those individuals.  (*See supra*, Background § C.2.)  The Company also threatened to file a complaint against those parties (and others) unless they entered into a tolling agreement.  (*See id*.)  Those parties agreed to enter into a tolling agreement with the Company, and the preservation of those claims—and the possibility

- 23 -

that the Company would eventually pursue those claims directly against the Derivative Defendants (rather than through Derivative Counsel)—unquestionably played a substantial part in the Derivative Defendants' agreement to enter into a global resolution.  Specifically, the OP Units and dividends that the Company refused to redeem and pay—and which the Company kept control over during the past four-and-a-half years to prevent the AR Capital Parties and Block from hiding or transferring the assets—were ***used to fund nearly 95% of the $237.5 million settlement contribution made by the AR Capital Parties and Block***.  (*See id*.)  Derivative Counsel played no role in the Company's strategic pursuit of these claims that ultimately funded the derivative settlement.

Moreover, as Derivative Counsel acknowledge, they failed to negotiate a settlement with the Derivative Defendants in early 2019.  (Houston Decl., Dkt. No. 291, ¶¶ 131-34.)  Only after the Company stepped in to participate directly in negotiations was a global resolution achieved. (*See supra*, Background § C.2.)

Finally, a significant portion of the settlement—the approximately $32 million contribution by the AR Capital Parties from their settlement with the SEC—was directly a result of the Company's efforts to cooperate with the SEC, and the SEC's resolution of the civil charges against them, and not attributable to any actions of Derivative Counsel.  (*See id*.)

In sum, providing Derivative Counsel with a percentage of the $286.5 million in contributions by the Derivative Defendants toward the global resolution of the Class Action and this action—the method advocated by Derivative Counsel—would be entirely unjustified.

### III. DERIVATIVE COUNSEL'S LODESTAR CANNOT BE ACCURATELY CALCULATED BECAUSE THEY DID NOT SUBMIT DETAILED BILLING RECORDS AND BECAUSE THE PROPOSED LODESTAR IS INFLATED BY EXCESSIVE AND DUPLICATIVE BILLING.

As explained above, the percentage recovery method is neither favored under applicable law nor appropriate under the facts of this case.  (*See supra*, Argument § II.)  Therefore, the only basis upon which the Court could grant attorneys' fees is the lodestar method.  But the Fee Motion, which attaches only one-page "summaries" of multiple years of billing by *fifteen law firms* rather than detailed time records, does not provide the information necessary for the Court to evaluate or approve any fee.  This is particularly so because even the summary information provided by Derivative Counsel indicates that their Fee Motion is plagued by redundant and excessive billing that requires denial or substantial reduction of their fee request.

#### A. Derivative Counsel's Failure to Provide Detailed, Contemporaneous Billing Records Requires Denial of Their Fee Request.

"In Maryland, the party requesting attorney's fees has the burden of providing the court with the necessary information to determine the reasonableness of its request."  *Weichert Co. of Md. v. Faust*, 191 Md. App. 1, 15 (2010), *aff'd*, 419 Md. 306 (2011).  The party requesting fees must show by a preponderance of the evidence that the fees sought are "necessary and reasonable."  *Diamond Point Plaza Ltd. P'ship v. Wells Fargo Bank, N.A.*, 400 Md. 718, 757 (2007).

Similarly, in the Second Circuit, "[a]pplications for fee awards should generally be documented by contemporaneously created time records that specify, for each attorney, the date, the hours expended, and the nature of the work done."  *Kirsch*, 148 F.3d at 173; *Scott v. City of New York*, 626 F.3d 130, 133 (2d Cir. 2010) ("[A]bsent unusual circumstances attorneys are required to submit contemporaneous records with their fee applications.").  The requirement to submit detailed, contemporaneous billing records is "a strict rule from which attorneys may deviate

only in the rarest of cases[,] . . . such as where the records were consumed by fire or rendered irretrievable by a computer malfunction before counsel had an opportunity to prepare his application." *Scott*, 626 F.3d at 133-34.  If detailed billing records are not submitted, courts can reduce the fee award requested based on the record and the court's "experience."  *Wallace*, 7 F. Supp. 2d at 139-41.  For example, in *In re World Trade Center Disaster Site Litigation*, this Court awarded just 16% of the requested amount for "not submit[ting] contemporaneous records sufficient to entitle [the applicant] to a fee under" Second Circuit precedent.  105 F. Supp. 3d at 417.

