UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| JOANNE WITCHKO, Derivatively on Behalf of Nominal Defendant AMERICAN REALTY CAPITAL PROPERTIES, INC., <br><br> Plaintiff, <br><br> v. <br><br> NICHOLAS S. SCHORSCH, et al., <br><br> Defendants, <br><br> -and- <br><br> AMERICAN REALTY CAPITAL PROPERTIES, INC., <br><br> Nominal Defendant. | Lead Case No. 1:15-cv-06043-AKH <br><br> (Consolidated with Case No. 1:15-cv-08563-AKH) |

**REPLY IN FURTHER SUPPORT OF DERIVATIVE PLAINTIFFS' MOTION
FOR ATTORNEYS' FEES AND REIMBURSEMENT OF EXPENSES**

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ...................................................................................... iii

INTRODUCTION ...................................................................................................... 1

ARGUMENT .............................................................................................................. 5

I.     THE COURT SHOULD APPLY THE PERCENTAGE METHOD WITH
LODESTAR CROSS-CHECK ........................................................................... 5

     A.    The Parties Agree that Attorney's Fees are Available Here ................................... 5

     B.    Courts in this Circuit and Nationwide Overwhelmingly Supports Use of the
Percentage Method with a Lodestar Cross-Check .................................... 7

     C.    Maryland Law Supports Use of the Percentage Method ........................................ 9

II.    THE 8% FEE REQUEST IS REASONABLE AND SHOULD BE
GRANTED ....................................................................................................... 11

     A.    Empirical Analysis and the *Goldberger* Factors Support an
8% Award ................................................................................................ 11

     B.    The Value of the Benefit to VEREIT is Clear ....................................... 12

     C.    Derivative Counsel is Responsible for the Benefit to VEREIT ............................. 14

          1.   Derivative Counsel Achieved the Result Without a Roadmap ....................... 14

          2.   If There Had Not Been a Derivative Action, VEREIT Would Not Have
Recovered $286.5 Million ............................................................... 15

          3.   The Derivative Settlement Is Not "Largely" the Result Of
The Company's Efforts .................................................................... 17

III.   IF THE COURT USES THE LODESTAR METHOD, A 1.83x LODESTAR
MULTIPLIER IS APPROPRIATE ................................................................. 18

     A.    The Relevant Factors Support Award of a Multiplier ........................... 19

          1.   Risk is the Most Important Factor and Supports a Lodestar
Multiplier ......................................................................................... 20

i

2.   The Magnitude and Complexities of the Litigation Support Award of a Multiplier ...........................................................................................................21

3.   The Quality of Derivative Counsel's Work Supports Payment of a Lodestar Multiplier.......................................................................................22

B.   VEREIT's Focus on Collateral Billing Disputes Should be Rejected..................23

IV.   EXPENSES HAVE BEEN PROPERLY QUANTIFIED..................................................28

CONCLUSION.........................................................................................................................30

# TABLE OF AUTHORITIES

Cases                                                                                                          Page

*Americas Mining Corp. v. Theriault*,
    51 A.3d 1213 (Del. 2012) ..............................................................6, 7, 10

*Arbor Hill Concerned Citizens Neighborhood Ass'n v. Cty. of Albany & Albany
County Bd. of Elections*,
    522 F.3d 182 (2d Cir. 2008).............................................................25

*Banca Della Svizzera Italiana v. Cohen*,
    756 F. Supp. 805 (S.D.N.Y. 1991) ...................................................23

*Banker v. Nighswander, Martin & Mitchell*,
    37 F.3d 866 (2d Cir. 1994)................................................................5

*Blessing v. Sirius XM Radio Inc.*,
    507 Fed. App'x 1 (2d Cir. 2012) .......................................................13

*Cassese v. Williams*,
    503 Fed. App'x 55 (2d Cir. 2012) .....................................................23

*Davis v. Gemmell*,
    73 Md. 530 (1891) .............................................................................6

*Decohen v. Abbasi, LLC*,
    299 F.R.D. 469 (D. Md. 2014)..........................................................19

*Fleisher v. Phoenix Life Ins. Co.*,
    2015 WL 10847814 (S.D.N.Y. Sept. 9, 2015).....................................13

*Fresno County Employees' Ret. Ass'n v. Isaacson /Weaver Family Trust*,
    925 F.3d 63 (2d Cir. 2019)...........................................................10, 20

*Friolo v. Frankel*,
    373 Md. 501 (2003) .....................................................................9, 10, 11

*Garcia v. Foulger Pratt Dev., Inc.*,
    155 Md. App. 634 (2003) ...........................................................6, 9, 10, 11

*Gimbel v Chertkof*,
    2003 WL 25907651 (Md. Cir. Ct. Dec. 11, 2003).....................................................................7

*Golberger v. Integrated Resources, Inc.* ,
    209 F.3d 43 (2d Cir. 2000)............................................................................................ passim

*Grice v. Pepsi Beverages Co.*,
    363 F. Supp. 3d 401 (S.D.N.Y. 2019)...........................................................................8

*Guevoura Fund Ltd. v. Sillerman*,
    2019 WL 6889901 (S.D.N.Y. Dec. 18, 2019) ...........................................................8

*Halle Dev., Inc. v. Anne Arundel County*,
    2017 WL 5629677 (Md. Ct. Spec. App. Nov. 22, 2017)......................................9, 11

*Hensley v. Eckerhart*,
    461 U.S. 424, 103 S. Ct. 1933 (1983)...................................................................9, 18

*In re Assicurazioni Generali S.p.A. Holocaust Ins. Litig.*,
    2009 WL 762438 (S.D.N.Y. Mar. 24, 2009) ............................................................14

*In re Auction Houses Antitrust Litig.*,
    2001 WL 170792 (S.D.N.Y. Feb. 22, 2001)............................................................13

*In re Colgate-Palmolive Co. ERISA Litig.*,
    36 F. Supp. 3d 344 (S.D.N.Y. 2014)............................................................................8

*In re Comverse Tech., Inc. Sec. Litig.*,
    2010 WL 2653354 (E.D.N.Y. June 24, 2010) .........................................................19

*In re Fab Universal Corp. S'holder Deriv. Litig.*,
    148 F. Supp. 3d 277 (S.D.N.Y. 2015).........................................................................5

*In re Marsh & McLennan Cos., Inc. Sec. Litig.*,
    2009 WL 5178546 (S.D.N.Y. Dec. 23, 2009) .........................................................19

*In re NASDAQ Mkt.-Makers Antitrust Litig.*,
    187 F.R.D. 465 (S.D.N.Y. 1998) ...........................................................8, 9, 19, 23

*In re Pfizer Inc. S'holder Deriv. Litig.*,
  780 F. Supp. 2d 336 (S.D.N.Y. 2011) ............................................................................ passim

*Kaplan v. Rand*,
  192 F.3d 60 (2d Cir. 1999) ..................................................................................................5, 6

*Klein v. Salvi*,
  2004 WL 596109 (S.D.N.Y. Mar. 30, 2004) ..........................................................................8

*Kurzweil v. Philip Morris Cos., Inc.*,
  1999 WL 1076105 (S.D.N.Y. Nov. 30, 1999) .......................................................................19

*Leasing Serv. Corp. v. Dickens*,
  1988 WL 151297 (S.D.N.Y. Oct. 20, 1988) ..........................................................................23

*Manor Country Club v. Flaa*,
  387 Md. 297 (2005) ...........................................................................................7, 9, 10, 11

*McCoy v. Health Net, Inc.*,
  569 F. Supp. 2d 448 (D.N.J. 2008) .......................................................................................13

*McGreevy v. Life Alert Emergency Response, Inc.*,
  258 F. Supp. 3d 380 (S.D.N.Y. 2017) .....................................................................................8

*Mills v. Elec. Auto-Lite Co.*,
  396 U.S. 375 (1970) ..............................................................................................................6

*New York State Ass'n for Retarded Children, Inc. v. Carey*,
  711 F.2d 1136 (2d Cir. 1983) ................................................................................................23

*Oliveira v. Sugarman*,
  451 Md. 208 (2017) ................................................................................................................7

*Plein v. Dep't of Labor, Licensing & Regulation*,
  369 Md. 421 (2002) ................................................................................................................9

*Riordan v. Nationwide Mut. Fire Ins. Co.*,
  977 F.2d 47 (2d Cir. 1992) ....................................................................................................23

*Shenker v. Laureate Educ., Inc.*,
    411 Md. 317, 983 A.2d 408 (2009) ........................................................................7