Here, Derivative Counsel's fee request must be denied because they have utterly failed to provide detailed, contemporaneous time records that describe the tasks they performed over the four-and-a-half-year duration of this case.  Instead, Derivative Counsel submitted "summaries" that simply list the total number of hours billed by each of the ***fifteen law firms*** seeking fees, along with a summary chart categorizing the total number of hours billed to (1) "Research/Complaint", (2) "Pleadings", (3) "Court Appearances", (4) "Document Review", (5) "Depositions", (6) "Mediation", (7) "Strategy/Experts", and (8) "Settlement".  (*See* Houston Decl., Dkt. No. 291, Exs. D-Q, S, T.)  These high-level summaries provide no basis for the Company or the Court to assess the reasonableness of Derivative Counsel's fee request, particularly in light of the significant overlap that is readily apparent from the fact that fifteen law firms—including eight law firms from the stayed derivative actions in other jurisdictions—have sought fees.

The Derivative Plaintiffs' liaison counsel are well aware of the consequences of a failure to submit contemporaneous billing records.  In fact, they have a history of submitting an initial fee request without billing records, only to reduce their requested fees significantly when they are required by a court to provide detailed records.  Courts have repeatedly criticized and penalized

them for these tactics.  For example, in *In re Star Scientific*, the court declined to approve a fee

application by the same Derivative Plaintiffs' liaison counsel here (Messrs. Harwood and Houston)

because counsel had submitted only "unsupported summaries of the fees incurred in litigating the

derivative actions, organized into charts that fail to provide a description of the work performed or

the time allocated to individual tasks[,]" *In re Star Scientific*, No. 13-cv-550 (AJT), Dkt. No. 117

at 1 (E.D. Va. Jan. 6, 2016) (attached hereto as Ex. 23)—*the exact same kind of submission they*

*have made in this case*.  The court observed that the application provided "no way for the Court

to assess the 2,584.15 hours spent on this litigation by seven different law firms."  *Id.* at 1-2.

Accordingly, the court required counsel to supplement their briefing with "daily time records for

each timekeeper included in plaintiffs' lodestar calculation along with a summary of the work

performed, the amount of time associated with each category of activity, and a brief explanation

of why such time was reasonably necessary." *Id.* at 2.  Counsel then "filed additional submissions

in response to the Court's Order" and voluntarily reduced their proposed lodestar by *39%*.  *In re*

*Star Scientific, Inc. Derivative Litig.*, 2016 WL 4820637, at *2.  *In other words, when the same*

*counsel here was forced to have their time records see the light of day, they unilaterally cut their*

*proposed time by almost 40%.*  The court then further reduced the proposed lodestar, resulting in

an aggregate *50% reduction* from the initial lodestar request.  *Id.* at *8 n.14.

Similarly, in *Wallace*, the District of Connecticut rebuked Messrs. Harwood and Houston

for their practice of refusing to submit "daily time records."  7 F. Supp. 2d at 140.  As a result,

after considering the company's objections to the vague time records that had been submitted, the

court reduced the lodestar amount to 53.7% of the total requested by counsel.  *Id.* at 140-42.  At

least one other court has likewise criticized Messrs. Harwood and Houston for their failure to

provide contemporaneous, detailed billing records.  *See, e.g.*, *Boyd*, 299 F.R.D. at 468 ("This

record, however, contains only the total hours spent by each attorney and other professional, with no specification of date or task.  Without that back-up detail, it is impossible to assess duplication of effort or unproductive time.").

Notwithstanding numerous courts' repeated admonitions to submit detailed billing records, and despite repeated requests made by the Company (*see, e.g.*, Ex. 3), Derivative Counsel have persisted in refusing to submit adequate documentation, again submitting charts that summarize work done by ***fifteen law firms over five years!***  (*See* Houston Decl., Dkt. No. 291, Exs. D-Q, S, T.)   Derivative Counsel's failure to provide detailed, contemporaneous records—despite purporting to act on the Company's behalf and seeking payment from the Company—makes it impossible for the Company and the Court to assess the reasonableness of their fee request and results in a waste of the Company's and the Court's resources.  Accordingly, Derivative Counsel's fee application should be denied.

### B.    At a Minimum, Derivative Counsel's Lodestar Must Be Substantially Reduced.

Even if the Court were to consider the Fee Motion without supporting billing records, it is apparent from consideration of the relevant factors and the summaries provided by counsel that the proposed lodestar must be substantially reduced.