*Sheppard v. Consol. Edison Co. of New York*,
    2002 WL 2003206 (E.D.N.Y. Aug. 1, 2002)......................................................13

*Silberblatt v. Morgan Stanley*,
    524 F. Supp. 2d 425 (S.D.N.Y. 2007)..................................................................6

*Steinberg v. Nationwide Mut. Ins. Co.*,
    612 F. Supp. 2d 219 (E.D.N.Y. 2009) .................................................................6

*Tandycrafts, Inc. v. Initio Partners*,
    562 A.2d 1162 (Del. 1989) ..................................................................................6

*United Cable Tel. of Baltimore v. Burch*,
    354 Md. 658, 732 A.2d 887 (1999) ......................................................................9

*United States v. Block*,
    2018 WL 722854 (S.D.N.Y. Feb. 6, 2018). .......................................................18

*Velez v. Novartis Pharm. Corp.*,
    2010 WL 4877852 (S.D.N.Y. Nov. 30, 2010)....................................................13

*Weil v. VEREIT Operating P'ship, L.P.*,
    2018 WL 834428 (Del. Ch. Feb. 13, 2018) ..................................................15, 16

## INTRODUCTION

The Derivative Settlement is "remarkable when measured against the outcomes of other derivative suits as well as the complaint leveled at shareholder litigation that such suits do not generally result in tangible benefits for the company." Cox Declaration at ¶ 1.[1] It "is a significant milestone in modern-day shareholder litigation" because "the settlement funds come from the pockets" of the alleged wrongdoers and no part of the settlement consideration comes from an insurance policy or third party, such as an acquisition partner. *Id.* at ¶¶ 18, 20. VEREIT does not dispute Professor Cox's analysis of the Derivative Settlement as "remarkable" and even filed a brief extolling the substantial benefits conferred on the Company by the Derivative Settlement. *See* American Realty Capital Properties Inc.'s Statement in Support of Plaintiffs' Unopposed Motion for Preliminary Approval of Derivative Settlement and Approval of Shareholder Notice ("VEREIT's Statement in Support of Settlement"), ECF No. 285 at 3.[2] Notwithstanding its' earlier praise, the Company, hoping to reduce the attorneys' fees and expenses it owes due to this remarkable result, now criticizes the counsel who obtained it. Derivative Counsel's fee request is well in line with the fees awarded for similarly sized recoveries, and VEREIT's arguments are unsupported by the law, the facts, or the equities.

The Individual Defendants were indemnified by VEREIT for their legal fees and for any amounts they might be required to pay in a judgment or to settle the Class Action. "But for" the Derivative Settlement, they would not have made "any contribution" to the global resolution and

---

[1] Unless otherwise defined, capitalized terms have the meanings set forth in the Declaration of Matthew M. Houston in Support of Derivative Plaintiffs' Motions for Final Approval of Derivative Settlement and Award of Attorneys' Fees and Reimbursement of Expenses (the "Houston Declaration"), ECF No. 291. The Cox Declaration is attached as Exhibit B to the Houston Declaration.

[2] Citations to "ECF No. _" refer to docket entries in the Derivative Action.

Grant Thornton would not have released the counterclaims that it intended to assert against the Company.  Houston Declaration at ¶ 173 (quoting Stipulation at § III).  VEREIT's current management "believes that the [class] plaintiffs would require the same aggregate payment regardless of its source."  VEREIT's Statement in Support of Settlement at 3.  Without  any contribution from the Individual Defendants, VEREIT either would have been required to pay $286.5 million more to settle the Class Action or would have been unable to resolve the Class Action, to the Company's significant financial detriment.  *Id.* at 5, 7; Stipulation at § III.  As a result, the $286.5 million recovered in the Derivative Settlement reduced VEREIT's expense to settle the Class Action by the same amount.  *Accord* Cox Declaration at ¶ 19.

VEREIT makes no effort to rebut the overwhelming cases set forth in Derivative Plaintiffs' Memorandum of Law in Support of Motion for Attorneys' Fees and Reimbursement of Expenses (the "Fee Brief") demonstrating that its fee request is in-line with, or below, the awards regularly granted in similarly-sized cases.  The fee requested by Derivative Counsel of $22,920,000 is 8% of the $286.5 million financial benefit conferred on the Company by the Derivative Settlement and represents a multiplier on Derivative Counsel's adjusted lodestar of 1.83x.  As set forth at length in the Fee Brief and herein, this attorneys' fee is reasonable both as a percentage of the recovery and as a multiplier on lodestar.  Unable to refute the empirical evidence, VEREIT attempts to denigrate the work of Derivative Counsel and create collateral billing disputes.

Having tried for years to prevent the prosecution of the derivative claims, VEREIT's management now tries to take credit for the results of the lawsuit that it repeatedly argued should not exist.  Throughout this litigation, VEREIT obstructed the Derivative Action rather than acting as its champion, repeatedly arguing that the claims should not be litigated.  None of VEREIT's attempts to recover on its own behalf were successful, and the Audit Committee investigation and

the restatement, never even disclosed the improper related-party transactions at the center of the Derivative Action.  Derivative Counsel developed theories of liability on its own, consistently fought for the ability to prosecute the derivative claims, invested over 20,000 hours of attorney time, overcame motions to dismiss, secured dismissal of an interlocutory appeal, prevailed when a special committee moved to stay, reviewed millions of pages of discovery, examined more than thirty deposition witnesses, and defeated four motions for summary judgment.  The record conclusively rebuts the assertion that VEREIT's management is responsible for the Derivative Settlement when it opposed litigation of the claims throughout.

VEREIT argues that the Court should apply Maryland law, which it claims favors the lodestar methodology when determining a fee award.  Maryland Courts, however, do not favor the lodestar method and regularly award fees on a percentage basis.  In any event, this Court  should apply the well-established *Goldberger v. Integrated Res., Inc.*, 209 F.3d 43, 54 (2d Cir. 2000) factors after determining that fees are available under Maryland law, a point on which all parties agree.  VEREIT does not want the Court to apply *Goldberger* because, as laid out in the fee brief, courts applying *Goldberger* overwhelmingly award higher fees, both as a percentage and as a multiplier on lodestar, than the fee requested by Derivative Counsel.  The requested fee of 8%, a multiplier of 1.83x on Derivative Counsel's adjusted lodestar, is clearly reasonable under either standard.

Courts in this Circuit view "risk" as the most important factor supporting the reasonableness of a fee award and the payment of a multiplier on lodestar.  Derivative Plaintiffs achieved an historic settlement in the face of well-financed and tenacious opposition from some of the most respected securities attorneys and law firms in the country.  Derivative Plaintiffs overcame the Maryland business judgment rule to establish wrongful refusal of the demand, which

as VEREIT argued at the time, few if any plaintiffs do.  VEREIT responded to denial of the motion to dismiss by convening a special committee which tried take over the action, normally the death knell of a derivative suit.  Even though Derivative Plaintiffs prevailed on VEREIT's motion to stay and developed unique, valuable claims in discovery that alleged wrongdoing never before brought to light with no help from VEREIT or any other party, the risks continued to be immense. When they moved for summary judgment, defendants argued that the very claims in this action did not exist under Maryland law, and that even if they did, Maryland's unusual related-party safe harbor and exculpation statutes were insurmountable hurdles.

Derivative Counsel's fee application is based on the contemporaneous time records of the firms involved in the *Witchko* action and firms in derivative actions pending in other jurisdictions whose claims will be compromised by the Derivative Settlement.  Derivative Counsel has already exercised billing discretion by removing time related to unsuccessful demand futility cases, administration time, and Derivative Counsel's request for fee and expenses.  With the most recent reductions to time, Derivative Counsel's collective lodestar is $12,506,368 for 20,201 total hours of work.  Derivative Counsel anticipates that, rather than acknowledge the satisfactory presentation of accurate and contemporaneously recorded time records, VEREIT will further complain that the time incurred on particular tasks was excessive.  As detailed herein, the Supreme Court has cautioned courts to avoid focusing on collateral billing disputes like those raised by VEREIT here. Derivative Counsel's time is modest when compared to the result achieved and evidences the efficient prosecution of the Derivative Action.

Derivative Counsel therefore respectfully requests that the Court grant its request for attorneys' fees and expenses in its entirety.