### 1.    Consideration of the Relevant Factors under Maryland Law Requires Substantial Reduction of the Proposed Lodestar.

Under Maryland law, lodestar analysis "is broader than simply hours spent times hourly rate but also includes careful consideration of appropriate adjustments to that product, which, in almost all instances, will be case-specific."  *Friolo*, 373 Md. at 505.  When determining the reasonableness of fees, Maryland trial courts look to "the factors set forth in Rule 1.5 of the Maryland Rules of Professional Conduct."  *Id.* at 519; *see also Diamond Point Plaza Ltd. P'ship*,

400 Md. at 757.  The factors enumerated by Rule 1.5 of the Maryland Rules of Professional

Conduct are:

> (1) the time and labor required, the novelty and difficulty of the questions involved, and the skill requisite to perform the legal service properly;

> (2) the likelihood, if apparent to the client, that the acceptance of the particular employment will preclude other employment by the lawyer;

> (3) the fee customarily charged in the locality for similar legal services;

> (4) the amount involved and the results obtained;

> (5) the time limitations imposed by the client or by the circumstances;

> (6) the nature and length of the professional relationship with the client;

> (7) the experience, reputation, and ability of the lawyer or lawyers performing the services; and

> (8) whether the fee is fixed or contingent.

*Friolo*, 373 Md. at 527 n.3.  However, "[i]n order to apply Rule 1.5 to a fee award, a court does

not need to evaluate each factor separately[.]"  *SunTrust Bank v. Goldman*, 201 Md. App. 390, 402

(2011).  In addition, courts will consider the "undesirability of the case."  *Friolo*, 373 Md. at 522

n.2.

Application of the factors warrants a decrease to Derivative Counsel's proposed lodestar.

Most importantly, Derivative Counsel could—and did—piggyback substantially on the work of

various other parties:  the Company in issuing the October 2014 Form 8-K and the Restatement;

the Company in maintaining control of the OP Units that ultimately funded almost all of the

Derivative Defendants' contributions to the global settlement; the Company in cooperating with

the Government and the SEC to allow them to bring successful cases; the Government in bringing

criminal actions against Block and McAlister; the SEC in bringing civil charges against the AR

Capital Parties and Block and obtaining a return of approximately $32 million to the Company

that went to fund the global settlement; and the Class Plaintiffs in prosecuting the securities fraud

claims which would largely be determinative of whether the Derivative Defendants had committed a breach of fiduciary duty.

Derivative Counsel's performance in this action did not require the level of skill warranting an award of the total proposed lodestar amount (even if that amount had been sufficiently documented and was free from duplication and excess).[7]  This action did not present novel or difficult questions of law or fact.  This case involved routine claims of breach of fiduciary duty. (Dkt. No. 87 at ¶¶ 143-84.)  Additionally, the outcome of the Derivative Action largely hinged on investigative work and strategic actions taken by the Company prior to Derivative Counsel's involvement.  (*See, supra,* Background § C.)

For all the foregoing reasons, this was not an "undesirable" or particularly risky case for Derivative Counsel to take on.  Tellingly, ***fifteen law firms*** commenced actions based on the same allegations (all of which now seek attorneys' fees).  *See, e.g.*, *In re Anthem, Inc. Data Breach Litig.*, 2018 WL 3960068, at *27 (N.D. Cal. Aug. 17, 2018) (intense competition over lead counsel role evidenced the lack of risk).  Accordingly, an award of the total proposed lodestar amount— even if that amount had been sufficiently documented and free from duplication and excess— would be inappropriate.

### 2.    It Is Clear That the Work Performed by Fifteen Law Firms Involved Substantial Duplication and Excess Billing.

"[T]he Court will not award attorneys' fees for hours that are excessive, redundant, or otherwise unnecessary to the litigation." *Merryman v. JPMorgan Chase Bank, N.A.*, 2019 WL

---

[7] Of note, the Derivative Plaintiffs were only partially successful.  *See Friolo*, 373 Md. at 525 (holding that if a plaintiff achieved "partial or limited success," an award of the entire lodestar amount "may be an excessive amount").  The Derivative Plaintiffs' claims under Section 14 of the Exchange Act and claims against the Company's former independent directors were all dismissed.  (Dkt. No. 75 at 15-19.)  The Derivative Plaintiffs' motions for summary judgment against defendants Block and McAlister were denied as premature.  (Dkt. No. 269 at 11.)