## ARGUMENT

## I.   THE COURT SHOULD APPLY THE PERCENTAGE METHOD WITH A LODESTAR CROSS-CHECK

Maryland courts have used the percentage method to award attorneys' fees in derivative actions since the 1880s and Maryland law does not favor the lodestar method over the percentage method; it permits either method or a blend of the two.  Regardless, so long as a fee is *available* under state law, courts in this District apply the reasonableness analysis in *Goldberger*, 209 F.3d at 54; *In re Pfizer Inc. S'holder Deriv. Litig.*, 780 F. Supp. 2d 336, 343 (S.D.N.Y. 2011).  Because the parties agree a fee is available under Maryland law, the Court should use the well-established factors employed in this Circuit.   The factors used by Maryland courts to determine the reasonableness of a fee request are not well-defined but would not conflict with *Goldberger*.  If the Court followed the approach advocated by VEREIT, the outcome would be the same as under the *Goldberger* analysis.

### A.   The Parties Agree that Attorneys' Fees are Available Here

In diversity actions like this one, state law governs the issue of counsel fee *availability*. *Kaplan v. Rand*, 192 F.3d 60, 70 (2d Cir. 1999) (New York law permitted the award of attorneys' fees in derivative actions involving a financial recovery or a corporate therapeutic settlement); *see also Banker v. Nighswander, Martin & Mitchell*, 37 F.3d 866, 873 (2d Cir. 1994) (evaluating whether New Hampshire law permitted the award of attorneys' fees in a legal malpractice case.). Where state law permits the award of attorneys' fees, courts in this Circuit employ the *Goldberger* analysis to determine a reasonable fee amount.  *Pfizer* 780 F. Supp. 2d at 343 (awarding fee as a percentage of the recovery in derivative action involving a Delaware company); *In re Fab Universal Corp. S'holder Deriv. Litig.*, 148 F. Supp. 3d 277, 283 (S.D.N.Y. 2015) (awarding

attorneys' fee after *Goldberger* analysis in derivative action on behalf of a Colorado corporation).[3] As Judge Rakoff explained in *Pfizer*, where state law permits the award of attorneys' fees and expenses, "the Court's determination of whether plaintiffs' counsel's requested fee award is reasonable is guided by the factors set forth in the Second Circuit in [*Goldberger*]." *Pfizer*, 780 F. Supp. 2d at 343 (citing *Tandycrafts, Inc. v. Initio Partners*, 562 A.2d 1162, 1165 (Del. 1989)). Fees are available in this action under the common fund doctrine.[4]

The common fund doctrine applies to the award of attorneys' fees in derivative actions like this. *See Mills v. Elec. Auto-Lite Co.*, 396 U.S. 375, 393 (1970) (common fund doctrine applies to derivative actions recovering on behalf of corporation); *Kaplan*, 192 F.3d at 69 (same). Like the federal courts, Maryland courts have recognized the common fund doctrine in derivative actions for over 100 years. *See Davis v. Gemmell*, 73 Md. 530 (1891) (in derivative action, awarding attorneys' fees under the common fund doctrine as a percentage of the recovery); *Garcia v. Foulger Pratt Dev., Inc.*, 155 Md. App. 634, 669 (2003) (payment of attorneys' fees in derivative actions warranted under common fund doctrine).[5] Because fees are available under Maryland law, the *Goldberger* analysis applies. *Pfizer*, 780 F. Supp. 2d at 343.

---

[3]     *See also Steinberg v. Nationwide Mut. Ins. Co.*, 612 F. Supp. 2d 219, 222 (E.D.N.Y. 2009) (applying *Goldberger* to assess reasonableness of fee award in diversity action under New York law); *Silberblatt v. Morgan Stanley*, 524 F. Supp. 2d 425, 433 (S.D.N.Y. 2007) (same).

[4]     VEREIT agrees. *See* Opposition at 6 (law governing attorneys' fees in "common fund cases" applicable here), 18 (same), 34 (same).

[5]     *See also Id.* at 665 (collecting cases recognizing the common fund doctrine and citing *Tandycrafts*); *Tandycrafts*, 562 A.2d at 1164–65 ("successful derivative or class action suits which result in the recovery of money or property wrongfully diverted from the corporation… are viewed as fund creating actions."); *Americas Mining Corp. v. Theriault*, 51 A.3d 1213, 1253 (Del. 2012) (recovery in derivative action constituted common fund).

Another reason the Court should apply the *Goldberger* analysis is that the analysis required by Maryland law is unclear.  *See Gimbel v. Chertkof*, 2003 WL 25907651 (Md. Cir. Ct. Dec. 11, 2003) ("Maryland law is not all that rich in giving direction as to the correct standards to be applied when awarding attorney's fees from a common fund.").[6]  Like the *Gimbel* court, Maryland courts frequently look to Delaware  for guidance on issues of corporate law.  *Oliveira v. Sugarman*, 451 Md. 208, 221 (2017); *see also Shenker v. Laureate Educ., Inc.*, 411 Md. 317, 338 n.14, 983 A.2d 408 (2009) ("This Court has noted the respect properly accorded Delaware decisions on corporate law ordinarily in our jurisprudence." (citation omitted)).  If the Court were to follow Delaware law, the analysis would presumably follow *Pfizer*, in which Judge Rakoff applied *Goldberger*.

No matter which law is applied, the result would be the same.  *Compare Pfizer*, 780 F. Supp. 2d at 343 (listing the *Goldberger* factors); Maryland Rule of Professional Conduct 1.5 (eight factors); *Americas Mining*, 51 A.3d at 1255 (applying the Delaware *Sugarland* factors).  The Second Circuit, Maryland and Delaware all look to the same criteria evaluating the quality of result, the risks of litigation, the time and effort required of counsel, the complexity or difficulty of the issues presented, and the quality of representation.  *Pfizer*, 780 F. Supp. 2d at 343; Maryland Rule of Professional Conduct Rule 1.5; *Americas Mining*, 51 A.3d at 1255.  The Court should apply the *Goldberger* factors, but even if it did not, the analysis would be materially the same.

### B.    Courts in this Circuit and Nationwide Overwhelmingly Support Use of the Percentage Method with a Lodestar Cross-Check

Courts in this Circuit and nationally favor application of the percentage method with a lodestar cross-check when awarding attorneys' fees under the common fund doctrine.  *See, e.g.,*

---

[6]    Outside the common fund context, the Maryland Court of Appeals has specifically declined to establish a set of factors for the evaluation of reasonable attorneys' fees under fee shifting statutes.  *Manor Country Club v. Flaa*, 387 Md. 297, 320 (2005) (Maryland law "did not preclude the use of criteria other than those found in [federal decisions], Rule 1.5 of the Maryland Rule of Professional Conduct, or others.").

*Guevoura Fund Ltd. v. Sillerman*, 2019 WL 6889901, at *15 (S.D.N.Y. Dec. 18, 2019) ("[d]istrict courts' adoption of the percentage of recovery methodology is consistent with national precedent."); *Grice v. Pepsi Beverages Co.*, 363 F. Supp. 3d 401, 406 (S.D.N.Y. 2019) ("… this Court 'applies the percentage of the fund method and considers the *Goldberger* factors in three steps.'"); *McGreevy v. Life Alert Emergency Response, Inc.*, 258 F. Supp. 3d 380, 384 (S.D.N.Y. 2017) ("The percentage of the fund method is the trend in this Circuit," employing percentage with lodestar cross-check); *In re Colgate-Palmolive Co. ERISA Litig.*, 36 F. Supp. 3d 344, 348 (S.D.N.Y. 2014) ("The percentage method 'directly aligns the interests of the class and its counsel and provides a powerful incentive for the efficient prosecution and early resolution of litigation.'").

As this Court explained in a different derivative action, there are fundamental problems with analyzing a fee request solely on a percentage basis or only by looking at lodestar. *Klein v. Salvi,* 2004 WL 596109, at **5-6, 11 (S.D.N.Y. Mar. 30, 2004) (awarding an attorneys' fee based on a percentage of the recovery with a lodestar cross-check using the *Goldberger* factors). Courts in this Circuit view the percentage method with lodestar cross-check as fairer than the lodestar method, easier to apply, and especially relevant here, helpful in avoiding "collateral disputes over billing." *In re NASDAQ Mkt.-Makers Antitrust Litig.*, 187 F.R.D. 465, 485 (S.D.N.Y. 1998) (awarding 14% attorneys' fee in mega-fund case). As the late Senior District Judge Sweet explained in his often-cited *NASDAQ* opinion, "advantages of the percentage of the fund method over the lodestar method include ease of administration [and] permitting the judge to focus on 'a showing that the fund conferring a benefit on the class resulted from the lawyers' efforts[,]' rather than collateral disputes over billing." *Id.* (quoting *Camden I Condo. Ass'n, Inc. v. Dunkle*, 946

F.2d 768, 774 (8th Cir. 1991) and *Hensley v. Eckerhart,* 461 U.S. 424 (1983)).[7]  The logic of *Nasdaq* is applicable here and Derivative Counsel respectfully submit that Second Circuit precedent clearly prefers the percentage method with lodestar cross-check in actions like this one.