6245396, at *5 (S.D.N.Y. Nov. 22, 2019) (citation and internal quotation marks omitted)).  "The quantity of hours billed must be reasonable.  Counsel are not entitled to collect for unreasonable duplicative effort."  *Wallace*, 7 F. Supp. 2d at 140.  While Derivative Counsel's failure to provide detailed, contemporaneous billing records prevents a proper examination of their fee request, even a cursory review of their summaries reveals that they seek fees for work that involved substantial duplication and excess across multiple actions involving fifteen law firms.

For example, Derivative Plaintiffs' liaison counsel, Glancy Prongay & Murray LLP, billed **2,485 hours** to "Research/Complaint"—an astonishing number in itself.  (Houston Decl., Dkt. No. 291, Ex. T.)  It is only made worse by the fact that the other 14 law firms seek an additional **1,056 hours** for this same work.  (*See id*.)  These exorbitant figures are only further exacerbated by the seemingly redundant billing of **4,660 hours** to "Pleadings"[8] (including 2,353 hours by Glancy Prongay & Murray LLP).  (*See id*.)  Seeking fees for 6,052 hours of "Document Review", on top of 3,897 hours for "Depositions" (*see id*.)—when Derivative Plaintiffs spent only approximately 57 hours of the 397 hours on the record questioning witnesses at depositions they attended— further underscores the gross duplication and overbilling by the fifteen law firms seeking fees, including eight law firms representing plaintiffs in stayed derivative actions in three other jurisdictions.

Although the descriptions in Derivative Counsel's submissions are so opaque that it is nearly impossible to tell what tasks were conducted by each firm, and why they were necessary in

---

[8] Rule 7 of the Federal Rules of Civil Procedure defines "pleadings" as consisting of the following: "(1) a complaint; (2) an answer to a complaint; (3) an answer to a counterclaim designated as a counterclaim; (4) an answer to a crossclaim; (5) a third-party complaint; (6) an answer to a third-party complaint; and (7) if the court orders one, a reply to an answer."  It is implausible—and grossly excessive—for Derivative Counsel to seek fees for 4,660.33 combined hours on preparing complaints, which were the only pleadings filed in their cases.  (*See* Houston Decl., Dkt. No. 291, Ex. T.)

light of the rampant duplication across the fifteen law firms, the following duplicative or unnecessary actions are a few examples that stand out:

- The Law Office of Alfred G. Yates Jr. PC **did not even submit a declaration** explaining why it should be awarded over $66,000. (*See* Houston Decl., Dkt. No. 291, Ex. T (inclusion on summary chart only).)

- Schubert Jonckheer & Kolbe seeks fees for preparation for two depositions **that did not occur** (Philippa Bond and Michael Ellis). (*Id.*, Ex. E ¶ 5.)

- The Brown Law Firm seeks fees for 675.50 hours on post-demand "Pleadings" in duplication of the 2,353.90 hours sought by Glancy Prongay Murray on the operative complaint in this action. The Brown Law Firm also seeks fees for 197.60 hours on the "motion for final approval of settlement" despite having not attended the mediation that resolved the litigation and Glancy's role as liaison counsel. (*Id.*, Ex. G ¶ 5; Ex. T.)

- Holzer & Holzer seeks fees for 308.25 hours on "Pleadings" despite being listed only as "Additional Plaintiffs' Counsel" on the *Serafin* complaint, and not as counsel to any of the plaintiffs in the operative complaints. (*Id.*, Ex. T.)

- All five firms in the *Serafin* action affirm that they spent time on the litigation demand, and collectively billed 1,570.95 hours to "Pleadings." (*Id.*, Ex. E ¶ 5; Ex. F ¶ 5; Ex. G ¶ 5; Ex. H ¶ 5; Ex. I ¶ 5.)

- Counsel in the stayed *Meloche* Action in Maryland federal court collectively request over $500,000 for doing exactly the same work, including fees for work they describe as "etc.": "investigation and research, litigation demand, drafting numerous pleadings including complaints, motion practice, client communications, *etc.*" (*Id.*, Ex. J ¶ 5; Ex. K ¶ 5.)

- Counsel in the stayed *Meloche* action in Maryland federal court seek fees for a total of 154.25 hours for "Settlement" despite not participating in any mediations or any settlement discussions with the Company. (*Id.*, Ex T.)