### C.    Maryland Law Supports Use of the Percentage Method

Maryland law does not conflict with the approach used in this Circuit.  Maryland Courts use the percentage method when awarding fees under the common fund doctrine.  *See United Cable Tel. of Baltimore v. Burch,* 354 Md. 658, 686-87 (1999) (in complex cases it is appropriate to use the percentage method to award attorneys' fees) *superceded by statute on other grounds*; *see Plein v. Dep't of Labor, Licensing & Regulation*, 369 Md. 421 (2002); *see also Halle Dev., Inc. v. Anne Arundel County*, 2017 WL 5629677, at *16 (Md. Ct. Spec. App. Nov. 22, 2017) (affirming award of attorneys' fees under percentage of the fund method).  "Attorney's fees awarded pursuant to the common fund doctrine may be calculated using either a percentage of the recovered benefit, the [l]odestar approach (i.e., a calculation of the attorney's reasonable hours multiplied by a reasonable hourly rate), or a combination of both."  *Garcia*, 155 Md. App. at 665; *Gimbel*, 2003 WL 25907651 (awarding 1/3 of amount recovered to plaintiffs' counsel in derivative action and using lodestar as cross-check).

VEREIT is wrong that Maryland "favors" the lodestar method to award attorneys' fees under the common fund doctrine.  Opposition at 18. On multiple occasions, the Maryland Court of Appeals has considered and rejected the argument that "a lodestar approach is the proper rule." *Burch*, 354 Md. at 687 (rejecting same argument made here and holding percentage method was appropriate); *Flaa*, 387 Md. at 316, 320 (2005) (twice explaining that *Friolo*, *infra*, did not

---

[7]      *See also NASDAQ*, 187 F.R.D. at 485 (referring to "'time-wasting computations of lodestars and multipliers,'" which "'do not guarantee a more fair result or a more expeditious disposition of litigation.'").

establish lodestar as the only approach for calculate of an award of attorneys' fees in Maryland cases).[8]   Neither of the two decisions VEREIT cites on this point support the proposition. Opposition at 18 (citing *Friolo v. Frankel*, 373 Md. 501, 504, 819 A.2d 354, 356 (2003) and *Garcia*, 155 Md. App. at 674).

 *Friolo* involved the award of attorneys' fees under a wage and hour fee shifting statute, not the common fund doctrine.  373 Md. at 504, 521-27 (detailed discussion of federal jurisprudence on fee-shifting statutes);[9] *accord Flaa*, 387 Md. at 316, 320 (*Friolo* does not mandate the use of the lodestar method and only applies to certain actions under fee shifting statutes).   The jurisprudence of fee awards arising under fee-shifting statutes is distinct from that of the common fund doctrine:

> [W]here counsel receives a fee award pursuant to a fee-shifting statute authorizing a reasonable fee, we presume that the unenhanced lodestar is a reasonable fee.
>
> In contrast to fees awarded pursuant to fee-shifting provisions, fees awarded pursuant to the common-fund doctrine do not extract a tax on the losing party but instead confer a benefit on the victorious attorney for her representation of her client and the class members.

*Fresno County Employers' Ret. Ass'n v. Isaacon/Weaver Family Trust*, 925 F.3d 63, 68 (2d Cir. 2019).  *Friolo* clearly does not apply to this action.

 *Garcia* also does not favor the application of the lodestar method in common fund cases. 155 Md. App. at 674.  The plaintiff in *Garcia* asserted two claims, a direct individual claim and a derivative claim.  *Id*. at 643-44.  After trial, the circuit court ruled against the plaintiff on the direct

---

[8] Similarly, to the extent that Delaware law informs the Maryland law analysis, Delaware has "explicitly disapproved the Third Circuit's 'lodestar method.'"  *Americas Mining*, 51 A.3d at 1254.

[9] To the extent that *Friolo* relies on federal decisions, it is further support that the outcome would be the same under Maryland law as federal common law and the Court should apply the precedent of this Circuit.

claim but in his favor on the derivative claim and awarded attorneys' fees.  *Id*. at 650-51, 660.  The *Garcia* court turned to *Friolo*, because it addressed the "proper amount of attorneys' fees when a plaintiff is only partially successful."  *Id*. at 672-73.  The award of fees for claims that had been lost at trial using the lodestar method was not an abuse of discretion.  *Id* at 674-75.  *Garcia* does not express a preference for the lodestar method in common fund actions.  In fact, the same court more recently affirmed an award under the percentage of the recovery method in a common fund case.  *See Halle*, 2017 WL 5629677, at \*16 (affirming award of attorneys' fees to lead counsel under percentage of the fund method); *see also Flaa*, 387 Md. at 320 (*Friolo* did not establish lodestar as the only approach for calculating an award of attorneys' fees in Maryland cases).

Maryland law grants courts wide discretion to award attorneys' fees under the common fund doctrine.  The approach and analysis favored in this Circuit do not conflict with Maryland law and there is no reason to depart from the well-established *Goldberger* factors.

## II.   THE 8% FEE REQUEST IS REASONABLE AND SHOULD BE GRANTED

### A.   Empirical Analysis and the *Goldberger* Factors Support an 8% Award

As set forth at length in the Fee Brief, the requested 8% fee award is below the range of awards granted in similarly sized settlements in this District and is reasonable on its face. Miller Declaration at ¶¶ 43-44, attached as Exhibit C to the Houston Declaration.  VEREIT makes no attempt to rebut the overwhelming empirical evidence demonstrating that an 8% award is entirely in line with awards in similar cases.  Opposition at 18-22.  Instead, VEREIT tries to convince the Court that the percentage method is inappropriate for two reasons: (1) the "precise value of the settlement is impossible to ascertain"; and (2) the VEREIT's management is primarily responsible for the Derivative Settlement, not Derivative Counsel.  Opposition at 18.  Both arguments are unsupported by law or fact and should be rejected.

11

**B.      The Value of the Benefit to VEREIT is Sufficiently Clear**

The settlement confers a finite financial benefit on VEREIT: $286.5 million.[10]  "[B]ut for" resolution of the Derivative Action, the Individual Defendants would not have made "any contribution" to the global resolution and Grant Thornton would not have released the counterclaims that it intended to assert against the Company.  Houston Declaration at ¶ 173 (quoting Stipulation at § III).  But for the Derivative Settlement, VEREIT would have been on the hook for the entire amount of the Class Action because "the [class] plaintiffs would require the same aggregate payment regardless of its source."  VEREIT's Statement in Support of Settlement, ECF No. 285, at 3.  Without the Derivative Settlement, VEREIT either would have been required to pay $286.5 million more to settle the Class Action or would have been unable to resolve the Class Action, to the Company's significant financial detriment.  *Id*. at 5, 7; Stipulation at § III.  As a result, the $286.5 million recovered in the Derivative Settlement reduced VEREIT's expense to settle the Class Action by the same amount.  Cox Declaration at ¶ 19.  Confirming the amount of the benefit is that, as VEREIT concedes, due to the Derivative Settlement, the Individual Defendants forfeited *to VEREIT* $225 million in OP Units and dividends.  Opposition at 16.  The total financial benefit sufficiently quantifiable to award an attorneys' fee using the percentage method.[11]

---

[10]      If, as VEREIT suggests, contrary to the plain language of the Stipulation, the $32 million disgorged by the AR Parties in the SEC action is deducted, which it should not be, the benefit is $254.5 million.  The release of VEREIT's obligation to indemnify the individual defendants for their surrender of partnership units and dividends paid to the SEC was also a dollar-for-dollar benefit to VEREIT.

[11]      It is further quantifiable that VEREIT avoided a $100 million obligation to indemnify the Individual Defendants if the actions had proceeded through trial, but that benefit is not included in the value of the settlement for the purposes of Derivative Counsel's 8% fee request.

Courts in this Circuit regularly value settlements for purposes of the percentage method in situations where a specific dollar value is far more speculative than in the Derivative Settlement. They do so by calculating "the value of both the monetary and non-monetary benefits conferred" to award attorneys' fees using the percentage method in settlements involving a mixture of "monetary and non-monetary benefits." *Fleisher v. Phoenix Life Ins. Co.*, 2015 WL 10847814, at *15 (S.D.N.Y. Sept. 9, 2015) (awarding attorneys' fees as percentage of value of settlement after combining values of monetary and non-monetary benefits); *accord Velez v. Novartis Pharm. Corp.*, 2010 WL 4877852, at *18 (S.D.N.Y. Nov. 30, 2010) (awarding 21.8% attorneys' fee on "gross value" of settlement including monetary relief and non-monetary relief that the court valued as "at least $22.5 million").[12]  The value of the monetary benefit to VEREIT is clear and is spelled out in the Stipulation.  VEREIT's complaint regarding the "precise" value of the settlement is therefore no obstacle to applying the percentage method with lodestar cross-check.