- Gainey McKenna & Egleston (one of the law firms in the stayed *Meloche* action in Maryland federal court) seeks fees for 67.75 hours for "Court Appearances"—nearly half of the amount of time sought by Derivative Plaintiffs' liaison counsel—despite the fact that **there were no court appearances** in the *Meloche* action. (*Id.*, Ex T.)

- Counsel at Hynes & Hernandez in the stayed *Frampton* Action in Maryland state court assert that the firm spent time "issuing a pre-suit litigation demand, filing a demand refused complaint, and motion practice" and billed over 169 total hours on "Research/Complaint"

and "Pleadings," despite that the firm did not sign the demand letter or the complaint.  (*Id.*, Ex. M ¶ 6; Ex. T.)[9]

- Counsel in the stayed *Kosky* Action in New York state court not only filed duplicative actions in this Court and New York state court, but counsel at TheGrantLawFirm and Stull, Stull & Brody duplicated their efforts, with both of them (1) drafting multiple complaints, (2) researching claims against Grant Thornton, (3) corresponding with the Company's board of directors, and (4) researching defenses and collateral estoppel (presumably the collateral estoppel effect of this action on their action).  (*Id.*, Ex. P ¶ 6; Ex. Q ¶ 10.)  Yet TheGrantLawFirm requests $312,302 for 542 hours of work, and Stull, Stull & Brody requests $205,189.25 for 227.21 hours.[10]

Several courts have previously recognized that fees billed by the same Derivative Counsel here were excessive or duplicative.  *See In re Star Scientific, Inc. Derivative Litig.*, 2016 WL 4820637, at *7 (criticizing "widespread duplication of effort among the seven law firms billing time to this case"); *In re Cablevision S'holders Litig.*, 2009 WL 357459 (Sup. Ct. Nassau Cnty. Jan. 22, 2009) ("[d]isallowing some of the hours for duplication of efforts"), *overruled on other grounds*, 904 N.Y.S.2d 492 (2d Dep't 2010); *Seinfeld v. Robinson*, 2001 WL 36023241 (Sup. Ct.

---

[9] Moreover, Derivative Counsel's excessive billing extends to the hourly rates sought by the five law firms in the stayed *Meloche* and *Frampton* actions pending in Maryland federal court and state court, respectively.  The reasonable hourly rates applicable in those cases, to the extent those counsel are entitled to a fee award at all, are the prevailing rates in Maryland, where courts look to Appendix B of the District of Maryland's local rules as establishing presumptively reasonable hourly rates.  *See Kabore v. Anchor Staffing, Inc.*, 2012 WL 5077636, at *8-9 (D. Md. Oct. 17, 2012) (holding that "[t]he relevant community in the instant case is Baltimore, Maryland, where this court sits[,]" and "presum[ing] a rate is reasonable if it falls within the[] ranges" set forth in Appendix B); *Garza v. Mitchell Rubenstein & Assocs., P.C.*, 2016 WL 7468039, at *3 (D. Md. Dec. 27, 2016) (rejecting argument that a requested rate was justified because it "was approved in a recent class action" by a district court outside of Maryland, and utilizing Appendix B rates instead); *Rochkind v. Stevenson*, 2016 WL 3961361, at *32 (Md. Ct. Spec. App. July 20, 2016) (referring to Appendix B rates), *rev'd on other grounds*, 454 Md. 277 (2017).  Here, the vast majority of the timekeepers in the Maryland cases seek hourly rates far in excess of the rates provided for in Appendix B (in some instances double those rates), and make no attempt to satisfy their burden of establishing why they should be awarded those high rates.  *Compare* Houston Decl., Exs. J-O *with* D. Md. Local R. App. B § 3(b) (2018) (attached hereto as Ex. 24).  To the extent the Court grants any fee award to counsel in the Maryland actions, their hourly rates must be reduced accordingly.

[10] The foregoing is only an overview of the obvious duplication and excess permeating through Derivative Counsel's fee application.  Detailed analysis has been made impossible in light of Derivative Counsel's failure to submit detailed billing records.  The Company reserves all rights to identify specific inappropriate billings upon receiving detailed billing records.

N.Y. Cnty. Mar. 8, 2001) (reducing the lodestar because "there had been unreasonable duplication among firms").