---

[12]    *See also Sheppard v. Consol. Edison Co. of New York*, 2002 WL 2003206, at *7 (E.D.N.Y. Aug. 1, 2002) (approving fee petition where fee was measured as a percentage of the "total settlement," which included $6.745 million in monetary relief and "an estimated $5 million in non-monetary, injunctive relief); *In re Auction Houses Antitrust Litig.*, 2001 WL 170792, at *10, *17 (S.D.N.Y. Feb. 22, 2001) *aff'd*, 42 Fed. App'x 511 (2d Cir. 2002) (approving fee measured as a "percentage of the recovery," which was valued at $512 million based on cash payments and nonmonetary discount certificates; the court noted that valuing the certificates, through expert testimony, was relevant to "fixing the amount of lead counsel's fee, which is fixed as a percentage of the gross recovery"); *McCoy v. Health Net, Inc.*, 569 F. Supp. 2d 448 (D.N.J. 2008) (awarding fee of $69.7 million, which represents "28% of the $249 million value of the common fund plus the parties' lowest estimated value of the injunctive relief" of $28 million and noting: "The value of the injunctive relief here is a highly relevant circumstance in determining what percentage of the common fund class counsel should receive as attorneys' fees."); *Blessing v. Sirius XM Radio Inc.*, 507 Fed. App'x 1, 4 (2d Cir. 2012) (district court properly determined that settlement was fair based in part on its valuation of the "nonmonetary antitrust" benefits, principally a "price freeze").

**C.      Derivative Counsel is Responsible for the Benefit to VEREIT**

**1.      Derivative Counsel Achieved the Result Without a Roadmap**

The record refutes VEREIT's assertion that Derivative Plaintiffs only achieved the Derivative Settlement by "piggy-backing" or using a roadmap provided by others.  Opposition at 1, 29, 35.  This is a remarkable argument considering that VEREIT successfully fought to prevent Derivative Plaintiffs from accessing the Audit Committee investigation and restatement materials, and never shared the details of the special committee's findings.   If the mere existence of the restatement resulted in the Derivative Settlement (Opposition at 29, 35), this action would have been concluded in 2015.  The restatement did not mean that anyone was liable for anything, as VEREIT itself repeatedly argued throughout the Class Action.  In any event, the restatement completely failed to disclose the wrongdoing related to the 2013 OPP or the ARCT III promote which were two of the principal related-party claims developed by Derivative Plaintiffs.[13]

Similarly, Derivative Counsel did not "piggy-back" off the efforts of Class Action counsel. The Class Action plaintiffs conferred a significant benefit on the class, but they did not litigate the breach of fiduciary duty claims or large related-party transactions at issue in the Derivative Action. For proof, the Court need only compare the substance of the briefing on the motions to dismiss and summary judgment in the Class Action and Derivative Action: the legal issues and arguments are entirely distinct.

---

[13]      VEREIT's citation of decisions in which counsel simply reiterated publicly available allegations (Opposition at 34-35) is inapposite.  Derivative Counsel developed the related party theories on their own with no public disclosures to aid them, and the significant issues in the Derivative Action were *sui generis*.   Moreover, the Court has Derivative Counsel's contemporaneous time records and review of them makes clear that time incurred reviewing Brian Block's criminal trial or work performed by class counsel is minimal.  *Cf. Goldberger*, 209 F.3d at 56 (good portion of hours spent scouring the records in criminal proceeding); *In re Assicurazioni Generali S.p.A. Holocaust Ins. Litig.*, 2009 WL 762438, at *4 (S.D.N.Y. Mar. 24, 2009) ("much of these firms' work involved review of work performed by Class Counsel or other attorneys").

Finally, while the record in Block's criminal trial certainly was informative to the Derivative Action, it did not involve the legal issues presented here or the self-dealing transactions and did not take place until well-after the Derivative Action had been sustained and discovery was underway. Likewise, the SEC consent judgment was not entered until July 2019, after the Court had adjudicated the summary judgment motions and only shortly before the settlement.

### 2. If There Had Not Been a Derivative Action, VEREIT Would Not Have Recovered $286.5 Million

If there had not been a Derivative Action it is inconceivable that the Individual Defendants would have contributed anything approximating the amount that they did to the benefit of VEREIT. The Individual Defendants were indemnified and would have looked to VEREIT to satisfy any judgment or settlement obligation against them. In 2017 and 2018, management litigated, and lost, the issue of whether VEREIT owed an on-going duty of indemnification. *See Weil v. VEREIT Operating P'ship, L.P.*, 2018 WL 834428, at **4, 15 (Del. Ch. Feb. 13, 2018). If there had not been a Derivative Action, the Individual Defendants' indemnification agreements would still have been enforceable and the Individual Defendants would likely have contributed nothing.

The record demonstrates that VEREIT's management wanted to wait until after resolution of the Class Action to decide whether to pursue the Company's claims. *See* Houston Declaration at ¶ 35 (demand refusal asserted pursuing the claims would negatively affect defense of Class Action, "assuming only for the sake of argument that the Claims have merit"); ¶ 51 (motion to dismiss argued same); ¶ 79 (motion to stay filed by Special Committee arguing same).[14] But, the

---

[14]     *See also* Motion to Stay Derivative Action, ECF No. 116 at 3 ("pursuing affirmative claims against the Individual Defendants now could have a detrimental effect on the Company's defense of the Class Action and the Opt-Out Actions"), 16 (same), 23-25 (section arguing same, collecting cases holding that staying a derivative action until "culmination" or "resolution" of securities class action.

Class Action plaintiffs would still require $1.025 billion payment. *See* VEREIT's Statement in Support of Settlement at 3. Accordingly, if the Derivative Action did not exist, the Company would have been required to pay $1.025 billion from its own coffers to settle the Class Action where VEREIT's claims against the Individual Defendants had not been filed or litigated and their indemnification agreements were held enforceable by the Delaware Court of Chancery.

There is no reasonable basis to believe that the Individual Defendants would forfeit their OP Units or contribute $286.5 million in cash to the Class Action settlement voluntarily. Any amounts conceivably owed by the Individual Defendants to resolve the Class Action would have been indemnified by VEREIT.[15] As a result, the Individual Defendants faced little threat of paying any amount to settle only the Class Action because VEREIT was required to indemnify them. To get the benefit of a contribution from the Individual Defendants even approximating the size of the contribution in Derivative Settlement, VEREIT would be required to sue the Individual Defendants. The Individual Defendants are represented by talented and aggressive counsel and it would be a fantasy to believe they would pay over $200 million directly from their own pockets simply because VEREIT "threatened" to sue them. *See* Opposition at 23.

If there were not a Derivative Action, VEREIT would be on the hook for a payment far larger than the fees and expenses sought by the Derivative Plaintiffs.

---

[15]   Contradicting the plain language of the indemnification provision, VEREIT argues that any judgment against the Individual Defendants would not be indemnifiable "as contrary to public policy." Opposition at 20; *compare Weil*, 2018 WL 834428, at *4. Even if the premise is correct, it does not apply to settlement payments. The Individual Defendants litigated the enforceability of the provision to a judgment and it is far-fetched to imagine they would simply pay over $200 million in a settlement of the Class Action rather than litigate the issue of "public policy."

### 3. The Derivative Settlement is Not "Largely" the Result of the Company's Efforts

VEREIT's claim that it is largely responsible for the settlement of the Derivative Action attempts to rewrite the record.  On numerous occasions, VEREIT's management refused to prosecute the claims itself or to participate in the prosecution of the Derivative Action, ceding complete responsibility for the claims, and the result, to Derivative Plaintiffs.  Management refused Witchko's demand to sue the Individual Defendants on the basis that doing so while the Class Action was pending would harm the defense of the Class Action.[16]  When Witchko sued, instead of joining the suit or seeking to prosecute the claims itself, management moved to dismiss the litigation.  After the Court denied the motion to dismiss, management convened a special committee that, rather than attempting to take over and prosecute the claims, moved to stay them. The special committee even identified undisclosed wrongdoing related to the award of millions of OP Units, but not only did it decline to share the specifics of this information with Derivative Plaintiffs who could have used it to the Company's advantage, it *declined to sue*.  When the Court denied the motion to stay, it specifically invited VEREIT's management to assign independent counsel to attend depositions and participate in the continued prosecution of the action.  Class Action ECF No. 304 at 24:6 – 25:6.[17]  Management never took that invitation: no independent counsel appeared in the derivative action or any deposition or court appearance thereafter.  The record is clear that VEREIT's management abdicated its right to prosecute the claims on behalf of

---

[16]     When management refused the demand in June 2015, it had not obtained tolling agreements with *any* individual defendant and did not do so until well after Witchko filed suit in July 2015.  *See* Motion to Stay Derivative Action, ECF No. 116, at 2 (tolling agreements entered in November 2015 with some parties, and with others in June 2016).