Derivative Counsel's obvious duplication and excess billing requires a substantial reduction of the requested fee award, to the extent the Court finds it appropriate to award one at all based on the current record. *See Levy v. Gen. Elec. Capital Corp.*, 2002 WL 1225542, at *4 (S.D.N.Y. June 4, 2002) (Hellerstein, J.) (reducing a fee application award for hours that were not "producing value for the case" and for duplicating work).

### C.    A Multiplier Is Not Warranted.

The Company is not aware of any "common fund" case where a court applying Maryland law employed a multiplier.  Indeed, under Maryland law, "[t]he use of risk enhancements or risk multipliers in common fund cases is unsettled." *Dotson*, 2003 WL 23508428, at *9.  But even if a multiplier were permissible under Maryland law, it would be unwarranted in this case.

Under Second Circuit law, adjustments to a lodestar calculation "are appropriate ***only in rare circumstances*** because the lodestar figure already includes most, if not all, of the relevant factors constituting a reasonable attorney's fee." *Millea v. Metro-N. R.R. Co.*, 658 F.3d 154, 167 (2d Cir. 2011) (internal quotations and alterations omitted) (emphasis added).  As one court has observed:  "Modifiers should not be a default award for any class-action advocacy.  They should instead be used to incentivize class-action litigators to take on genuinely risky litigation, and to go the extra mile to generate noteworthy results that advance the interests of class members and society as a whole." *McLaughlin v. IDT Energy*, 2018 WL 3642627, at *19 (E.D.N.Y. July 30, 2018).

As discussed previously (*see supra*, Argument § III.B.1.), this action was not particularly risky for Derivative Counsel nor did it entail a particularly high level of performance because Derivative Counsel largely could and did "piggy-back" off the work of others. *See Goldberger v.*

*Integrated Res., Inc.*, 209 F.3d 43, 55-56 (2d Cir. 2000); *In re Assicurazioni Generali S.p.A. Holocaust Ins. Litig.*, 2009 WL 762438, at *4 (S.D.N.Y. Mar. 24, 2009) (discounting the requested fee by 44% where "much of these firms' work involved review of work performed by Class Counsel or other attorneys").

The Company investigated the conduct underlying this action, and issued the October 2014 Form 8-K and the Restatement that formed a roadmap for Plaintiffs' claims. *See In re Tremont Sec. Law, State Law & Ins. Litig.*, 2019 WL 516148, at *11 (S.D.N.Y. Feb. 11, 2019) (holding "where claims were precipitated by public events, the risk undertaken by class counsel is especially slight") (internal quotations omitted), *report and recommendation adopted*, No. 1:08-cv-11117 (CM), Dkt. No. 1286 (Mar. 15, 2019).  The U.S. Attorney's Office reached a plea deal with the Company's former Chief Accounting Officer, Lisa McAlister, and instituted another criminal case that resulted in a conviction of the Company's former Chief Financial Officer, Brian Block.  *See Goldberger*, 209 F.3d at 56 (declining to award a quality multiplier where "a good portion of counsel's lodestar was based on hours spent scouring the records developed during the parallel criminal proceedings").  The Company alerted the SEC to issues that led to a recovery of OP Units that formed approximately $32 million of the $286.5 of the Derivative Defendants' contributions to the global settlement.  And it was the Company's preservation of claims against the AR Capital Parties and Block and the Company's refusal to redeem OP Units and pay associated dividends to them that formed the basis for those parties' contribution of $238 million toward the global settlement.  *See Flores v. Mamma Lombardi's of Holbrook, Inc.*, 104 F. Supp. 3d 290, 316 (E.D.N.Y. 2015) (not awarding a multiplier where "[t]he relatively large size of the settlement cannot, in any way, be attributed to 'superior attorney performance,' but is rather attributable to fortuity and circumstance"); *Zimmerman v. Portfolio Recovery Assocs., LLC*, 2013 WL 6508813,

at *12 (S.D.N.Y. Dec. 12, 2013) ("[T]his is a routine [breach of fiduciary duty] case that broke no new ground," and as a result, "[a]pplication of a multiplier here is not appropriate.").

Due to the significant factual development and strategic work done for them, Derivative Counsel's risk was very small. *In re Wash. Mut. RESPA Fee Litig.*, 2009 WL 749933, at *4 (E.D.N.Y. Mar. 17, 2009) (declining to award a multiplier where "the risk no recovery would be obtained was very small"). That there was little risk for Derivative Counsel is reinforced by the fact that fifteen law firms brought derivative actions on behalf of the Company (with all of those firms now seeking a fee award). *See, e.g.*, *In re Anthem, Inc. Data Breach Litig.*, 2018 WL 3960068, at *27 (intense competition over lead counsel role evidenced the lack of risk). Accordingly, a multiplier would be grossly unjustified here.