[17]     Independent counsel for management should "assign someone low on the totem pole to follow depositions, attend the depositions, and write reports…".  *Id*.

the Company, leaving only Derivative Plaintiffs to do so.  Management cannot now claim credit for the result of a litigation that it refused to participate in and attempted to stymie at every turn.

Actions taken by management prior to and outside of the Derivative Action all failed to achieve a recovery on behalf of the Company.  Management ended the Audit Committee investigation with nothing more than the termination of some Individual Defendants and the forfeiture of a relatively small amount of stock.[18]  As described above, the special committee declined to sue over the undisclosed wrongdoing it found related to the OP units.  When management tried to avoid VEREIT's indemnification obligations to the AR Parties, they sued and won, and the indemnification obligations were held enforceable.  After Brian Block was convicted at trial, the Company moved for $35 million in restitution, which Judge Oetken denied. *See United States v. Block*, 2018 WL 722854, at *1 (S.D.N.Y. Feb. 6, 2018).

All of management's efforts to recover for the Company failed and only Derivative Plaintiffs successfully obtained a recovery on behalf of VEREIT.  Contrary to VEREIT's assertion, the Derivative Settlement is not due to the efforts of management.

## III.   IF THE COURT USES THE LODESTAR METHOD, A 1.83x LODESTAR MULTIPLIER IS APPROPRIATE

 The Court should award the requested fee because it is reasonable on a percentage basis and, as a multiplier of 1.83x, is supported by the lodestar cross-check.  Derivative Counsel should be awarded a multiplier on its lodestar based upon the risk and success achieved in this Derivative Action.  *Golberger*, 209 F.3d at 54.  An important factor justifying an enhancement to lodestar is the "results obtained."  *Hensley v. Eckerhart*, 461 U.S. 424, 434 (1983).  A multiplier is particularly warranted due to the exceptional results obtained in the Derivative Settlement.  That VEREIT does

---

[18]      The stock was relinquished by Schorsch and Block prior to the filing of this action, it is not part of the Derivative Settlement, and Derivative Plaintiffs claim no credit for it.

not contest Professor Cox's analysis reveals its arguments against a multiplier as no more than an effort to reduce the amount it will have to pay to Derivative Counsel.  Opposition at 25.  VEREIT principally argues that a reduction to lodestar is appropriate because Derivative Counsel did not advance original theories of liability, the case did not require any particular level of skill, and Derivative Counsel expended too many hours.  These arguments are easily refuted by the record.

### A.     The Relevant Factors Support Award of a Multiplier

"Where, as here, counsel has litigated a complex case under a contingency fee arrangement, they are entitled to a fee in excess of the lodestar."  *In re Comverse Tech., Inc. Sec. Litig.*, 2010 WL 2653354, at *5 (E.D.N.Y. June 24, 2010) (awarding multiplier of 2.78).  A "positive multiplier is typically applied to the lodestar in recognition of the risk of the litigation, the complexity of the issues, the contingent nature of the engagement, the skill of the attorneys, and other factors."  *In re Marsh & McLennan Cos., Inc. Sec. Litig.*, 2009 WL 5178546, at *20 (S.D.N.Y. Dec. 23, 2009).

Empirical evidence demonstrates that the multiplier request here is below the range paid in similar cases.  *See* Miller Declaration at ¶¶ 54-55 (average lodestar multiplier in the Second Circuit is 1.93 and the average multiplier in cases obtaining more than $175.5 million was 3.18); *see also NASDAQ*, 187 F.R.D. at 489 (collecting cases awarding multipliers over 3 and concluding "[a] multiplier of 3.97 is not unreasonable"); *Kurzweil v. Philip Morris Cos., Inc.*, 1999 WL 1076105, at *3 (S.D.N.Y. Nov. 30, 1999) ("multipliers of between 3 and 4.5 have been common").  Like the Second Circuit, Maryland law also permits lodestar multipliers at the discretion of the trial court.  *See Decohen v. Abbasi, LLC*, 299 F.R.D. 469, 483 (D. Md. 2014) (awarding lodestar multiplier of 3.9 in action arising under Maryland law).

### 1.      Risk is the Most Important Factor and Supports a Lodestar Multiplier

The risk faced by counsel is the most important factor when considering a lodestar multiplier. "We have historically labeled the risk of success as 'perhaps the foremost' factor to be considered in determining whether to award an enhancement." *Goldberger*, 209 F.3d at 54 (citation omitted). Courts measure risk on a continuum, considering the risk when the case was initiated and the risks faced throughout the pendency of the action. *Id.* "Notably, an unenhanced lodestar fee does not account for the contingent risk that a lawyer may assume in taking on a case." *Fresno*, 925 F.3d at 68. Here, the many risks faced by Derivative Plaintiffs and the extraordinary result achieved support a multiplier.

Derivative Plaintiffs have already described in detail the myriad risks faced in this action. Fee Brief at 10-15. As set forth in the Houston Declaration, this action was procedurally and substantively complex. VEREIT's implausible argument that there was no risk in prosecuting the Derivative Action (Opposition at 34) should be rejected. Derivative actions are inherently risky and more often than not dismissed for failure to comply with the pleading requirements of Rule 23.1. This action involved amplified risk due to VEREIT's management's hostility to the litigation and repeated attempts to stop prosecution of the claims. Houston Declaration at ¶¶ 58, 77-80. Derivative Plaintiffs aggressively prosecuted their particular theories of wrongdoing over a period of years, investing thousands of hours in this action under constant threat that management could convince the Court to halt prosecution of the claims, that defendants' summary judgment motions might be granted, or that Derivative Plaintiffs would lose at trial. The risk factor supports application of a lodestar multiplier.

### 2. The Magnitude and Complexities of the Litigation Support Award of a Multiplier

This was a complex, multi-party litigation, involving enormous damages and well-financed defendants.  Derivative Plaintiffs focused on Maryland breach of fiduciary duty claims that were not present in any other action and they alone developed.  The restatement did not acknowledge the Individual Defendants' wrongdoing in connection with the 2013 OPP or the ARCT III Promote.  Derivative Plaintiffs refined the law and facts supporting these claims through their own hard work and long hours – there was no roadmap.[19]  No other party sought repayment from the Individual Defendants for these unauthorized transactions,[20] and no other party obtained that repayment.  Based on the work of their forensic accountant, Derivative Plaintiffs projected that the AR Individuals would face approximately $200 million in liability on these two transactions alone if proven at trial.  VEREIT tacitly acknowledges the role these related-party claims played in obtaining the Derivative Settlement (Opposition at 2, 15) but attempts to take credit for the theory. However, VEREIT never sued over the wrongdoing or shared its findings with Derivative Plaintiffs.  Derivative Plaintiffs alone developed these complex theories of recovery that VEREIT acknowledges played a significant role in securing the funds recovered in the Derivative Settlement.[21]

---

[19]     See Section II C. 1., *supra*.

[20]     *See* Derivative Plaintiffs' Opposition to the AR Individuals' Motion for Summary Judgment ("Opposition to AR Individuals' Summary Judgment Motion"). ECF No. 228, 229.

[21]     VEREIT's implication that it developed these theories of wrongdoing is easily refuted by the fact that it never disclosed the wrongdoing in the restatement.  If its management had identified the wrongdoing, it was obligated to disclose it and correct the public filings that had mischaracterized the transactions, which it did not do.