## IV.   DERIVATIVE COUNSEL'S REQUEST FOR EXPENSES IS UNSUPPORTED AND EXCESSIVE.

Litigation expenses, including costs, may be recovered "when the expenses 'are necessary and were directly related to the results achieved.'" *Merryman*, 2019 WL 6245396, at *7 (quoting *Siddiky v. Union Square Hosp. Grp., LLC*, 2017 WL 2198158, at *12 (S.D.N.Y. 2017)). Here, Derivative Counsel have failed to submit sufficient documentation to support an award of expenses, and certain categories of expenses are unnecessary or excessive on their face.

### A.   Derivative Counsel Fail to Provide Sufficient Documentation of Expenses.

"[C]ourts may reduce or decline to award costs altogether where counsel fails to proffer documentation of the expenses." *Mango v. BuzzFeed, Inc.*, 397 F. Supp. 3d 368, 378 (S.D.N.Y. 2019) (denying certain costs where plaintiff "did not provide receipts, invoices, or any other sort of contemporaneous evidence" because "the Court ha[d] no warranted basis for noting their accuracy"); *Jerstad v. New York Vintners, LLC*, 2019 WL 6769431, at *6 (S.D.N.Y. Dec. 12, 2019) (denying certain costs where "[p]laintiff declined to provide any evidence of costs"); *King Fook*

*Jewellry Grp. v. Jacob & Co. Watches, Inc.*, 2019 WL 2535928, at \*11 (S.D.N.Y. June 20, 2019) (denying certain costs where expenses "did not come with supporting documentation" or where counsel did not provide explanation of expenses), *report and recommendation adopted*, 2019 WL 4879212 (S.D.N.Y. Oct. 3, 2019); *Zimmerman*, 2013 WL 6508813, at \*13 (reducing disputed expenses by 50% where "[p]laintiff has not provided back-up documentation for these expenses, such as invoices, receipts, or bills").

Similar to their request for attorneys' fees, Derivative Counsel do not provide any contemporaneous, itemized expense records to support their request for $594,882 in expenses across fifteen law firms.  Instead, they provide only a summary chart categorizing their expenses as "Filing Fees/Notices", "Electronic Research", "Court Reporting", "Document Repository", "Travel/Transportation", "Overnight Delivery", "Mediation Fees", or "Expert Witness".  (Houston Decl., Dkt. No. 291, Ex. U.)  Derivative Counsel's request for reimbursement of these expenses does not provide any basis for the Company or the Court to assess any duplication or excess in the expenses.  Accordingly, the Court should deny their request for expense reimbursement.

### B.     Plaintiffs Seek Reimbursement of Unnecessary and Excessive Expert Costs.

Plaintiffs seek reimbursement of $158,928.38 in expert costs.  (Houston Decl., Dkt. No. 291, Ex. U.)  However, at the November 29, 2018 status conference, the Court warned that experts were wholly unnecessary in the Derivative Action, stating that "[t]here is no need for separate experts on your part" because "[a]ll this does is add expense" and "[t]here are no experts that are used for [the issue of breach of loyalty or breach of candor], it is a law issue."  (Ex. 1 at 21:11-16.)  Without an itemized accounting of Derivative Counsel's expert expenses, it is impossible to assess whether Derivative Counsel seek reimbursement for expert costs incurred after that date, or the reasonableness of the expert expenses as a general matter.  Their request for expert expenses should therefore be denied.

## <u>CONCLUSION</u>

For the foregoing reasons, Derivative Counsel's Fee Motion should be denied. Alternatively, their requested lodestar should be reduced substantially, and no multiplier should be applied.

Dated: December 31, 2019
New York, New York

**MILBANK LLP**

By:   <u>/s/ Scott A. Edelman</u>
Scott A. Edelman
Antonia M. Apps
Jed M. Schwartz
Jonathan Ohring
55 Hudson Yards
New York, New York 10001
Telephone: (212) 530-5000

Jerry L. Marks
2029 Century Park East, 33rd Floor
Los Angeles, CA 90067-3019
Telephone: (424) 386-4000

*Attorneys for Nominal Defendant American Realty Capital Properties, Inc. (n/k/a VEREIT, Inc.)*