### 3.  The Quality of Derivative Counsel's Work Supports Payment of a Lodestar Multiplier

The quality of Derivative Counsel's work is best demonstrated by the result achieved, which is discussed in detail in the Fee Brief and the brief in support of final approval of the Derivative Settlement ("Settlement Brief").  ECF 290 at 9-15; Fee Brief at 20.  The notorious difficulty of prevailing on derivative claims and slim chance of success are well established.  Settlement Brief at 16.  This action was complex and risky even in comparison to other derivative litigation.  Derivative Plaintiffs defeated a motion to dismiss on demand refusal under Maryland law, which is itself highly unusual.  As VEREIT argued early in this litigation, "'[f]ew, if any, plaintiffs surmount [this] obstacle.'"  Memorandum in Support of Motion to Dismiss, ECF No. 62, at 4 (quoting *Espinoza ex rel. JPMorgan Chase & Co. v. Dimon*, 797 F.3d 229, 234 (2d Cir. 2015)).  Derivative Plaintiffs secured dismissal of an interlocutory appeal, overcame the Special Committee's attempt to stay the action, reviewed and synthesized a massive discovery production, prepared and participated in nearly three-dozen depositions, worked with experts to develop and advance original damage claims related to related-party transactions, brought two affirmative motions for summary judgment and opposed four motions brought by the seven Individual Defendants.  Houston Declaration at ¶ 10(a)-(u).

Few plaintiffs in Maryland derivative litigation overcome one of the foregoing obstacles, let alone all of them.  The result, a $286.5 million recovery on behalf of the corporation, is more exceptional still.  Cox Declaration at ¶¶ 17-18.  As rare as it is for a derivative action to obtain payment in excess of $200 million, the Derivative Settlement is unprecedented because the recovery comes from the pockets of individual defendants and not a corporation or its insurer.  Cox Declaration at ¶ 17.  Without support, VEREIT claims that the Derivative Action did not require the level of skill warranting payment of a lodestar multiplier.  Opposition at 30 ("this case involved

routine claims of breach of fiduciary duty."). Defendants even contested whether breach of fiduciary duty claims *exist* under Maryland law. *See* Opposition to AR Individuals' Summary Judgment Motion. Whatever a "routine" breach of fiduciary duty action is, this action was not it.

### B.   VEREIT's Focus on Collateral Billing Disputes Should be Rejected

The Court should not allow VEREIT to turn this fee application into a second litigation regarding the 20,000 hours of work expended in this four-year litigation. "[W]e are instructed by the Supreme Court that the determination of attorney's fees 'should not result in a second major litigation,' that 'trial courts need not, and indeed should not, become green-eyeshade accountants.'" *Cassese v. Williams*, 503 Fed. App'x 55, 59 (2d Cir. 2012). Before it had even seen Derivative Counsel's time records, VEREIT opposed the fee award by complaining about the time Derivative Counsel spent on various tasks. Opposition at 30. Derivative Plaintiffs respectfully submit that the Court should heed Judge Sweet's warning in *NASDAQ* and focus on the benefit conferred by the Derivative Settlement and not "collateral disputes over billing." 187 F.R.D. at 485.

Derivative Counsel has now provided its time and expense records.[22] A review of them confirms that Derivative Counsel exercised billing discretion prior to moving for attorneys' fees

---

[22]   Derivative Counsel submitted contemporaneous time records pursuant to *New York State Ass'n for Retarded Children, Inc. v. Carey*, 711 F.2d 1136, 1148 (2d Cir. 1983). *See* January 3, 2020 Order, ECF No. 297. However, contemporaneous time records are not required under Maryland law. *Leasing Serv. Corp. v. Dickens*, 1988 WL 151297, at *6 (S.D.N.Y. Oct. 20, 1988) ("'some documentation' [is] sufficient to satisfy the requirements of Maryland law."). The Second Circuit has held that *Carey* does not apply to diversity actions where state law does not require the production of contemporaneous time records. *Riordan v. Nationwide Mut. Fire Ins. Co.*, 977 F.2d 47, 53 (2d Cir. 1992) ("[s]tate law creates the substantive right to attorney's fees, a right which cannot be deprived by applying the contemporaneous time records rule adopted in this Circuit); *accord Banca Della Svizzera Italiana v. Cohen*, 756 F. Supp. 805, 808–09 (S.D.N.Y. 1991). Accordingly, VEREIT's opposition is contradictory, arguing on the one hand that records must be produced under *Carey* and on the other that Maryland law applies. If Maryland law applied, *Carey* would not.

and continued to do so thereafter, which resulted in the adjustment of the lodestar figure. Derivative Counsel removed from the lodestar submitted to the Court all time billed for work on any derivative action that alleged demand futility.  *See* Fee Brief at 26-27; Houston Declaration, Ex. D-Q.  Derivative Counsel determined that no time billed for case administration should be included in the lodestar submitted to the Court and removed such time.  Fee Brief at 26-27; Houston Declaration, Ex. T.  Derivative Counsel identified and excluded an additional $234,250 from its lodestar based upon the incorrect billing of time for one attorney during the month of July 2018.[23]  After all of these deductions, Derivative Counsel's lodestar is $12,506,368 for 20,201 total hours of work.  *See* Houston Declaration, Exhibit S.

VEREIT complains about duplication by attorneys working on the action.  These complaints are meritless, and as a general matter the total number of hours expended by Derivative Plaintiffs prosecuting this action is completely reasonable, particularly in light of the scale of motion practice and discovery.  The *Pfizer* derivative action provides useful context.  There, the scale of discovery was roughly equivalent, and the parties agreed to the settlement the day plaintiffs' summary judgment oppositions were due.  *Pfizer*, 780 F. Supp. 2d at 338 (over ten million pages produced and over thirty depositions conducted).  The *Pfizer* plaintiffs incurred over *38,000* hours prosecuting the action, which Judge Rakoff concluded was reasonable.  *Id*. at 343 (finding "plaintiffs' counsel's reported hours reasonable in light of the complexity and scale of the instant litigation.").  Every action is different, but *Pfizer* is another recent example of a derivative action litigated to summary judgment.  The hours incurred there were almost twice the hours

---

[23]     In the further review of time records for Harwood Feffer, it was discovered that time entries for attorney Jay Saltzman had been replicated multiple times for each day between July 28, 2018 and August 31, 2018 on the computer-generated report.  Supplemental Houston Declaration at ¶ 12.

incurred by Derivative Counsel here.  VEREIT cannot and does not provide any example of a derivative action or securities class action on the scale of this action litigated through summary judgment in which counsel was able to obtain the result with significantly less hours.  The hours incurred by Derivative Counsel were completely reasonable and are less than in relevant analogues.

Liaison Counsel worked diligently to assign tasks to the consolidated firms without overlap.  That does not mean, however, that there could be only one timekeeper billing for a given task.  For example, even though one firm might be assigned to draft a brief, several attorneys at that firm could be responsible for different parts of the brief.  Liaison Counsel retained the responsibility to oversee and finalize every brief prior to filing.  This action involved complex legal principles and voluminous briefing.  Derivative Counsel staffed this action much more leanly than defense counsel did.  Where multiple attorneys collaborated on one project, doing so was required to produce the finished product.  This approach is no different for plaintiffs or defendants.[24]

Contrary to the Supreme Court's direction, VEREIT generally attempts to turn this fee application into a billing audit.[25]  For example, VEREIT argues that 2,485 hours incurred by

---

[24]     Derivative Counsel have provided time and expense records.  Counsel for VEREIT and the Individual Defendants have not, even though VEREIT indemnified the Individual Defendants and paid legal fees to defense firms in this action.  The corresponding time records for VEREIT's counsel and defense counsel would aid the Court in evaluating the reasonableness of time expended by Derivative Counsel.

[25]     VEREIT also takes issue with the billable rate of the firms.  Courts assess the reasonableness of billing rates against prevailing rates in the district where the action is pending. *Arbor Hill Concerned Citizens Neighborhood Ass'n v. Cty. of Albany & Albany Cty. Bd. of Elections*, 522 F.3d 182, 190 (2d Cir. 2008).  Derivative Counsel's hourly rates are modest and range between $350 and $960 and the average rate was $623.  Houston Declaration, Exhibit S. The survey of rates in the Miller Declaration shows that Derivative Counsel's rates are reasonable and likely well below the rates charged by the firm defending VEREIT in the Class Action and

Liaison Counsel conducting legal research is excessive. This action was pending for four years and involved myriad and complex legal issues. Liaison Counsel made or opposed *seven* summary judgment motions involving different arguments. The research was not only necessary, it was completely reasonable. Likewise, the Court should reject VEREIT's complaint that the 2,353 hours dedicated to the drafting of pleadings is "exorbitant." Derivative Counsel expended that time working on, among other things, opposition to the motions to dismiss, obtaining dismissal of the interlocutory appeal, preparing the opposition to the motion to stay, and the cross-motions for summary judgment. The resulting work product is hundreds of pages of briefing. The time incurred under the "pleadings" category in the summary chart is supported by the contemporaneous billing records. *See* Houston Declaration, Ex. T; Supplemental Houston Declaration, Ex. E-DD. Rather than acknowledge that Derivative Counsel efficiently reviewed the massive document production in this action by using attorneys with lower billable rates, VEREIT argues that no time should be paid for review of documents unless they were specifically referenced in Derivative Counsel's questions at a deposition. Opposition at 31. No support is given and clearly, that is not the rule. It would have been a breach of Derivative Counsel's ethical obligations if it had attempted to prosecute this case without conducting comprehensive document review, and it would have put Derivative Plaintiffs at a disadvantage in depositions and on summary judgment.

---

counsel representing the Individual Defendants. *See* Houston Declaration, Ex. C at ¶¶ 49-51. (Miller Declaration). As for the Maryland Derivative actions, they do not fall within the fixed rates suggested by Appendix B of the Maryland rules. Maryland courts have regularly granted hourly rates in excess of those outlined in Appendix B for derivative actions. *See In re American Capital, Ltd. Derivative Litigation*, 8:11-cv-02424-PJM, Order and Final Judgment (D. Md. August 28, 2013) (derivative settlement approving partners' hourly rates ranging from $500 to $835); *Salley v. Debrandere, et al.* (Osiris Therapeutics, Inc.), 1:17-cv-03777, Final Order and Judgment (D. Md. February 1, 2019) (derivative settlement approving partners' hourly rates ranging from $585 to $950).

VEREIT also specifically criticizes the time recorded by other firms in the *Witchko* action. These criticisms are bound to multiply after VEREIT reviews the contemporaneous time records with an eye to lessening its attorneys' fee liability.   Most of VEREIT's complaints are easily refuted.  For example, VEREIT takes issue with the Holzer Firm recording 308 hours for work on pleadings.   The Holzer firm drafted the initial response to David Kay's motion for summary judgment, which involved refuting 582 statements of fact in the Rule 56.1 statement.  Similarly, VEREIT criticizes the Brown Firm for spending 197 hours on the final settlement approval papers. The Brown Firm prepared the first draft papers, including the memorandum and sections of the supporting declaration.  VEREIT attacks the Schubert Firm for spending 5.4 hours (a total lodestar of $2,459) over four days preparing for two depositions that were initially postponed and later cancelled.  This contemporaneously recorded time is justifiable and certainly not excessive.

VEREIT also complains about duplication of efforts in the various stayed actions and *Witchko*.   However, there were multiple separate derivative actions in this Court and in other jurisdictions.  The time incurred in cases in other jurisdictions (*Meloche*, *Frampton*, and *Kosky*) was not duplicative of time incurred in this action because those actions were pending in other jurisdictions and were not coordinated with this one.  The time and expense applications of firms not associated with the *Witchko* action are voluntarily submitted here to avoid competing applications for fees and to simplify fee issues for the Court's consideration.  The time and expense records for firms working on *Meloche*, *Frampton*, and *Kosky* have been separately set forth in the summary of Derivative Counsel's time records and in the separate declarations from those counsel. *See* Houston Declaration, Exs. J-Q, S, U; Supplemental Houston Declaration, Exs. R-DD.

VEREIT's complaints about the lodestar in the *Kosky* action are also baseless.  Plaintiff Kosky did not pursue duplicate actions in both this Court and the New York state court.  Instead,

she withdrew her action before this Court at the special committee's request after it represented that it had "inadvertently" failed to respond to her demand for action.  After much correspondence with the special committee, Plaintiff Kosky then filed an action in New York State Supreme Court when the special committee refused to act or toll claims against Grant Thornton.  VEREIT also claims that there was duplicate work by the firms in *Kosky*.  The Grant Firm and Stull Stull & Brody worked efficiently and in coordination, as the detailed time records reveal.  A comparison of the time records for the two firms indicate that the Grant Firm was responsible for developing the claims against Grant Thornton, researching and drafting the original state court complaint and amended complaint, the federal complaint and the current complaint, drafting the demand letters to the special committee and communicating with its counsel, researching supplemental jurisdiction issues in relation to the filing of the federal complaint, drafting discovery, and researching potential defenses to the auditor claims, among other things.  Stull Stull & Brody was responsible for some drafting of the fact portion of the amended complaint, the client contact, researching the demand refused issues once the Board failed to response to the demand, researching potential Section 14(a) claims, researching the statute of limitations issue and tolling issues, researching the collateral estoppel issue, drafting exhibits to the original demand letter, including exhibits respecting claw back provisions and corporate governance measures.

## IV.   EXPENSES HAVE BEEN PROPERLY QUANTIFIED

Derivative Plaintiffs seek reimbursement of $594,882.47 in expenses.  Derivative Plaintiffs have provided categorization of expenses both globally and by individual firm. *See* Houston Declaration, Exs. D-Q and U. Additionally, Derivative Plaintiffs have now also provided their individual expense records for each firm.  *See* Supplemental Houston Declaration, Exs. F, H, J, L, N, O, Q, S, T, U, W, Y, Z, BB, and DD.  Derivative Plaintiffs took the additional step of eliminating

categories of expenses that could be considered as general office expenses such as photocopying, telephone, faxes, and first-class postage.  This was a reduction of $31,849.00 from the expense reimbursement sought. By comparison, the expenses incurred in the Derivative Action are modest next to other parties in this litigation.[26]

VEREIT takes specific issue with the $158,900 paid to Derivative Plaintiffs' consulting experts. As described in the Houston Declaration, Derivative Plaintiffs retained a consulting governance expert and forensic accountants to assist in development of the derivative claims.  It was not only permissible, it was necessary to retain experts to assist in the development of the specific claims asserted.  For example, valuing the excess amounts that the Individual Defendants received from the 2013 OPP and the promote paid as part of the ARCT III transaction required a sophisticated understanding of accounting for these transactions.  On November 15, 2018, Derivative Plaintiffs identified the experts that they intended to rely upon when the Derivative Action proceeded to trial.  No expert, however, drafted an expert report for use at trial before or after the identification of such witness.  Payments to the consulting experts are reflected in Exhibit F to the Supplemental Houston Declaration.  The total payment to experts in the Derivative Action is exceedingly modest when compared to other parties in the related litigation.[27]

---

[26]     Class Counsel's expenses were in excess of $5,164,000.00 and presented in a similar way as to the format provided by Derivative Plaintiffs.  An additional data point that would be informative is the expenses incurred by VEREIT and the Individual Defendants during the pendency of the Derivative Action.

[27]     Class Counsel reported $2,216,000 expert costs.  *See* Wyman Declaration, 1:15-mc-40, ECF No. 1291 at ¶ 6.  VEREIT and Individual retained numerous experts in the class litigation but has not disclosed the costs of such experts.

## CONCLUSION

For the reasons set forth in the Fee Brief and herein, Derivative Plaintiffs' respectfully request that the Court grant their motion for attorneys' fees and reimbursement of expenses in its entirety.

Dated:  January 14, 2020

Respectfully submitted,

**GLANCY PRONGAY & MURRAY LLP**

_____

Robert I. Harwood
Matthew M. Houston
Benjamin I. Sachs-Michaels
712 Fifth Avenue, 31st Floor
New York, NY 10019
Tel: (212) 935-7400

*Liaison Counsel for Plaintiffs*

Robert C. Schubert
Willem F. Jonckheer
SCHUBERT JONCKHEER & KOLBE LLP
Three Embarcadero Center, Suite 1650
San Francisco, CA 94111
Tel: (415) 788-4220

Jeffrey M. Norton
NEWMAN FERRARA LLP
1250 Broadway, 27th Floor
New York, NY 10001
Tel: (212) 619-540

Timothy Brown
THE BROWN LAW FIRM, P.C.
240 Townsend Square
Oyster Bay, NY 11771
Tel: (516) 922-5427

Corey D. Holzer
Marshall P. Dees
HOLZER & HOLZER, LLC
1200 Ashwood Parkway, Suite 410
Atlanta, GA 30338
Tel: (770) 392-0090

Curtis V. Trinko
LAW OFFICES OF CURTIS V. TRINKO, LLP
16 West 46th Street, 7th Floor
New York, NY 10036
Tel: (212) 490-9550

Alfred G. Yates, Jr.
Gerald L. Rutledge
LAW OFFICE OF ALFRED G. YATES JR PC
519 Allegheny Building
300 Mt. Lebanon Blvd, Suite 206-B
Pittsburgh, PA 15219
Tel: (412) 391-5164

*Counsel for Plaintiffs*